RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
JACQUELINE L. RODRIGUEZ (SBN 198838)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  rb@lnbrb.com, myk@lnbrb.com
         jlr@lnbrb.com, jyo@lnbrb.com

Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# (SAN FERNANDO VALLEY DIVISION)

| | |
|---|---|
| In re | Case No. 1:09-bk-13964-KT |
| | Case No. 1:09-bk-13965-KT |
| FATBURGER RESTAURANTS OF CALIFORNIA, INC. and FATBURGER RESTAURANTS OF NEVADA, INC. | Chapter 11 |
| | **DEBTORS' EMERGENCY MOTION FOR JOINT ADMINISTRATION OF CASES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF HAROLD FOX IN SUPPORT THEREOF** |
| Debtors. | |
| __ Affects Fatburger Restaurants of California, Inc. Only | Date:    April 10, 2009 |
| __ Affects Fatburger Restaurants of Nevada, Inc. Only | Time:    2:00 p.m. |
| X  Affects Both Debtors | Place:    Courtroom "301" 21041 Burbank Blvd. Woodland Hills, CA |

## SUMMARY

Pursuant to Local Bankruptcy Rules 1015-2, 2081-1 and 9075-1 and Rule 1015 of the Federal Rules of Bankruptcy Procedure, Fatburger Restaurants of California, Inc. ("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and together with FB California, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, hereby move, on an emergency basis by this motion (the "Motion") for the entry of an order authorizing and directing the joint administration of the Debtors' pending chapter 11 cases (the "Cases").

The Debtors operate thirty two (32) hamburger restaurants located in California and Nevada. The Debtors are part of a larger Fatburger enterprise which currently consists of approximately 90 restaurants in 14 states as well as 3 foreign countries (Canada, Dubai and China). Both of the Debtors are wholly-owned subsidiaries of an entity called Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger Holdings, Inc. ("FB Holdings"). FB Holdings serves only as a holding company and does not have any employees. FB Corp. houses the corporate activities of the entire Fatburger enterprise and has approximately 31 employees. Another wholly-owned subsidiary of FB Corp, Fatburger North America, Inc., does not own or operate any restaurants and does not have any employees but serves as the franchisor entity for the Fatburger enterprise and collects royalty and marketing fees from all Fatburger franchisees. Based on the foregoing, the Debtors are "affiliates" of each other as that term is defined under Section 101(2) of the Bankruptcy Code. In addition to having common owners, the Debtors share management, file tax returns on a consolidated basis, and have complex intercompany relationships with each other and with the Debtors' non-debtor affiliates. The Debtors and their non-debtor affiliates essentially operate as one integrated business enterprise. Accordingly, the Debtors believe that the joint administration of the Debtors' Cases with each other is appropriate.

Joint administration will avoid duplicative expenses, rendering the process less costly, and will ensure that creditors in the Cases will receive appropriate notice of pertinent matters.

2

1   Furthermore, the Debtors believe that joint administration of the Cases, including the use of a

2   single pleadings docket, the combining of notices to creditors of the different estates, and the

3   joint handling of purely administrative matters will aid in expediting the Cases, and ease the

4   administrative burden for the Court and the parties without prejudicing the substantive rights

5   of any creditor.    Accordingly, the Debtors respectfully request that the Court grant this

6   Motion.

7                                   **ADDITIONAL INFORMATION**

8           This Motion is based upon Local Bankruptcy Rules 1015-1, 2081-1 and 9075-1, and

9   Rule 1015 of the Federal Rules of Bankruptcy Procedure, this Motion, the supporting

10  Memorandum of Points and Authorities, the Declaration of Harold Fox attached hereto, the

11  arguments and statements of counsel to be made at the hearing on the Motion, and other

12  admissible evidence properly brought before the Court.

13          In order to provide maximum notice of this Motion, concurrently with the filing of this

14  Motion with the Court (on Wednesday, April 8, 2009), the Debtors have served a copy of this

15  Motion and all supportive papers (including notice of the hearing) upon the Office of the

16  United States Trustee, all secured creditors and their counsel (if known), the Debtors' 20

17  largest unsecured creditors, and other parties in interest via overnight mail.  As such, these

18  parties should receive delivery of the Motion and all supportive papers by not later than the

19  morning of Thursday, April 9, 2009.

20          **WHEREFORE**, the Debtors respectfully request that this Court hold a hearing on the

21  Motion on an emergency basis and issue an order:

22          (a)    granting the Motion in its entirety;

23          (b)    approving the joint administration of the Debtors' Cases with each other

24  pursuant to the terms set forth in the Motion; and

25  / / /

26  / / /

27  / / /

28

                                          3

1        (c)    granting such other and further relief as the Court deems just and proper.

2   Dated: April ⎯⎯ , 2009                    FATBURGER RESTAURANTS OF
                                              CALIFORNIA, INC. and FATBURGER
3                                             RESTAURANTS OF NEVADA, INC.

4

5                                             By: _____
                                                  RON BENDER
6                                                 MONICA Y. KIM
                                                  JACQUELINE L. RODRIGUEZ
7                                                 JULIET Y. OH
                                                  LEVENE, NEALE, BENDER,
8                                                   RANKIN & BRILL L.L.P.
                                                  Proposed Attorneys for
9                                                 Chapter 11 Debtors and Debtors in
                                                   Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.    Case Background**

1.    On April 7, 2009 (the "Petition Date"), Fatburger Restaurants of California, Inc. ("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and with FB California, the "Debtors") filed voluntary petitions under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"). The Debtors are operating their business and managing their financial affairs and operating their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtors are the operators of a total of thirty two (32) Fatburger restaurants located in California and Nevada. FB California owns and operates 19 restaurants in California and has approximately 285 employees. FB Nevada owns and operates 13 Fatburger restaurants in Nevada, employs approximately 205 employees, and owns two parcels of developed real property in Nevada. The Debtors' revenue is derived from sales at their respective restaurants.

3.    The Debtors are part of a larger Fatburger enterprise which, as of the Petition Date, consisted of approximately 90 restaurants in 14 states as well as 3 foreign countries (Canada, Dubai and China). The Debtors are both wholly-owned subsidiaries of an entity called Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger Holdings, Inc. ("FB Holdings"). FB Holdings serves only as a holding company and does not have any employees. FB Corp. houses the Fatburger enterprise's corporate activities and has approximately 31 employees. Another wholly-owned subsidiary of FB Corp, Fatburger North America, Inc. does not own or operate any restaurants and does not have any employees, but serves as the franchisor entity for the Fatburger enterprise and collects royalty and marketing fees from all Fatburger franchisees.

5

4. As part of the corporate activities housed at FB Corp., employees of FB Corp. provide extensive corporate, administrative and logistical support to the Debtors. Accordingly, the Debtors have historically contributed, and will continue to contribute, funds to reimburse FB Corp. for its corporate overhead costs in accordance with the allocations agreed upon by the entities.

5. The Fatburger enterprise was started in 1952 by Lovie Yancey ("Yancey") and Charles Simpson ("Simpson") as "Mr. Fatburger" with one hamburger stand in South Central Los Angeles that catered to African-American musicians who needed a place that served good food, late at night. The first burger stand proved so successful that Yancey and Simpson soon opened three more locations. In 1973, Yancey and Simpson parted ways, and Yancey renamed her restaurants "Fatburger" and opened a restaurant in Beverly Hills. In 1980, Yancey began franchising the Fatburger concept. By the end of 1985, the chain had 32 locations, 4 of which were company-owned, and it was named the fifth largest growing hamburger franchise chain by "Entrepreneur" magazine, trailing only McDonald's, Burger King, Wendy's and Jack in the Box.

6. In or around 1990, Yancey sold her interests in the Fatburger enterprise to a group of investors led by Island Trading Co., a New York investment firm ("Island Trading"), and FB Corp. was created to effectuate the buyout. By the end of 1997, Fatburger had 29 restaurants (that were neither fast food restaurants nor full-service diners), of which 12 were company-owned, but management wanted to expand much further. Nevertheless, for a variety of reasons, that expansion was delayed.

7. In 2001, former basketball-star-turned entrepreneur Earvin "Magic" Johnson ("Johnson") stepped forward, and one of his companies and several other investors acquired the Fatburger enterprise from Island Trading. At that point, Keith Warlick ("Warlick") became Fatburger's Chief Executive Officer and President, and the enterprise continued to expand into new geographical areas.

6

8.    Beginning in 2003, Portland, Oregon-based Fog Cutter Capital Group, Inc. ("Fog Cutter") began acquiring its current equity interests in FB Holdings through a series of transactions.   In 2003, Fog Cutter acquired the equity interests of Burger Business, LLC ("Burger Business"), the holding company utilized by Johnson and his related investors in connection with the Fatburger enterprise.  This initial acquisition took place at a point in time when Fatburger's prior management was near the point of losing their equity interests in the enterprise under an agreement with Burger Business.  In particular, in January 2004, Fog Cutter acquired 389 shares of preferred Series D stock with a 20% accrual, and 140 shares of preferred Series A (which is convertible to 15% of common stock) in exchange for $5.4 million.  At that time, the Fatburger enterprise had annual revenue of approximately $20 million per year.

9.    In May 2004, Fog Cutter invested an additional $3 million and increased its Series D and Series A holdings and acquired 117 shares of Series A2 preferred stock in FB Holdings.   In 2006, Fog Cutter invested another $5 million in exchange for 15% of the common stock in FB Holdings. As of the Petition Date, Fog Cutter owned 83% of the voting power in FB Holdings.  There are also a few minority holders of preferred and common stock including Warlick, the former President and Chief Executive Officer of the Fatburger enterprise.

10.    In 2003, Fatburger began to establish a national presence.  In 2004, the chain opened restaurants in Florida as well as Pennsylvania, Louisiana, Georgia and New Jersey. In 2008, the entire Fatburger enterprise (the Debtors and their affiliates) had combined annual revenue of approximately $36 million; of that amount approximately $14 million in revenue was generated by FB California and approximately $12 million in revenue was generated by FB Nevada. Thus, in 2008, the Debtors had combined revenue of approximately $26 million.

/ / /

/ / /

/ / /

/ / /

7

**B.     Events Leading To the Filing of the Debtors' Chapter 11 Bankruptcy Cases.**

11.     Despite its growth, however, the Debtors and their affiliates began to experience financial problems as a result of: (1) a shortage in available restaurant financing, and (2) a decline in sales over the past three years.

12.     For years, the Debtors and their affiliates used General Electric Capital Franchise Finance Corporation and/or GE Capital Business Asset Funding Corporation ("GE") as a source of financing.  During the past few years, the Debtors and their affiliates entered into a number of lease and other agreements relating to the opening of new restaurants.  However, approximately 2 years ago, GE decided to substantially reduce its financing of small-to-medium restaurant companies in response to the deteriorating U.S. and world economic climate, and the Debtors and their affiliates were no longer able to use GE as a source of financing.  In addition, the Debtors and their affiliates were not able to find alternate financing and were forced to finance the expenses related to constructing and equipping the new restaurants that they had already committed to building from their existing cash flow.  This strain on existing cash flow caused the Debtors to start getting behind on their accounts payable.

13.     Additionally, during the past two years the Debtors' sales began to decline as a result of the general slowdown in the U.S. economy.  The Debtors and their affiliates experienced a decline of 10.7% in sales in 2007 and a decline of 4.3% in sales in 2008.

14.     The Debtors' fundamental business plan is to restructure or reject a number of their unfavorable leases and executory contracts so that they are left with only profitable locations, and to restructure their existing debt.

/ / /

/ / /

### C.    Obligations to GE and GE's Security Interest

15.    The Debtors' primary creditor is GE.    GE is currently owed a total of approximately $3.8 million in connection with: (1) an equipment loan made to the Debtors and several of their affiliates on or about September 20, 2004 in the amount of $6 million which is secured by all of the equipment and fixtures at certain of the Debtors' locations (the "2004 Loan Agreement"), and (2) an equipment loan made to FB California on or about May 22, 2003 in the amount of $290,000 secured by all of the equipment and fixtures at certain of the FB California's locations (the "2003 Loan Agreement").    Although GE has security interests against some of their equipment, inventory and/or fixtures, the Debtors do not believe that GE has a valid security interest in their cash. Additionally, the Debtors are not aware of any other creditor that would assert an interest in their Debtors' cash. As a result, the Debtors have not filed a motion seeking authority to use cash collateral.

### D.    The Need for Joint Administration of the Debtors' Cases.

16.    As noted above, the Debtors are both wholly-owned subsidiaries of FB Corp. In addition to having common owners, the Debtors share management, file tax returns on a consolidated basis, and have complex inter-company relationships with each other and with the Debtors' non-debtor affiliates.    The Debtors and their non-debtor affiliates essentially operate as one integrated business enterprise.    Accordingly, the Debtors are "affiliates" of each other as that term is defined under Section 101(2) of the Bankruptcy Code. Based on the foregoing, the Debtors believe that the joint administration of the Debtors' chapter 11 cases (the "Cases") is appropriate.

17.    By way of this Motion, the Debtors request that the Court enter an order directing the joint administration of the Debtors' Cases with each other. The affairs of the Debtors are sufficiently intertwined to make joint administration of the Cases more efficient

9

and economical than separate administration. Joint administration will avoid duplicative expenses, rendering the process less costly. Joint administration will also ensure that creditors in the Cases are not prejudiced by any conflict of interest and ensure that creditors receive appropriate notice of pertinent matters. In addition, the Debtors believe that joint administration of the Cases, including the use of a single pleadings docket, the combining of notices to creditors of the different estates, and the joint handling of purely administrative matters will aid in expediting the Cases, and ease the administrative burden for the Court and the parties without prejudicing the substantive rights of any creditor. At this time, the Debtors are not seeking substantive consolidation of their estates with each other.

18.    Should the Court order joint administration of the Cases, the Debtors propose that all pleadings relating to any of the Cases contain a collective caption, and that all pleadings be filed and maintained under the docket for "Fatburger Restaurants of California, Inc." However, each pleading filed should indicate either that both of the Debtors are parties to or are affected by the pleading, or, if both of the Debtors are not involved, indicate which of the Debtors is party to or affected by the pleading.

19.    In the event the Court orders joint administration of the Cases, the Debtors respectfully suggest that the following caption be approved for use in the Cases:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

| | |
|---|---|
| In re | ) Main Case No.1:09-13964-KT |
| | ) |
| FATBURGER RESTAURANTS OF | ) Jointly Administered With Case No. 1:09- |
| CALIFORNIA, INC. and | ) 13965-KT |
| FATBURGER RESTAURANTS OF NEVADA, | ) |
| INC. | ) Chapter 11 |
| | ) |
| Debtors. | ) |
| | ) |
| _____ | ) |
| | ) |
| __ Affects Fatburger Restaurants of | ) |
| California, Inc. Only | ) |
| __ Affects Fatburger Restaurants of | ) |
| Nevada, Inc. Only | ) |
| X  Affects Both Debtors | ) |
| | ) |
| | ) |

20.    Notwithstanding the joint administration of the Cases, creditors would be required to file their respective proofs of claim as to the specific affected and applicable debtor.

## II.

## DISCUSSION

Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that the Court may order the joint administration of cases involving a debtor and an affiliate[1] where such an order "may tend to avoid unnecessary costs and delay."  Fed. R. Bankr. Pro. 1015(c).

Bankruptcy Rule 1015 is designed to promote the fair and efficient administration of related cases of affiliated debtors, while ensuring that no rights of individual creditors are unduly prejudiced.  See 8 LAWRENCE KING, COLLIER ON BANKRUPTCY ¶ 1015.03 (15th ed. rev. 2008); In re Brookhollow Assocs., 435 F.Supp. 763, 766 (D. Mass. 1977), aff'd, 575 F.2d 1003 (1st Cir. 1986) (joint administration "help[s] the bankruptcy court to administer

---

[1] Under the definition of "affiliate" in the Bankruptcy Code, the Debtors are all "affiliates" of each other.  See 11 U.S.C. § 101(2)(A), (B), and (D).

11

economically and efficiently different estates with substantial interests in common"); In re H&S Transportation Co., 55 B.R. 786 (Bankr. M.D. Tenn. 1985).

Unlike substantive consolidation, which pools the assets and liabilities of related entities, joint administration is merely procedural; each of the Debtors' estates would remain a separate legal entity and creditors' individual rights against each estate are preserved. In re N.S. Garrott & Sons, 63 B.R. 189, 191 (E.D. Ark. 1986); In re Arnold, 33 B.R. 765, 767 (Bankr. E.D.N.Y. 1983).

Joint administration of the Cases is warranted and appropriate under Bankruptcy Rule 1015(b). As set forth above, the Debtors share common ownership and management and are "affiliates" as that term is defined in the Bankruptcy Code. See 11 U.S.C. § 101(2). In addition, the affairs of the Debtors are sufficiently intertwined to make joint administration of the Cases more efficient and economical than separate administration. Joint administration will also greatly reduce the costs in administering these Cases, and would serve to eliminate any potential confusion and waste associated with maintaining separate dockets. Moreover, joint administration would assist the Office of the United States Trustee ("OUST") in the event that it would like to appoint only one committee of unsecured creditors instead of one committee for each of the Debtors' cases.[2] Finally, joint administration would eliminate the need for filing duplicative pleadings in each of the Cases, and would reduce the burden for the Clerk's office in administering the Cases.

Further, the Debtors believe that there would be no material prejudice to any creditor if the Cases are jointly administered. Indeed, creditors of the Debtors' estates will benefit from the reduction of administrative costs and fees. Moreover, to the extent any conflict between the estates herein arises, the Court may take further steps to modify its order of joint administration to eliminate any such conflict. In light of the foregoing, the Court should

---

[2] This is another reason why the Debtors believe that this Motion should be heard on an emergency basis.

1  exercise its discretion under Bankruptcy Rule 1015(c) and order joint administration of the

2  Cases.

3      Entry of an order granting the Motion (1) will permit the OUST to appoint one

4  committee with respect to the Cases, (2) will eliminate the further need for the Debtors to file

5  identical motions and orders in each of the Cases when seeking relief that is common to all of

6  the Debtors, (3) will avoid the further waste of judicial resources related to, for example, the

7  docketing of identical motions, declarations and orders in the each of the Cases, and (4) will

8  avoid the substantial costs to the estates associated with the copying, filing and service of

9  motions and other pleadings in each of the Cases to obtain relief that is common to both

10  Debtors. For these reasons, the Debtors respectfully submit that cause exists to grant the

11  Motion on an emergency basis.

### III.

### CONCLUSION

14      Based on the foregoing, the Debtors submit that approval by this Court of the Motion

15  is in the best interests of the Debtors' estates and respectfully request that the Court hold a

16  hearing on the Motion within 48 hours of the filing of the Motion and enter an order:

17      (a)    affirming the adequacy of the notice given;

18      (b)    granting the Motion in its entirety;

19      (c)    authorizing the joint administration of the Cases;

20      (d)    approving the form of caption proposed by the Debtors herein; and

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

1    (e)    granting such other and further relief as the Court deems just and proper under

2    the circumstances of the Cases.

3    Dated: April ___, 2009                FATBURGER RESTAURANTS OF
                                           CALIFORNIA, INC. and FATBURGER
4                                          RESTAURANTS OF NEVADA, INC.

5
                                    By:_____
6                                          RON BENDER
                                           MONICA Y. KIM
7                                          JACQUELINE L. RODRIGUEZ
                                           JULIET Y. OH
8                                          LEVENE, NEALE, BENDER,
                                           RANKIN & BRILL L.L.P.
9                                          Proposed Attorneys for
                                           Chapter 11 Debtors and Debtors in
10                                             Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

**DECLARATION OF HAROLD FOX**

I, HAROLD FOX, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto. Capitalized terms used in this Declaration and not otherwise defined have the same meanings as assigned to them in the attached motion.

2.    I am the Chief Financial Officer and Secretary of Fatburger Restaurants of California, Inc. ("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and together with FB California, the "Debtors"), debtors and debtors in possession herein.

3.    I make this Declaration in support of the Debtors' emergency motion for entry of an order authorizing and directing the joint administration of the Debtors' pending chapter 11 bankruptcy cases (the "Cases"). As the Debtors' Chief Financial Officer I have full access to the Debtors' books and records, which are created in the ordinary course of the Debtors' business. I have reviewed those books and records to the extent necessary to make this declaration.

4.    On April 7, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their financial affairs and operating their bankruptcy estates as debtors in possession.

5.    The Debtors are the operators of a total of thirty two (32) Fatburger restaurants located in California and Nevada. FB California owns and operates 19 restaurants in California and has approximately 285 employees. FB Nevada owns and operates 13 Fatburger restaurants in Nevada, employs approximately 205 employees, and owns two parcels of developed real property in Nevada. The Debtors' revenue is derived from sales at their respective restaurants.

6.    The Debtors are part of a larger Fatburger enterprise which, as of the Petition Date, consisted of approximately 90 restaurants in 14 states as well as 3 foreign countries (Canada, Dubai and China). The Debtors are both wholly-owned subsidiaries of an entity

called Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger Holdings, Inc. ("FB Holdings"). FB Holdings serves only as a holding company and does not have any employees. FB Corp. houses the Fatburger enterprise's corporate activities and has approximately 31 employees. Another wholly-owned subsidiary of FB Corp, Fatburger North America, Inc. does not own or operate any restaurants and does not have any employees, but serves as the franchisor entity for the Fatburger enterprise and collects royalty and marketing fees from all Fatburger franchisees.

7.    As part of the corporate activities housed at FB Corp., employees of FB Corp. provide extensive corporate, administrative and logistical support to the Debtors. Accordingly, the Debtors have historically contributed, and will continue to contribute, funds to reimburse FB Corp. for its corporate overhead costs in accordance with the allocations agreed upon by the entities.

8.    The Fatburger enterprise was started in 1952 by Lovie Yancey ("Yancey") and Charles Simpson ("Simpson") as "Mr. Fatburger" with one hamburger stand in South Central Los Angeles that catered to African-American musicians who needed a place that served good food, late at night. The first burger stand proved so successful that Yancey and Simpson soon opened three more locations. In 1973, Yancey and Simpson parted ways, and Yancey renamed her restaurants "Fatburger" and opened a restaurant in Beverly Hills. In 1980, Yancey began franchising the Fatburger concept. By the end of 1985, the chain had 32 locations, 4 of which were company-owned, and it was named the fifth largest growing hamburger franchise chain by "Entrepreneur" magazine, trailing only McDonald's, Burger King, Wendy's and Jack in the Box.

9.    In or around 1990, Yancey sold her interests in the Fatburger enterprise to a group of investors led by Island Trading Co., a New York investment firm ("Island Trading"), and FB Corp. was created to effectuate the buyout. By the end of 1997, Fatburger had 29 restaurants (that were neither fast food restaurants nor full-service diners), of which 12 were

16

company-owned, but management wanted to expand much further. Nevertheless, for a variety of reasons, that expansion was delayed.

10.     In 2001, former basketball-star-turned entrepreneur Earvin "Magic" Johnson ("Johnson") stepped forward, and one of his companies and several other investors acquired the Fatburger enterprise from Island Trading. At that point, Keith Warlick ("Warlick") became Fatburger's Chief Executive Officer and President, and the enterprise continued to expand into new geographical areas.

11.     Beginning in 2003, Portland, Oregon-based Fog Cutter Capital Group, Inc. ("Fog Cutter") began acquiring its current equity interests in FB Holdings through a series of transactions. In 2003, Fog Cutter acquired the equity interests of Burger Business, LLC ("Burger Business"), the holding company utilized by Johnson and his related investors in connection with the Fatburger enterprise. This initial acquisition took place at a point in time when Fatburger's prior management was near the point of losing their equity interests in the enterprise under an agreement with Burger Business. In particular, in January 2004, Fog Cutter acquired 389 shares of preferred Series D stock with a 20% accrual, and 140 shares of preferred Series A (which is convertible to 15% of common stock) in exchange for $5.4 million. At that time, the Fatburger enterprise had annual revenue of approximately $20 million per year.

12.     In May 2004, Fog Cutter invested an additional $3.0 million and increased its Series D and Series A holdings and acquired 117 shares of Series A2 preferred stock in FB Holdings. In 2006, Fog Cutter invested another $5 million in exchange for 15% of the common stock in FB Holdings. As of the Petition Date, Fog Cutter owned 83% of the voting power in FB Holdings. There are also a few minority holders of preferred and common stock including Warlick, the former President and Chief Executive Officer of the Fatburger enterprise.

13.     In 2003, Fatburger began to establish a national presence. In 2004, the chain opened restaurants in Florida as well as Pennsylvania, Louisiana and Georgia and New Jersey. In 2008, the entire Fatburger enterprise (the Debtors and their affiliates) had combined annual

17

revenue of approximately $36 million; of that amount approximately $14 million in revenue was generated by FB California and approximately $12 million in revenue was generated by FB Nevada. Thus, in 2008, the Debtors had combined revenue of approximately $26 million.

14. Despite its growth, however, the Debtors and their affiliates began to experience financial problems as a result of: (1) a shortage in available restaurant financing, and (2) a decline in sales over the past three years.

15. For years, the Debtors and their affiliates used General Electric Capital Franchise Finance Corporation and/or GE Capital Business Asset Funding Corporation ("GE") as a source of financing. During the past few years, the Debtors and their affiliates entered into a number of lease and other agreements relating to the opening of new restaurants. However, approximately 2 years ago, GE decided to substantially reduce its financing of small-to-medium restaurant companies in response to the deteriorating U.S. and world economic climate, and the Debtors and their affiliates were no longer able to use GE as a source of financing. In addition, the Debtors and their affiliates were not able to find alternate financing and were forced to finance the expenses related to constructing and equipping the new restaurants that they had already committed to building from their existing cash flow. This strain on existing cash flow caused the Debtors to start getting behind on their accounts payable.

16. Additionally, during the past two years the Debtors' sales began to decline as a result of the general slowdown in the U.S. economy. The Debtors and their affiliates experienced a decline of 10.7% in sales in 2007 and a decline of 4.3% in sales in 2008.

17. The Debtors' fundamental business plan is to restructure or reject a number of their unfavorable leases and executory contracts so that they are left with only profitable locations, and to restructure their existing debt.

18

18.     The Debtors' primary creditor is GE. GE is currently owed a total of approximately $3.8 million in connection with: (1) an equipment loan made to the Debtors and several of their affiliates on or about September 20, 2004 in the amount of $6 million which is secured by all of the equipment and fixtures at certain of the Debtors' locations (the "2004 Loan Agreement"), and (2) an equipment loan made to FB California on or about May 22, 2003 in the amount of $290,000 secured by all of the equipment and fixtures at certain of the FB California's locations (the "2003 Loan Agreement"). Although GE has security interests against some of their equipment, inventory and/or fixtures, the Debtors do not believe that GE has a valid security interest in their cash. Additionally, the Debtors are not aware of any other creditor that would assert an interest in their Debtors' cash. As a result, the Debtors have not filed a motion seeking authority to use cash collateral.

19.     As noted above, the Debtors are both wholly-owned subsidiaries of FB Corp. In addition to having common owners, the Debtors share management, file tax returns on a consolidated basis, and have complex inter-company relationships with each other and with the Debtors' non-debtor affiliates. The Debtors and their non-debtor affiliates essentially operate as one integrated business enterprise. Accordingly, the Debtors are "affiliates" of each other as that term is defined under Section 101(2) of the Bankruptcy Code. Based on the foregoing, the Debtors believe that the joint administration of the Debtors' chapter 11 cases (the "Cases") is appropriate.

20.     By way of the Motion, the Debtors request that the Court enter an order directing the joint administration of the Debtors' Cases with each other. The affairs of the Debtors are sufficiently intertwined to make joint administration of the Cases more efficient and economical than separate administration. Joint administration will avoid duplicative expenses, rendering the process less costly. Joint administration will also ensure that creditors

in the Cases are not prejudiced by any conflict of interest and ensure that creditors receive appropriate notice of pertinent matters.    In addition, the Debtors believe that joint administration of the Cases, including the use of a single pleadings docket, the combining of notices to creditors of the different estates, and the joint handling of purely administrative matters will aid in expediting the Cases, and ease the administrative burden for the Court and the parties without prejudicing the substantive rights of any creditor.    At this time, the Debtors are not seeking substantive consolidation of their estates with each other.

21.    Should the Court order joint administration of the Cases, the Debtors propose that all pleadings relating to any of the Cases contain a collective caption, and that all pleadings be filed and maintained under the docket for "Fatburger Restaurants of California, Inc."    However, each pleading filed should indicate either that both of the Debtors are parties to or are affected by the pleading, or, if both of the Debtors are not involved, indicate which of the Debtors is party to or affected by the pleading.

22.    In the event the Court orders joint administration of the Cases, the Debtors respectfully suggest that the following caption be approved for use in the Cases:

| In re | ) | Main Case No.1:09-13964-KT |
| | ) | |
| FATBURGER RESTAURANTS OF | ) | Jointly Administered With Case No. 1:09- |
| CALIFORNIA, INC. and | ) | 13965-KT |
| FATBURGER RESTAURANTS OF NEVADA, | ) | |
| INC. | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| __ Affects Fatburger Restaurants of | ) | |
| California, Inc. Only | ) | |
| | ) | |
| __ Affects Fatburger Restaurants of | ) | |
| Nevada, Inc. Only | ) | |
| | ) | |
| X Affects Both Debtors | ) | |
| | ) | |
| _____ | ) | |

20

23.    Notwithstanding the joint administration of the Cases, creditors would be required to file their respective proofs of claim as to the specific affected and applicable debtor.

24.    I respectfully request that the Court grant the Motion in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __7 TH__ day of April 2009 at Santa Monica California.

_____
HAROLD FOX

21