1  RON BENDER (SBN 143364)
2  MONICA Y. KIM (SBN 180139)
   JACQUELINE L. RODRIGUEZ (SBN 198838)
3  JULIET Y. OH (SBN 211414)
   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
4  10250 Constellation Blvd., Suite 1700
   Los Angeles, California 90067
5  Telephone: (310) 229-1234
6  Facsimile: (310) 229-1244
   Email: rb@lnbrb.com, myk@lnbrb.com
7         jlr@lnbrb.com, jyo@lnbrb.com

8  Proposed Attorneys for Chapter 11 Debtors
9  and Debtors in Possession

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12              **SAN FERNANDO VALLEY DIVISION**

13
   In re                                    )  Case No. 1:09-bk-13964-KT
14                                           )  Case No. 1:09-bk-13965-KT
                                             )
15 FATBURGER RESTAURANTS OF                  )
   CALIFORNIA, INC. and                      )  Chapter 11
16 FATBURGER RESTAURANTS OF                  )
   NEVADA, INC.                              )
17                                           )  **DEBTORS' EMERGENCY MOTION**
                                             )  **FOR AUTHORITY TO (1) PAY PRE-**
18              Debtors.                     )  **PETITION PRIORITY WAGES; (2)**
   _____   )  **HONOR ACCRUED VACATION AND**
19                                           )  **LEAVE BENEFITS; MEMORANDUM**
   ___ Affects Fatburger Restaurants of      )  **OF POINTS AND AUTHORITIES;**
20     California, Inc. Only                 )  **DECLARATION OF HAROLD FOX IN**
                                             )  **SUPPORT THEREOF**
21 ___ Affects Fatburger Restaurants of      )
22     Nevada, Inc. Only                     )  Date:   April 10, 2009
                                             )  Time:   2:00 p.m.
23  X  Affects Both Debtors                  )  Place:  Courtroom "301"
                                             )          21041 Burbank Blvd.
24                                           )          Woodland Hills, CA
                                             )
25                                           )
                                             )
26                                           )
                                             )
27                                           )
                                             )
28

1

## TABLE OF CONTENTS

2 | SUMMARY..............................................................................................................................2

3 | ADDITIONAL INFORMATION................................................................................................4

4 | MEMORANDUM OF POINTS AND AUTHORITIES...............................................................6

5 | I.    STATEMENT OF FACTS.................................................................................6

6 |      A.    Background .................................................................................6

7
8 |      B.    Events Leading to the Filing of the Debtors' Chapter 11 Bankruptcy
             Cases .........................................................................................8

9
10 |     C.    Necessity to Pay Pre-Petition Priority Wages
             And Honor Vacation and Other Leave Benefits.......................................9

11 | II.   DISCUSSION.................................................................................................12

12 |     A.    Payment of Certain Pre-Petition Wages Is
             Permissible Under Section 507(a)(4)............................................... 12

13
14 |     B.    This Court Has The Authority To Grant
             The Relief Requested Herein..............................................................12

15
16 |     C.    Sufficient Evidence Has Been Provided, In Compliance with Local
             Bankruptcy Rule 2081-1 Of The United States Bankruptcy Court for
             The Central District of California, To Grant The Relief Requested
             Herein.......................................................................................... 14

17 |           1.    The employees are still employed ......................................... 14

18 |           2.    The necessity for payment................................................... 14

19 |           3.    The benefit of the procedures................................................15

20 |           4.    The prospect of reorganization............................................. 15

21 |           5.    Whether the employees are insiders....................................... 15

22
23 |           6.    Whether the employees' claims are within
                   The limits established by 11 U.S.C. § 507.................................15

24 |           7.    The payment will not render the estates
                   Administratively insolvent....................................................15

25
26 |     D.    The Relief Requested Herein Is Necessary to Avoid Immediate and
             Irreparable Harm and is Therefore Warranted Under Rule 6003 of the
             Federal Rules of Bankruptcy Procedure .................................................16

27 | III.  CONCLUSION.................................................................................................16

28 | DECLARATION OF HAROLD FOX.......................................................................18

i

1

# <u>TABLE OF AUTHORITIES</u>

2 <u>Cases</u>

3 *Armstrong World Industries, Inc. v. James A. Phillips, Inc.*
    (*In re James A. Phillips, Inc.*),
4       29 B.R. 391, 394 (S.D.N.Y. 1983)..................................................................13

5 *Dave Noake, Inc. v Harold's Garage, Inc.*,
    (*In re Dave Noake, Inc.*),
6       45 B.R. 555 (Bankr. D.Vt. 1984).....................................................................13

7 *Dudley v. Mealey*,
       147 F.2d 268 (2d Cir. 1945)
8    *cert. denied*, 325 U.S. 873 (1945).................................................................13

9 *Green v. Drexler*,
    (*In re Feit & Drexler, Inc.*),
10      760 F.2d 406 (2d Cir. 1985)............................................................................12

11 *In re Gulf Air, Inc.*,
       112 Bankr. 152 (Bankr. W.D.La. 1989)...........................................................13

12
*In re Ionosphere Clubs, Inc.*,
13      98 B.R. 174 (Bankr. S.D.N.Y. 1989).........................................................12, 13

14 *In re Leigh and New England Railway Company*,
       657 F.2d 570, 581 (3rd Cir. 1981).................................................................13

15
*Miltberger v. Logansport, C. & S. W. R. Co.*,
16      106 U.S. 286 (1882).......................................................................................12

17 <u>Statutes</u>

18 11 U.S.C. § 101 ................................................................................................6
11 U.S.C. § 105(a)..........................................................................2, 4, 12, 13
19 11 U.S.C. § 363(b)...........................................................................................13
11 U.S.C. § 507...........................................................................................14, 15
20 11 U.S.C. § 507(a)(4)...........................................................................2, 4, 11, 12, 15
11 U.S.C. § 549...............................................................................................13
21 11 U.S.C. § 1107................................................................................................6
11 U.S.C. § 1108................................................................................................6

22
Local Bankruptcy Rule 2081-1(a)(6).............................................................2, 4, 14
23 Local Bankruptcy Rule 9075-1.......................................................................2, 4
Federal Rule of Bankruptcy Procedure 4001....................................................16
24 Federal Rule of Bankruptcy Procedure 6003............................................2, 4, 16

25 <u>Treatises</u>

26 2 <u>Collier on Bankruptcy</u>,
       ¶ 105.01 at 105-3 (15th ed. rev. 1998)..........................................................12
27
Ordin, <u>Finality of Order of Bankruptcy Court</u>,
28       54 Am. Bankr. L.J. 173 (1980).....................................................................13

**SUMMARY**

Pursuant to Local Bankruptcy Rules 2081-1(a)(6) and 9075-1, 11 U.S.C. §§ 105(a) and 507(a)(4), and Rule 6003 of the Federal Rules of Bankruptcy Procedure, Fatburger Restaurants of California, Inc. and Fatburger Restaurants of Nevada, Inc. (collectively, the "Debtors"), debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, hereby bring this emergency motion (the "Motion") for the entry of an order authorizing the Debtors to (1) pay pre-petition priority wages, commissions, benefits and reimbursable expenses (collectively, "Wages")[1] to their employees, and (2) honor pre-petition accrued vacation and leave benefits in the ordinary course of the Debtors' business, provided that no employee shall receive in value over $10,950 on account of the foregoing pre-petition claims. The Debtors are not seeking authority to pay the pre-petition priority Wages of any "insiders"; approval to pay insider compensation will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

The Debtors currently employ approximately 490 individuals who work out of the Debtors' thirty two (32) restaurants located in California and Nevada (collectively, the "Employees"). With very few exceptions, all of the Employees are paid on an hourly basis. All of the Employees are paid biweekly (*i.e.*, every two weeks) on Friday. While salaried Employees are paid on a current basis through the date of payroll, hourly Employees are paid approximately one week in arrears. So, for example, payroll paid on April 3, 2009 covered the period from March 21, 2009 through April 3, 2009 for the Debtors' salaried Employees but covered the period from March 16, 2009 through March 29, 2009 for the Debtors' hourly Employees.

The Debtors utilize a payroll service, Automatic Data Processing, Inc. ("ADP"), to process the payment of Wages to the Employees. In the normal course of their relationship with ADP, the funds necessary for the payment of Wages are transferred to ADP or otherwise

---

[1] Certain of the Debtors' Employees may be entitled to reimbursement of authorized automobile and other business-related expenses as part of their Wages. Accordingly, the Wages that the Debtors are seeking authority to pay include reimbursements of authorized employee expenses as well as all applicable federal and state withholding taxes and payroll taxes.

1  made available approximately two (2) days prior to each payroll date. ADP then ensures
2  payment of Wages (either by check or direct deposit into the Employees' bank accounts) by the
3  payroll date.

4       On April 3, 2009, the Debtors paid Wages to their salaried Employees for the period
5  from March 21, 2009 through April 3, 2009 and to their hourly Employees for the period from
6  March 16, 2009 through March 29, 2009. The total amount of Wages paid on April 3, 2009 to
7  the Employees was approximately $283,349.44. On April 17, 2009, the Debtors will owe
8  Wages to the salaried Employees for the period from April 4, 2009 through and including April
9  17, 2009 – of which approximately 3 days (April 4 – 6) will constitute pre-petition obligations,
10 and to the hourly Employees for the period from March 30, 2009 through and including April
11 12, 2009 – of which approximately 8 days (March 30 – April 6) will constitute pre-petition
12 obligations. The Debtors estimate that the total payroll obligations due on April 17, 2009,
13 including all payroll taxes, will also be approximately $283,349.44 (approximately $161,913.97
14 of which will be for pre-petition obligations). The foregoing amount will need to be transferred
15 to ADP or otherwise made available by no later than Wednesday, April 15, 2009.

16      By the Motion, the Debtors seek authority to (i) pay and/or honor all pre-petition Wages
17 of the Employees (including those Wages which are unpaid as a result of a pre-petition payroll
18 check being returned for insufficient funds which may be caused by, among other things, the
19 conversion of the Debtors' pre-petition bank accounts to debtor in possession accounts); and
20 (ii) honor accrued vacation and leave benefits by allowing the Employees to take their accrued
21 vacation or leave time in the ordinary course of business, provided that no employee shall
22 receive in value over $10,950 on account of pre-petition claims for Wages and vacation and
23 leave benefits.

24      The source of the funds to be used to pay and/or honor the pre-petition Wages and
25 accrued vacation and leave benefits of the Employees will be the Debtors' revenue, which the
26 Debtors do not believe is subject to any perfected lien or security interest of any creditor. Since
27 the Debtors do not believe that any party has a perfected lien against their revenue and cash, the
28 Debtors have not filed a concurrent motion seeking authority to use cash collateral. Based on

3

1  the Debtors' current operations and cash flow, approval to honor their employees' pre-petition

2  priority claims for Wages and accrued vacation and leave benefits will not render the Debtors'

3  bankruptcy estates administratively insolvent.

4        Needless to say, the Debtors cannot continue to operate and reorganize without the

5  Employees. As a retail restaurant business, it is crucial for the Debtors to retain a sufficient

6  number of full-time and part-time Employees to operate each of their restaurants. If the

7  Debtors do not continue to pay the Employees their ordinary and earned Wages and continue to

8  honor employee benefits, the morale of the Employees will drop significantly, and the

9  Employees will likely quit. Without the Employees, the Debtors' operations and the value of

10  their business will be severely impaired, if not eviscerated altogether. The Debtors must retain

11  the Employees to remain in business and preserve the value of their assets. Based on the

12  foregoing, the Debtors respectfully submit that the relief requested in the Motion is necessary to

13  avoid immediate and irreparable harm.

14  **ADDITIONAL INFORMATION**

15        This Motion is based upon Local Bankruptcy Rules 2081-1(a)(6) and 9075-1, 11 U.S.C.

16  §§ 105(a) and 507(a)(4), and Rule 6003 of the Federal Rules of Bankruptcy Procedure, this

17  Motion, the supporting Memorandum of Points and Authorities, the Declaration of Harold Fox

18  attached hereto, the arguments and statements of counsel to be made at the hearing on the

19  Motion, and other admissible evidence properly brought before the Court.

20        In order to provide maximum notice of this Motion, concurrently with the filing of this

21  Motion with the Court (on April 8, 2009), the Debtors have served a copy of this Motion and all

22  supportive papers (including notice of the hearing) upon the Office of the United States Trustee,

23  all secured creditors and their counsel (if known), the Debtors' 20 largest unsecured creditors,

24  and other parties in interest via overnight mail. These parties will receive delivery of the

25  Motion and all supportive papers by not later than the morning of Thursday, April 9, 2009.

26        **WHEREFORE**, the Debtors respectfully requests that this Court hold a hearing on the

27  Motion and issue an order:

28        (a)    affirming the adequacy of the notice given;

4

1    (b)    finding that the relief requested in the Motion is necessary to avoid immediate

2   and irreparable harm;

3    (c)    authorizing the Debtors to (i) pay and/or honor all pre-petition priority Wages[7][2]

4   to the Employees as requested herein, including, without limitation, any outstanding checks for

5   Wages issued pre-petition to the Employees and the issuing of replacement checks to the extent

6   necessary to pay such Wages; and (ii) honor accrued vacation and leave benefits in the ordinary

7   course of business, provided that no employee shall receive in value over $10,950 on account of

8   such pre-petition claims for Wages and vacation and leave benefits; and

9    (d)    granting such other and further relief as the Court deems just and proper.

10  Dated: April  8 , 2009                    FATBURGER RESTAURANTS OF
                                              CALIFORNIA, INC. and FATBURGER
11                                            RESTAURANTS OF NEVADA, INC.

12

13                                            By: _____

14                                                RON BENDER
                                                  MONICA Y. KIM
15                                                JACQUELINE L. RODRIGUEZ
                                                  JULIET Y. OH
16                                                LEVENE, NEALE, BENDER,
                                                      RANKIN & BRILL L.L.P.
17                                                Proposed Attorneys for
                                                  Chapter 11 Debtors and
18                                                Debtors in Possession

19

20

21

22

23

24

25

26

27

28  [2]   As noted above, the payment of pre-petition priority Wages shall include payment of authorized
employee expenses and all applicable federal and state withholding taxes and payroll taxes.

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I. STATEMENT OF FACTS**

3

**A.    Background.**

4   1.    On April 7, 2009 (the "Petition Date"), Fatburger Restaurants of California, Inc.
5   ("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and with FB
6   California, the "Debtors") filed voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq.
7   (as amended, the "Bankruptcy Code"). The Debtors are operating their business and managing
8   their financial affairs and operating their bankruptcy estates as debtors in possession pursuant to
9   Sections 1107 and 1108 of the Bankruptcy Code.

10   2.    The Debtors are the operators of a total of thirty two (32) Fatburger restaurants
11   located in California and Nevada. FB California owns and operates 19 restaurants in California
12   and has approximately 285 employees. FB Nevada owns and operates 13 Fatburger restaurants
13   in Nevada, employs approximately 205 employees, and owns two parcels of developed real
14   property in Nevada. The Debtors' revenue is derived from sales at their respective restaurants.

15   3.    The Debtors are part of a larger Fatburger enterprise which, as of the Petition
16   Date, consisted of approximately 90 restaurants in 14 states as well as 3 foreign countries
17   (Canada, Dubai and China). The Debtors are both wholly-owned subsidiaries of an entity
18   called Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of
19   Fatburger Holdings, Inc. ("FB Holdings"). FB Holdings serves only as a holding company and
20   does not have any employees. FB Corp. houses the Fatburger enterprise's corporate activities
21   and has approximately 31 employees. Another wholly-owned subsidiary of FB Corp, Fatburger
22   North America, Inc. does not own or operate any restaurants and does not have any employees,
23   but serves as the franchisor entity for the Fatburger enterprise and collects royalty and
24   marketing fees from all Fatburger franchisees.

25   4.    As part of the corporate activities housed at FB Corp., employees of FB Corp.
26   provide extensive corporate, administrative and logistical support to the Debtors. Accordingly,
27   the Debtors have historically contributed, and will continue to contribute, funds to reimburse

28

6

FB Corp. for its corporate overhead costs in accordance with the allocations agreed upon by the entities.

5.        The Fatburger enterprise was started in 1952 by Lovie Yancey ("Yancey") and Charles Simpson ("Simpson") as "Mr. Fatburger" with one hamburger stand in South Central Los Angeles that catered to African-American musicians who needed a place that served good food, late at night.  The first burger stand proved so successful that Yancey and Simpson soon opened three more locations.  In 1973, Yancey and Simpson parted ways, and Yancey renamed her restaurants "Fatburger" and opened a restaurant in Beverly Hills.  In 1980, Yancey began franchising the Fatburger concept.  By the end of 1985, the chain had 32 locations, 4 of which were company-owned, and it was named the fifth largest growing hamburger franchise chain by "Enterpreneur" magazine, trailing only McDonald's, Burger King, Wendy's and Jack in the Box.

6.        In or around 1990, Yancey sold her interests in the Fatburger enterprise to a group of investors led by Island Trading Co., a New York investment firm ("Island Trading"), and FB Corp. was created to effectuate the buyout.  By the end of 1997, Fatburger had 29 restaurants (that were neither fast food restaurants nor full-service diners), of which 12 were company-owned, but management wanted to expand much further.  Nevertheless, for a variety of reasons, that expansion was delayed.

7.        In 2001, former basketball-star-turned entrepreneur Earvin "Magic" Johnson ("Johnson") stepped forward, and one of his companies and several other investors acquired the Fatburger enterprise from Island Trading.  At that point, Keith Warlick ("Warlick") became Fatburger's Chief Executive Officer and President, and the enterprise continued to expand into new geographical areas.

8.        Beginning in 2003, Portland, Oregon-based Fog Cutter Capital Group, Inc ("Fog Cutter") began acquiring its current equity interests in FB Holdings through a series of transactions.  In 2003, Fog Cutter acquired the equity interests of Burger Business, LLC ("Burger Business"), the holding company utilized by Johnson and his related investors in connection with the Fatburger enterprise.  This initial acquisition took place at a point in time

7

when Fatburger's prior management was near the point of losing their equity interests in the enterprise under an agreement with Burger Business. In particular, in January 2004, Fog Cutter acquired 389 shares of preferred Series D stock with a 20% accrual, and 140 shares of preferred Series A (which is convertible to 15% of common stock) in exchange for $5.4 million. At that time, the Fatburger enterprise had annual revenue of approximately $20 million per year.

9.    In May 2004, Fog Cutter invested an additional $3.0 million and increased its Series D and Series A holdings and acquired 117 shares of Series A2 preferred stock in FB Holdings. In 2006, Fog Cutter invested another $5 million in exchange for 15% of the common stock in FB Holdings. As of the Petition Date, Fog Cutter owned 83% of the voting power in FB Holdings. There are also a few minority holders of preferred and common stock including Warlick, the former President and Chief Executive Officer of the Fatburger enterprise.

10.    In 2003, the entire Fatburger enterprise (the Debtors and their affiliates) had combined annual revenue of approximately $36 million; of that amount approximately $14 million in revenue was generated by FB California and approximately $12 million in revenue was generated by FB Nevada. Thus, in 2008, the Debtors had combined revenue of approximately $26 million.

**B.    Events Leading To the Filing of The Debtors' Chapter 11 Bankruptcy Cases.**

11.    Despite its growth, however, the Debtors and their affiliates began to experience financial problems as a result of: (1) a shortage in available restaurant financing, and (2) a decline in sales over the past three years.

12.    For years, the Debtors and their affiliates used General Electric Capital Franchise Finance Corporation and/or GE Capital Business Asset Funding Corporation ("GE") as a source of financing. During the past few years, the Debtors and their affiliates entered into a number of lease and other agreements relating to the opening of new restaurants. However, approximately 2 years ago, GE decided to substantially reduce its financing of small-to-medium restaurant companies in response to the deteriorating U.S. and world economic climate, and the Debtors and their affiliates were no longer able to use GE as a source of financing. In addition, the Debtors and their affiliates were not able to find alternate financing and were forced to

8

finance the expenses related to constructing and equipping the new restaurants that they had already committed to building from their existing cash flow. This strain on existing cash flow caused the Debtors to start getting behind on their accounts payable.

13.    Additionally, during the past two years the Debtors' sales began to decline as a result of the general slowdown in the U.S. economy. The Debtors and their affiliates experienced a decline of 10.7% in sales in 2007 and a decline of 4.3% in sales in 2008.

14.    The Debtors' fundamental business plan is to restructure or reject a number of their unfavorable leases and executory contracts so that they are left with only profitable locations, and to restructure their existing debt.

**C.    Necessity To Pay Pre-Petition Priority Wages And Honor Vacation And Other Leave Benefits.**

15.    Collectively, the Debtors currently employ approximately 490 individuals who work out of the Debtors' thirty two (32) restaurants located in California and Nevada (collectively, the "Employees"). The Employees are employed and paid by the Debtors, as follows:

| Fatburger Restaurants of California, Inc. | 285 employees | 19 California restaurants |
|---|---|---|
| Fatburger Restaurants of Nevada, Inc. | 205 employees | 13 Nevada restaurants |
| Total: | 490 employees | 32 restaurants |

16.    With very few exceptions, all of the Employees are paid on an hourly basis. All of the Employees are paid biweekly (*i.e.*, every two weeks) on Friday. While salaried Employees are paid on a current basis through the date of payroll, hourly Employees are paid approximately one week in arrears. So, for example, payroll paid on April 3, 2009 covered the period from March 21, 2009 through April 3, 2009 for the Debtors' salaried Employees but covered the period from March 16, 2009 through March 29, 2009 for the Debtors' hourly Employees.

17. The total amount of wages, commissions and benefits ("Wages")[3] paid to the Employees on April 3, 2009 was approximately \$283,349.44. On April 17, 2009, the Debtors will owe Wages to the salaried Employees for the period from April 4, 2009 through and including April 17, 2009 – of which approximately 3 days (April 4 – 6) will constitute pre-petition obligations, and to the hourly Employees for the period from March 30, 2009 through and including April 12, 2009 – of which approximately 8 days (March 30 – April 6) will constitute pre-petition obligations. The Debtors estimate that the total payroll obligations due on April 17, 2009, including all payroll taxes, will also be approximately \$283,349.44 (approximately \$161,913.97 of which will be for pre-petition obligations).

18. The Debtors are not seeking authority to pay the pre-petition priority Wages of any "insiders"; approval to pay insider compensation will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

19. The Debtors utilize a payroll service, Automatic Data Processing, Inc. ("ADP"), to process the payment of Wages to the Employees. In the normal course of their relationship with ADP, the funds necessary for the payment of Wages are transferred to ADP or otherwise made available approximately two (2) days prior to each payroll date. ADP then ensures payment of Wages (either by check or direct deposit into the Employees' bank accounts) by the payroll date. Therefore, the Wages due on April 17, 2009 will have to be transferred to ADP or otherwise made available by no later than Wednesday, April 15, 2009.

20. The Employees have also accrued vacation and leave benefits pre-petition. In the ordinary course of the Debtors' business, the Employees are authorized to take their accrued vacation or leave time in connection with their continued service. Maintaining good relationships with, and the morale of, the Employees requires continuing to honor vacation and leave policies currently in effect for the Employees. By this Motion, the Debtors seek authority

---

[3] Certain of the Debtors' Employees may be entitled to reimbursement of authorized automobile and other business-related expenses as part of their Wages. Accordingly, the Wages that the Debtors are seeking authority to pay include reimbursements of authorized employee expenses as well as all applicable federal and state withholding taxes and payroll taxes.

10

1  to honor post-petition these policies for the benefit of the Employees in order to allow the
2  Employees to take their accrued vacation or leave time in the ordinary course of business.

3      21.    In summary, by this Motion, the Debtors seek authority to:

4          (a)    pay pre-petition priority Wages to the Employees, including those which
5  are due to be paid on April 17, 2009 as described above;

6          (b)    honor pre-petition priority Wages of the Employees, including those
7  outstanding checks for Wages and commissions that were issued to the Employees prior
8  to the Petition Date but were not yet cashed as of the Petition Date of that were returned
9  for insufficient funds due to the conversion of the Debtors' pre-petition bank accounts
10  to debtor in possession accounts, and to issue replacement checks to the extent
11  necessary to pay such Wages; and

12          (c)    honor post-petition the Debtors' vacation and leave policies in order to
13  allow the Employees to take their accrued vacation or leave time in the ordinary course
14  of business, provided that none of the Employees shall receive more than $10,950 of
15  value on account of pre-petition claims for Wages and vacation and leave benefits in
16  accordance with Section 507(a)(4) of the Bankruptcy Code.

17      22.    Since most of the claims described above constitute priority claims, they must be
18  paid in full in connection with any reorganization of the Debtors' cases. Moreover, based on
19  the Debtors' current operations and cash flow, approval to honor their employees' pre-petition
20  priority claims for Wages and accrued vacation and leave benefits will not render the Debtors'
21  bankruptcy estates administratively insolvent.

22      23.    The source of the funds to be used to pay and/or honor the pre-petition Wages
23  and accrued vacation and leave benefits of the Employees will be the Debtors' revenue, which
24  the Debtors do not believe is subject to any perfected lien or security interest of any creditor.
25  Since the Debtors do not believe that any party has a perfected lien against their revenue and
26  cash, the Debtors have not filed a concurrent motion seeking authority to use cash collateral.

27      24.    The Debtors simply cannot continue to operate and reorganize without the
28  Employees. As a retail restaurant business, it is crucial for the Debtors to retain a sufficient

11

1  number of full-time and part-time Employees to operate each of their restaurants as well their

2  corporate offices.  If the Debtors do not continue to pay the Employees their ordinary and

3  earned Wages and continue to honor employee benefits, the morale of the Employees will drop

4  significantly, and the Employees will likely quit.  Without the Employees, the Debtors'

5  operations and the value of their business will be severely impaired, if not eviscerated

6  altogether.  The Debtors must retain the Employees to remain in business and preserve the

7  value of their assets.  Based on the foregoing, the Debtors respectfully submit that the relief

8  requested herein is necessary to avoid immediate and irreparable harm.

9                               **II.    DISCUSSION**

10 **A.    Payment Of Certain Pre-Petition Wages Is Permissible Under Section 507(a)(4).**

11         11 U.S.C. § 507(a)(4) provides priority to claimants, up to $10,950 per individual, for

12 wages, salaries, or commissions, including vacation, insurance, and sick leave earned by

13 individuals within 180 days prior to the filing of a case under chapter 11 of the Bankruptcy

14 Code.

15 **B.    This Court Has The Authority To Grant The Relief Requested Herein.**

16         Pursuant to Section 105(a) of the Bankruptcy Code, "the court may issue any order,

17 process, or judgment that is necessary or appropriate to carry out the provisions of this title."

18 The basic purpose of Section 105(a) is "to assure the bankruptcy courts power to take whatever

19 action is appropriate or necessary in aid in their jurisdiction." 2 Collier on Bankruptcy ¶ 105.01

20 at 105-3 (15th ed. rev. 1998).  Essentially, Section 105(a) codifies the bankruptcy court's

21 inherent equitable powers. See Green v. Drexler (In re Feit & Drexler, Inc.), 760 F.2d 406 (2d

22 Cir. 1985).

23         Where business exigencies require, courts have authorized debtors to pay the pre-

24 petition claims of particular creditors.  In re Ionosphere Clubs, Inc., 98 B.R. 174 (Bankr.

25 S.D.N.Y. 1989). The "Necessity of Payment Rule" empowers a court to authorize a debtor to

26 pay pre-petition claims essential to continued operations.  Id. at 175-76, citing Miltenberger v.

27 Logansport, C. & S. W .R. Co., 106 U.S. 286 (1882):

28

                                        12

1
2
3
4

> "The 'necessity of payment' doctrine permits immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre-reorganization claims have been paid."

5
6
7
8
9
10
11
12

Ionosphere Clubs, 98 B.R. at 176, quoting In re Leigh and New England Railway Company, 657 F.2d 570, 581 (3rd Cir. 1981). This rule applies in all chapter 11 cases because "the rationale for the necessity of payment rule, i.e., facilitating the continued operation and rehabilitation of the debtor . . . is . . . a paramount goal of chapter 11." Ionospere Clubs, 98 B.R. at 176, citing Dudley v. Mealey, 147 F.2d 268 (2d Cir. 1945), cert. den'd, 325 U.S. 873 (1945). Therefore, where continued operation and rehabilitation of the debtor require payment of pre-petition wages, the Court may authorize such payment under Sections 363 (b) and/or 105(a) of the Bankruptcy Code.

13
14
15
16
17
18
19
20
21

In Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983), the district court recognized the "special status" of suppliers holding unstayed lien rights, and authorized the debtor to pay their claims in the ordinary course of its business activities. See also Dave Noake, Inc. v. Harold's Garage, Inc. (In re Dave Noake, Inc.), 45 B.R. 555 (Bankr. D. Vt. 1984) (rejecting a challenge under section 549 to post-petition payments made to creditor holding lien rights under local law). Similarly, one former bankruptcy judge has recognized that when "confronted with special circumstances . . . particularly in the early stages of the case, a court may preserve the potential for rehabilitation." Ordin, Finality of Order of Bankruptcy Court, 54 Am. Bankr. L.J. 173 (1980).

22
23
24
25
26
27

In In re Gulf Air, Inc., 112 Bankr. 152 (Bankr. W.D. La. 1989), the court noted that cases decided both under the Act and the Code have recognized the "necessity of payment" doctrine under which payment of pre-petition employee claims is authorized prior to the time a plan of reorganization is confirmed so long as absent such payment there is a risk that the services of key employees will be lost to the debtor and without such employees, the debtor's going concern value will be impaired. Id. at 153.

28

13

**C.     Sufficient Evidence Has Been Provided, In Compliance With Local Bankruptcy Rule 2081-1(a)(6) Of The United States Bankruptcy Court for the Central District of California, To Grant The Relief Requested Herein.**

Local Bankruptcy Rule 2081-1(a)(6) provides that motions to pay pre-petition payroll and to honor pre-petition employment procedures must be supported with evidence that establishes:

(i)        The employees are still employed;

(ii)       The necessity for payment;

(iii)      The benefit of the procedures;

(iv)      The prospect of reorganization;

(v)       Whether the employees are insiders;

(vi)      Whether the employees' claims are within the limits established by 11 U.S.C. § 507; and that

(vii)     The payment will not render the estate administratively insolvent.

The foregoing factors are discussed individually below:

1.        *The employees are still employed.*  Attached as Exhibit "1" to the Declaration of Harold Fox (the "Fox Declaration") annexed hereto are summary reports generated by ADP which reflect the amount of wages paid to the Employees on April 3, 2009 by each of the Debtors. As set forth in the Fox Declaration, all of the Employees who were paid on April 3, 2009 are still employed by the Debtors.

2.        *The necessity for payment.*  The Debtors believe that significantly all of the Employees will quit if they are not paid their salaries and benefits in full in a timely fashion. This is particularly true given that some of the Employees work on a part-time basis, and virtually all of the Employees are paid on an hourly basis. Such employees would have little incentive to continue working for the Debtors and could very acquire new employment elsewhere. As a retail restaurant business, it is crucial for the Debtors to retain a sufficient number of full-time and part-time Employees to operate each of their restaurants as well as their corporate offices. The Debtors must retain the Employees to continue their business operations without interruption and preserve and maximize the value of their assets during these cases.

1   The Debtors' personnel are familiar with the Debtors' operations and business philosophy, and,

2   thus, essential to the preservation of the Debtors' business.  Therefore, the Debtors' failure to

3   pay pre-petition Wages to the Employees and honor the Employees' accrued vacation and leave

4   benefits will likely result in severe disruptions to the Debtors' operations to the detriment of

5   these cases.  The Debtors' ability to preserve the full value of their business and assets depends

6   upon the Debtors' continued operations, which cannot occur without the efforts of the

7   Employees.

8        3.     The benefit of the procedures.  In order to attract and retain Debtors' corporate

9   employees and restaurant staff, among other things, the Debtors maintain what they believe are

10  competitive and reasonable vacation and leave benefits policies.  The Debtors believe that

11  maintaining good relationships with, and the morale of, the Employees requires continuing to

12  honor vacation and leave policies currently in effect for the Employees.  By this Motion, the

13  Debtors are seeking to honor these policies post-petition in order to allow the Employees to

14  take their accrued vacation or leave time in the ordinary course of business.

15       4.     The prospect of reorganization.  As discussed above, the Debtors believe that,

16  through their Chapter 11 cases, the Debtors will be able to restructure their debts in an efficient

17  and timely manner.

18       5.     Whether the employees are insiders.  As discussed above, the Debtors are not

19  seeking authority to pay the pre-petition priority Wages of any "insiders."  Approval to pay

20  insider compensation will be sought pursuant to Notices of Setting Insider Compensation which

21  will be filed with the United States Trustee.

22       6.     Whether the employees' claims are within the limits established by 11 U.S.C. §

23  507.  As set forth in the Fox Declaration annexed hereto, all of the Employees' claims are

24  within the $10,950 limit established by 11 U.S.C. § 507(a)(4).  Notwithstanding the foregoing,

25  the Motion expressly provides that none of the Employees shall receive in value over $10,950

26  on account of pre-petition priority claims for Wages and vacation or leave benefits.

27       7.     The payment will not render the estates administratively insolvent.  As set forth

28  in the Fox Declaration annexed hereto, based on the Debtor's current operations and cash flow,

1    the Debtors do not believe that the payment of pre-petition priority claims for Wages and

2    vacation and leave benefits will render the estates administratively insolvent.

3
4

**D.    The Relief Requested Herein Is Necessary To Avoid Immediate And Irreparable Harm And Is Therefore Warranted Under Rule 6003 Of The Federal Rules Of Bankruptcy Procedure.**

5    Rule 6003 of the Federal Rules of Bankruptcy Procedure states, in relevant part:

6      "Except to the extent that relief is necessary to avoid immediate and

7      irreparable harm, the court shall not, within 20 days after the filing of the

8      petition, grant relief regarding the following:

9      [...]

10        (b) a motion to use, sell, lease, or otherwise incur an obligation,

11      regarding property of the estate, including a motion to pay all or part of a

12      claim that arose before the filing of the petition, but not a motion under

13      Rule 4001; [...]."

14    Fed. R. Bankr. Pro. 6003.

15      The Debtors' failure to pay pre-petition Wages to the Employees on April 15, 2009 and

16    honor the Employees' accrued vacation and leave benefits will likely result in severe

17    disruptions to the Debtors' operations and may jeopardize the Debtors' ability to preserve the

18    full value of their business and assets. Accordingly, the Debtors respectfully submit that the

19    payment of the Employees' pre-petition Wages and the honoring of the Employees' accrued

20    vacation and leave benefits within 20 days of the Petition Date are necessary to avoid

21    immediate and irreparable harm and are therefore warranted under Rule 6003 of the Federal

22    Rules of Bankruptcy Procedure.

23                 **III.    CONCLUSION**

24      **WHEREFORE**, the Debtors respectfully request that this Court hold a hearing on the

25    Motion and issue an order:

26      (a)    affirming the adequacy of the notice given;

27      (b)    finding that the relief requested in the Motion is necessary to avoid immediate

28    and irreparable harm;

1    (c)    authorizing the Debtors to (i) pay and/or honor all pre-petition priority Wages[3] to

2    the Employees as requested herein, including, without limitation, any outstanding checks for

3    Wages issued pre-petition to the Employees and the issuing of replacement checks to the extent

4    necessary to pay such Wages; and (ii) honor accrued vacation and leave benefits in the ordinary

5    course of business, provided that no employee shall receive in value over $10,950 on account of

6    such pre-petition claims for Wages and vacation and leave benefits; and

7        (d)    granting such other and further relief as the Court deems just and proper.

8    Dated: April 6 , 2009                    FATBURGER RESTAURANTS OF
                                             CALIFORNIA, INC. and FATBURGER
9                                            RESTAURANTS OF NEVADA, INC.

10                                      By: _____
11                                           RON BENDER
                                             MONICA Y. KIM
12                                           JACQUELINE L. RODRIGUEZ
                                             JULIET Y. OH
13                                           LEVENE, NEALE, BENDER,
                                                  RANKIN & BRILL L.L.P.
14                                           Proposed Attorneys for
                                             Chapter 11 Debtors and
15                                           Debtors in Possession

16

17

18

19

20

21

22

23

24

25

26

27

28    [4] As set forth above, the payment of pre-petition priority wages shall include payment of authorized
      employee expenses and all applicable federal and state withholding taxes and payroll taxes.

17

**DECLARATION OF HAROLD FOX**

I, HAROLD FOX, hereby declare as follows:

1.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto. Capitalized terms used in this Declaration and not otherwise defined have the same meanings as assigned to them in the attached Motion.

2.  I am the Chief Financial Officer and Secretary of Fatburger Restaurants of California, Inc. ("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and together with FB California, the "Debtors"), debtors and debtors in possession herein.

3.  I make this Declaration in support of the Debtors' emergency motion for authority to pay pre-petition priority wages, commissions, benefits and reimbursable expenses (collectively, "Wages")[5] and honor accrued vacation and leave benefits (the "Motion") to which this Declaration is attached.

4.  On April 7, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their financial affairs and operating their bankruptcy estates as debtors in possession.

5.  The Debtors are the operators of a total of thirty two (32) Fatburger restaurants located in California and Nevada. FB California owns and operates 19 restaurants in California and has approximately 285 employees. FB Nevada owns and operates 13 Fatburger restaurants in Nevada, employs approximately 205 employees, and owns two parcels of developed real property in Nevada. The Debtors' revenue is derived from sales at their respective restaurants.

6.  The Debtors are part of a larger Fatburger enterprise which, as of the Petition Date, consisted of approximately 90 restaurants in 14 states as well as 3 foreign countries (Canada, Dubai and China). The Debtors are both wholly-owned subsidiaries of an entity called Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger Holdings, Inc. ("FB Holdings"). FB Holdings serves only as a holding company and

---

[5] Certain of the Debtors' employees may be entitled to reimbursement of authorized automobile and other business-related expenses as part of their Wages. Accordingly, the Wages that the Debtors are seeking authority to pay include reimbursements of authorized employee expenses as well as all applicable federal and state withholding taxes and payroll taxes.

does not have any employees. FB Corp. houses the Fatburger enterprise's corporate activities and has approximately 31 employees. Another wholly-owned subsidiary of FB Corp, Fatburger North America, Inc. does not own or operate any restaurants and does not have any employees, but serves as the franchisor entity for the Fatburger enterprise and collects royalty and marketing fees from all Fatburger franchisees.

7.     As part of the corporate activities housed at FB Corp., employees of FB Corp. provide extensive corporate, administrative and logistical support to the Debtors. Accordingly, the Debtors have historically contributed, and will continue to contribute, funds to reimburse FB Corp. for its corporate overhead costs in accordance with the allocations agreed upon by the entities.

8.     The Fatburger enterprise was started in 1952 by Lovie Yancey ("Yancey") and Charles Simpson ("Simpson") as "Mr. Fatburger" with one hamburger stand in South Central Los Angeles that catered to African-American musicians who needed a place that served good food, late at night. The first burger stand proved so successful that Yancey and Simpson soon opened three more locations. In 1973, Yancey and Simpson parted ways, and Yancey renamed her restaurants "Fatburger" and opened a restaurant in Beverly Hills. In 1980, Yancey began franchising the Fatburger concept. By the end of 1985, the chain had 32 locations, 4 of which were company-owned, and it was named the fifth largest growing hamburger franchise chain by "Enterpreneur" magazine, trailing only McDonald's, Burger King, Wendy's and Jack in the Box.

9.     In or around 1990, Yancey sold her interests in the Fatburger enterprise to a group of investors led by Island Trading Co., a New York investment firm ("Island Trading"), and FB Corp. was created to effectuate the buyout. By the end of 1997, Fatburger had 29 restaurants (that were neither fast food restaurants nor full-service diners), of which 12 were company-owned, but management wanted to expand much further. Nevertheless, for a variety of reasons, that expansion was delayed.

10.     In 2001, former basketball-star-turned entrepreneur Earvin "Magic" Johnson ("Johnson") stepped forward, and one of his companies and several other investors acquired the

1   Fatburger enterprise from Island Trading. At that point, Keith Warlick ("Warlick") became
2   Fatburger's Chief Executive Officer and President, and the enterprise continued to expand into
3   new geographical areas.

4       11.    Beginning in 2003, Portland, Oregon-based Fog Cutter Capital Group, Inc.
5   ("Fog Cutter") began acquiring its current equity interests in FB Holdings through a series of
6   transactions. In 2003, Fog Cutter acquired the equity interests of Burger Business, LLC
7   ("Burger Business"), the holding company utilized by Johnson and his related investors in
8   connection with the Fatburger enterprise. This initial acquisition took place at a point in time
9   when Fatburger's prior management was near the point of losing their equity interests in the
10  enterprise under an agreement with Burger Business. In particular, in January 2004, Fog Cutter
11  acquired 389 shares of preferred Series D stock with a 20% accrual, and 140 shares of preferred
12  Series A (which is convertible to 15% of common stock) in exchange for $5.4 million. At that
13  time, the Fatburger enterprise had annual revenue of approximately $20 million per year.

14      12.    In May 2004, Fog Cutter invested an additional $3.0 million and increased its
15  Series D and Series A holdings and acquired 117 shares of Series A2 preferred stock in FB
16  Holdings. In 2006, Fog Cutter invested another $5 million in exchange for 15% of the common
17  stock in FB Holdings. As of the Petition Date, Fog Cutter owned 83% of the voting power in
18  FB Holdings. There are also a few minority holders of preferred and common stock including
19  Warlick, the former President and Chief Executive Officer of the Fatburger enterprise.

20      13.    In 2003, the entire Fatburger enterprise (the Debtors and their affiliates) had
21  combined annual revenue of approximately $36 million; of that amount approximately $14
22  million in revenue was generated by FB California and approximately $12 million in revenue
23  was generated by FB Nevada. Thus, in 2008, the Debtors had combined revenue of
24  approximately $26 million.

25      14.    Despite its growth, however, the Debtors and their affiliates began to experience
26  financial problems as a result of: (1) a shortage in available restaurant financing, and (2) a
27  decline in sales over the past three years.

28

15.     For years, the Debtors and their affiliates used General Electric Capital Franchise Finance Corporation and/or GE Capital Business Asset Funding Corporation ("GE") as a source of financing.  During the past few years, the Debtors and their affiliates entered into a number of lease and other agreements relating to the opening of new restaurants.  However, approximately 2 years ago, GE decided to substantially reduce its financing of small-to-medium restaurant companies in response to the deteriorating U.S. and world economic climate, and the Debtors and their affiliates were no longer able to use GE as a source of financing.  In addition, the Debtors and their affiliates were not able to find alternate financing and were forced to finance the expenses related to constructing and equipping the new restaurants that they had already committed to building from their existing cash flow.  This strain on existing cash flow caused the Debtors to start getting behind on their accounts payable.

16.     Additionally, during the past two years the Debtors' sales began to decline as a result of the general slowdown in the U.S. economy.  The Debtors and their affiliates experienced a decline of 10.7% in sales in 2007 and a decline of 4.3% in sales in 2008.

17.     The Debtors' fundamental business plan is to restructure or reject a number of their unfavorable leases and executory contracts so that they are left with only profitable locations, and to restructure their existing debt.

18.     Collectively, the Debtors currently employ approximately 490 individuals who work out of the Debtors' thirty two (32) restaurants located in California and Nevada (collectively, the "Employees").  The Employees are employed and paid by the Debtors, as follows:

| Fatburger Restaurants of California, Inc. | 285 employees | 19 California restaurants |
|---|---|---|
| Fatburger Restaurants of Nevada, Inc. | 205 employees | 13 Nevada restaurants |
| **Total:** | 490 employees | 32 restaurants |

19. With very few exceptions, all of the Employees are paid on an hourly basis. All of the Employees are paid biweekly (*i.e.*, every two weeks) on Friday. While salaried Employees are paid on a current basis through the date of payroll, hourly Employees are paid approximately one week in arrears. So, for example, payroll paid on April 3, 2009 covered the period from March 21, 2009 through April 3, 2009 for the Debtors' salaried Employees but covered the period from March 16, 2009 through March 29, 2009 for the Debtors' hourly Employees.

20. Attached hereto as Exhibit "1" are summary reports generated by ADP which reflect the amount of wages paid to the Employees on April 3, 2009 by each of the Debtors. The total amount of wages, commissions and benefits ("Wages")[6] paid to the Employees on April 3, 2009 was approximately $283,349.44. To the best of my knowledge, all of the Employees who were paid on April 3, 2009 are still employed by the Debtors.

21. On April 17, 2009, the Debtors will owe Wages to the salaried Employees for the period from April 4, 2009 through and including April 17, 2009 – of which approximately 3 days (April 4 – 6) will constitute pre-petition obligations, and to the hourly Employees for the period from March 30, 2009 through and including April 12, 2009 – of which approximately 8 days (March 30 – April 6) will constitute pre-petition obligations. I estimate that the total payroll obligations due on April 17, 2009, including all payroll taxes, will also be approximately $283,349.44 (approximately $161,913.97 of which will be for pre-petition obligations).

22. The Debtors are not seeking authority to pay the pre-petition priority Wages of any "insiders": approval to pay insider compensation will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

23. The Debtors utilize a payroll service, Automatic Data Processing, Inc. ("ADP"), to process the payment of Wages to the Employees. In the normal course of their relationship

---

[6] Certain of the Debtors' Employees may be entitled to reimbursement of authorized automobile and other business-related expenses as part of their Wages. Accordingly, the Wages that the Debtors are seeking authority to pay include reimbursements of authorized employee expenses as well as all applicable federal and state withholding taxes and payroll taxes.

1  with ADP, the funds necessary for the payment of Wages are transferred to ADP or otherwise
2  made available approximately two (2) days prior to each payroll date. ADP then ensures
3  payment of Wages (either by check or direct deposit into the Employees' bank accounts) by the
4  payroll date. Therefore, the Wages due on April 17, 2009 will have to be transferred to ADP or
5  otherwise made available by no later than Wednesday, April 15, 2009.

6        24.    In order attract and retain the Debtors' corporate employees and restaurant staff,
7  among other things, the Debtors maintain what I believe are competitive and reasonable
8  vacation and leave benefits policies. As a result, the Employees have accrued vacation and
9  leave benefits pre-petition. In the ordinary course of the Debtors' business, the Employees are
10 authorized to take their accrued vacation or leave time in connection with their continued
11 service. I believe that maintaining good relationships with, and the morale of, the Employees
12 requires continuing to honor vacation and leave policies currently in effect for the Employees.
13 By the Motion, the Debtors seek authority to honor post-petition these policies for the benefit of
14 the Employees in order to allow the Employees to take their accrued vacation or leave time in
15 the ordinary course of business.

16       25.    To the best of my knowledge, all of the Employees' pre-petition priority claims
17 for Wages and accrued vacation and leave benefits are within the $10,950 limit established by
18 11 U.S.C. § 507(a)(4). Notwithstanding the foregoing, the Motion expressly provides that none
19 of the Employees shall receive in value over $10,950 on account of pre-petition priority claims
20 for Wages and vacation or leave benefits.

21       26.    The source of the funds to be used to pay and/or honor the pre-petition Wages
22 and accrued vacation and leave benefits of the Employees will be the Debtors' revenue, which I
23 do not believe is subject to any perfected lien or security interest of any creditor. Since it is the
24 Debtors' belief that no party has a perfected lien against the Debtors' revenue and cash, the
25 Debtors have not filed a concurrent motion seeking authority to use cash collateral. The
26 Debtors' business operations are currently resulting in positive cash flow. Based on the
27 foregoing, I do not believe that the payment of the employees' pre-petition priority claims for

28

1  Wages and accrued vacation and leave benefits will render the Debtors' bankruptcy estates
2  administratively insolvent.

3      27.    I do not believe that the Debtors can continue to operate and reorganize without
4  the Employees. As a retail restaurant business, I believe it is crucial for the Debtors to retain a
5  sufficient number of full-time and part-time Employees to operate each of their restaurants as
6  well their corporate offices. If the Debtors do not continue to pay the Employees their ordinary
7  and earned Wages and continue to honor employee benefits, I believe that the morale of the
8  Employees will drop significantly, and the Employees will likely quit. I believe this is
9  particularly true given that some of the Employees work on a part-time basis, and virtually all
10 of the Employees are paid on an hourly basis. I believe such employees would have little
11 incentive to continue working for the Debtors and could very acquire new employment
12 elsewhere. Without the Employees, the Debtors' operations and the value of their business will
13 be severely impaired, if not eviscerated altogether. The Debtors must retain the Employees to
14 remain in business and preserve the value of their assets. Based on the foregoing, I believe that
15 the relief requested in the Motion is necessary to avoid immediate and irreparable harm.

16      I declare under penalty of perjury that the foregoing is true and correct.
17      Executed this ___7TH___ day of April 2009, at Santa Monica, California.

19      HAROLD FOX, Declarant

24

# EXHIBIT "1"

# Statistical Summary
## Recap

**FATBURGER RESTAURANT**
Company Code: **EWI**
Region Name: **LAPALMA REGION**

Batch : **5277**
Quarter Number: **2**

Period Ending : **03/29/2009**
Pay Date : **04/03/2009**
Current Date : **03/31/2009**

**Week 14**
Page  1

® 2008 Automatic Data Processing, Inc.

| Liability Recap | | | |
|---|---|---|---|
| **Taxes Debited** | Federal Income Tax | | 5,017.91 |
| | Earned Income Credit Advances | | .00 |
| | Social Security - EE | | 9,146.46 |
| | Total Social Security - EE | | 9,146.52 |
| | Social Security - ER | | 9,146.52 |
| | Social Security Adj - EE | | .00 |
| | Medicare - EE | | 2,138.46 |
| | Medicare - ER | | 2,139.11 |
| | Medicare Adj - EE | | .58 |
| | Federal Unemployment Tax | | 894.19 |
| | State Income Tax | | 1,313.39 |
| | State Unemployment Insurance - EE | | .00 |
| | State Unemployment/Disability Ins - ER | | 3,355.20 |
| | State Unemployment Insurance Adj - ER | | .00 |
| | State Disability Insurance - EE | | 1,615.33 |
| | State Disability Insurance Adj - EE | | 12.28 |
| | Worker's Benefit Fund Assessment - EE | | .00 |
| | Worker's Benefit Fund Assessment - ER | | .00 |
| | Local Income Tax | | .00 |
| | School District Tax | | .00 |
| | **Total Taxes Debited** | Account Number 149907/3379 | 34,777.38 |
| **Other Transfers** | ADP Direct Deposit | Account Number 149907/3379 | 31,823.95 |
| | Wage Garnishments | Account Number 149907/3379 | 1,501.92 |
| | **Total Amount Debited From Your Accounts** | | 68,103.25 |
| **Bank Debits and Other Liability** | Checks | | 87,146.33 |
| | Adjustments/Prepay/Voids | | 7,973.86 |
| **Taxes - Your Responsibility** | None This Payroll | | |

| | Total Liability |
|---|---|
| | 68,103.25 |
| | 155,249.58 |
| | 163,223.44 |
| | 163,223.44 |

Includes Adjustments that are your responsibility

EXHIBIT 1

WSS

25

# Statistical Summary Detail

**FATBURGER RESTAURANT**
Company Code: EWI
Region Name: LAPALMA REGION

| | |
|---|---|
| Batch: 5277 | Period Ending : 03/29/2009 | Week 14 |
| Quarter Number: 2 | Pay Date : 04/03/2009 | Page 2 |
| | Current Date : 03/31/2009 |

## Net Pay

| | |
|---|---:|
| Checks | 87,146.33 |
| Direct Deposits | 31,823.95 |
| Subtotal Net Pay | 118,970.28 |
| Adjustments | |
| Total Net Pay Liability (Net Cash) | 7,973.86   126,944.14 |

## Taxes

| | | You are responsible for Depositing these amounts | | Amount debited from your account | | |
|---|---|---|---|---|---|---|
| Agency | Rate | EE withheld | ER contrib. | EE withheld | ER contrib. | |
| **Federal** | | | | | | |
| Federal Income Tax | | | | 5,017.91 | | |
| Earned Income Credit Advances | | | | | | |
| Social Security | | | | 9,146.46 | 9,146.52 | |
| Medicare | | | | 2,139.04 | 2,139.11 | |
| Federal Unemployment Tax | | | | | 894.19 | |
| Subtotal Federal | | | | 16,303.41 | 12,179.82 | 28,483.23 |
| CA State Income Tax | | | | 1,313.39 | | |
| CA State Unemployment/Disability Ins-ER 3.0000 | | | | | 3,353.20 | |
| CA State Disability Insurance-EE | | | | 1,627.56 | | |
| Subtotal CA | | | | 2,940.95 | 3,353.20 | 6,294.15 |
| OR Workers' Benefit Fund Assessment-EE | | | | | | |
| OR Workers' Benefit Fund Assessment-ER | | | | | | |
| Subtotal OR | | | | | | |
| Total Taxes | | | | 19,244.36 | 15,533.02 | 34,777.38 |
| Amount ADP Debited From Account 145907379 | | Tran/ABA  121000358 | .00 | .00 | 19,244.36 | 15,533.02   34,777.38 |

Excludes Taxes That Are Your Responsibility

## Other Transfers

| | | |
|---|---|---:|
| ADP Direct Deposit: | | |
| Amount ADP Debited From Account 145907379 | Tran/ABA  121000358 | 31,823.95 |
| Wage Garnishments | | |
| Amount ADP Debited From Account 145907379 | Tran/ABA  12000061 | 1,501.92 |

Employee Transaction

| | |
|---|---:|
| | 1,501.92 |
| **Total Amount ADP Debited From Your Accounts** | **68,103.25** |

© 2004 Automatic Data Processing, Inc.

WSS

26

**ADP Statistical Summary Recap**

**FATBURGER RESTAURANT**
Company Code: 1YA
Region Name: LAPALMA REGION

Batch: 5212
Quarter Number: 2

Period Ending: 03/29/2009   Week 14
Pay Date: 04/03/2009   Page 1
Current Date: 03/31/2009

## Liability Recap

### Taxes Debited

| | |
|---|---:|
| Federal Income Tax | 3,934.25 |
| Earned Income Credit Advances | .00 |
| Social Security - EE | 6,832.81 |
| Social Security - ER | 6,832.95 |
| Social Security Adj - EE | .00 |
| Medicare - EE | 1,598.10 |
| Medicare - ER | 1,598.03 |
| Medicare Adj - EE | .00 |
| Federal Unemployment Tax | 649.31 |
| State Income Tax | .00 |
| State Unemployment Insurance - EE | .00 |
| State Unemployment/Disability Ins - ER | 1,001.23 |
| State Unemployment Insurance Adj - EE | .00 |
| State Disability Insurance - EE | .00 |
| State Disability Insurance Adj - EE | .00 |
| Workers' Benefit Fund Assessment - EE | .00 |
| Workers' Benefit Fund Assessment - ER | .00 |
| Local Income Tax | .00 |
| School District Tax | .00 |
| **Total Taxes Debited** | **22,446.82** |

### Other Transfers

| | | | |
|---|---|---:|---:|
| ADP Direct Deposit | Account Number 145915989 | 27,206.65 | |
| Wage Garnishments | Account Number 145915989 | 557.89 | |
| Total Amount Debited From Your Accounts | | | 50,211.36 |

### Bank Debits and Other Liability

| | |
|---|---:|
| Checks | 69,581.08 |
| Adjustments/Prepay/Voids | 333.56 |

### Taxes - Your Responsibility

None This Payroll

**Total Liability**
50,211.36
119,782.44
120,126.00

120,126.00   Includes Adjustments that are your responsibility

WSS

27

**ADP** Statistical Summary
Detail

© 2002 Automatic Data Processing, Inc.

**FATBURGER RESTAURANT**

Company Code: 1YA
Region Name: LA PALMA REGION

Batch: 5212
Quarter Number: 2

Period Ending: 03/29/2009
Pay Date: 04/03/2009
Current Date: 03/31/2009

Week 14
Page 2

| Net Pay | | | | | |
|---|---|---|---|---|---|
| Checks | | | | | 69,561.08 |
| Direct Deposits | | | | | 27,206.65 |
| Subtotal Net Pay | | | | | 96,767.73 |
| Adjustments | | | | | |
| Total Net Pay Liability (Net Cash) | | | | | 333.56 |
| | | | | | 97,121.29 |

| Taxes | | | | | |
|---|---|---|---|---|---|

| Federal | Agency | Rate | You are responsible for Depositing these amounts | | Amount debited from your account | |
|---|---|---|---|---|---|---|
| | | | EE withheld | ER contrib. | EE withheld | ER contrib. |
| | Federal Income Tax | | | | 3,934.29 | |
| | Earned Income Credit Advances | | | | | |
| | Social Security | | | | 6,832.91 | 6,832.95 |
| | Medicare | | | | 1,598.10 | 1,598.03 |
| | Federal Unemployment Tax | | | | | 649.31 |
| | Subtotal Federal | | | | 12,365.30 | 9,080.29 |
| State | NV State Unemployment/Disability Ins-ER .9000 | | | | | 1,001.23 |
| | Subtotal NV | | | | | 1,001.23 |
| | Total Taxes | | .00 | .00 | 12,365.30 | 10,081.52 |

| | | | | | | 21,445.59 |
|---|---|---|---|---|---|---|
| | | | | | | 22,446.82 |

Amount ADP Debited From Account 1459159849    Tran/ABA  122000661

| Other | | | | | |
|---|---|---|---|---|---|
| Transfers | ADP Direct Deposit | | | 27,206.65 | |
| | Amount ADP Debited From Account 1459159849    Tran/ABA  121000358 | | | | 27,206.65 |
| | Wage Garnishments | | | 557.89 | |
| | Amount ADP Debited From Account 1459159849    Tran/ABA  122000661 | | | | 557.89 |

Total Amount ADP Debited From Your Accounts    50,211.36

Excludes Taxes That Are Your Responsibility

Employee Transaction

WSS