RON BENDER (SBN 143364)
JACQUELINE L. RODRIGUEZ (SBN 198838)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbrb.com, jlr@lnbrb.com, jyo@lnbrb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:09-bk-13964-KT |
| FATBURGER RESTAURANTS OF CALIFORNIA, INC., *et al.* | Chapter 11 |
| Debtors. | Jointly Administered with Case No. 1:09-bk-13965-KT |
| ___ Affects Fatburger Restaurants of California, Inc. Only | DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO INCUR POST-PETITION FINANCING ON A SECURED BASIS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF HAROLD FOX AND JACQUELINE L. RODRIGUEZ, ESQ. IN SUPPORT THEREOF |
| ___ Affects Fatburger Restaurants of Nevada, Inc. Only | |
| _X_ Affects Both Debtors | |
| | Date: May 28, 2009 |
| | Time: 2:00 p.m. |
| | Place: Courtroom "301" |
| | 21041 Burbank Blvd. |
| | Woodland Hills, CA |

**TO ALL SECURED CREDITORS; THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

Pursuant to Local Bankruptcy Rules 2081-1(c) and 9075-1, and Section 364(c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 4001(d) and 9014 of the Federal Rules of Bankruptcy Procedure, Fatburger Restaurants of California, Inc. ("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and together with FB California, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, hereby move, on an emergency basis (the "Emergency Motion"), for entry of an order authorizing the Debtors to borrow up to $2.2 million from Signature Capital Partners (or its designee – "Signature") on a secured basis in accordance with the terms of the Letter of Intent ("LOI") attached as Exhibit "1" to the annexed Declaration of Harold Fox.

On April 7, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business, manage their financial affairs and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtors are presently the owner-operators of twenty-eight (28) Fatburger restaurants located in California and Nevada. FB California presently owns and operates fifteen (15) restaurants in California and has approximately 285 employees. FB Nevada presently owns and operates thirteen (13) Fatburger restaurants in Nevada, employs approximately 205 employees, and owns two parcels of developed real property in Nevada.

1    The Debtors' revenue is derived from sales at their respective restaurants. In 2008, the

2    Debtors had combined annual revenue of approximately $26 million, approximately $14

3    million of which was generated by FB California and approximately $12 million of which was

4
5    generated by FB Nevada.

6        While the Debtors' businesses are profitable, the Debtors are substantially under-

7    capitalized. The Debtors have only a small amount of cash in the bank, which is insufficient

8    liquidity for businesses of this size. Moreover, the Debtors believe that they have a great

9    product and concept to offer customers, but do not have a sufficient amount of money or cash

10
11   flow to advertise in a manner to maintain and hopefully increase their revenue, while their

12   competitors spend a substantial amount of money advertising. The Debtors must have funds to

13   increase substantially the amount of their advertising to remain competitive with their

14   competitors. The Debtors also want to have sufficient liquidity to make sure they are able to

15   make all of their post-petition lease payments on a timely basis and to have sufficient funds

16
17   available to them to fund the cure amounts that the Debtors will ultimately have to pay to

18   assume their leases, which statutorily must occur by the latest of 210 days after the Petition

19   Date unless the landlords agree otherwise. Finally, the Debtors want to make sure that they

20   have sufficient funds to pay for the administrative costs of these bankruptcy estates, including

21   the professional fees and expenses of counsel to the Debtors and the Creditors' Committee.

22        As set forth in the LOI, the Debtors and Signature have agreed that Signature will

23   receive a first priority lien against all of the Debtors' unencumbered assets (with the exception

24   of avoidance causes of action against which Signature will not receive any lien), and Signature

25
26   will receive a junior lien against all of the Debtors' encumbered assets. As a result, the

27
28

contemplated financing with Signature does <u>not</u> involve the "priming" of any existing perfected liens.

As set forth in the LOI, Signature will earn a closing fee, which means that the $2.2 million loan will result in net loan proceeds being paid to the Debtors of $2 million. Interest will accrue on the loan at the rate of 15% per annum with interest-only payments to be made by the Debtors (in the amount of $27,500 per month). The loan shall have an initial term of 12 months with a commitment to roll the loan into a post-confirmation loan with a total term of two years in the event of the confirmation of a plan of reorganization, which is the Debtors' intention.

As also set forth in the LOI, concurrently with the consummation of this financing, certain non-debtor affiliates of the Debtors will also be borrowing $1,650,000 from Signature those affiliates will be guaranteeing Signature's loan to the Debtors. This is very important as Signature has advised the Debtors that it would likely not be willing to make this loan without this affiliate guaranty. The guaranty is only one-directional, meaning that the Debtors are <u>not</u> in turn guaranteeing the loan to the non-debtor affiliates.

Signature is requiring a Good Faith Deposit of $50,000 to fund Signature's due diligence expenses. The Debtors and the non-debtor affiliates have agreed to share the cost of this Good Faith Deposit (and any other reasonable expenses which must be paid to Signature) on a proportional basis (which translates into the Debtors funding approximately 57% of the cost of this Good Faith Deposit, which translates into a payment of $28,500).

In addition, a local investment banker has earned a fee of $50,000 for finding a DIP lender for the Debtors and the non-debtor affiliates. The Debtors and the non-debtor affiliates have agreed to share the cost of this fee on a proportional basis (which translates into the

Debtors funding approximately 57% of the cost of this fee, which translates into a payment of $28,500). The Debtors are in the process of filing an employment application for the investment banker.

The Debtors believe that the DIP financing proposal from Signature is the best financing option available to the Debtors. However, the Debtors have extensively negotiated and received an acceptable proposal from an alternative lender located in Texas known as Adjacent Opportunity Capital, L.L.C. ("Adjacent"). A copy of the Adjacent letter of intent is attached as Exhibit "2" to the annexed Declaration of Harold Fox. If the Signature DIP financing fails to consummate for whatever reason, the Debtors intend to proceed with attempting to consummate a DIP financing arrangement with Adjacent. In order to avoid any additional time delay to the Debtors' ability to consummate financing, given the importance of the financing, the Debtors are seeking Court authority at this time to enter into and perform in accordance with the proposal with Adjacent if Signature fails to consummate its financing. The Debtors would file a written notice with the Court if this should occur.

Pursuant to Local Bankruptcy Rule 2081-1(c), General Order, the Debtors submit that their requested relief pertaining to the Debtors' obtaining DIP financing does not (or does) contain any of the following provisions:

| Provision | Paragraph |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in | No |

| Provision | Paragraph |
|---|---|
| interest with respect to the relative priorities of the secured party's pre-petition lien. | |
| Provisions that operate, as a practical matter, to divest the Debtors of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtors are authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtors with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtors' right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |

| Provision | Paragraph |
|---|---|
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

The relief sought in this Emergency Motion is based upon this Emergency Motion, the annexed Memorandum of Points and Authorities and Declaration submitted in support of this Emergency Motion, the statements, arguments and representations of counsel to be made at the hearing on this Emergency Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Emergency Motion.

The Debtors will file with the Court a copy of the proposed Order granting the relief requested herein prior to the hearing on this Emergency Motion.

The Debtors will serve a copy of this Emergency Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Official Committee of Unsecured Creditors and those parties who have requested special notice.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

1.      granting this Emergency Motion;

2.      authorizing the Debtors to borrow up to $2.2 million from Signature Capital Partners (or its designee – "Signature") on a secured basis in accordance with the terms of the Letter of Intent ("LOI") attached as Exhibit "1" to the annexed Declaration of Harold Fox,

including entering into the LOI and consummating the DIP financing contemplated by the LOI, including entering into the documents related to such DIP financing;

3.    authorizing the Debtors to grant to Signature to secure the Debtors' obligations to Signature under the DIP financing a first priority lien against all of the Debtors' unencumbered assets (with the exception of avoidance causes of action against which Signature will not receive any lien), and a junior lien against all of the Debtors' encumbered assets;

4.    authorizing the Debtors to pay to Signature their proportionate share of the Good Faith Deposit of $50,000 to fund Signature's due diligence expenses (and any other reasonable expenses which must be paid to Signature), which translates into the Debtors funding approximately 57% of the cost of this Good Faith Deposit, equating to a payment of $28,500;

5.    authorizing the Debtors to pay their proportionate share of the $50,000 fee owing to the local investment banker for finding a DIP lender for the Debtors and the non-debtor affiliates, which translates into the Debtors funding approximately 57% of the cost of this fee, equating to a payment of $28,500;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

6.    authorizing the Debtors to pursue the DIP financing with Adjacent in the event the Signature DIP financing fails to consummate; and

7.    granting such other and further relief as the Court deems just and proper.

Dated: May 15, 2009

Fatburger Restaurants of California, Inc.;
Fatburger Restaurants of Nevada, Inc.


By: _____
    Ron Bender
    Jacqueline L. Rodriguez
    Juliet Y. Oh
    LEVENE, NEALE, BENDER,
    RANKIN & BRILL L.L.P.
    Proposed Attorneys for
    Chapter 11 Debtors and Debtors
    in Possession

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES

I.    CASE BACKGROUND...................................................................................10

    A.    Case Background and Description of the Debtors' Businesses......................10

    B.    Necessity of the Filing of the Debtors' Chapter 11 Bankruptcy Cases ..........12

    C.    The Debtors' General Asset Base and Debt Description................................13

        1.    Assets..................................................................................................13

        2.    Debts...................................................................................................14

    D.    The Debtors' Need for DIP Financing and Summary of Proposed
        DIP Loan................................................................................................15

II.    DISCUSSION ..........................................................................................18

    A.    The Standard for Obtaining Secured Credit Pursuant to
        11 U.S.C. § 364(c)..................................................................................18

        1.    The Debtors Have Satisfied the First Standard Because the
            Debtors Are Not Able to Obtain Unsecured Credit............................20

        2.    The Terms of the Proposed DIP Financing are Fair, Reasonable
            and Adequate ...................................................................................20

    B.    The Procedural Requirements Regarding Approval of this Emergency
        Motion Have   Been Satisfied...................................................................21

III.    CONCLUSION.......................................................................................22

DECLARATION OF HAROLD FOX ...........................................................................24

DECLARATION OF JACQUELINE L. RODRIGUEZ .......................................................34

1

2
# **TABLE OF AUTHORITIES**

3
Page(s)

**FEDERAL CASES**

4

5
In re Ames Department Stores, Inc.
    115 B.R. 34 (Bankr. S.D.N.Y. 1990)..................................................................................19

6
In re Aqua Assoc.
7
    123 B.R. 192 (Bankr. E.D.Pa. 1991) ................................................................................20

8
In re C.B.G. Ltd.
    150 B.R. 570 (Bankr. M.D.Pa. 1992).............................................................................20
9

10
In re Crouse Group, Inc.
    71 B.R. 544 (Bankr. E.D.Pa. 1987) ................................................................................20

11
In re Photo Promotion Associates, Inc.
12
    87 B.R. 835 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d. Cir. 1989)..................19

13
In re Southern Soya, Corp.
    251 B.R. 302 (Bankr. D.S.C. 2000)................................................................................19
14

15
In re T.M. Sweeney & Sons LTL Services, Inc.
    131 B.R. 984 (Bankr.N.D.Ill.1991) ................................................................................19

16
Resolution Trust Corp. v. Official Unsecured Creditors Committee (In re Defender
17
    Drug Stores, Inc.)
    145 B.R 312 (9th Cir. BAP 1992) ...................................................................................19
18

19
**FEDERAL STATUTES**

20
11 U.S.C. §§ 101. ...............................................................................................................2

21
11 U.S.C. § 363(c)(2)(B) ...................................................................................................6

22
11 U.S.C. § 364(b).............................................................................................................19

23
11 U.S.C. § 364(d)(1)(B)....................................................................................................20

24
11 U.S.C. § 503(b)(1)(A)....................................................................................................19

25
11 U.S.C. § 506(c) ...............................................................................................................6

26
11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549 ...........................................................6

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### CASE BACKGROUND

4

A.    Case Background and Description of the Debtors' Businesses.

5

6       On April 7, 2009 (the "Petition Date"), Fatburger Restaurants of California, Inc. ("FB

7    California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and together with FB

8    California, the "Debtors"), the debtors and debtors in possession in the above-captioned

9    chapter 11 bankruptcy cases, filed voluntary petitions under Chapter 11 of the Bankruptcy

10   Code.   The Debtors continue to operate their business, manage their financial affairs and

11   operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108

12

13   of the Bankruptcy Code.

14       The Debtors are presently the owner-operators of twenty-eight (28) Fatburger

15   restaurants located in California and Nevada.   FB California presently owns and operates

16   fifteen (15) restaurants in California and has approximately 285 employees.   FB Nevada

17
     presently owns and operates thirteen (13) Fatburger restaurants in Nevada, employs
18

19   approximately 205 employees, and owns two parcels of developed real property in Nevada.

20   The Debtors' revenue is derived from sales at their respective restaurants.   In 2008, the

21   Debtors had combined annual revenue of approximately $26 million, approximately $14

22   million of which was generated by FB California and approximately $12 million of which was

23
     generated by FB Nevada.
24

25       The Debtors are part of a larger Fatburger enterprise which, as of the Petition Date,

26   consisted of approximately 90 restaurants in 14 states as well as 3 foreign countries (Canada,

27   Dubai and China).   The Debtors are both wholly-owned subsidiaries of an entity called

28

1   Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger

2   Holdings, Inc. ("FB Holdings"). FB Holdings serves only as a holding company and does not

3   have any employees. FB Corp. houses the Fatburger enterprise's corporate activities and has

4   approximately 31 employees. Another wholly-owned subsidiary of FB Corp, Fatburger North

5   America, Inc. ("FB North America") does not own or operate any restaurants and does not

6   have any employees, but serves as the franchisor entity for the Fatburger enterprise and

7   collects royalty and marketing fees from all Fatburger franchisees.

8

9       The Fatburger enterprise was started in 1952 by Lovie Yancey ("Yancey") and Charles

10  Simpson ("Simpson") as "Mr. Fatburger" with one hamburger stand in South Central Los

11  Angeles that catered to African-American musicians who needed a place that served good

12  food, late at night. The first burger stand proved so successful that Yancey and Simpson soon

13  opened three more locations. In 1973, Yancey and Simpson parted ways, and Yancey renamed

14  her restaurants "Fatburger" and opened a restaurant in Beverly Hills. In 1980, Yancey began

15  franchising the Fatburger concept. By the end of 1985, the chain had 32 locations, 4 of which

16  were company-owned, and it was named the fifth largest growing hamburger franchise chain

17  by "Entrepreneur" magazine, trailing only McDonald's, Burger King, Wendy's and Jack in the

18  Box.

19

20

21      In or around 1990, Yancey sold her interests in the Fatburger enterprise to a group of

22  investors led by Island Trading Co., a New York investment firm ("Island Trading"), and FB

23  Corp. was created to effectuate the buyout. By the end of 1997, Fatburger had 29 restaurants

24  (that were neither fast food restaurants nor full-service diners), of which 12 were company-

25  owned, but management wanted to expand much further. Nevertheless, for a variety of

26  reasons, that expansion was delayed.

27

28

11

1    In 2001, former basketball-star-turned-entrepreneur Earvin "Magic" Johnson

2    ("Johnson") stepped forward, and one of his companies and several other investors acquired

3    the Fatburger enterprise from Island Trading. At that point, Keith Warlick ("Warlick")

4    became Fatburger's Chief Executive Officer and President, and the enterprise continued to

5
6    expand into new geographical areas.

7    Beginning in 2003, Portland, Oregon-based Fog Cutter began acquiring its current

8    equity interests in FB Holdings through a series of transactions. As of the Petition Date, Fog

9    Cutter owned 83% of the voting power in FB Holdings. There are also a few minority holders

10    of preferred and common stock including Warlick, the former President and Chief Executive

11    Officer of the Fatburger enterprise.

12

13    In 2008, the Debtors had combined annual revenue of approximately $26 million,

14    approximately $14 million of which was generated by FB California and approximately $12

15    million of which was generated by FB Nevada.

16
B.    Necessity of the Filing of the Debtors' Chapter 11 Bankruptcy Cases.

17
Despite its impressive growth, the Debtors and their affiliates began to experience
18
financial problems as a result of: (1) a shortage in available restaurant financing, and (2) a
19
20    decline in same store sales over the past three years. For years, the Debtors and their affiliates

21    used General Electric Capital Franchise Finance Corporation and/or GE Capital Business

22    Asset Funding Corporation ("GE") as a source of financing. During the past few years, the

23    Debtors and their affiliates entered into a number of lease and other agreements relating to the

24
opening of new restaurants (explained in detail more below). However, approximately two
25
26    years ago, GE decided to substantially reduce its financing of small-to-medium restaurant

27    companies in response to the deteriorating U.S. and world economic climate, and the Debtors

28

12

1  and their affiliates were no longer able to use GE as a source of financing. In addition, the

2  Debtors and their affiliates were not able to find alternate financing and were forced to finance

3
4  the expenses related to constructing and equipping their new restaurants that they had already

5  committed to building from their existing cash flow. This strain on existing cash flow caused

6  the Debtors to start getting behind on their accounts payable and landlord obligations.

7  Additionally, during the past two years the Debtors' same store sales began to decline

8  as a result of the general slowdown in the U.S. economy. The Debtors and their affiliates

9  experienced a decline of 10.7% in sales in 2007 and a decline of 4.3% in sales in 2008. The

10  Debtors strongly believe that they continue to have a viable and profitable business. The

11  Debtors' fundamental business plan is to restructure or reject a number of their unfavorable

12  leases and executory contracts so that they are left with only profitable locations, and to

13  restructure their existing debt through a confirmed plan of reorganization.

14

15  C.    The Debtors' General Asset Base and Debt Description.

16        1.    Assets.

17
18  Cash. On the Petition Date, FB California had a total of approximately $32,931 of cash

19  on hand, and FB Nevada had a total of approximately $26,934 of cash on hand.

20  Inventory. On the Petition Date, FB California had a total of approximately $83,348 of

21  perishable goods inventory at its restaurants, and FB Nevada had a total of approximately

22  $79,929 of perishable goods inventory at its restaurants.

23
24  Equipment. The Debtors have used equipment and related assets at each of their

25  restaurants with a total estimated book value of approximately $1,185,911 (broken down as

26  approximately $642,671 for FB California and $543,240 for FB Nevada). The Debtors believe

27

28

that the fair market value of this equipment and related assets is approximately $50,000 per restaurant, which amounts to approximately $1,400,000 at all twenty-eight (28) restaurants).

Real Estate. As described above, FB Nevada owns certain real estate with an estimated fair market value of approximately $2.5 million although the real properties in question appear to be fully or nearly encumbered.

Restaurants. The primary value of the assets of both FB California and FB Nevada consists of the restaurants that they own, which have a substantial but unknown value.

Other Assets. The Debtors have certain other assets as identified on their bankruptcy schedules including certain deposits, accounts receivable, trademarks and intangibles, vehicles, office equipment, sound and security equipment, signage, and leasehold improvements.

2.    Debts.

The Debtors' largest and primary creditor is GE, which as of the Petition Date the Debtors believe was owed a total of approximately $3,563,107 by the Debtors. GE's debt is secured by a first priority lien against certain of the Debtors' equipment. In addition, GE's debt is also secured by the "goods" at certain restaurants on the Petition Date.

In addition to the Debtors' debt to GE, the Debtors estimate that they have a total of approximately $3.9 million of additional (potentially) secured debt and approximately $4.6 million of unsecured debt.

Attached as Exhibit "1" to the annexed Declaration of Jacqueline L. Rodriguez, Esq. (the "Rodriguez Declaration") are copies of the UCC financing statements recorded against FB California as of April 1, 2009, and attached as Exhibit "2" to the Rodriguez Declaration are copies of the UCC financing statements recorded against FB Nevada as of April 1, 2009. Attached as Exhibits "3" and "4" to the Rodriguez Declaration, respectively, are charts

14

1    summarizing the information contained in the Debtors' Schedule D's for FB California and FB

2    Nevada, which were recently filed with the Court on or about May 8, 2009 as part of the

3    Debtors' Bankruptcy Schedules.

4
5    D.    The Debtors' Need for DIP Financing and Summary of Proposed DIP Loan.

6        The Debtors collectively currently generate approximately $24 million of revenue per

7    year.  A copy of the Debtors' operating budgets for April, May and June, 2009 ("Budget" or

8    "Budgets") are collectively attached as Exhibit "3" to the annexed Declaration of Harold Fox.

9    The April Budget is not a complete monthly budget because the Petition Date fell during the

10   middle part of the month.  While the May Budget is a complete monthly budget, it does not

11   include a limited amount of pre-petition percentage rent which came due in April.  The June

12   Budget is a complete monthly budget and provides a good overview of the present state of the

13   Debtors' finances.

14

15       While the Debtors' businesses are profitable, the Debtors are substantially under-

16   capitalized.  The Debtors have only a small amount of cash in the bank, which is insufficient

17   liquidity for businesses of this size.  Moreover, the Debtors believe that they have a great

18   product and concept to offer customers, but do not have a sufficient amount of money or cash

19   flow to advertise in a manner to maintain and hopefully increase their revenue, while their

20   competitors spend a substantial amount of money advertising.  The Debtors must have funds to

21   increase substantially the amount of their advertising to remain competitive with their

22   competitors.  The Debtors also want to have sufficient liquidity to make sure they are able to

23   make all of their post-petition lease payments on a timely basis and to have sufficient funds

24   available to them to fund the cure amounts that the Debtors will ultimately have to pay to

25   assume their leases, which statutorily must occur by the latest of 210 days after the Petition

26

27

28

15

1  Date unless the landlords agree otherwise. Finally, the Debtors want to make sure that they

2  have sufficient funds to pay for the administrative costs of these bankruptcy estates, including

3

4  the professional fees and expenses of counsel to the Debtors and the Creditors' Committee.

5  Since the commencement of these Chapter 11 cases, the Debtors (in conjunction with

6  their non-debtor affiliates) have been actively engaged in seeking DIP financing. In that

7  regard, the Debtors have spent a considerable amount time discussing possible DIP Financing

8  and facilitated due diligence efforts with a number of prospective lenders, and the Debtors and

9  their non-debtor affiliates have been assisted in this process by a local investment bank known

10

11  as FocalPoint Partners. After extensive efforts, the best DIP financing proposal the Debtors

12  the Debtors have received is a proposal for the Debtors to borrow up to $2.2 million from

13  Signature Capital Partners (or its designee – "Signature") on a secured basis in accordance

14  with the terms of the Letter of Intent ("LOI") attached as Exhibit "1" to the annexed

15  Declaration of Harold Fox.

16

17  As set forth in the LOI, the Debtors and Signature have agreed that Signature will

18  receive a first priority lien against all of the Debtors' unencumbered assets (with the exception

19  of avoidance causes of action against which Signature will not receive any lien), and Signature

20  will receive a junior lien against all of the Debtors' encumbered assets. As a result, the

21  contemplated financing with Signature does not involve the "priming" of any existing

22  perfected liens.

23

24  As set forth in the LOI, Signature will earn a closing fee, which means that the $2.2

25  million loan will result in net loan proceeds being paid to the Debtors of $2 million. Interest

26  will accrue on the loan at the rate of 15% per annum with interest-only payments to be made

27  by the Debtors (in the amount of $27,500 per month). The loan shall have an initial term of 12

28

16

1    months with a commitment to roll the loan into a post-confirmation loan with a total term of

2    two years in the event of the confirmation of a plan of reorganization, which is the Debtors'

3    intention.

4

5        As also set forth in the LOI, concurrently with the consummation of this financing,

6    certain non-debtor affiliates of the Debtors will also be borrowing $1,650,000 from Signature

7    those affiliates will be guaranteeing Signature's loan to the Debtors. This is very important as

8    Signature has advised the Debtors that it would likely not be willing to make this loan without

9    this affiliate guaranty. The guaranty is only one-directional, meaning that the Debtors are not

10   in turn guaranteeing the loan to the non-debtor affiliates.

11

12       Signature is requiring a Good Faith Deposit of $50,000 to fund Signature's due

13   diligence expenses. The Debtors and the non-debtor affiliates have agreed to share the cost of

14   this Good Faith Deposit (and any other reasonable expenses which must be paid to Signature)

15   on a proportional basis (which translates into the Debtors funding approximately 57% of the

16   cost of this Good Faith Deposit, which translates into a payment of $28,500).

17

18       In addition, FocalPoint has earned a fee of $50,000 for finding a DIP lender for the

19   Debtors and the non-debtor affiliates. The Debtors and the non-debtor affiliates have agreed to

20   share the cost of this fee on a proportional basis (which translates into the Debtors funding

21   approximately 57% of the cost of this fee, which translates into a payment of $28,500). The

22   Debtors are in the process of filing an employment application for the investment banker.

23

24       The Debtors believe that the DIP financing proposal from Signature is the best

25   financing option available to the Debtors. However, the Debtors have extensively negotiated

26   and received an acceptable proposal from an alternative lender located in Texas known as

27   Adjacent Opportunity Capital, L.L.C. ("Adjacent"). A copy of the Adjacent letter of intent is

28

17

1    attached as Exhibit "2" to the annexed Declaration of Harold Fox. If the Signature DIP

2    financing fails to consummate for whatever reason, the Debtors intend to proceed with

3    attempting to consummate a DIP financing arrangement with Adjacent. In order to avoid any

4
     additional time delay to the Debtors' ability to consummate financing, given the importance of
5
     the financing, the Debtors are seeking Court authority at this time to enter into and perform in
6

7    accordance with the proposal with Adjacent if Signature fails to consummate its financing.

8    The Debtors would file a written notice with the Court if this should occur.

9                                          **II.**

10                                    **DISCUSSION**

11

12   A.    <u>The Standard for Obtaining Secured Credit Pursuant to 11 U.S.C. § 364(c)</u>.

13          Pursuant to Section 364 of the Bankruptcy Code, the Court may, after notice and a

14   hearing, grant authority to a trustee or debtor in possession to obtain credit or incur a debt

15   secured by a lien on property of the estate. Section 364(c) of the Bankruptcy Code provides, in

16   pertinent part, as follows:

17
              If the trustee is unable to obtain unsecured unsecured debt
18
              allowable under section 503(b)(1) of this title as an administrative
19
20            expense, the court, after notice and a hearing, may authorize the

21            obtaining of credit or the incurring of debt – (1) with priority over

22            any or all administrative expenses of the kind specified in section

23            503(b) or 507(b) of this title; (2) secured by a lien on property of
24
              the estate that is not otherwise subject to a lien; or (3) secured by a
25
26            junior lien on property of the estate that is subject to a lien.

27   11 U.S.C. § 364(c).

28
                                          18

Section 364(d) of the Bankruptcy Code authorizes the granting of senior (or commonly referred to as "priming") liens against property of the estate, senior even to existing liens, under certain circumstances.

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to obtain credit during the postpetition period. In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d. Cir. 1989); In re Southern Soya, Corp., 251 B.R. 302, 307 (Bankr. D.S.C. 2000); In re Ames Department Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Therefore, where a trustee or debtor in possession cannot otherwise obtain unsecured postpetition credit, such credit may be obtained on a secured basis under certain carefully proscribed conditions. In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr.N.D.Ill.1991); In re Ames Department Stores, Inc., 115 B.R. at 37. For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval, after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364 (d). In re Photo Promotion Associates, Inc., 87 B.R. at 839; see Resolution Trust Corp. v. Official Unsecured Creditors Committee (In re Defender Drug Stores, Inc.), 145 B.R 312, 317 (9th Cir. BAP 1992).

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b) i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower

19

1    and the proposed lender. In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987);

2    see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

3
     In addition to the foregoing, a debtor in possession seeking subordination of liens to
4
5    new financing must establish adequate protection of the liens to be subordinated to the new

6    financing. 11 U.S.C. § 364(d)(1)(B); In re C.B.G. Ltd., 150 B.R. 570, 571 (Bankr. M.D.Pa.

7    1992).

8        1.    The Debtors Have Satisfied the First Standard Because the Debtors Are Not
9    Able to Obtain Unsecured Credit.
10
     After extensive conversations and dialogue with numerous prospective lenders over the
11
12   past approximately six weeks, it is clear that as is typical in a Chapter 11 bankruptcy case, no

13   lender is willing to provide the Debtors with their needed DIP financing on an unsecured basis,

14   with allowing the lender only an administrative claim.

15
         2.    The Terms of the Proposed DIP Financing are Fair, Reasonable and Adequate.
16
17       The Debtors submit that the terms of the DIP financing proposed by Signature (and by

18   Adjacent if the DIP financing with Signature is not consummated) are fair, reasonable and

19   adequate given the circumstances of the Debtors and the proposed DIP lender.    As is

20   commonly known, it is extremely difficult for anybody to obtain financing in the current

21   economy, let alone debtors in chapter 11.  Most lenders who would even consider providing a

22
     chapter 11 debtor with DIP financing require a senior lien against all assets to securitize that
23
24   loan. Here, after extensive negotiations, Signature has agreed to provide the Debtors with DIP

25   financing without priming any existing lien holders.   The Debtors believe that under the

26   circumstances, the terms of the DIP financing are fair and reasonable and are the best terms

27   that have been offered to the Debtors.

28

20

1    The Debtors' management is comprised of sophisticated individuals who have every

2    incentive to obtain the least expensive financing available. None of the Debtors nor the non-

3    debtor affiliates, nor any of their principals has any prior connection with Signature or with

4
5    Adjacent. Indeed, both of those entities were introduced to the Debtors and the non-debtor

6    affiliates by FocalPoint as there was no previous relationship. As a result, there is no insider

7    connection whatsoever between the Debtors and the non-debtor affiliates, on the one hand, and

8    Signature (and Adjacent if applicable), on the other hand. Further, the Debtors are benefiting

9    from the debt guaranty being provided by the non-debtor affiliates, which Signature was

10   requiring as a condition to providing the Debtors with DIP financing.

11

12    The Debtors must obtain this DIP financing if they are to remain competitive in an

13   extremely competitive marketplace where the Debtors' competitors spend substantial sums of

14   money on advertising. The Debtors also need the DIP financing to make sure that they can

15   comply with all of their post-petition obligations to landlords and to other administrative

16   claimants in these cases. In summary, the Debtors believe that there is no question that the

17   proposed DIP financing is in the overwhelming best interests of these estates.

18

19   B.    The Procedural Requirements Regarding Approval of this Emergency Motion Have

20         Been Satisfied.

21    Pursuant to Bankruptcy Rule 4001(c)(1)(C), the Debtors are required to serve a copy of

22   this Emergency Motion on the Creditors' Committee, and any other entity that the Court

23   directs. The Debtors have complied with the foregoing by serving a copy of this Emergency

24   Motion by email on counsel to the Creditors' Committee and by first-class mail to the United

25   States Trustee, all parties who have requested special notice, and all lien holders.

26

27

28

# III.

# CONCLUSION

Based upon all of the foregoing, the Debtors respectfully request that the Court enter an order:

1.      granting this Emergency Motion;

2.      authorizing the Debtors to borrow up to $2.2 million from Signature Capital Partners (or its designee – "Signature") on a secured basis in accordance with the terms of the Letter of Intent ("LOI") attached as Exhibit "1" to the annexed Declaration of Harold Fox, including entering into the LOI and consummating the DIP financing contemplated by the LOI, including entering into the documents related to such DIP financing;

3.      authorizing the Debtors to grant to Signature to secure the Debtors' obligations to Signature under the DIP financing a first priority lien against all of the Debtors' unencumbered assets (with the exception of avoidance causes of action against which Signature will not receive any lien), and a junior lien against all of the Debtors' encumbered assets;

4.      authorizing the Debtors to pay to Signature their proportionate share of the Good Faith Deposit of $50,000 to fund Signature's due diligence expenses (and any other reasonable expenses which must be paid to Signature), which translates into the Debtors funding approximately 57% of the cost of this Good Faith Deposit, equating to a payment of $28,500;

5.      authorizing the Debtors to pay their proportionate share of the $50,000 fee owing to the local investment banker for finding a DIP lender for the Debtors and the non-

22

1   debtor affiliates, which translates into the Debtors funding approximately 57% of the cost of

2   this fee, equating to a payment of $28,500;

3          6.      authorizing the Debtors to pursue the DIP financing with Adjacent in the event

4
    the Signature DIP financing fails to consummate; and
5

6          7.      granting such other and further relief as the Court deems just and proper.

7   Dated: May 15, 2009                        Fatburger Restaurants of California, Inc.;
                                               Fatburger Restaurants of Nevada, Inc.
8

9
                                        By:_____
10                                          Ron Bender
                                           Jacqueline L. Rodriguez
11                                         Juliet Y. Oh
                                           LEVENE, NEALE, BENDER,
12                                         RANKIN & BRILL L.L.P.
                                           Proposed Attorneys for
13                                         Chapter 11 Debtors and Debtors
                                           in Possession
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF HAROLD FOX

2

I, Harold Fox, hereby declare as follows:

3

4

1.      I have personal knowledge of the facts set forth herein, and, if called as a

5

witness, could and would testify competently with respect thereto.

6

2.      On April 7, 2009 (the "Petition Date"), Fatburger Restaurants of California, Inc.

7

("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and together with

8

FB California, the "Debtors"), the debtors and debtors in possession in the above-captioned

9

chapter 11 bankruptcy cases, filed voluntary petitions under Chapter 11 of the Bankruptcy

10

11

Code.   The Debtors continue to operate their business, manage their financial affairs and

12

operate their bankruptcy estates as debtors in possession.  I am the Chief Financial Officer and

13

Secretary of both of the Debtors.

14

3.      The Debtors are presently the owner-operators of twenty-eight (28) Fatburger

15

restaurants located in California and Nevada.   FB California presently owns and operates

16

17

fifteen (15) restaurants in California and has approximately 285 employees.   FB Nevada

18

presently owns and operates thirteen (13) Fatburger restaurants in Nevada, employs

19

approximately 205 employees, and owns two parcels of developed real property in Nevada.

20

The Debtors' revenue is derived from sales at their respective restaurants.   In 2008, the

21

Debtors had combined annual revenue of approximately $26 million, approximately $14

22

million of which was generated by FB California and approximately $12 million of which was

23

generated by FB Nevada.

24

25

4.      The Debtors are part of a larger Fatburger enterprise which, as of the Petition

26

Date, consisted of approximately 90 restaurants in 14 states as well as 3 foreign countries

27

(Canada, Dubai and China).   The Debtors are both wholly-owned subsidiaries of an entity

28

called Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger Holdings, Inc. ("FB Holdings"). FB Holdings serves only as a holding company and does not have any employees. FB Corp. houses the Fatburger enterprise's corporate activities and has approximately 31 employees. Another wholly-owned subsidiary of FB Corp, Fatburger North America, Inc. ("FB North America") does not own or operate any restaurants and does not have any employees, but serves as the franchisor entity for the Fatburger enterprise and collects royalty and marketing fees from all Fatburger franchisees.

5.     The Fatburger enterprise was started in 1952 by Lovie Yancey ("Yancey") and Charles Simpson ("Simpson") as "Mr. Fatburger" with one hamburger stand in South Central Los Angeles that catered to African-American musicians who needed a place that served good food, late at night. The first burger stand proved so successful that Yancey and Simpson soon opened three more locations. In 1973, Yancey and Simpson parted ways, and Yancey renamed her restaurants "Fatburger" and opened a restaurant in Beverly Hills. In 1980, Yancey began franchising the Fatburger concept. By the end of 1985, the chain had 32 locations, 4 of which were company-owned, and it was named the fifth largest growing hamburger franchise chain by "Entrepreneur" magazine, trailing only McDonald's, Burger King, Wendy's and Jack in the Box.

6.     In or around 1990, Yancey sold her interests in the Fatburger enterprise to a group of investors led by Island Trading Co., a New York investment firm ("Island Trading"), and FB Corp. was created to effectuate the buyout. By the end of 1997, Fatburger had 29 restaurants (that were neither fast food restaurants nor full-service diners), of which 12 were company-owned, but management wanted to expand much further. Nevertheless, for a variety of reasons, that expansion was delayed.

25

7.    In 2001, former basketball-star-turned-entrepreneur Earvin "Magic" Johnson stepped forward, and one of his companies and several other investors acquired the Fatburger enterprise from Island Trading. At that point, Keith Warlick ("Warlick") became Fatburger's Chief Executive Officer and President, and the enterprise continued to expand into new geographical areas.

8.    Beginning in 2003, Portland, Oregon-based Fog Cutter began acquiring its current equity interests in FB Holdings through a series of transactions. As of the Petition Date, Fog Cutter owned 83% of the voting power in FB Holdings. There are also a few minority holders of preferred and common stock including Warlick, the former President and Chief Executive Officer of the Fatburger enterprise.

9.    In 2008, the Debtors had combined annual revenue of approximately $26 million, approximately $14 million of which was generated by FB California and approximately $12 million of which was generated by FB Nevada.

10.   Despite its impressive growth, the Debtors and their affiliates began to experience financial problems as a result of: (1) a shortage in available restaurant financing, and (2) a decline in same store sales over the past three years. For years, the Debtors and their affiliates used General Electric Capital Franchise Finance Corporation and/or GE Capital Business Asset Funding Corporation ("GE") as a source of financing. During the past few years, the Debtors and their affiliates entered into a number of lease and other agreements relating to the opening of new restaurants (explained in detail more below). However, approximately two years ago, GE decided to substantially reduce its financing of small-to-medium restaurant companies in response to the deteriorating U.S. and world economic climate, and the Debtors and their affiliates were no longer able to use GE as a source of

financing. In addition, the Debtors and their affiliates were not able to find alternate financing and were forced to finance the expenses related to constructing and equipping their new restaurants that they had already committed to building from their existing cash flow. This strain on existing cash flow caused the Debtors to start getting behind on their accounts payable and landlord obligations.

11.    Additionally, during the past two years the Debtors' same store sales began to decline as a result of the general slowdown in the U.S. economy. The Debtors and their affiliates experienced a decline of 10.7% in sales in 2007 and a decline of 4.3% in sales in 2008. The Debtors strongly believe that they continue to have a viable and profitable business. The Debtors' fundamental business plan is to restructure or reject a number of their unfavorable leases and executory contracts so that they are left with only profitable locations, and to restructure their existing debt through a confirmed plan of reorganization.

12.    The Debtors' Primary Assets Consist of the following:

Cash. On the Petition Date, FB California had a total of approximately $32,931 of cash on hand, and FB Nevada had a total of approximately $26,934 of cash on hand.

Inventory. On the Petition Date, FB California had a total of approximately $83,348 of perishable goods inventory at its restaurants, and FB Nevada had a total of approximately $79,929 of perishable goods inventory at its restaurants.

Equipment. The Debtors have used equipment and related assets at each of their restaurants with a total estimated book value of approximately $1,185,911 (broken down as approximately $642,671 for FB California and $543,240 for FB Nevada). The Debtors believe that the fair market value of this equipment and related assets is approximately $50,000 per restaurant, which amounts to approximately $1,400,000 at all twenty-eight (28) restaurants).

1    <u>Real Estate</u>.  As described above, FB Nevada owns certain real estate with an estimated

2    fair market value of approximately \$2.5 million although the real properties in question appear

3    to be fully or nearly encumbered.

4    <u>Restaurants</u>.  The primary value of the assets of both FB California and FB Nevada

5    consists of the restaurants that they own, which have a substantial but unknown value.

6

7    <u>Other Assets</u>.  The Debtors have certain other assets as identified on their bankruptcy

8    schedules including certain deposits, accounts receivable, trademarks and intangibles, vehicles,

9    office equipment, sound and security equipment, signage, and leasehold improvements.

10   13.    <u>Debts</u>.

11

12   The Debtors' largest and primary creditor is GE, which as of the Petition Date the

13   Debtors believe was owed a total of approximately \$3,563,107 by the Debtors.  GE's debt is

14   secured by a first priority lien against certain of the Debtors' equipment.  In addition, GE's

15   debt is also secured by the "goods" at certain restaurants on the Petition Date.  In addition to

16   the Debtors' debt to GE, the Debtors estimate that they have a total of approximately \$3.9

17   million of additional (potentially) secured debt and approximately \$4.6 million of unsecured

18   debt.

19

20   14.    The Debtors collectively currently generate approximately \$24 million of

21   revenue per year.  A copy of the Debtors' operating budgets for April, May and June, 2009

22   ("Budget" or "Budgets") are collectively attached hereto as Exhibit "3".  The April Budget is

23   not a complete monthly budget because the Petition Date fell during the middle part of the

24   month.  While the May Budget is a complete monthly budget, it does not include a limited

25   amount of pre-petition percentage rent which came due in April.  The June Budget is a

26

27

28

complete monthly budget and provides a good overview of the present state of the Debtors' finances.

15.    While the Debtors' businesses are profitable, the Debtors are substantially under-capitalized.  The Debtors have only a small amount of cash in the bank, which is insufficient liquidity for businesses of this size.  Moreover, the Debtors believe that they have a great product and concept to offer customers, but do not have a sufficient amount of money or cash flow to advertise in a manner to maintain and hopefully increase their revenue, while their competitors spend a substantial amount of money advertising.  The Debtors must have funds to increase substantially the amount of their advertising to remain competitive with their competitors.  The Debtors also want to have sufficient liquidity to make sure they are able to make all of their post-petition lease payments on a timely basis and to have sufficient funds available to them to fund the cure amounts that the Debtors will ultimately have to pay to assume their leases, which I understand statutorily must occur by the latest of 210 days after the Petition Date unless the landlords agree otherwise.  Finally, the Debtors want to make sure that they have sufficient funds to pay for the administrative costs of these bankruptcy estates, including the professional fees and expenses of counsel to the Debtors and the Creditors' Committee.

16.    Since the commencement of these Chapter 11 cases, the Debtors (in conjunction with their non-debtor affiliates) have been actively engaged in seeking DIP financing.  In that regard, the Debtors have spent a considerable amount of time discussing possible DIP Financing and facilitated due diligence efforts with a number of prospective lenders, and the Debtors and their non-debtor affiliates have been assisted in this process by a local investment bank known as FocalPoint Partners.  After extensive efforts, the best DIP

financing proposal the Debtors the Debtors have received is a proposal for the Debtors to borrow up to $2.2 million from Signature Capital Partners (or its designee – "Signature") on a secured basis in accordance with the terms of the Letter of Intent ("LOI") attached hereto as Exhibit "1".

17. As set forth in the LOI, the Debtors and Signature have agreed that Signature will receive a first priority lien against all of the Debtors' unencumbered assets (with the exception of avoidance causes of action against which Signature will not receive any lien), and Signature will receive a junior lien against all of the Debtors' encumbered assets. As a result, the contemplated financing with Signature does not involve the "priming" of any existing perfected liens.

18. As set forth in the LOI, Signature will earn a closing fee, which means that the $2.2 million loan will result in net loan proceeds being paid to the Debtors of $2 million. Interest will accrue on the loan at the rate of 15% per annum with interest-only payments to be made by the Debtors (in the amount of $27,500 per month). The loan shall have an initial term of 12 months with a commitment to roll the loan into a post-confirmation loan with a total term of two years in the event of the confirmation of a plan of reorganization, which is the Debtors' intention.

19. As also set forth in the LOI, concurrently with the consummation of this financing, certain non-debtor affiliates of the Debtors will also be borrowing $1,650,000 from Signature those affiliates will be guaranteeing Signature's loan to the Debtors. This is very important as Signature has advised the Debtors that it would likely not be willing to make this loan without this affiliate guaranty. The guaranty is only one-directional, meaning that the Debtors are not in turn guaranteeing the loan to the non-debtor affiliates.

20.    Signature is requiring a Good Faith Deposit of $50,000 to fund Signature's due diligence expenses. The Debtors and the non-debtor affiliates have agreed to share the cost of this Good Faith Deposit (and any other reasonable expenses which must be paid to Signature) on a proportional basis (which translates into the Debtors funding approximately 57% of the cost of this Good Faith Deposit, which translates into a payment of $28,500).

21.    In addition, FocalPoint has earned a fee of $50,000 for finding a DIP lender for the Debtors and the non-debtor affiliates. The Debtors and the non-debtor affiliates have agreed to share the cost of this fee on a proportional basis (which translates into the Debtors funding approximately 57% of the cost of this fee, which translates into a payment of $28,500). The Debtors are in the process of filing an employment application for the investment banker.

22.    I believe that the DIP financing proposal from Signature is the best financing option available to the Debtors. However, the Debtors have extensively negotiated and received an acceptable proposal from an alternative lender located in Texas known as Adjacent Opportunity Capital, L.L.C. ("Adjacent"). A copy of the Adjacent letter of intent is attached hereto as Exhibit "2". If the Signature DIP financing fails to consummate for whatever reason, the Debtors intend to proceed with attempting to consummate a DIP financing arrangement with Adjacent. In order to avoid any additional time delay to the Debtors' ability to consummate financing, given the importance of the financing, the Debtors are seeking Court authority at this time to enter into and perform in accordance with the proposal with Adjacent if Signature fails to consummate its financing. The Debtors would file a written notice with the Court if this should occur.

23.    After extensive conversations and dialogue with numerous prospective lenders over the past approximately six weeks, it is clear that as is typical in a Chapter 11 bankruptcy case, no lender is willing to provide the Debtors with their needed DIP financing on an unsecured basis, with allowing the lender only an administrative claim.

24.    I submit that the terms of the DIP financing proposed by Signature (and by Adjacent if the DIP financing with Signature is not consummated) are fair, reasonable and adequate given the circumstances of the Debtors and the proposed DIP lender.    As is commonly known, it is extremely difficult for anybody to obtain financing in the current economy, let alone debtors in chapter 11. Most lenders who would even consider providing a chapter 11 debtor with DIP financing require a senior lien against all assets to securitize that loan. Here, after extensive negotiations, Signature has agreed to provide the Debtors with DIP financing without priming any existing lien holders. I believe that under the circumstances, the terms of the DIP financing are fair and reasonable and are the best terms that have been offered to the Debtors.

25.    The Debtors' management (including me) is comprised of sophisticated individuals who have every incentive to obtain the least expensive financing available. None of the Debtors nor the non-debtor affiliates, nor any of their principals, has any prior connection with Signature or with Adjacent. Indeed, both of those entities were introduced to the Debtors and the non-debtor affiliates by FocalPoint as there was no previous relationship. As a result, there is no insider connection whatsoever between the Debtors and the non-debtor affiliates, on the one hand, and Signature (and Adjacent if applicable), on the other hand. Further, the Debtors are benefiting from the debt guaranty being provided by the non-debtor

affiliates, which Signature was requiring as a condition to providing the Debtors with DIP financing.

26.     I believe that the Debtors must obtain this DIP financing if they are to remain competitive in an extremely competitive marketplace where the Debtors' competitors spend substantial sums of money on advertising.  The Debtors also need the DIP financing to make sure that they can comply with all of their post-petition obligations to landlords and to other administrative claimants in these cases.  In summary, I believe that there is no question that the proposed DIP financing is in the overwhelming best interests of these estates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of May, 2009 at Santa Monica, California.

HAROLD FOX

33