RON BENDER (SBN 143364)
JACQUELINE L. RODRIGUEZ (SBN 198838)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:   rb@lnbrb.com, jlr@lnbrb.com, jyo@lnbrb.com

Attorneys for Chapter 11 Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>FATBURGER RESTAURANTS OF CALIFORNIA, INC., *et al.*,<br><br>Debtors. | ) Case No. 1:09-bk-13964-GM<br>)<br>) Chapter 11<br>)<br>) Jointly Administered with Case<br>) No.<br>) 1:09-bk-13965-GM<br>) |
| _____   Affects Fatburger Restaurants of California, Inc. Only | ) DISCLOSURE          STATEMENT<br>) DESCRIBING DEBTORS' JOINT PLAN<br>) OF    REORGANIZATION    (DATED<br>) NOVEMBER 3, 2009)<br>) |
| _____   Affects Fatburger Restaurants of Nevada, Inc. Only | ) Disclosure Statement Hearing:<br>) Date:      December 15, 2009<br>) Time:      10:00 a.m.<br>) |
| _X_   Affects Both Debtors | ) Plan Confirmation Hearing:<br>) Date:     [To Be Scheduled]<br>) Time:     [To Be Scheduled]<br>)<br>) Place: Courtroom "303"<br>)         21041 Burbank Blvd.<br>)         Woodland Hills, CA<br>) |

# TABLE OF CONTENTS

I.   INTRODUCTION...........................................2

    A. PURPOSE OF THIS DISCLOSURE STATEMENT .................3

    B. DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN
       CONFIRMATION HEARING .................................4

       1. Time and Place of the Plan Confirmation Hearing.....4

       2. Deadline For Voting For or Against the Plan........5

       3. Deadline for Objecting to the Confirmation of
          the Plan.........................................5

    C. IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION
       REGARDING THE PLAN ..................................5

    D. DISCLAIMER .........................................6

II.  BACKGROUND............................................6

    A. DESCRIPTION AND HISTORY OF THE DEBTORS' BUSINESS
       AND A SUMMARY OF THE CIRCUMSTANCES THAT LED TO THE
       FILING OF THE DEBTORS' CHAPTER 11 CASES ..............6

    B. SIGNIFICANT EVENTS DURING THE DEBTORS'
       BANKRUPTCIES ........................................10

       1. Formation of the Committee and Employment
          Of Counsel.......................................10

       2. Use of Cash Collateral and the GE Secured Debt ....11

       3. Post-Petition Financing ...........................17

       4. Emergency (First-Day) Motions ....................22

          i. Emergency Motion for Joint Administration of
            these Chapter 11 Bankruptcy Cases ..............22

          ii. Emergency Motion to Continue Using the
            Debtors' Cash Management Systems ..............22

          iii. Emergency Motion to Provide Adequate Assurance
            of Payment to the Debtor' Utilities ...........23

i

iv. Emergency Motion to Pay the Debtors'
    Pre-Petition Priority Wages and Benefits .......23

v.  Emergency Motion to Limit Notice ...............24

vi. Emergency Motion to Extend Time to File
    Bankruptcy Schedules and Statements of
    Financial Affairs ..............................24

5. Insider Compensation................................25

6. Real Property Leases................................27

   a. The Baldwin Hills Lease .........................31
   b. The Granada Hills Lease..........................32
   c. The Sherman Oaks Lease. .........................32
   d. The Hollywood Lease. ............................33
   e. The Morongo Casino Lease ........................33
   f. The West Hollywood Lease ........................34
   g. The Thunder Valley Casino Lease .................34
   h. The Red Rock Station Casino Lease ..............35
   i. The Fiesta Henderson Casino Lease. .............35

   California Leases

   a. The Redondo Beach Lease .........................38
   b. The Woodland Hills Lease ........................39
   c. The Orange Lease ................................40
   d. The Palm Springs Lease ..........................41
   e. The Rancho Cucamonga Lease ......................42
   f. The Newport Beach Lease .........................42

7. Administrative Matters..............................47

8. Employment of Professionals........................48

9. Litigation Matters.................................48

C. The Debtors' Current Financial Condition and
   Future Business Prospects ..........................49

III. PLAN SUMMARY........................................53

IV.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS....57

     A. What Creditors and Interest Holders Will Receive
        Under the Plan ................................57

ii

B. Unclassified Claims ................................. 57

   1. Administrative Expenses........................... 57

   2. Priority Tax Claims.............................. 62

C. Classified Claims and Interests ..................... 63

   1. Classes of Secured Claims........................ 63

   2. Classes of Priority Unsecured Claims.............. 68

   3. Class of General Unsecured Claims................. 68

   4. Class of Interest Holders......................... 71

D. Means of Effectuating the Plan and Implementation
   of the Plan ....................................... 72

   1. Funding for the Plan............................. 72

   2. Composition of the Reorganized Debtor............. 74

   3. Post-Confirmation Management...................... 74

   4. Disbursing Agent................................. 80

   5. Objections to Claims............................. 80

   6. Avoidance Actions................................ 81

   7. Employment of Professionals by the Reorganized
      Debtor and Payment of Professional Fees and
      Expenses Incurred after the Effective Date........ 82

   8. Post-Confirmation Committee....................... 82

   9. Exemption from Transfer Taxes..................... 83

   10.  Distributions to be Made Pursuant to the Plan ... 83

   11.  Exculpations and Releases ...................... 84

   12.  Injunctions .................................... 84

   13.  Executory Contracts and Unexpired Leases ....... 85

iii

14. Changes in Rates Subject to Regulatory
Commission Approval.................................87

15. Retention of Jurisdiction ......................87

V.     TAX CONSEQUENCES OF THE PLAN...........................89

VI.    CONFIRMATION REQUIREMENTS AND PROCEDURES...............97

       A. Who May Vote or Object ...............................98

       B. Who May Vote to Accept/Reject the Plan ..............98

       C. What Is an Allowed Claim/Interest ...................98

       D. What Is an Impaired Claim/Interest ..................99

       E. Who Is Not Entitled to Vote ........................100

       F. Who Can Vote in More Than One Class ................101

       G. Votes Necessary to Confirm the Plan ................101

       H. Votes Necessary for a Class to Accept the Plan ......101

       I. Treatment of Non-accepting Classes .................102

       J. Request for Confirmation Despite Nonacceptance by
          Impaired Class(es) .................................102

       K. Liquidation Analysis ...............................102

       L. Feasibility ........................................108

VII.   RISK FACTORS REGARDING THE PLAN.......................109

VIII.  EFFECT OF CONFIRMATION OF THE PLAN....................110

       A. Discharge ..........................................110

       B. Modification of the Plan ...........................110

       C. Post-Confirmation Status Reports ...................111

       D. Post-Confirmation Conversion/Dismissal .............111

       E. Final Decree .......................................111

# I. __INTRODUCTION__

Fatburger Restaurants of California, Inc. ("FRC") and Fatburger Restaurants of Nevada, Inc. ("FRN" and, collectively with FRC, the "Debtors"), the Debtors and Debtors in Possession in the above-referenced chapter 11 bankruptcy cases, are the Debtors in pending chapter 11 bankruptcy cases.  On April 7, 2009 (the "Petition Date"), the Debtors commenced these bankruptcy cases by filing Voluntary Petitions under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. ("Bankruptcy Code").  One Official Committee of Unsecured Creditors (the "Committee") has been formed to represent the interests of all of the unsecured creditors in both bankruptcy cases.  This document is the Disclosure Statement which describes the Debtors' Joint Plan of Reorganization ("Plan") that is being jointly proposed by the Debtors.

Chapter 11 allows the Debtors, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization.  The Plan is a joint plan of reorganization which has been jointly proposed by the Debtors. The effective date of the Plan (the "Effective Date") will be April 15, 2010 provided that all of the following conditions to the effectiveness of the Plan have been satisfied or waived by the Debtors: (a) the Court has entered an order confirming the Plan (the "Plan Confirmation Order"); (b) there shall not be any stay in effect with respect to the Plan Confirmation Order; (c)

the Plan Confirmation Order shall not be subject to any appeal or rehearing; and (d) the Plan and all documents, instruments and agreements to be executed in connection with the Plan shall have been executed and delivered by all parties to such documents, instruments and agreements.

On the Plan Effective Date, FRC will be deemed to be merged into and substantively consolidated with FRN, with the post-confirmation substantively consolidated entity to be referred to herein as the "Reorganized Debtor".

**A.    Purpose of this Disclosure Statement**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)  WHO CAN VOTE OR OBJECT,**

**(2)  WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

**(3)  THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR BANKRUPTCY CASES,**

**(4)  WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)  WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6) WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

**1. Time and Place of the Plan Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan (the "Plan Confirmation Hearing") will take place on _____, 2010, at __:__ a.m., before the

Honorable Geraldine Mund, United States Bankruptcy Judge for the Central District of California, in Courtroom "301" located at 21041 Burbank Boulevard, Woodland Hills, California.

### 2. Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067.

Your ballot must be received by 5:00 p.m., PST, on _____, 2010 or it will not be counted.

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must, by _____, 2010, be filed with the Court and served by same day service upon Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, fax: (310) 229-1244, email: rb@lnbrb.com.

## C. Identity of Persons to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067; phone: (310) 229-1234; fax: (310) 229-1244; email: jyo@lnbrb.com.

D.    **Disclaimer**

The financial data relied upon in formulating the Plan is based on the Debtors' books and records which, unless otherwise indicated, are unaudited. The information contained in this Disclosure Statement is provided by the Debtors. The Debtors represent that everything stated in this Disclosure Statement is true to the Debtors' best knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

## II. BACKGROUND

A.    **Description and History of the Debtors' Business and a Summary of the Circumstances that Led to the Filing of the Debtors' Chapter 11 Cases**

The Debtors are presently the owner-operators of twenty-eight (28) Fatburger restaurants located in California and Nevada. FRC presently owns and operates fifteen (15) restaurants in California and has approximately 285 employees. FRN presently owns and operates thirteen (13) Fatburger restaurants in Nevada, employs approximately 205 employees, and owns two parcels of developed real property in Nevada. The Debtors' revenue is derived from sales at their respective restaurants. In 2008, the Debtors had combined annual revenue of approximately $26 million, approximately $14 million of which

was generated by FRC and approximately $12 million of which was generated by FRN.

The Debtors are part of a larger Fatburger enterprise which, as of the Petition Date, consisted of approximately 90 restaurants in 14 states as well as 4 foreign countries (Canada, Dubai, China and Indonesia).  The Debtors are both wholly-owned subsidiaries of an entity called Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger Holdings, Inc. ("FB Holdings").  FB Holdings serves only as a holding company and does not have any employees.  FB Corp. houses the Fatburger enterprise's corporate activities and has approximately 30 employees.  Another wholly-owned subsidiary of FB Corp., Fatburger North America, Inc. ("FB North America"), does not own or operate any restaurants and does not have any employees, but serves as the franchisor entity for the Fatburger enterprise and collects royalty and marketing fees from all Fatburger franchisees.

The Fatburger enterprise was started in 1952 by Lovie Yancey ("Yancey") and Charles Simpson ("Simpson") as "Mr. Fatburger" with one hamburger stand in South Central Los Angeles that catered to African-American musicians who needed a place that served good food, late at night.  The first burger stand proved so successful that Yancey and Simpson soon opened three more locations.  In 1973, Yancey and Simpson parted ways, and Yancey renamed her restaurants "Fatburger" and opened a restaurant in Beverly Hills.  In 1980, Yancey began franchising

1  the Fatburger concept.  By the end of 1985, the chain had 32

2  locations, 4 of which were company-owned, and it was named the

3  fifth largest growing hamburger franchise chain by

4  "Entrepreneur" magazine, trailing only McDonald's, Burger King,

5  Wendy's and Jack in the Box.

6      In or around 1990, Yancey sold her interests in the

7  Fatburger enterprise to a group of investors led by Island

8  Trading Co., a New York investment firm, and FB Corp. was

9  created to effectuate the buyout.  By the end of 1997, Fatburger

10 had 29 restaurants (that were neither fast food restaurants nor

11 full-service diners), of which 12 were company-owned.

12     In 2001, a company affiliated with former basketball-star-

13 turned-entrepreneur Earvin "Magic" Johnson along with other

14 investors acquired the Fatburger enterprise from Island Trading

15 Co.  At that point, Keith Warlick became Fatburger's Chief

16 Executive Officer and President, and the enterprise continued to

17 expand into new geographical areas.

18     Beginning in 2003, Portland, Oregon-based Fog Cutter

19 Capital Group Inc. ("Fog Cutter") began acquiring its current

20 equity interests in FB Holdings through a series of

21 transactions.  As of the Petition Date, Fog Cutter owned 83% of

22 the voting power in FB Holdings.  Andrew A. Wiederhorn is the

23 Chairman and Chief Executive Officer and primary shareholder of

24 Fog Cutter.  There are also a few minority holders of preferred

25 and common stock of FB Holdings, including Mr. Warlick.

1    Mr. Wiederhorn is the Chairman of the Board of both

2 Debtors.    Donald J. Berchtold is the President and Chief

3 Operating Officer of both Debtors.    Jason Melvin is the Chief

4 Financial Officer and Secretary of both Debtors.

5    Despite impressive growth, the Debtors and their affiliates

6 began to experience financial problems as a result of: (1) a

7 shortage in available restaurant financing, and (2) a decline in

8 same store sales over the past three years.    For years, the

9 Debtors and their affiliates used General Electric Capital

10 Franchise Finance Corporation and/or GE Capital Business Asset

11 Funding Corporation ("GE") as a financing source.    During the

12 past few years, the Debtors and their affiliates entered into a

13 number of lease and other agreements relating to the opening of

14 new restaurants.    However, approximately two years ago, GE

15 decided to substantially reduce its financing of small-to-medium

16 restaurant companies in response to the deteriorating U.S. and

17 world economic climate, and the Debtors and their affiliates

18 were no longer able to use GE as a financing source.    The

19 Debtors and their affiliates were not able to find alternate

20 financing and were forced to finance the expenses related to

21 constructing and equipping their new restaurants that they had

22 already committed to building from their existing cash flow.

23 This strain on existing cash flow caused the Debtors to fall

24 behind on their accounts payable and real property lease

25 obligations.

Additionally, during the past two years the Debtors and their affiliates experienced a comparable same store sales decline as a result of the general slowdown in the U.S. economy. The Debtors and their affiliates experienced a comparable same store sales decline of approximately 10.1% in 2007 and approximately 3.7% in 2008.

The Debtors' cash flow constraints placed them in a position where they were unable to pay their debts as they came due, which necessitated the filing of the Debtors' chapter 11 bankruptcy cases. While the Debtors required the protection of chapter 11 to provide them with the opportunity to reorganize, the Debtors strongly believe that they continue to have a viable and profitable business.

**B.    Significant Events During the Debtors' Bankruptcies**

The following is a list of significant events which have occurred during the Debtors' chapter 11 cases:

**1.    Formation of the Committee and Employment of Counsel**

The Office of the United States Trustee (the "OUST") appointed one Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the unsecured creditors in both the FRC and FRN bankruptcy cases. There are seven members of the Committee consisting of Puritan Bakery; DeBilio Food Distributors; Manhattan Place, Inc.; Industrial Plaza LLC; Hoxsie's Equipment; Frontier Music; and Image Systems Signs. The Committee employed Landau & Berger LLP as bankruptcy

counsel, with Rodger M. Landau, Esq. serving as lead counsel.
Mr. Landau's contact information is as follows:   Rodger M.
Landau, Esq., Landau & Berger LLP, 1801 Century Park East, Suite
1460, Los Angeles, California 90067, phone: (310) 557-0050; fax:
(310) 557-0056; email: RLandau@lblawllp.com.

   **2.   <u>Use of Cash Collateral and the GE Secured Debt</u>**

The Debtors, along with certain of their non-debtor
affiliates, are parties to that certain "Amended and Restated
Promissory Note" with GE dated September 20, 2004 (the "Primary
GE Promissory Note").   Pursuant to the Primary GE Promissory
Note, the Debtors (along with certain of their non-debtor
affiliates) owed GE the total sum of approximately
$4,435,325.66.[1]   The Debtors (along with certain of their non-
debtor affiliates) paid down some of their indebtedness to GE
under the Primary GE Promissory Note.   As of the Petition Date,
the Debtors estimate that the total outstanding indebtedness
owing to GE under the Primary GE Promissory Note was
approximately $3,469,668.   As of the Petition Date, the Debtors
(along with their co-obligor non-debtor affiliates) were in
default of their obligations to GE under the Primary GE
Promissory Note, resulting from the Debtors' cash flow problems.

---

[1] On June 22, 2005, the Debtors (along with their co-obligor non-
debtor affiliates) entered into that certain "Amendment to Loan
Documents" under which the maximum loan amount from GE was increased
from $4,435,325.66 to $4,785,325.66.

To securitize their obligations under the Primary GE Promissory Note, the Debtors (along with their co-obligor non-debtor affiliates) entered into that certain "Amended and Restated Loan and Security Agreement" with GE also dated September 20, 2004 (the "Primary GE Security Agreement"). GE's collateral consists primarily of equipment located at certain of the Debtors' restaurants, consisting of ten (10) restaurants owned by FRC and eight (8) restaurants owned by FRN. GE perfected its security interest in the collateral by filing (a) that certain UCC-1 Financing Statement with the California Secretary of State on September 29, 2004 at document no. 04-1006543831, and (b) that certain UCC-1 Financing Statement with the Nevada Secretary of State on September 29, 2004 at document no. 2004029800-9.

In addition to the Primary GE Promissory Note, FRC is also a party to that certain "Equipment Promissory Note" with GE dated July 22, 2003 (the "Secondary GE Promissory Note"). Pursuant to the Secondary GE Promissory Note, FRC owed GE the total sum of approximately $290,000. FRC paid down some of its indebtedness to GE under the Secondary GE Promissory Note. As of the Petition Date, the Debtors estimate that the total outstanding indebtedness owing to GE under the Secondary GE Promissory Note was approximately $93,346. However, as of the Petition Date, FRC was in default of its obligations to GE under

12

the Secondary GE Promissory Note, resulting from the Debtors'
cash flow problems.

To securitize its obligations under the Secondary GE
Promissory Note, FRC entered into that certain "Loan and
Security Agreement" with GE dated May 22, 2003 (the "Secondary
GE Security Agreement"; the Secondary GE Security Agreement and
the Primary GE Security Agreement are collectively referred to
herein as the "GE Security Agreements"). GE's collateral
consists primarily of equipment located at the Thunder Valley
Casino, 1200 Athens Avenue, Lincoln, California 95648. GE
perfected its security interest in the collateral by filing that
certain UCC-1 Financing Statement with the California Secretary
of State on June 5, 2003 at document no. 0315760701, with a
continuation statement having been filed by GE with the
California Secretary of State on January 11, 2008 as document
no. 08-71432916. All of GE's various loan agreements, security
agreements and financing statements, and any all documents
related thereto, are collectively referred to herein as the "GE
Loan Documents".

On the Petition Date, the Debtors had understood that the
scope of GE's collateral was limited to equipment and similar
types of assets located at the participating restaurants. Since
the Debtors had not sold, and were not in the process of
selling, any such equipment, none of the Debtors' cash consisted
of the proceeds from the sale of such equipment. As a result,

13

on the Petition Date, the Debtors did not believe that GE had any interest in or lien against any of the Debtors' cash or operating funds. However, subsequent to the Petition Date, GE advised the Debtors that GE considers the reference to "goods" in the GE Security Agreements to include the food which existed at the participating restaurants on the Petition Date and the proceeds from the sale of that food to constitute GE's cash collateral. The Debtors estimate that the total amount of "goods" at all of their restaurants was in the approximate amount of $163,277 on the Petition Date, so the estimated value of the "goods" which served as GE's collateral on the Petition Date has to be somewhat less than this amount. The Debtors do not believe that any other creditor asserts any interest in the Debtors' cash.

The Debtors and GE negotiated and reached an agreement for the Debtors' consensual use of cash collateral. As part of that agreement, and as additional adequate protection for GE, the Debtors proposed to make a monthly payment to GE in the total amount of $25,000 (broken down proportionately by restaurant number as 56% for FRC and 44% for FRN), commencing with the month of June, 2009.

An initial hearing on the Debtors' motion for approval of their cash collateral agreement with GE was held on May 28, 2009. The Committee filed an opposition to the Debtors' agreement with GE, particularly with regard to the proposed

$25,000 monthly payment.  At the May 28, 2009 hearing, the Court authorized the Debtors to use cash collateral on an interim basis and ordered the Debtors to impound the $25,000 monthly payments in a segregated account pending a further Court order. The Court scheduled a continued cash collateral hearing to be held on August 14, 2009.  The Court also ordered the parties to determine the fair market value of the GE equipment during the interim.

Prior to the hearing on August 14, 2009, the Debtors, the Committee and GE were able to reach an agreement on a cash collateral stipulation which was acceptable to all of them, resolving the Debtors' operating budgets for the months of August and September, 2009, as well as the issue of the GE adequate protection payments.  In that stipulation, the parties agreed that the Debtors would pay to GE the sum of $12,500 per month as adequate protection payments for the Debtors' use of GE's collateral, with the first payment to be made to GE by July 15, 2009 in the amount of $37,500 for the payments due and owing for May 2009, June 2009 and July 2009.  Pursuant to the stipulation, the Debtors are required to continue to make those monthly payments to GE until the earlier of (i) April 1, 2010, or (ii) the effective date of plans of reorganization for the Debtors.  The August/September budgets included advertising and marketing expenses totaling $100,000 (*i.e.*, $25,000 per month for each of the Debtors).

At the initial cash collateral hearing held on May 28, 2009, the Debtors also obtained Court authority to borrow money (discussed below).  The Court ordered that the Debtors were not authorized to spend any of the post-petition financing proceeds absent Court authority to spend those funds.  After the Debtors' financing closed, the Debtors sought Court approval to spend money on "Advertising and Marketing" and "Capital Expenditures".

At a continued cash collateral hearing held on June 10, 2009, the Court authorized the Debtors to spend a portion of their financing proceeds as follows:  (i) FRC was authorized to spend up to $100,000 for "Advertising and Marketing" in June 2009 and to spend up to $75,000 for "Advertising and Marketing" in July 2009; (ii) FRN was authorized to spend up to $50,000 for "Advertising and Marketing" in June 2009 and to spend up to $25,000 for "Advertising and Marketing" in July 2009; (iii) FRC was authorized to spend up to $50,000 for "Capital Expenditures"" in June 2009 and to spend up to $50,000 for "Capital Expenditures" in July 2009; and (iv) FRN was authorized to spend up to $50,000 for "Capital Expenditures" in June 2009 and up to $50,000 for "Capital Expenditures" in July 2009. Ultimately, the Debtors spent only a small fraction of these budgeted amounts – collectively, the Debtors spent less than $50,000 for "Advertising and Marketing" and less than $10,000 for "Capital Expenditures" in June and July 2009.  However, many of the Debtors' restaurants required painting and some immediate repairs.    In  addition,  beginning  in  October,  the  Debtors

intended to begin an extensive remodel of the restaurant located in Redondo Beach, California. As a result, the Debtors sought authority to spend a total of $45,000 in the month of October 2009 (*i.e.*, $25,000 for FRC, and $20,000 for FRN) on those capital expenditures.

At a hearing held on September 2, 2009, the Court approved a revised September, 2009 budget for the Debtors. At a hearing held on September 29, 2009, the Court approved the Debtors' October, 2009 operating budgets and continued use of cash collateral, and the Court scheduled the next cash collateral hearing to be held on October 27, 2009. The October, 2009 budgets included capital expenditures totaling $45,000. These capital expenditures are necessary for the Debtors to begin repainting many of their restaurants and remodeling the restaurant located in Redondo Beach, California. At a hearing held on October 27, 2009, the Court approved the Debtors' November, 2009 operating budgets and continued use of cash collateral, and the Court scheduled the next cash collateral hearing to be held on November 24, 2009. The November, 2009 budgets included capital expenditures totaling $50,000.

### 3.  Post-Petition Financing

While the Debtors' businesses are profitable, at the time of their bankruptcy filings, the Debtors were substantially under-capitalized and did not have sufficient liquidity. The Debtors also wanted to make sure that they had sufficient liquidity to make all of their post-petition lease payments on a

timely basis and sufficient funds available to them to fund the

cure amounts that the Debtors were required to pay to assume

their leases, which statutorily had to occur within 210 days

after the Petition Date unless the landlords agreed otherwise.

The Debtors also wanted to provide themselves with funds to pay

for at least a portion of the administrative costs of these

bankruptcy estates, including the professional fees and expenses

of counsel to the Debtors and the Committee.

Since the commencement of their chapter 11 cases, the

Debtors (in conjunction with their non-debtor affiliates) have

been actively engaged in seeking post-petition financing to help

solve the Debtors' liquidity shortfall.   In that regard, the

Debtors spent a considerable amount time discussing possible

post-petition financing with a number of prospective lenders,

and were assisted in this process by a local investment bank

known as FocalPoint Partners.   After extensive efforts, the best

post-petition financing proposal the Debtors received was a

proposal for the Debtors to borrow up to $2.2 million from

Signature Capital Partners (or its designee – "Signature") on a

secured basis.

The agreement reached between the Debtors and Signature was

for Signature to receive a first priority lien against all of

the Debtors' unencumbered assets (with the exception of

avoidance causes of action against which Signature will not

receive any lien), and for Signature to receive a junior lien

against all of the Debtors' encumbered assets.   As a result, the

contemplated financing with Signature did not involve the "priming" of any existing perfected liens.

The agreement was for Signature to earn a 10% closing fee, which meant that the $2.2 million loan would result in net loan proceeds being paid to the Debtors of $2 million. Interest would accrue on the loan at the rate of 15% per annum with interest-only payments to be made by the Debtors. The loan would have an initial term of 12 months with a commitment to roll the loan into a post-confirmation loan with a total term of two years in the event of the confirmation of a plan of reorganization acceptable to Signature. Signature also required payment of a $50,000 good faith deposit, which the Debtors agreed to share on a proportional basis with their non-debtor affiliates who were also seeking to close a concurrent loan from Signature. The Debtors and their non-debtor affiliates also agreed to share on a proportional basis the $50,000 investment banking fee that FocalPoint Partners had earned. Finally, Signature required the non-debtor affiliates to guaranty Signature's loan to the Debtors.

At a hearing held on May 28, 2009, the Court authorized the Debtors to obtain the post-petition financing with Signature. After completing its due diligence, Signature agreed to proceed with providing the Debtors with post-petition financing, subject to two material changes from the initial letter of intent.

First, the letter of intent provided for there to be a term loan of $1,200,000 and a revolving loan of $1,000,000 and a

closing fee of $200,000.  The final loan agreements provided for a term loan of $1,100,000 and a revolving loan of $1,100,000. The final loan agreements also provided for Signature to advance to the Debtors at the closing the cash sum of $1,000,000 on the term loan and to charge a reduced closing fee of $100,000, and then to charge a further closing fee of 10% of any advances obtained by the Debtors under the revolving loan.  The Debtors believe that this change was of a substantial benefit as the Debtors were now required to pay the 10% closing fee only on funds actually borrowed, as compared to the original loan terms which required the Debtors to pay the 10% closing fee on all committed funds, regardless of whether they were actually borrowed.

Second, the letter of intent provided that upon the successful confirmation of the Debtors' plan of reorganization and upon payment of a $350,000 fee, Signature had agreed to provide a $3,850,000 combined credit line to the Debtors and their non-debtor affiliates on terms substantial similar to the existing loans, with the term of that loan to be 12 months plus any time left on the original one-year term of the bankruptcy loan.  That post-confirmation loan commitment in the letter of intent was contingent upon, among other things, confirmation of a plan of reorganization acceptable to Signature in all respects.  This $3,850,000 was computed as the $2 million (net) loan to the Debtors, a $1.5 million (net) loan to the non-debtor affiliates, and the $350,000 post-confirmation loan fee.

The letter of intent was never intended to provide the Debtors with additional funds post-confirmation. Rather, it was intended to enable the Debtors to roll their $2 million loan into a post-confirmation loan. However, since the Debtors' ability to roll their loan into a post-confirmation loan was always subject to the plan of reorganization being acceptable to Signature in all respects, it was never a true commitment since Signature always had an "out" by simply claiming that the Debtors' plan of reorganization was not acceptable to Signature. Ultimately, Signature elected to lend only $380,000 to the non-debtor affiliates, and Signature decided that it was not willing to commit to providing the Debtors with any post-confirmation financing or to enabling the Debtors to roll the existing loan into a post-confirmation loan. While Signature orally made clear to the Debtors that this is something that Signature was open to discussing with the Debtors, Signature was not making any such commitment to the Debtors at that time. The Debtors did not believe that this was any material issue since, as described above, Signature's obligation to enable the Debtors to roll their loan into a post-confirmation was always subject to Signature's approval of the Debtors' plan of reorganization. The one-year term of the Debtors' loan is unchanged but now becomes due and payable upon the confirmation of a plan of reorganization unless Signature permits the Debtors to roll their loan into a post-confirmation loan.

The Debtors and the Committee were ultimately able to reach agreement on the terms of the Signature post-petition financing consistent with that set forth above. As part of this agreement, the Debtors agreed to impound $500,000 from the Signature loan to make sure those funds were available to cover the amounts necessary to assume and cure defaults under the Debtors' non-residential real property leases. The post-petition financing from Signature closed and funded on or about June 30, 2009. The entire amount of the term loan was immediately funded by Signature. The Debtors never borrowed any money from Signature under the revolving loan.

**4.    Emergency (First-Day) Motions**

The Debtors filed a total of 6 first-day emergency motions dealing with various operations issues. The following is a summary of them.

**i.    Emergency Motion for Joint Administration of these Chapter 11 Bankruptcy Cases**

At the commencement of these cases, the Debtors filed an emergency motion for authority to jointly administer their chapter 11 bankruptcy cases. The Court granted this emergency motion at a hearing held on April 10, 2009.

**ii. Emergency Motion to Continue Using the Debtors' Cash Management Systems**

At the commencement of these cases, the Debtors filed an emergency motion to (a) continue using the Debtors' existing cash management systems, (b) maintain and continue to use

several of the Debtors' existing bank accounts, and (c) order all banks who may have placed administrative freezes or holds on the Debtors' accounts as a result of the bankruptcy filings (or for any other reason) to immediately release such holds and/or freezes.   The Court granted this emergency motion at a hearing held on April 10, 2009.

### iii.  Emergency Motion to Provide Adequate Assurance of Payment to the Debtor' Utilities

At the commencement of these cases, the Debtors filed an emergency motion for an order authorizing the Debtors to provide adequate assurance of future payment to certain utility companies pursuant to Section 366(c) of the Bankruptcy Code. The Court granted this emergency motion at a hearing held on April 10, 2009 by authorizing the Debtors to provide adequate assurance of payment to the various utility companies in the form of cash deposits in the amounts proposed by the Debtors. The Court deemed the amounts of those deposits to constitute adequate assurance of payment to the utility companies, and the Court prohibited the utilities from altering, refusing, or discontinuing utility services on account of any debts owed by the Debtors to the utility companies for services rendered pre-petition.

### iv.  Emergency Motion to Pay the Debtors' Pre-Petition Priority Wages and Benefits

At the commencement of these cases, the Debtors filed an emergency motion for authority to pay the Debtors' pre-petition

priority wages and related benefits in the ordinary course of business to avoid the disruption to the Debtors' business from failing to do so. The Court granted the Debtors' emergency wage motion at a hearing held on April 10, 2009. The Court authorized the Debtors to pay and/or honor all pre-petition priority wages, including all applicable federal and state withholding taxes and payroll taxes, to their employees (not to exceed $10,950 to any employee). The Court also authorized the Debtors to honor any outstanding checks for wages issued pre-petition to their employees and to issue replacement checks to the extent necessary to pay such wages. The Court also authorized the Debtors to honor the employees' accrued vacation and leave benefits in the ordinary course of business.

### v.    Emergency Motion to Limit Notice

At the commencement of these cases, the Debtors filed an emergency motion for authority to limit notice of certain matters requiring notice to creditors and equity security holders in the Debtors' pending chapter 11 cases. The Court granted the Debtors' emergency motion at a hearing held on April 10, 2009.

### vi.  Emergency Motion to Extend Time to File Bankruptcy Schedules and Statements of Financial Affairs

At the commencement of these cases, the Debtors filed an emergency motion for authority to extend the deadline by when the Debtors were required to file their bankruptcy schedules of assets and liabilities and their statements of financial

24

affairs.   The Court granted the Debtors' emergency motion at a
hearing held on April 10, 2009 and extended the Debtors'
deadline to May 8, 2009.   The Debtors ultimately filed their
bankruptcy schedules of assets and liabilities and statements of
financial affairs in a timely manner.

     **5.   <u>Insider Compensation</u>**

At the commencement of these cases, the Debtors filed a
number of forms for authority to pay the wages and benefits of
various "insiders" of the Debtors, including FB Corp., Donald J.
Berchtold, Jacob Berchtold, Warren Christiansen, David Dale-
Johnson, Harold Fox, Bentley C. Hetrick, Elaine Patel, Victor
Santillan, Robert J. Schuster and Andrew A. Wiederhorn.
Objections were filed by the Committee, Industrial Plaza, LLC,
and Westside Properties 1, LLC to certain of the Debtors'
insider compensation requests.

At a hearing held on May 11, 2009, the Court authorized the
Debtors to provide monthly compensation to the following
insiders (whose compensation was uncontested) in the following
amounts:

| Insider | FRC | FRN | Total |
|---------|-----|-----|-------|
| FB Corp.[2] | $58,245 | $112,225 | $170,470 |
| Harold Fox | $7,853 | $7,853 | $15,706 |

---

[2] The "compensation" proposed to be paid to FB Corp. consisted of the
Debtors' allocated shares of corporate operating expenses including,
among other things, compensation for non-insider corporate employees,
travel and marketing, bankruptcy professional fees, etc.

| Insider | FRC | FRN | Total |
|---|---|---|---|
| Bentley C. Hetrick | $5,811 | $5,811 | $11,622 |
| Elaine Patel | $2,269 | $2,269 | $4,538 |
| Victor Santillan | $5,250 | $5,250 | $10,500 |

In addition, at the hearing held on May 11, 2009, the Court authorized the Debtors to provide monthly compensation to the following insiders whose compensation was contested (the "Contested Insiders") on an interim basis in the following amounts:

| Insider | FRC | FRN | Total |
|---|---|---|---|
| Donald J. Berchtold | $7,805 | $7,805 | $15,610 |
| Jacob Berchtold | $2,889 | $2,889 | $5,778 |
| Warren Christiansen | $4,342 | $4,342 | $8,684 |
| David Dale-Johnson | $7,883 | $7,883 | $15,766 |
| Robert J. Schuster | $1,435 | $1,435 | $2,870 |
| Andrew A. Wiederhorn | $9,355 | $9,355 | $18,710 |

The Court scheduled a continued hearing regarding the compensation of the Contested Insiders to be held on July 13, 2009. The Debtors and the Committee agree to continue the hearing on the Contested Insiders' compensation while the Committee conducted certain discovery, including taking the

depositions of Mr. Fox and Mr. Wiederhorn. The Debtors and the Committee ultimately reached an agreement regarding the compensation of the Contested Insiders, obviating the need for any further contested hearing.

The Debtors subsequently filed an insider compensation request for Jason Melvin, the newly hired Chief Financial Officer, which was approved without objection, and the Debtors modified the employment and compensation terms of Mr. Fox (the former Chief Financial Officer), ultimately by stipulation with the Committee.

### 6. **Real Property Leases**

As of the Petition Date, the Debtors were operating out of or otherwise in possession of thirty one (31) restaurant locations in California and Nevada pursuant to various non-residential real property lease agreements, consisting of seventeen (17) restaurant locations in California, and fourteen (14) restaurant locations in Nevada.

Prior to the Petition Date, the Debtors reviewed all of their lease agreements in conjunction with restaurant performance, and made preliminary assessments regarding the restaurants that should be closed. As a result of such assessments, the Debtors determined it was in the best interest of their estates to reject certain of their real property leases. Accordingly, shortly after the Petition Date, the Debtors filed a motion seeking authority to reject two leases for restaurants located in Irvine, California and Corona,

California, as well as a lease for an unopened restaurant in Las Vegas, Nevada. On May 18, 2009, the Court entered an order granting the foregoing lease rejection motion.

Following the rejection of the foregoing three leases, the Debtors were parties to real property leases for the remaining twenty-eight (28) locations in California and Nevada, consisting of fifteen (15) restaurant locations in California, and thirteen (13) restaurant locations in Nevada. The Debtors have remained substantially current on their payments of post-petition rents and other obligations due and payable under the remaining twenty-eight (28) leases.

On July 8, 2009, the Debtors filed a motion seeking the entry of an order extending the time for the Debtors to assume or reject their unexpired non-residential real property leases. On August 18, 2009, the Court entered an order granting the Debtors' motion and extending the deadline by which the Debtors were required to assume or reject their non-residential real property leases to and including November 3, 2009.

One of the Debtors' real property leases expired by its own terms. Specifically, the real property lease between FRN and LD Nellis, LLC, pursuant to which FRN leased the premises located at 2485 South Nellis Blvd., Las Vegas, Nevada 89121, expired and therefore was not assumed by FRN. However, FRN and the Nellis landlord negotiated and documented the terms of a new real property lease for the Nellis premises (the "New Nellis Lease"), which was submitted to the Court for approval pursuant to a

motion filed by FRN on September 30, 2009. On October 26, 2009, the Court entered an order granting the foregoing motion and authorized FRN to enter into the New Nellis Lease.

The Debtors rejected another one of their real property leases pursuant to a separate motion. After reviewing the performance of its restaurant located at 1218 Third Street Promenade, Santa Monica, California (the "Promenade Premises"), FRC determined that the immediate rejection of its unexpired real property lease for that restaurant was necessary and appropriate. Accordingly, on September 18, 2009, FRC filed a motion seeking authority to (i) reject the lease for the Promenade Premises in accordance with the terms of a stipulation entered into with the landlord for such premises, and (ii) enter into a new real property lease for retail restaurant space located on the new third-level rooftop dining deck in the renovated Santa Monica Place shopping mall (which location is slated to open in approximately August 2010). The Court entered an order granting the foregoing motion on October 9, 2009.

Excluding the Nellis lease, which expired by its own terms, and the Promenade lease, which FRC rejected, the Debtors are currently parties to twenty six (26) unexpired non-residential real property leases.[3]

---

[3] This figure excludes the New Nellis Lease and FRC's new real property lease for the retail restaurant space located in the renovated Santa Monica Place shopping mall.

On or about September 23, 2009, the Debtors filed a motion to assume, and cure defaults under, nine (9) of the Debtors' remaining real property leases (the "First Assumption Motion"), as follows:

**California Leases**

| Landlord | Address of Leased Premises |
|---|---|
| Capri Urban Baldwin, LLC<br>3650 Martin Luther King Blvd.<br>Los Angeles, CA 90008 | 4070 Marlton Ave.<br>Los Angeles, CA 90008<br>(Baldwin Hills location) |
| Devonshire, Ltd.<br>c/o ACF Property Mgmt.<br>12411 Ventura Blvd.<br>Studio City, CA 91604 | 16848 Devonshire St.<br>Granada Hills, CA 91344<br>(Granada Hills location) |
| Frances Rinck Estate<br>Partnership<br>P.O. Box 5571<br>Santa Barbara, CA 93150 | 14402 Ventura Blvd.<br>Sherman Oaks, CA 90401<br>(Sherman Oaks location) |
| Bernstein's International<br>Food Service, Inc.<br>860 Mission Creek Dr.<br>Palm Desert, CA 92211 | 1611 N. Vermont Ave.<br>Hollywood, CA 90027<br>(Hollywood location) |
| Morongo Band of Mission<br>Indians<br>11581 Potrero Road<br>Banning, CA 92220 | 49500 Seminole Drive<br>Cabazon, CA 92230<br>(Morongo Casino location) |
| Sakae Sueyoshi, *et al.*<br>7515 W. Norton Avenue<br>Hollywood, CA 90046 | 7450 Santa Monica Blvd.<br>West Hollywood, CA 90046<br>(West Hollywood location) |
| United Auburn Indian<br>Community d/b/a Thunder<br>Valley Casino<br>1200 Athens Avenue<br>Lincoln, CA 95648 | 1200 Athens Avenue<br>Lincoln, CA 95648<br>(Thunder Valley Casino location) |

**Nevada Leases**

| Landlord | Address of Leased Premises |
|---|---|

| Charleston Station, LLC<br>11011 W. Charleston Blvd.<br>Las Vegas, NV 89135 | 11011 W. Charleston Blvd.<br>Las Vegas, NV 89135<br>(Red Rock location) |
| Lake Mead Station, Inc.<br>777 West Lake Mead Drive<br>Henderson, NV 89015 | 777 West Lake Mead Drive<br>Henderson, NV 89015<br>(Fiesta Henderson<br>location) |

At hearings held on October 14, 2009 and October 28, 2009, the Court granted the Debtors' First Assumption Motion and authorized the Debtors to assume and cure defaults under the foregoing nine leases.  Detailed summaries of each of the nine leases that the Debtors assumed in connection with the First Assumption Motion are set forth below:

a.  **The Baldwin Hills Lease**.  On or about February 14, 1995, FRC entered into a written lease agreement with Alexander Haagen Properties Operating Partnership, L.P., the predecessor in interest to the current landlord, Capri Urban Baldwin, LLC, whereby FRC leased the premises located at 4070 Marlton Avenue, Los Angeles, California 90008 (the "Baldwin Hills Lease").  Pursuant to the Baldwin Hills Lease, FRC leased the premises for a term of ten years, with three successive options to extend the term of the lease for a period of five years each.  Following litigation between the parties regarding the Baldwin Hills Lease, FRC and the Baldwin Hills landlord executed a Lease Reinstatement Agreement and a Confession to Judgment Statement in March 2009, which, among other things, established a new lease termination date of December 31, 2010 and provided FRC

with the right to lease new space at the Baldwin Hills premises for one five-year term at then prevailing market rates. The current monthly base rent due and payable under the Baldwin Hills Lease is $4,950.00. In addition, the Baldwin Hills Lease provides for the payment of 5% of FRC's gross sales to the extent that the 5% of gross sales exceeds the base rent amount, which has historically never occurred. Under the Baldwin Hills Lease, FRC is also responsible for payment of its share of certain common area maintenance ("CAM") charges, real property taxes and insurance expenses.

b. **The Granada Hills Lease**. On or about March 14, 1995, FRC entered into a written lease agreement with Devonshire, LTD., whereby FRC leased the premises located at 16848 Devonshire Street, Granada Hills, California 91344 (the "Granada Hills Lease"). FRC and the Granada Hills landlord subsequently entered into an Addendum and a First Amendment to the Granada Hills Lease. The First Amendment to the Granada Hills Lease provided for the extension of the lease term to March 31, 2010, with one option to further extend the term for a period of five years. The current monthly base rent due and payable under the Granada Hills Lease is $4,827.00. Under the Granada Hills Lease, FRC is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses.

c. **The Sherman Oaks Lease**. On or about October 1, 2002, FRC entered into a written lease agreement with Frances Rinck Estate Partnership, whereby FRC leased the premises located at

14402 Ventura Blvd., Sherman Oaks, California 90401 (the "Sherman Oaks Lease"). Pursuant to the Sherman Oaks Lease, FRC leased the premises for a term of five years, with two successive options to extend the term of the lease for a period of five years each. The current monthly base rent due and payable under the Sherman Oaks Lease is $5,061.11. Under the Sherman Oaks Lease, FRC is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses.

d. **The Hollywood Lease**. On or about November 30, 1990, FRC entered into a written sublease agreement with Bernstein's International Food Service, Inc., whereby FRC subleased the premises located at 1611 N. Vermont Avenue, Hollywood, California 90027 (the "Hollywood Lease"). Pursuant to the Hollywood Lease, FRC leased the premises for a term of ten years, with two successive options to extend the term of the lease for a period of ten years each. The current monthly base rent due and payable under the Hollywood Lease is $6,500.00. In addition, the Hollywood Lease provides for the payment of 10% of FRC's gross sales, which FRC estimates comes out to approximately $3,611.00 per month. Under the Hollywood Lease, FRC is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses.

e. **The Morongo Casino Lease**. In 2004, FRC entered into a written lease agreement with the Morongo Band of Mission Indians, whereby FRC leased the premises located at 49500

33

Seminole Drive, Cabazon, California 92230 (the "Morongo Casino Lease"). Pursuant to the Morongo Lease, FRC leased the premises for a term of five years, with four successive options to extend the term of the lease for a period of five years each. The current monthly base rent due and payable under the Morongo Casino Lease is $9,417.91.

f.    **The West Hollywood Lease.**  On or about August 1, 1993, FRC entered into a written lease agreement with Sakae (James) Sueyoshi, Hideko M. Sueyoshi, Edwin Sueyoshi, Osamu Sueyoshi and Hideko Sueyoshi, whereby FRC leased the premises located at 7450 Santa Monica Blvd., West Hollywood, California 90046 (the "West Hollywood Lease"). Pursuant to the West Hollywood Lease, FRC leased the premises for a term of ten years, with two successive options to extend the term of the lease for a period of ten years and five years, respectively. The current monthly base rent due and payable under the West Hollywood Lease is $4,000.00. Under the West Hollywood Lease, FRC is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses.

g.    **The Thunder Valley Casino Lease.**  On or about March 3, 2003, FRC entered into a written lease agreement with United Auburn Indian Community *dba* Thunder Valley Casino, whereby FRC leased the premises located at 1200 Athens Avenue, Lincoln, California 95648 (the "Thunder Valley Lease"). Pursuant to the Thunder Valley Lease, FRC leased the premises for a term of five years. The current monthly base rent due and payable under the

34

Thunder Valley Lease is $1,464.00.   In addition, the Thunder
Valley Lease provides for the payment of percentage rent as
follows:  6% of FRC's gross sales up to $1 million, 10% of FRC's
gross sales between $1 million and $1.5 million, and 15% of
FRC's gross sales in excess of $1.5 million.   Historically, the
amount of percentage rent payable to the Thunder Valley Landlord
was approximately $3,756.00 per month.   Under the Thunder Valley
Lease, FRC is also responsible for payment of its share of CAM
charges, real property taxes and insurance expenses.

     h.   **The Red Rock Station Casino Lease**.   On or about
October 15, 2004, FRN entered into a written lease agreement
with Charleston Station, LLC, whereby FRN leased the premises
located at 11011 W. Charleston Blvd., Las Vegas, Nevada 89135
(the "Red Rock Lease").   Pursuant to the Red Rock Lease, FRN
leased the premises for a term of five years, with three
successive options to extend the term of the lease for a period
of five years each.   The current monthly base rent due and
payable under the Red Rock Lease is $2,702.18.   In addition, the
Red Rock Lease provides for the payment of 11% of FRN's gross
sales, which FRN estimates comes out to approximately $8,475.00
per month.   Under the Red Rock Lease, FRN is also responsible
for payment of its share of CAM charges, real property taxes and
insurance expenses.

     i.   **The Fiesta Henderson Casino Lease**.   On or about March
8, 2007, FRN entered into a written lease agreement with Lake
Mead Station, Inc., whereby FRN leased the premises located at

35

777 West Lake Mead Drive, Henderson, Nevada 89015 (the "Fiesta Henderson Lease"). Pursuant to the Fiesta Henderson Lease, FRN leased the premises for a term of five years, with two successive options to extend the term of the lease for a period of five years each. The current monthly base rent due and payable under the Fiesta Henderson Lease is $3,093.75. In addition, the Fiesta Henderson Lease provides for the payment of 11% of FRN's gross sales, which FRN estimates comes out to approximately $2,571.00 per month. Under the Fiesta Henderson Lease, FRN is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses.

The following is a summary of the defaults under these nine leases, which the Debtors cured in connection with the Debtors' assumption of those leases:

**California Leases**

| Landlord | Lease | Default/Cure Amount |
|---|---|---|
| Capri Urban Baldwin, LLC | Baldwin Hills | $39,626.76 |
| Devonshire, Ltd. | Granada Hills | $28,286.32 |
| Frances Rinck Estate Partnership | Sherman Oaks | $1,180.93 |
| Bernstein's International Food Service, Inc. | Hollywood | $3,559.69 |
| Morongo Band of Mission Indians | Morongo Casino | $12,026.53 |
| Sakae Sueyoshi, *et al.* | West Hollywood | $30,837.33 |

| United Auburn Indian Community d/b/a Thunder Valley Casino | Thunder Valley Casino | $13,969.32 |
|---|---|---|
| | TOTAL: | $129,486.88 |

**Nevada Leases**

| Landlord | Lease | Default/Cure Amount |
|---|---|---|
| Charleston Station, LLC | Red Rock Casino | $29,825.61 |
| Lake Mead Station, Inc. | Fiesta Henderson | $9,025.30 |
| | TOTAL: | $38,850.91 |

These total cure payments of $168,337.79 (broken down as $129,486.88 for the FRC leases and $38,850.91 for the FRN leases) was funded out of the $500,000 of funds which were previously impounded from the proceeds of the post-petition financing obtained by the Debtors from Signature. The Debtors have remained current on all of their post-assumption obligations under these assumed leases.

In addition to the real property leases described above under which FRC is the lessee, FRC is also the named lessee under an additional six (6) real property leases. On or about October 6, 2009, FRC filed a motion to assume these remaining six leases (the "Second Assumption Motion"), as follows:

| Landlord | Address of Leased Premises |
|---|---|
| Daisy Ellis 300 South Arden Blvd. Los Angeles, CA 90020 | 1698 Pacific Coast Highway Redondo Beach, CA 90277 (Redondo Beach location) |

| Landlord | Address of Leased Premises |
|---|---|
| Duesenberg Investment Company 5990 Sepulveda Blvd., #200 Van Nuys, CA 91411 | 21911 Ventura Blvd. Woodland Hills, CA 91364 (Woodland Hills location) |
| OR Associates, LLC 9295 Chesapeake Drive, Suite D San Diego, CA 92123 | 2318 North Tustin Street, Suite C Orange, CA 92665 (Orange location) |
| PS Metro, LLC 4150 Long Beach Blvd. Long Beach, CA 90807 | 451 Paseo Dorotea Palm Springs, CA 92264 (Palm Springs location) |
| SCP Rancho I, LLC 23 Corporate Plaza, Suite 247 Newport Beach, CA 92660 | 11226 4th Street, Suite 101 Rancho Cucamonga, CA 91730 (Rancho Cucamonga location) |
| The Irvine Company 401 Newport Center Dr., #A-150 Newport Beach, CA 92660 | 401 Newport Center Dr., #A-103 Newport Beach, CA 92660 (Newport Beach location) |

At a hearing held on October 28, 2009, the Court granted the Second Assumption Motion and authorized FRC to assume and cure defaults under the foregoing six leases. Detailed summaries of each of the six leases that FRC assumed in connection with the Second Assumption Motion are set forth below:

a. **The Redondo Beach Lease**. On or about August 4, 1983, FRC's predecessor in interest, Hymie Shuter, Friends Fast Food, Inc. d/b/a FatBurger, entered into a written lease agreement with Mardi Rustam, the predecessor in interest to the current landlord, Daisy Ellis (the "Redondo Beach Landlord"), whereby FRC leased the premises located at 1698 Pacific Coast Highway, Redondo Beach, California 90277 (the "Redondo Beach Lease").

38

Subsequently, on or about January 26, 2000, FRC and the Redondo
Beach Landlord entered into an Addendum to the Redondo Beach
Lease, which provided for a renewal of the term of the lease for
a period of fifteen years, with one option to extend the lease
term for a period of five years. The current monthly base rent
due and payable under the Redondo Beach Lease is $11,051.09. In
addition, the Redondo Beach Lease provides for the payment of 6%
of FRC's gross sales to the extent that the 6% of gross sales
exceeds the base rent amount, which has historically never
occurred. FRC has reached an agreement with the Redondo Beach
Landlord to modify the Redondo Beach Lease to provide for the
landlord to contribute towards 50% of the cost of repairs and
capital improvements made to the Redondo Beach premises, with
the landlord contribution to be capped at $51,000, which
contribution will be made in the form of rent credits at $2,000
per month. FRC and the Redondo Beach Landlord have documented
these modifications to the Redondo Beach Lease to their
satisfaction. FRC assumed the Redondo Beach Lease subject to
the foregoing modifications.

b.   **The Woodland Hills Lease**. On or about February 15,
1994, FRC entered into a written lease agreement with Ventura &
Topanga Partners L.P., the predecessor in interest to the
current landlord, Duesenberg Investment Company (the "Woodland
Hills Landlord"), whereby FRC leased the premises located at
21911 Ventura Blvd., Woodland Hills, California 91364 (the
"Woodland Hills Lease"). Following the Petition Date, FRC and

39

the Woodland Hills Landlord entered into a stipulation, which was approved by the Court and which provides for the extension of the term of the Woodland Hills Lease to July 31, 2014. The current monthly base rent due and payable under the Woodland Hills Lease is $9,244.71. In addition, the Woodland Hills Lease provides for the payment of 6% of FRC's gross sales in excess of $1,695,734.00 per year, which has historically never occurred. Under the Woodland Hills Lease, FRC is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses.

c. **The Orange Lease**. On or about March 1, 2008, FB Corp., the Debtors' parent company, entered into a written lease agreement with OR Associates, LLC (the "Orange Landlord"), whereby FB Corp. leased the premises located at 2318 N. Tustin Street, Suite C, Orange, California 92665 (the "Orange Lease"). Pursuant to the Orange Lease, FB Corp. leased the premises for a term of ten years, with three successive options to extend the term of the lease for a period of five years each. Although FRC was not the original party to the Orange Lease, FRC contends that it is a *de facto* assignee or sublessee under the Orange Lease and/or is a "tenant at will" under California law. Since the outset of the Orange Lease, FRC has been the entity that has operated business at the Orange premises and taken responsibility for the payment of rent and other obligations under the Orange Lease. The Orange Landlord disputed FRC's contentions. Following the Petition Date, FRC and the Orange

40

1  Landlord entered into a settlement agreement, which was approved

2  by the Court at a hearing held on October 28, 2009.    That

3  settlement agreement provided, among other things, that FB Corp.

4  would pay all unpaid pre-petition amounts due under the Orange

5  Lease; FRC would assume the Orange Lease; FRC would be deemed a

6  party to the Orange Lease; and the Orange Lease would be

7  effective and enforceable as to both FB Corp. and FRC.    The

8  current monthly base rent due and payable under the Orange Lease

9  is $7,500.00.    Under the Orange Lease, FRC or FB Corp. is also

10  responsible for payment of its share of certain CAM charges,

11  real property taxes and insurance expenses.

12        d.   **The Palm Springs Lease**.    On or about June 7, 1993, FRC

13  entered into a written sublease agreement with National Bank of

14  Long Beach, the predecessor in interest to the current landlord,

15  PS Metro, LLC, whereby FRC subleased the premises located at 451

16  Paseo Dorotea, Palm Springs, California 92264 (the "Palm Springs

17  Lease").    Pursuant to the Palm Springs Lease, FRC leased the

18  premises for a term of fifteen years, with an option to extend

19  the term of the lease for a period of nineteen years.    The

20  current monthly base rent due and payable under the Palm Springs

21  Lease is $6,471.33.    In addition, the Palm Springs Lease

22  provides for the payment of 6.5% of FRC's gross sales to the

23  extent that the 6.5% of gross sales exceeds the base rent

24  amount, which has historically never occurred.    Under the Palm

25  Springs Lease, FRC is also responsible for payment of its share

of CAM charges, real property taxes and insurance expenses.

41

e.    **The Rancho Cucamonga Lease**.    On or about October 15, 2008, FB Cucamonga, Inc., a wholly-owned subsidiary of FRC which FRC believes has been merged into FRC, entered into a written lease agreement with SCP Rancho I, LLC, whereby FRC leased the premises located at 11226 4th Street, Suite 101, Rancho Cucamonga, California 91730 (the "Rancho Cucamonga Lease"). Pursuant to the Rancho Cucamonga Lease, FRC leased the premises for a term of one year, with two successive options to extend the term of the lease for a period of five years each.    The current monthly base rent due and payable under the Rancho Cucamonga Lease is $3,750.00.    Under the Rancho Cucamonga Lease, FRC is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses.

f.    **The Newport Beach Lease**.    On or about July 1, 2003, FRC entered into a written lease agreement with The Irvine Company (the "Newport Beach Landlord"), whereby FRC leased the premises located at 401 Newport Center Drive, Suite A-103, Newport Beach, California 92660 (the "Newport Beach Lease"). Pursuant to the Newport Beach Lease, FRC leased the premises for a term of ten years.    Following litigation between the parties regarding the Newport Beach Lease, FRC and the Newport Beach Landlord entered into a new Month to Month Tenancy Agreement for the Newport Beach premises in April 2009.    The current monthly base rent due and payable under the Newport Beach Lease is $6,742.00.    In addition, the Newport Beach Lease provides for the payment of 10% of FRC's gross sales to the extent that the

42

10% of gross sales exceeds the base rent amount, which has historically never occurred. Under the Newport Beach Lease, FRC is also responsible for payment of its share of CAM charges, real property taxes and insurance expenses. Given that the Newport Beach Lease is currently operating on a month to month basis, FRC agreed to assume the Newport Beach Lease and to pay the cure amount _only if_ the Newport Beach Landlord agreed not to terminate the Newport Beach Lease for a period of eighteen (18) months following FRC's assumption of the Newport Beach Lease. FRC concluded that this provided FRC with sufficient time to recoup the cost of curing its defaults under the Newport Beach Lease from the profits generated by the restaurant at the Newport Beach location prior to any termination of the Newport Beach Lease. Following discussions between FRC and the Newport Beach Landlord, the parties agreed to modify the Newport Beach Lease to provide, upon FRC's assumption of such lease, the following: (1) the term of the Newport Beach Lease shall be extended for a period of eighteen months, with such extension to be effective as of the date of the entry of an order authorizing FRC to assume the Newport Beach Lease; (2) the foregoing extension of the term of the Newport Beach Lease shall be subject to the Newport Beach Landlord's right to recapture the premises upon ninety (90) days' advance written notice, _provided_, however, that in no event shall the extended term of the Newport Beach Lease be less than twelve (12) months

43

following the date of the entry of an order authorizing FRC to assume the Newport Beach Lease.

The following is a summary of the defaults under these six leases, which (except as noted below) FRC cured in connection with its assumption of those leases:

| Landlord | Lease | Default/Cure Amount |
|---|---|---|
| Daisy Ellis | Redondo Beach | $23,262.26 |
| Duesenberg Investment Company | Woodland Hills | $60,764.55 |
| OR Associates, LLC | Orange | $0 as the cure payment was made by FB Corp. |
| PS Metro, LLC | Palm Springs | $32,934.22 |
| SCP Rancho I, LLC | Rancho Cucamonga | $10,629.61 |
| The Irvine Company | Newport Beach | $31,405.57 |
| | TOTAL: | $158,996.21 |

These total cure payments of $158,996.21 were paid out of the $500,000 of funds which were previously impounded from the proceeds of the post-petition financing obtained by the Debtors from Signature.

In addition to the fifteen (15) locations described above where FRC or FRN is the actual named lessee under the real property lease with an unrelated third-party landlord and where the underlying real property leases have been assumed, FRN is operating and in possession of a total of ten (10) restaurants

44

1  in which FRN is not the actual named lessee in any written lease

2  agreement, and FRC is operating and in possession of one (1)

3  restaurant in which FRC is not the actual named lessee in any

4  written lease agreement.  Of the ten (10) restaurants involving

5  FRN, FB Corp. is the owner of two of the properties and

6  therefore the lessor to FRN.  Of the remaining eight (8)

7  restaurants involving FRN and the one (1) restaurant involving

8  FRC, FB North America or FB Corp. is the actually named lessee

9  to the premises pursuant to a written lease with a third party

10 landlord, and FRN and FRC have been operating and in possession

11 of the restaurants (typically for many years) with no written

12 lease.

13      In order to avoid any prejudice to the Debtors' bankruptcy

14 estates with respect to these eleven (11) locations and to

15 preserve whatever rights the Debtors' bankruptcy estates have

16 with respect these eleven (11) locations, the Debtors entered

17 into stipulations with the affiliated entities to extend by

18 ninety days (from November 3, 2009 through and including

19 February 1, 2010) the date by when the Debtors are required to

20 assume or reject their "leases" for these locations, without

21 prejudice to the Debtors' rights to seek further extensions of

22 such period.

23      The two (2) locations which are operated by FRN and owned

24 by FB Corp. are for the premises located at:

25          a.  4851 Charleston Boulevard, Las Vegas, Nevada

                89146 (the "Charleston Premises"); and

45

b.    4663 East Sunset Road, Henderson, Nevada 89014
(the "Sunset Premises").

FRN does not have a written lease agreement with FB Corp. for the Charleston Premises or the Sunset Premises. However, since the time that FB Corp. initially acquired the Charleston Premises and the Sunset Premises, FRN has been the entity that has operated businesses at such locations and taken responsibility for the payment of all obligations related to such businesses. Accordingly, FRN believes that it is a *de facto* lessee, a "tenant at will," and/or the holder of other occupancy rights with respect to the foregoing premises.

The following are the addresses of the other nine (9) locations where one of the Debtors is in possession of the premises and is operating the restaurant but is not a party to any written lease agreement for the restaurant (but where FB Corp. or FB North America is the actual named lessee in the lease):

a.    3021 Michelson Drive, Irvine, California 92612;

b.    2300 Paseo Verde, Suite 2011, Henderson, Nevada 89052;

c.    4949 North Rancho Drive, Suite 4, Las Vegas, Nevada 89130;

d.    2101 Texas Star Lane, North Las Vegas, Nevada 89032;

e.    1301 West Sunset Road, Henderson, Nevada 89014;

46

f.    3763 South Las Vegas Blvd., Suite A, Las Vegas, Nevada 89109;

g.    4525 North Rancho Drive, Las Vegas, Nevada 89130;

h.    6775 West Flamingo Road, Las Vegas, Nevada 89103; and

i.    4199 South Fort Apache Blvd, Las Vegas, Nevada 89147.

Although the Debtors are not a party to any written lease agreements for the foregoing locations, the Debtors have been the entities that have operated the businesses and taken responsibility for the payment of all obligations related to such businesses.  Accordingly, the Debtors believe that they are *de facto* lessees, sublessees, "tenants at will," and/or the holders of other occupancy rights with respect to the foregoing locations.

**7.    Administrative Matters**

The Debtors were required to address the various administrative matters attendant to the commencement of these bankruptcy cases, which required an extensive amount of work by the Debtors' employees and their bankruptcy counsel.  These matters included the preparation of the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs, and the preparation of the materials required by the OUST, including, without limitation, the 7-Day Packages for the Debtors.  The Debtors have made every effort to comply with their duties under 11 U.S.C. Sections 521, 1106 and 1107 and all

47

applicable OUST guidelines, including the filing of the Debtors'
monthly operating reports with the OUST. The Debtors also
attended their initial interviews with the OUST, and their
meetings of creditors required under 11 U.S.C. § 341(a).

**8.    Employment of Professionals**

The Debtors have employed Levene, Neale, Bender, Rankin &
Brill L.L.P. ("LNBRB") as their bankruptcy counsel. The
Committee employed Landau & Berger LLP as bankruptcy counsel and
Crowe Horwath LLP as financial advisor.

**9.    Litigation Matters**

As of the Petition Date, there were approximately five
state court actions pending against the Debtors. The foregoing
actions were filed primarily by the Debtors' landlords and
vendors, and were stayed following the commencement of the
Debtors' bankruptcy cases. The Debtors anticipate that the
claims of these landlords and vendors will be resolved through
the claims allowance process in connection with the Debtors'
bankruptcy cases.

One of the state court actions that was pending as of the
Petition Date was an action commenced by Mr. Warlick, the
Debtors' former Chief Executive Officer and President, against
the Debtors and certain of the Debtors' affiliates in the
Superior Court of the State of California for the County of Los
Angeles (the "Warlick Action"). Although the Warlick Action has
been stayed with respect to the Debtors, it has continued to
proceed against the non-debtor defendants. In late October

2009, the parties to the Warlick Action (other than the Debtors) participated in a mediation which resulted in a tentative global settlement of the parties' various disputes and claims, including those that are the subject of the Warlick Action.

There has been no state court action or bankruptcy adversary proceeding commenced against the Debtors following the Petition Date.

## C.   The Debtors' Current Financial Condition and Future Business Prospects

During the first nine months of 2009 (i.e., January 1-September 30, 2009), the Debtors had total revenue of approximately $17,645,482 (which equates to a same store sales decrease of approximately 6.4% from the same period of 2008) and total operating profit of approximately $2,477,467 before taking into account the legal fees associated with the Debtors' bankruptcy cases. Copies of the Debtors' operating financial statements for the first nine months of 2009, broken down separately for FRC and FRN, are attached as exhibit "4" to this Disclosure Statement.

The Debtors have been doing their best to increase revenue and profitability through improved marketing and increased advertising, but the Debtors are constrained on these fronts by limited capital, and the Debtors compete in an extremely competitive, advertising intensive industry.

The Debtors believe that after emerging from bankruptcy, they will have the ability to generate collective operating revenue of approximately $23 million per year, broken down as approximately $12 million for FRC and approximately $11 million for FRN. Cash flow projections for the Reorganized Debtor for the next five years (2010-2014), prepared on a quarterly basis, are attached as exhibit "5" to this Disclosure Statement. As indicated in the cash flow projections, the Debtors believe that the Reorganized Debtor will generate positive cash flow after payment of all operating expenses from the outset. However, as indicated in more detail below, affiliates of the Debtors will lend sufficient funds to the Reorganized Debtor following the Effective Date to enable the Reorganized Debtor to make all of its required Plan payments to creditors.

While the Debtors may attempt to increase the number of restaurants they own as opportunities present themselves, absent the availability of new restaurant financing, the Debtors will likely be financially constrained from any meaningful domestic growth in the number of owned restaurants. As an overall enterprise, the more likely source of revenue growth is an increase in the royalty and marketing fees to be received by FB North America, particularly from international growth. Even though the Debtors are not entitled to receive any of these royalty or marketing fees, as more explained below, FB North America has agreed to lend sufficient funds to the Reorganized

Debtor following the Effective Date to assist the Reorganized Debtor to fund the Plan.

The following is a description of the Debtors' current financial condition as of September 30, 2009 (with asset values determined on a book basis):

**Assets of FRC:**

| | |
|---|---|
| Cash | $ 401,401 |
| Accounts Receivable | $ 126,732 |
| Inventory – Net | $ 52,848 |
| Prepaid Expense | $ 121,334 |
| Furniture, Fixtures, Equipment and Leasehold Improvements (net of depreciation) | $1,065,413 |
| Other Assets (including Intangibles and goodwill) | $1,380,025 |
| Total Assets | $3,147,753[4] |

**Liabilities of FRC:**

Secured Claims:

| | |
|---|---|
| GE | $ 250,000[5] |
| S&S Hospitality, Inc. | $ 45,000[6] |

---

[4] As a practical matter, the Debtors believe that the only assets that FRC owns that have any real sellable value are the thirteen (13) restaurants owned by FRC where FRC is the named lessee. However, if a third party purchased these restaurants, they would either have to operate them as entirely different restaurants or businesses other than as "Fatburger" restaurants, or they would have to enter into franchise agreements with FB North America and become obligated to pay normal royalty fees, etc. as all other franchisees pay. The Debtors estimate that the actual sellable value of these thirteen (13) restaurants is approximately $45,000 per restaurant, equating to a total actual sellable value of approximately $585,000.

[5] This is the estimated value of GE's collateral at the restaurants owned by FRC, value at $25,000 per restaurant with ten restaurants involved. The balance of GE's claim against FRC is included as part of the group of general unsecured creditors below.

[6] This is the estimated value of the collateral which secures the claim of S&S Hospitality, Inc. The balance of the claim of S&S Hospitality, Inc. is included as part of the group of general unsecured creditors below.

51

Signature DIP Loan              $1,100,000[7]

Administrative Claims:
    Professionals Fees/Expenses   $ 500,000[8]
    Post-Petition A/P             $ 400,000

Pre-Petition Priority Tax Claims:   $  106,140

Pre-Petition General Unsecured   $12,925,000[9]

**TOTAL LIABILITIES**               **$15,326,140**


**Assets of FRN:**

Cash                            $  374,758
Accounts Receivable             $  155,811
Inventory - Net                 $   55,743
Prepaid Expense                 $   59,228
Furniture, Fixtures, Equipment  $1,377,244
and Leasehold Improvements
(net of depreciation)
Other Assets (including         $4,248,357
Intangibles and goodwill)
Total Assets                    $6,271,141[10]

---

[7] The Debtors are jointly liable on the Signature DIP loan, which is in the outstanding amount of $1.1 million.

[8] This is the estimated aggregate amount for both FRC and FRN.

[9] This includes the approximately $2.6 million of general unsecured claims which were scheduled by FRC + the approximately $3,150,000 unsecured deficiency claim of GE + the approximately $5.9 million general unsecured claim asserted by Fog Cutter in a timely filed proof of claim + the approximately $300,000 unsecured deficiency claim of S&S Hospitality, Inc. + the approximately $975,000 unsecured deficiency claim of Bernardi Funding, LLC and does not include any claim in favor of Mr. Warlick.

[10] As a practical matter, the Debtors believe that the thirteen (13) restaurants that FRN owns do not have any real sellable value because the two (2) restaurants where FRN is the named lessee are required by the terms of their leases to be "Fatburger" restaurants, which FRN cannot do without a franchise agreement from FB North America, and the balance of the restaurants owned by FRN do not contain any lease rights that could be sold to a third party buyer. The Debtors therefore estimate that the actual value of these thirteen (13)

**Liabilities of FRN:**

Secured Claims:
    GE                              $  200,000[11]
    Signature DIP Loan              $1,100,000[12]

Administrative Claims:
    Professionals Fees/Expenses     $  500,000[13]
    Post-Petition A/P               $  400,000

Pre-Petition Priority Tax Claims:   $   98,190

Pre-Petition General Unsecured      $10,850,000[14]

**TOTAL LIABILITIES                  $13,148,190**

### III. PLAN SUMMARY

On the Plan Effective Date, FRC will be deemed to be merged into and substantively consolidated with FRN, with the post-confirmation substantively consolidated entity to be referred to herein as the Reorganized Debtor. FRC shall cease to exist as a legal entity on the Plan Effective Date without the need for FRC to take any further action. The Debtors believe that their

---

restaurants is approximately $25,000 per restaurant, equating to a total actual sellable value of approximately $325,000.

[11] This is the estimated value of GE's collateral at the restaurants owned by FRC, value at $25,000 per restaurant with eight restaurants involved. The balance of GE's claim against FRN is included as part of the group of general unsecured creditors below.

[12] The Debtors are jointly liable on the Signature DIP loan, which is in the outstanding amount of $1.1 million.

[13] This is the estimated aggregate amount for both FRC and FRN.

[14] This includes the approximately $1.8 million of general unsecured claims which were scheduled by FRN + the approximately $3,150,000 unsecured deficiency claim of GE + the approximately $5.9 million general unsecured claim asserted by Fog Cutter in a timely filed proof of claim and does not include any claim in favor of Mr. Warlick.

substantive consolidation under the Plan is the appropriate
result for these cases for, among other reasons, the following:

- On a business level, FRN is substantially more
profitable than FRC, but the assets owned by FRN
(due primarily to FRN's lease situation) are worth
much less than the assets owned by FRC.

- The Debtors intended to provide identical treatment
to the unsecured creditors of FRC and FRN under the
Plan.

- The Debtors are jointly and severally liable for the
full amount of the GE, Signature and Fog Cutter
debts, which are the Debtors' largest creditors.

- There is only one Committee representing the
interests of the unsecured creditors of both FRC and
FRN, and the Committee hired one set of
professionals who have not allocated their billable
time separately between the Debtors.

- The Debtors have only one law firm representing both
Debtors and that law firm has not allocated its
billable time separately between the Debtors.

- The Debtors are effectively involved in the
identical business and have common ownership and
common management.

- Many creditors filed proofs of claim against both
Debtors indicating that creditors themselves are not
sure which of the Debtors actually owes them money.

On the Plan Effective Date, FB Corp. will make a capital contribution to the Reorganized Debtor in the amount of $500,000[15] to assist the Reorganized Debtor to pay the outstanding professional fees and expenses owing by the Debtors, which must be paid in order for the Debtors to confirm the Plan. In addition, on the Plan Effective Date, FB Corp. will make a further capital contribution to the Reorganized Debtor to enable the Reorganized Debtor to fund the Class 6 Discounted Cash Out Option (defined below).  These capital contributions from FB Corp. are collectively defined herein as the "New Value Contribution."  FB Corp. will retain its 100% equity ownership interest in the Reorganized Debtor.

The class 1 claim under both the Plan is comprised of GE's allowed secured claim.  GE's class 1 claim will be treated in the manner described below.

The class 2 claim under the Plan is comprised of the allowed secured claim of Bernardi Funding, LLC.

The class 3 claim under the Plan is comprised of the allowed secured claim of S&S Hospitality, Inc.

Class 4 claim holders are comprised of any other allowed secured claims other than the secured claims contained in class 1, class 2 or class 3 in the Plan.  The Debtors do not believe that there are any class 4 allowed claims.  If there are any

---

[15] The amount of this capital contribution may need to be increased due to circumstances which arise in these cases but this figure is the Debtors' current estimate of the amount needed.

holders of class 4 allowed claims, they will be treated in a manner consistent with the provisions of Section 1129(b)(2)(A)(i) of the Bankruptcy Code (i.e., the holders of such claims will retain their liens securing such claims and receive payments from the Reorganized Debtor over time with interest equal to the present value of such claims existing on the Plan Effective Date).

Class 5 claim holders are comprised of any non-tax priority claims under the Plan.  The Debtors do not believe that there are any class 2 allowed claims.  If there are any, they will be paid in cash in full on the Plan Effective Date.

Class 6 claim holders are comprised of all general unsecured creditors.  Each holder of a class 6 allowed claim will have the option of receiving in full settlement and satisfaction of its class 6 allowed claim either (i) a cash payment on the Plan Effective Date equal to 25% of the amount of its class 6 allowed claim (the "Class 6 Discounted Cash Out Option"), or (ii) quarterly cash payments equal to 5% of the amount of its class 6 allowed claim by the last day of each of the following twenty calendar quarters following the Plan Effective Date (June 30, 2010; September 30, 2010; December 31, 2010; March 31, 2011; June 30, 2011; September 30, 2011; December 31, 2011; March 31, 2012; June 30, 2012; September 30, 2012; December 31, 2012; March 31, 2013; June 30, 2013; September 30, 2013; December 31, 2013; March 31, 2014; June 30, 2014; September 30, 2014; December 31, 2014; and March 31,

2015), with interest to accrue following the Effective Date on the outstanding amount of its class 6 allowed claim at the rate of 3.25 % per annum, with all accrued interest to be paid to the holder of the class 6 allowed claim concurrently with the final quarterly payment to be paid by March 31, 2015.

The class 7 interest holder (FB Corp.) will retain its 100% equity ownership interest in the Debtors and therefore own 100% of the equity interest of the Reorganized Debtor.

## IV. **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

### A. **What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

### B. **Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have <u>not</u> placed the following claims in a class.

#### 1. **Administrative Expenses**

Administrative expenses are claims for costs or expenses of

57

administering the Debtors' chapter 11 cases which are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy Code requires that all administrative claims be paid on the Plan Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the Debtors' § 507(a)(2) administrative claims and their treatment under the Plan.[16]

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Clerk's Office Fees | $0 | Paid in full on the Effective Date |
| Office of the U.S. Trustee Fees | $0 | Paid in full on the Effective Date |
| Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"), bankruptcy counsel to the Debtors | $400,000 (est.), which would be in addition to the $150,000 of post-petition payments paid by the Debtors to LNBRB through October 31, 2009, an estimated $200,000 of additional post-petition payments expected to be paid by the Debtors to LNBRB prior to the Effective Date, and LNBRB's | Paid in full out of the New Value Contribution on the later of the Effective Date and the date the Court enters an order allowing such fees and expenses |

---

[16] The professionals who have been employed in these cases have not been billing FRC and FRN separately. The fees and expense figures set forth below are the total fees and expenses figures for these professionals for their representation involving both the FRC and the FRN bankruptcy estates.

| | | |
|---|---|---|
| | $19,322.50 retainer balance remaining on the Petition Date | |
| Landau & Berger LLP ("L&B"), bankruptcy counsel to the Committee | $150,000 (est.), which would be in addition to the $75,000 of post-petition payments paid by the Debtors to L&B through October 31, 2009, and an estimated $120,000 of additional post-petition payments expected to be paid by the Debtors to L&B prior to the Effective Date | Paid in full out of the New Value Contribution on the later of the Effective Date and the date the Court enters an order allowing such fees and expenses |
| Crowe Horwath LLP, financial advisor to the Committee | $50,000 | Paid in full out of the New Value Contribution on the later of the Effective Date and the date the Court enters an order allowing such fees and expenses |
| Post-Petition Non-Professional Fee Administrative Claims | $800,000 (approx.) of post-petition accounts payable accrued in the ordinary course of the Debtors' business (broken down as approximately $400,000 for FRC and $400,000 for FRN). | Paid in full out of the Reorganized Debtor's funds in the ordinary course of the Reorganized Debtor's business or following the entry of an order of the Court if a dispute exists between the Reorganized Debtor and the |

| | | administrative claim holder |
|---|---|---|
| **TOTAL** | $1,400,000 est. comprised of $600,000 of professional fees and expenses and $800,000 of post-petition outstanding accounts payable | Paid in the manner described above |

Court Approval of Fees Required:

The Court must approve all professional fees and expenses listed in this chart before they may be paid. For all professional fees and expenses except fees owing to the Clerk of the Bankruptcy Court and fees owing to the OUST, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by the Court will be required to be paid under the Plan. The administrative claim amounts set forth above simply represent the Debtors' best estimates as to the amount of allowed administrative claims in these cases. The actual administrative claims may be higher or lower. Much of whether the actual administrative claims described above for professionals will be dependent upon whether the Debtors are required to engage in any substantial litigation regarding the confirmation of the Plan and/or objecting to claims. To the extent the Debtors are required to engage in any such substantial litigation, the Debtors' professionals are

likely to incur professional fees and expenses in excess (and possibly substantially in excess) of the figures set forth above. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims. By including the figures described above, the Debtors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and the Debtors are not waiving any of their rights to object to the allowance of any of these administrative claims. Similarly, professionals who have been employed in these cases are not being deemed to have agreed that the figures contained herein represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order as such fees and expenses are just estimates provided at the time of the preparation of this Disclosure Statement.

To the extent allowed administrative claims are allowed prior to the Effective Date, such allowed administrative claims may be paid by the Debtors out of the Debtors' funds to the extent the Debtors have sufficient funds to pay them. To the extent allowed administrative claims are allowed after the Effective Date, such allowed administrative claims will be paid by the Reorganized Debtor out of the New Value Contribution with

any balance to be paid out of the Reorganized Debtor's operating funds.

### 2. Priority Tax Claims

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive regular installment payments of a total value, as of the Plan Effective Date, equal to the allowed amount of such allowed tax claims, over a period ending not later than five years after the Petition Date. All allowed Section 507(a)(8) priority tax claims will be paid the full amount of such claims over a period of sixteen calendar quarters (with the payments to be made by June 30, 2010; September 30, 2010; December 31, 2010; March 31, 2011; June 30, 2011; September 30, 2011; December 31, 2011; March 31, 2012; June 30, 2012; September 30, 2012; December 31, 2012; March 31, 2013; June 30, 2013); September 30, 2013; December 31, 2013; and March 31, 2014 in equal quarterly payments with interest to accrue from the Plan Effective Date at the rate of 4% per annum. The chart below indicates all priority tax claims which were either scheduled by the Debtors or asserted by the taxing agencies in filed proofs of claim. The inclusion of the claims in the chart below is intended simply to reflect the claims that have been scheduled and/or asserted in filed proofs of claim as priority tax claims, and is not intended to be a concession by the

1    Debtors regarding the validity of such claims or the

2    classification of such claims as priority tax claims under

3    Section 507(a)(8) of the Bankruptcy Code.  Any claims by taxing

4    agencies not listed below may be found on the claims chart

5    attached as Exhibit "1" to this Disclosure Statement.

| Claimant | Claim No. | Debtor | Claim Amount |
|---|---|---|---|
| City of Irvine | 33 | FRC | $1,029.10 |
| City of Los Angeles Office of Finance | 82 | FRC | $2,287.51 |
| City of Los Angeles Alarm Permit | Scheduled | FRC | $2,950.00 |
| City of Newport Beach | Scheduled | FRC | $233.00 |
| City of Palm Springs | Scheduled | FRC | $672.00 |
| City of Santa Barbara | Scheduled | FRC | $8,549.40 |
| City of Santa Monica | 15 | FRC | $18,490.80 |
| City of West Hollywood | Scheduled | FRC | $300.00 |
| Corona Police Department | Scheduled | FRC | $960.00 |
| County of L.A. Public Health Permit | Scheduled | FRC | $68.00 |
| County of Santa Barbara | Scheduled | FRC | $1,440.65 |
| Internal Revenue Service | 4 | FRC | $32,523.86 |
| Los Angeles County Tax Collector | 23 | FRC | $12,584.31 |
| Riverside County | Scheduled | FRC | $5,528.87 |
| Santa Barbara Police Dept. | Scheduled | FRC | $20.00 |
| State Board of Equalization | 69 | FRC | $167,020.00 |
| Office of the Clark County Treasurer | 1 | FRN | $17,269.20 |
| Bernice James, Treasurer-Tax Collector | 21 | FRN | $3,231.19 |
| Internal Revenue Service | 4 | FRN | $24,413.08 |
| Nevada Dept. of Taxation | Scheduled | FRN | $90,247.79 |
| Secretary of State | Scheduled | FRN | $325.00 |

**C.    Classified Claims and Interests**

**1. Classes of Secured Claims**

Secured claims are claims secured by liens on property of

the estates.  The following charts set forth the description and

treatment of each of the Debtors' secured claims.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 1 | The allowed secured claims of GE, which will be in an amount equal to the collateral which secures GE's claims against the Debtors, which the Debtors estimate to be in the amount of approximately $450,000 (broken down as $250,000 for FRC and $200,000 for FRN).<br><br>The balance of GE's claims will be paid in full pursuant to a separate settlement agreement to be entered into between GE and certain non-bankruptcy affiliates of the Debtors. | Impaired; allowed claim in this class is entitled to vote on the Plan. | GE's allowed secured claim will accrue interest following the Effective Date at the rate of 3% per annum. The Reorganized Debtor will pay GE's allowed secured claim over a period of five years by making sixty equal fully amortizing monthly payments to GE by the last day of each of the first sixty full calendar months following the Effective Date. |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 2 | The allowed secured claim of Bernardi Funding LLC ("Bernardi"), in an amount equal to the collateral which secures Bernardi's claim against FRC, consisting of certain equipment located at the restaurant located at 49500 Seminole Drive, Cabazon, California, which the Debtors estimate to be in the amount of approximately $73,000.<br><br>The balance of Bernardi's claim against FRC will be paid in full pursuant to a separate settlement agreement to be entered | Impaired; allowed claim in this class is entitled to vote on the Plan. | Bernardi's allowed secured claim will accrue interest following the Effective Date at the rate of 3% per annum. The Reorganized Debtor will pay Bernardi's allowed secured claim over a period of five years by making sixty equal fully amortizing monthly payments to Bernardi by the last day of each of the first sixty full calendar months following the Effective Date. |

|  |  |  |  |
|---|---|---|---|
|  | into between Bernardi and certain non-bankruptcy affiliates of the Debtors. |  |  |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 3 | The allowed secured claim of S&S Hospitality, Inc. ("S&S"), in an amount equal to the collateral which secures S&S's claim against FRC, consisting of certain equipment at the restaurant located at 2318 N. Tustin Ave., Suite C, Orange, California, which the Debtors estimate to be in the amount of approximately $45,000.

The balance of S&S's claim against FRC will be paid in full | Impaired; allowed claim in this class is entitled to vote on the Plan. | S&S's allowed secured claim will accrue interest following the Effective Date at the rate of 3% per annum. The Reorganized Debtor will pay S&S's allowed secured claim over a period of five years by making sixty equal fully amortizing monthly payments to S&S by the last day of each of the first sixty full calendar months following the Effective Date. |

| | | | |
|---|---|---|---|
| | pursuant to a separate settlement agreement to be entered into between S&S and certain non-bankruptcy affiliates of the Debtors. | | |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 4 | Class 4 claim holders are comprised of any other secured claims which exist other than those contained in any other class. As described above, the Debtors have not included any such other secured claims in their bankruptcy schedules. The Debtors will be objecting to any and all secured claims asserted by creditors in proofs of claim. | Impaired; allowed claims in this class are entitled to vote on the Plan. | In full settlement and satisfaction of all class 4 claims, each holder of a class 4 allowed claim will be treated in a manner consistent with the provisions of Section 1129(b)(2)(A)(i) of the Bankruptcy Code (i.e., the holders of such claim will retain its liens securing such claim and receive payments from the Reorganized Debtor over time with interest equal to the present value of such claim existing on the Plan Effective Date). |

## 2. Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claim.  The Debtors do not believe that there are any allowed unsecured priority claims.  To the extent any such allowed unsecured priority claims do exist, they will be considered class 5 allowed claims and will be paid in full out of the New Value Contribution on the later of (i) the Plan Effective Date and (ii) the date the Court enters an order allowing such priority claims, unless such class 5 allowed claims can be satisfied in an alternative manner acceptable to the holders of the class 5 allowed claims.

## 3. Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).  The following chart identifies the Plan's treatment of the class containing all of the Debtors' non-priority general unsecured claims (see the claims chart attached as Exhibit "1" to this Disclosure Statement for detailed information about each general unsecured claim):

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 6 | All general unsecured claims which are not included in any other class.<br><br>Total amount of class 6 claims which have been scheduled by or asserted in proofs of claim filed against FRC is approximately $33,664,421.<br><br>Total amount of class 6 claims which have been scheduled by or asserted in proofs of claim filed against FRN is approximately $31,779,427.<br><br>A detailed claims chart showing all claims which were scheduled by the Debtors and all proofs of claim which have been | Impaired; allowed claims in this class are entitled to vote on the Plan. | Each holder of a class 6 allowed claim will have the option of receiving in full settlement and satisfaction of its class 6 allowed claim either (i) a cash payment on the Plan Effective Date from the Reorganized Debtor funded out of the New Value Contribution equal to 25% of the amount of its class 6 allowed claim, or (ii) quarterly cash payments from the Reorganized Debtor equal to 5% of the amount of its class 6 allowed claim by the last day of each of the following twenty calendar quarters following the Plan Effective Date (June 30, 2010; September 30, 2010; December 31, 2010; March 31, 2011; June 30, 2011; September 30, 2011; December 31, 2011; March 31, 2012; June 30, 2012; September 30, 2012; December 31, 2012; March 31, 2013; June 30, 2013; September 30, 2013; December 31, 2013; March 31, 2014; June 30, 2014; September 30, 2014; December 31, 2014; and March 31, 2015), with interest |

69

filed against the Debtors (separated out between FRC and FRN) is attached hereto as Exhibit "1" (the "Claims Chart"). It is the Debtors' intention to update the Claims Chart prior to the Disclosure Statement hearing to indicate which claims in the Claims Chart are objectionable to the Debtors, even if the Debtors have not yet filed formal objections to those claims. The Debtors estimate that after the objection to claims process has been completed and after deducting out those class 6 claims which will be paid by certain non-debtor

to accrue following the Effective Date on the outstanding amount of its class 6 allowed claim at the rate of 3.25 % per annum, with all accrued interest to be paid to the holder of the class 6 allowed claim concurrently with the final quarterly payment to be paid by March 31, 2015.

Attached as Exhibit "2" to this Disclosure Statement is a listing of the name and dollar amount of the those class 6 allowed claims against FRC expected to be paid by the Reorganized Debtor pursuant to the terms of the Plan. The balance of any class 6 allowed claims against FRC are expected to be paid in full by certain non-debtor affiliates of the Debtors.

Attached as Exhibit "3" to this Disclosure Statement is a listing of the name and dollar amount of the those class 6 allowed claims against FRN expected to be paid by the Reorganized Debtor pursuant to the terms of the Plan. The balance of any class 6 allowed claims against

| | | | |
|---|---|---|---|
| | affiliates of the Debtors, there will likely be a total of approximately $1,626,115 of class 6 allowed claims against FRC and approximately $950,600 of class 6 allowed claims against FRN to be paid by the Reorganized Debtor pursuant to the terms of the Plan. | | FRN are expected to be paid in full by certain non-debtor affiliates of the Debtors.<br><br>Conditioned upon the confirmation of the Plan and the occurrence of the Plan Effective Date, Fog Cutter agrees to subordinate all of its claims against the Debtors to all class 6 allowed claims, and Fog Cutter agrees that it will not receive any distribution from the Reorganized Debtor until all holders of class 6 allowed claims have received all payments they are entitled to receive under the Plan. |

**4. Class of Interest Holders**

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in the Debtors. The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 7 | FB Corp. which owns 100% of the equity interests of the Debtors | Not Impaired; FB Corp. is not entitled to vote on the Plan | FB Corp. will own 100% of the equity interests in the Reorganized Debtor. |

71

| | | because it is not impaired. | |
|---|---|---|---|

**D.   Means of Effectuating the Plan and Implementation of the Plan**

   **1.   Funding for the Plan**

The Plan will be funded from three primary sources consisting of (i) the New Value Contribution to be contributed by FB Corp. to the Reorganized Debtor on the Plan Effective Date; (ii) the annual loan to be made by FB North America to the Reorganized Debtor to make up for any cash flow shortfall incurred by them[17]; and (iii) from the positive cash flow generated by the business operations of the Reorganized Debtor.

The New Value Contribution will be in amount of at least $500,000 to assist the Reorganized Debtor to pay the outstanding professional fees and expenses owing by the Debtors, plus whatever additional sum is needed to enable the Reorganized Debtor to fund the Class 6 Discounted Cash Out Option under the Plan.  If the $500,000 portion of the New Value Contribution is not sufficient to enable the Reorganized Debtor to pay the full amount of the outstanding professional fees and expenses owing by the Debtors, the New Value Contribution will be increased by whatever amount is needed to enable the Reorganized Debtor to

---

[17] Depending upon the actual cash flow of the Reorganized Debtor, the loans from FB Corp. to the Reorganized Debtor may have to be made more frequently than annually.

pay the full amount of the outstanding professional fees and expenses owing by the Debtors unless a mutually acceptable alternative arrangement is reached between the Reorganized Debtor and the respective professionals.

Based upon the cash flow projections for the Reorganized Debtor for the next five years (2010-2014), prepared on a quarterly basis, attached as exhibit "5" to this Disclosure Statement, the Debtors are projecting that the loan from FB North America to the Reorganized Debtor will need to be approximately $750,000 for 2010; approximately $300,000 for 2011; approximately $200,000 for 2012; approximately $125,000 for 2013; and approximately $50,000 for 2014. The foregoing projections assume that either Signature will voluntarily agree to extend out the term of its loan or a replacement lender will be found to take Signature's place. If the Signature loan will required to be paid off and no replacement lender can be found, the loan from FB North America to the Reorganized Debtor will need to be increased by an amount to enable the Reorganized Debtor to pay off the Signature loan.

As of October 31, 2009, the Debtors owe Signature a total of approximately $1,100,000 on account of the post-petition financing provided by Signature to the Debtors. That post-petition financing will become due and payable to Signature upon the confirmation of the Plan. The Debtors are engaged in discussions with Signature regarding possibly extending the maturity date of the existing Signature post-petition financing

73

and possibly providing the Reorganized Debtor with additional post-confirmation financing. The Debtors will amend this Disclosure Statement prior to the Disclosure Statement hearing to describe any developments that arise with Signature. If Signature is not willing to extend the maturity date of the existing Signature post-petition financing, the Debtors will as part of the confirmation of the Plan either obtain replacement financing to pay off the outstanding Signature debt or FB Corp. will increase the amount of the New Value Contribution to enable the Debtors to pay off the outstanding Signature debt.

### 2.    Composition of the Reorganized Debtor

The legal and ownership structures of the Debtors will remain unchanged following the Plan Effective Date, which will mean that FB Corp. will own 100% of the equity interests of the Reorganized Debtor.

### 3.    Post-Confirmation Management

Andrew A. Wiederhorn will serve as the Chief Executive Officer of the Reorganized Debtor, which is the same title he holds at this time for the Debtors. Mr. Wiederhorn has served as an active director of FB Corp. and its subsidiaries (including the Debtors) since January, 2006, and has been Chief Executive Officer and Chairman of the Board of Directors since May 15, 2006. Mr. Wiederhorn received his Bachelor of Science degree in Business Administration from the University of Southern California. Mr. Wiederhorn has substantial experience serving as a senior level executive. Mr. Wiederhorn will be in

charge of the Reorganized Debtor's overall business operations, finances and strategic planning. Mr. Wiederhorn's initial compensation will consist of a base salary of $360,000 per year plus usual and customary benefits.

Donald J. Berchtold will serve as the President and co-Chief Operating Officer of the Reorganized Debtor, which are the same titles he holds at this time for the Debtors. Mr. Berchtold has been President of FB Corp. and its subsidiaries since September, 2006 and Chief Operating Officer of FB Corp. and its subsidiaries since May, 2006. Mr. Berchtold received his Bachelor of Science degree in Finance and Marketing from Santa Clara University. Mr. Berchtold has over thirty years of experience in the restaurant and food service industry and has substantial experience serving as a senior level executive. Mr. Berchtold will be responsible for all aspects of the day-to-day operations of the Reorganized Debtor's restaurant locations. Mr. Berchtold's initial compensation will remain the same as it currently is, which consists of a base salary of $183,898 per year plus usual and customary benefits.

Harold Fox will serve as the co-Chief Operating Officer of the Reorganized Debtor, which is the same title he holds at this time for the Debtors. Mr. Fox has been co-Chief Operating Officer of FB Corp. and its subsidiaries since June, 2009. Previously, Mr. Fox served as Chief Financial Officer of FB Corp. and its subsidiaries from September, 2004 to June, 2009. Mr. Fox is a seasoned restaurant executive with over 27 years of

industry experience. Earlier in his career, Mr. Fox served as a senior executive for Grace Restaurant Company, which operated over 600 restaurants and had annual revenues in excess of $1.1 billon; American Restaurant Group, which owned and operated Stuart Anderson's Black Angus and Spoons restaurants (among others); Del Taco; RJM Enterprises, which operated Gladstone's Universal, Hollywood Sports Grill and Paradise Cove Beach Café; and El Pollo Loco Restaurants. Mr. Fox will be responsible for developing, negotiating and implementing programs designed to improve the operational effectiveness and overall profitability of the Reorganized Debtor. Mr. Fox's initial compensation will consist of a discounted base salary of $100,000 per year (it is currently $190,000 per year) plus usual and customary benefits.

Jason Melvin will serve as the Chief Financial Officer of the Reorganized Debtor, which is the same title he holds at this time for the Debtors. Mr. Melvin served as Vice President and Controller of the Debtors from July 2004 to September 2007, and returned to serve as Chief Financial Officer of the Debtors in June 2009. Mr. Melvin will be responsible for the Reorganized Debtor's finance, treasury, accounting and tax functions. Mr. Melvin's initial compensation will remain the same as it currently is, which consists of a base salary of $200,000 per year plus usual and customary benefits.

Warren Christiansen will serve as the Vice President – Legal Counsel for the Reorganized Debtor, which is the same title he holds at this time for the Debtors. Mr. Christiansen

1    has been in-house legal counsel for FB Corp. and its

2    subsidiaries since May, 2008.  Mr. Christiansen received his

3    Juris Doctor degree from the University of Idaho and was

4    previously the Deputy Prosecuting Attorney for Blaine County,

5    Idaho from July 2002 to August 2007.  Mr. Christiansen will be

6    responsible for negotiating and documenting franchise sales,

7    real estate leases and purchase transactions, and coordinating

8    other legal matters for the Reorganized Debtor.  Mr.

9    Christiansen's initial compensation will remain the same as it

10    currently is, which consists of a base salary of $101,920 per

11    year plus usual and customary benefits.

12       Bentley C. Hetrick will serve as the Vice President of

13    Construction and Purchasing for the Reorganized Debtor, which is

14    the same title he holds at this time for the Debtors.  Mr.

15    Hetrick has held the position of Vice President of Construction

16    and Purchasing for FB Corp. and its subsidiaries since

17    September, 2001.  Mr. Hetrick has over thirty years of

18    experience in the restaurant industry, during which time he has

19    held positions with McDonald's and Wendy's.  Mr. Hetrick will be

20    responsible for food, paper and equipment procurement for all

21    corporate and franchise locations nationwide, management of all

22    aspects of restaurant construction, as well as facility

23    management for all corporate restaurant locations.  Mr.

24    Hetrick's initial compensation will remain the same as it

25    currently is, which consists of a base salary of $155,000 per

year plus usual and customary benefits.

Elaine Patel will serve as the Vice President of Marketing for the Reorganized Debtor, which is the same title she holds at this time for the Debtors.  Ms. Patel has held the position of Vice President of Marketing for FB Corp. and its subsidiaries since February, 2003.  Previously, Ms. Patel served as the Director of Marketing for Trizec Properties at the Paseo Colorado Pasadena Shopping Center, Marketing Manager for Los Cerritos Shopping Center and the Assistant Marketing Director for the Westside Pavilion Shopping Center with Macerich Properties.  At these properties, Ms. Patel specialized in brand development, media and communication relations, guest services and various promotions and events.  Ms. Patel will be responsible for overseeing all marketing functions of the Reorganized Debtor, including advertising, public relations, local store marketing, marketing material production, merchandising, product promotions and trade dress development. Ms. Patel's initial compensation will remain the same as it currently is, which consists of a base salary of $120,000 per year plus usual and customary benefits.

Victor Santillan will serve as the Vice President of Human Resources and Administration for the Reorganized Debtor, which is the same title he holds at this time for the Debtors.  Mr. Santillan has held the position of Vice President of Human Resources and Administration for FB Corp. and its subsidiaries since May, 2002.  Mr. Santillan received his Bachelor of Science degree in Business Administration and Marketing from California

State University at Northridge.  Mr. Santillan has over thirteen years of experience in human resources and operations administration in multiple retail settings, both domestically and internationally.  Mr. Santillan will be responsible for the management and oversight of all human resources and administrative affairs, which include payroll, benefits, compensation, compliance training and development, environmental health, risk and safety administration for the Reorganized Debtor.  Mr. Santillan's initial compensation will remain the same as it currently is, which consists of a base salary of $125,000 per year plus usual and customary benefits.

Robert Schuster will serve as the Vice President of International Development and Operations for the Reorganized Debtor, which is the same title he holds at this time for the Debtors.  Mr. Schuster has held the position of Vice President of International Development and Operations for FB Corp. and its subsidiaries since June, 2006.  Mr. Schuster has over twenty years of experience in the restaurant industry, both as an owner and executive of several restaurant companies.  Mr. Schuster will be responsible for overseeing all United States and international trademark issues, and overseeing all international franchises and corporate locations.  Mr. Schuster's initial compensation will remain the same as it currently is, which consists of a base salary of $120,000 per year plus usual and customary benefits.

### 4.  Disbursing Agent

The Reorganized Debtor will serve as the disbursing agent for purposes of making all distributions required to be made under the Plan.  The Reorganized Debtor will not charge any disbursing agent fee for making such distributions.

### 5.  Objections to Claims

The Debtors or the Reorganized Debtor, as the case may be, will file objections to all claims which are inconsistent with the Debtors' books and records unless the Debtors deem the inconsistency to be insignificant.  With respect to disputed claims which are not resolved prior to the Plan Effective Date, the Reorganized Debtor will have the authority, in its sole discretion, in the reasonable exercise of its business judgment, to settle or compromise any disputed claim without further notice or Court approval.  As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan.  The Debtors or the Reorganized Debtor, as the case may be, will have the authority to file any objections to claims following the confirmation of the Plan, and the Court shall retain jurisdiction over the Debtors, the Reorganized Debtor and these cases to resolve such objections to claims following the confirmation of the Plan.  Nothing contained in the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtor of any rights of setoff or recoupment, or of any defense,

the Debtors or the Reorganized Debtor may have with respect to any claim.

**6.    Avoidance Actions**

The Debtors have not performed a detailed analysis of payments made during the ninety-day preference period for non-insiders, but are not aware of any such payments which would be clearly avoidable as preference payments, as the Debtors believe that all such payments would be subject to some form of ordinary course, contemporaneous exchange or new value defense. A copy of the schedule of the Debtors' payments made during the ninety-day preference period for non-insiders is attached hereto as Exhibit "6". The Debtors also believe that the detriment to their business from suing vendors would outweigh any benefit from the pursuit of preference actions. The Debtors are also not aware of any fraudulent conveyances which have occurred and which need to be avoided with respect to non-insiders. A copy of the schedule of the Debtors' payments made during the one-year preference period for insiders is attached hereto as Exhibit "7". The rights of these estates with respect to any preferences or fraudulent conveyances to insiders of the Debtors will, on the Plan Effective Date, will be deemed assigned to the Committee as the representative of the Debtors' estates under section 1123(b) of the Bankruptcy Code. However, any professional fees and expenses incurred in the pursuit of avoidance causes of action may be paid solely from the recovery from the pursuit of such avoidance causes of action. All

claims, causes of action and avoidance actions of the Debtors
and their estates with regard to insider transactions are
preserved by the Plan, and the Committee shall have full power
and authority to settle, adjust, retain, enforce or abandon any
claim, cause of action or avoidance actions as the
representative of the Debtors' estates under section 1123(b) of
the Bankruptcy Code or otherwise, regardless of whether such
claims, causes of action or avoidance actions were commenced
prior or subsequent to the Plan Effective Date.

**7.   Employment of Professionals by the Reorganized Debtor
and Payment of Professional Fees and Expenses Incurred after the
Effective Date**

On and after the Effective Date, the Reorganized Debtor
shall have the right to employ and compensate professionals as
the Reorganized Debtor determines is appropriate and to
compensate any such professionals without the need for any
further order of the Court.

**8.   Post-Confirmation Committee**

The members of the Committee shall have the right, but not
the obligation, to form a post-confirmation committee (the
"Post-Confirmation Committee") for the purposes of insuring the
Reorganized Debtor's compliance with their obligations under the
Plan.   The Post-Confirmation Committee shall have the right to
employ professionals to represent the interests of the Post-
Confirmation Committee, with the reasonable fees and expenses of
such professionals to be paid by the Reorganized Debtor, not to

exceed $15,000 per year, until such time as all Plan obligations to the holders of class 6 allowed claims have been satisfied.

### 9.   Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar tax.  Transfers under the Plan that are exempt from taxes under section 1146(c) of the Bankruptcy Code include all transfers by the Debtors after the commencement of their chapter 11 cases in contemplation of the Plan but prior to the Effective Date.  The taxes from which such transfers are exempt include stamp taxes, recording taxes, sales and use taxes, transfer taxes, and other similar taxes.

### 10.  Distributions to be Made Pursuant to the Plan

Except as otherwise agreed to by the Reorganized Debtor in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtors' schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1000, or, if a different address is stated in a proof of claim duly filed with the Bankruptcy Court, to such address. Checks issued to pay allowed claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.

**11.  Exculpations and Releases**

To the maximum extent permitted by law, neither the Debtors, the Reorganized Debtor, nor the Committee, nor any of their employees, officers, directors, shareholders, agents, members, representatives, or professionals employed or retained by any of them, whether or not by Bankruptcy Court order, shall have or incur liability to any person or entity for any act taken or omission made in good faith in connection with or related to the formulation and implementation of the Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein.

**12.  Injunctions**

The Plan Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to the Plan.  Except as provided in the Plan or the Plan Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is discharged or an interest or other right of an equity security holder that is extinguished pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the

Reorganized Debtor, or their property on account of any such discharged claims, debts or liabilities or extinguished interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan.  By accepting distributions pursuant to the Plan, each holder of an allowed claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section.

### 13.  Executory Contracts and Unexpired Leases

On the Effective Date, all of the Debtors' remaining executory contracts and unexpired leases which have not previously been assumed or rejected by the Debtors and which are identified in Exhibit "8" hereto shall be deemed to be assumed by the Debtors and to become valid and binding executory contracts and unexpired leases of the Reorganized Debtor (the "Debtors' Assumed Contracts and Leases").  By 5:00 p.m. PST on the day prior to the date of the Plan confirmation hearing, the Debtors shall file a pleading with the Court identifying all of the Debtors' Assumed Contracts and Leases.  All of the Debtors'

remaining executory contracts and unexpired leases which have not previously been assumed or rejected by the Debtors and which are not included among the Debtors' Assumed Contracts and Leases shall be deemed rejected effective as of 11:59 PST on the Plan Effective Date.  With respect to all of the Debtors' Assumed Contracts and Leases for which a default exists on the Plan Effective Date, the Debtors will be required to (a) cure or provide adequate assurance that the Reorganized Debtor will promptly cure any default existing under any such executory contracts and unexpired leases, (b) compensate or provide adequate assurance that the Reorganized Debtor will promptly compensate any other party to such executory contracts and unexpired leases for any actual pecuniary loss to such parties resulting from any default existing under any such executory contracts and unexpired leases, and (c) provide adequate assurance of future performance under such executory contracts and unexpired leases. **THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT WHICH IS REJECTED ON THE PLAN EFFECTIVE DATE WILL BE THIRTY DAYS AFTER THE PLAN EFFECTIVE DATE.** Any claim based on the rejection of an unexpired lease or executory contract will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

**14. Changes in Rates Subject to Regulatory Commission Approval**

The Debtors are not subject to governmental regulatory commission approval of their rates.

**15. Retention of Jurisdiction**

After confirmation of the Plan and occurrence of the Plan Effective Date, in addition to jurisdiction which exists in any other court, the Court will retain such jurisdiction as is legally permissible including for the following purposes:

i. To resolve any and all disputes regarding the operation and interpretation of the Plan and the Plan Confirmation Order;

ii. To determine the allowability, classification, or priority of claims and interests upon objection by the Debtors, the Reorganized Debtor, the Committee or by other parties in interest with standing to bring such objection or proceeding and to consider any objection to claim or interest whether such objection is filed before or after the Effective Date;

iii. To determine the extent, validity and priority of any lien asserted against property of the Debtors and property of the Debtors' estates;

iv. To construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Plan Confirmation Order, and all matters referred to

87

in the Plan and the Plan Confirmation Order, and to determine all matters that may be pending before the Court in these cases on or before the Effective Date with respect to any person or entity related thereto;

v. To determine any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

vi. To determine any request for payment of administrative expenses;

vii. To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any claims resulting therefrom;

viii. To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date including avoidance causes of action, and the Reorganized Debtor (with respect to non-insiders) and the Committee (with respect to insiders) shall have the right to commence any avoidance causes of action after the Effective Date and to continue with the prosecution of any avoidance causes of action commenced by the Debtors prior to the Effective Date;

ix. To determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

x.   To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

xi.  Except as otherwise provided in the Plan and the Plan Confirmation Order, to issue injunctions, to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

xii. To issue such orders in aid of consummation of the Plan and the Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

xiii.   To enter a final decree closing these chapter 11 cases.

## V. TAX CONSEQUENCES OF THE PLAN

The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtors.  The Debtors CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make

it difficult to state completely and accurately all of the tax implications of any action.

The implementation of the Plan may have Federal, state, and local tax consequences to the Debtors, and the Debtors' creditors and equity holder.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. *This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or a tax advice to any person, and the summary contained herein is provided for informational purposes only.*

The discussion below summarizes only certain of the Federal income tax consequences associated with the Plan's implementation.  The discussion does not attempt to comment on all aspects of the Federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular creditor or stockholder, which may modify or alter the consequences described herein.  This discussion does not address state, local, or foreign tax consequences, or the consequences of any Federal tax other then Federal income tax.

The following discussion is based upon the provisions of the Internal Revenue Code of 1986, as amended, the regulations promulgated thereunder, existing judicial decisions and administrative rulings.  In light of continuous amendments to the Internal Revenue Code, no assurance can be given that legislative, judicial or administrative changes will not be

forthcoming that would affect the accuracy of the discussion below.   Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof.   The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

Under the Plan, the Debtor anticipates the discharge of certain pre-petition debt and claims.   As a result of the Plan's implementation, the amount of the Debtors' aggregate outstanding indebtedness will be reduced.   Specifically, debt reduction for the Debtors will occur if the Court confirms the Plan.

In general, the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must include the discharged amount in its gross income in the taxable year of discharge to the extent that the discharged amount exceeds any consideration given for such discharge.   No income from the discharge of indebtedness is realized to the extent that payment, if the liability is discharged, would have given rise to a deduction.

However, the discharge of indebtedness which occurs pursuant to a confirmed chapter 11 plan of reorganization for a corporate taxpayer such as the Debtors is specifically excluded from gross income pursuant to Internal Revenue Code Section 108 (a)(1)(A), which is sometimes referred to as the "Bankruptcy

91

Exception". Accordingly, the Debtors will not be required to include in income any debt discharged as a result of confirmation of the Plan.

If the Debtors exclude from income any discharged debt, the Debtors will be required to reduce certain tax attributes. Tax attributes are reduced in the following order of priority: net operating losses and net operating loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers; and foreign tax credit carryovers. Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income.

An election can be made to alter the order of priority of attribute reduction by first applying the reduction against depreciable property held by the taxpayer in an amount not to exceed the aggregate adjusted basis of such property. The Debtors have not yet decided whether to make such election. The deadline for making such election is the due date (including extensions) of the Debtors' Federal income tax return for the taxable year in which such debt is discharged pursuant to the Plan.

Any claim against the Debtors (except a claim that would give rise to a deduction if paid) that is discharged by payment to a creditor of cash and/or property will result in the

creation of a debt discharge reducing tax attributes to the extent that the adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market value of the payment made in cancellation thereof.

Internal Revenue Code Section 382 places potentially severe limitations upon the use of certain tax attributes if an "ownership change" occurs with respect to a corporation's stock. Generally, the limitations imposed by Section 382 apply in addition to, and not in lieu of, any reduction tax attributes occurring pursuant to Internal Revenue Code Section 108 (described below). Based upon the anticipated stock ownership of the Reorganized Debtor under the Plan, the Debtors believe that an "ownership change" will not occur with respect to the Debtors and, accordingly, that the limitations and restrictions of Section 382 will apply to the Reorganized Debtor as a result of the transactions occurring pursuant to the Plan.

The Tax consequences of the Plan's implementation to a creditor will depend on whether the creditor's present debt claim constitutes a "security" of Debtor for Federal income tax purpose and the type of consideration received by the creditor in exchange for its claim, whether the creditor reports income on the cash or accrual method, whether the creditor receives consideration in more than one tax year of the creditor, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction. The tax consequences upon the receipt of cash, debt instruments

or other property allocable to interest are discussed more below.

In the case of a creditor whose existing claim against a Debtor constitutes a capital asset in such creditor's hands, the gain required to be recognized will be classified as a capital gain, except to the extent of interest (including accrued market discount, if any). Any gain recognized will be treated as ordinary income to the extent of accrued market discount. Accordingly, any gain recognized by such creditors as a result of the Plan's implementation will be ordinary income, notwithstanding the nature of their claims. Any capital gain recognized by a creditor will be long-term capital gain with respect to those claims for which the creditor's holding period is more than one year, and short-term capital gain with respect to such claims for which the creditor's holding period is one year or less.

A creditor whose existing claims do not constitute Tax Securities of a debtor will recognize gain or loss on the actual or constructive exchange of such creditor's existing claims (other than claims for accrued interest) for cash and any other consideration received (including a new debt instrument) equal to the difference between (i) the "amount realized" in respect of such claims and (ii) the creditor's tax basis in such claims. The "amount realized" will be equal to the sum of the cash, and (i) as to a cash-basis taxpayer, market value of all other consideration received, and (ii) as to an accrual-basis

taxpayer, the face amount of any new debt instruments and fair market value of the other consideration received, less any amounts allocable to interest, unstated or original issue discount.

The aggregate tax basis in the items received by a creditor will equal the amount realized in respect of such items (other than amounts allocable to any accrued interest). The holding period for items received in the exchange will begin on the day following the exchange.

A creditor whose existing claim does not constitute a Tax Security and who receives no consideration under the Plan with respect to such claim may be entitled to a bad debt deduction equal in amount to such creditor's adjusted basis in such claim. A bad debt deduction is allowed in the taxable year of the creditor in which a debt becomes wholly worthless as of the date of discharge (assuming the holder of the claim receives no consideration under the Plan with respect to such claim). It is possible, however, that such a claim may have become wholly worthless on an earlier date, depending upon all the facts and circumstances. The Debtors express no opinion regarding the date or dates on which claims discharged under the Plan became worthless.

Income attributable to accrued but unpaid interest will be treated as ordinary income regardless of whether the creditor's existing claims are capital assets in its hands.

A creditor who, under its accounting method, was not previously required to include in income accrued but unpaid interest attributable to existing claims, and who exchanges its interest claim for cash, or other property pursuant to the Plan, will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that creditor realizes an overall gain or loss as a result of the exchange of its existing claims. A creditor who had previously included in income accrued but unpaid interest attributable to its existing claims will recognize a loss to the extent such accrued but unpaid interest is not satisfied in full. For purpose of the above discussion, "accrued" interest means interest, which was accrued while the creditor held the underlying claim. The extent to which consideration distributable under the Plan is allocable to such interest is uncertain.

If a creditor has a lower tax basis in a debtor obligation than its face amount, the difference may constitute market discount under Section 1276 of the Internal Revenue Code. (Certain debtor obligations are excluded from the operation of this rule, such as obligations with a fixed maturity date not exceeding one year from the date of issue, installment obligations to which Internal Revenue Code Section 452(B) applies and, in all likelihood, demand instruments).

**NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH**

RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.  THE DISCUSSION SET FORTH ABOVE IS FOR GENERAL INFORMATION ONLY.  THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH HIS, HER OR ITS OWN ACCOUNTANT, ATTORNEY OR TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, PLEASE BE ADVISED THAT ANY WRITTEN U.S. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENT) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (1) AVOIDING PENALITIES UNDER THE INTERNAL REVENUE CODE, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

## VI. CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

97

Many requirements must be met before the Court can confirm a plan. Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

**A.    Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

**B.    Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

**C.    What Is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THESE CASES ON ACCOUNT OF PRE-PETITION CLAIMS WAS JULY 20, 2009. A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtors' schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

A detailed Claims Chart is attached hereto as Exhibit "1". The Claims Chart identifies all claims which were scheduled by the Debtors, including the amounts and priorities of the claims and whether the Debtors contend that the claims are disputed, contingent or unliquidated. The Claims Chart also identifies all proofs of claim which were filed by creditors asserting claims against the Debtors, including the amounts and priorities of the claims asserted. Finally, the Claims Chart indicates whether the Debtors have disputed or presently dispute any portion of the claims. The Debtors reserve the right to update and modify the Claims Chart at any time and to file objections to claims even if the Claims Chart does not identify any dispute relating to a particular claim.

**D.    What Is an Impaired Claim/Interest.**

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is <u>impaired</u> under the

Plan.   A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

The Debtors believe that members of classes 1, 2, 3, 4 and 6 are impaired and entitled to vote to accept or reject the Plan.   Parties who dispute the Debtors' characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtors have incorrectly characterized the class.

**E.    Who Is Not Entitled to Vote.**

The following four types of claims are not entitled to vote:   (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan.   Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have

rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED
ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION
OF THE PLAN.

**F.    Who Can Vote in More Than One Class.**

A creditor whose claim has been allowed in part as a
secured claim and in part as an unsecured claim is entitled to
accept or reject the Plan in both capacities by casting one
ballot for the secured part of the claim and another ballot for
the unsecured claim.

**G.    Votes Necessary to Confirm the Plan.**

If impaired classes exist, the Court cannot confirm the
Plan unless (1) at least one impaired class has accepted the
Plan without counting the votes of any insiders within that
class, and (2) all impaired classes have voted to accept the
Plan, unless the Plan is eligible to be confirmed by "cramdown"
on non-accepting classes, as discussed below.

**H.    Votes Necessary for a Class to Accept the Plan.**

A class of claims is considered to have accepted the Plan
when more than one-half (1/2) in number and at least two-thirds
(2/3) in dollar amount of the claims which actually voted on the
plan, voted in favor of the plan.  A class of interests is
considered to have "accepted" a plan when at least two-thirds
(2/3) in amount of the interest-holders of such class which
actually voted on the plan, voted to accept the plan.

101

## I.    Treatment of Non-accepting Classes.

As noted above, even if _all_ impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

## J.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).

The Debtors will ask the Court to confirm the Plan by cramdown on any and all impaired classes that do not vote to accept the Plan.

## K.    Liquidation Analysis.

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not

1  less than the amount that such holder would receive or retain if

2  the Debtors were liquidated under chapter 7 of the Bankruptcy

3  Code.

4       In a chapter 7 case, the debtor's assets are usually sold

5  by a chapter 7 trustee.  Secured creditors are paid first from

6  the sales proceeds of properties on which the secured creditor

7  has a lien.   Administrative claims are paid next.   Next,

8  unsecured creditors are paid from any remaining sales proceeds,

9  according to their rights to priority.  Unsecured creditors with

10 the same priority share in proportion to the amount of their

11 allowed claim in relationship to the amount of total allowed

12 unsecured claims.  Finally, interest holders receive the balance

13 that remains after all creditors are paid, if any.

14      For the Court to be able to confirm the Plan, the Court

15 must find that all creditors and interest holders who do not

16 accept the Plan will receive at least as much under the Plan as

17 such holders would receive under a chapter 7 liquidation of the

18 Debtors.   The Debtors maintain that this requirement is clearly

19 met.

20      The impaired classes under the Plan consist of class 1

21 (GE's allowed secured claim), class 2 (Bernardi's allowed

22 secured claim), class 3 (S&S's allowed secured claim), class 4

23 (other secured claims), and class 6 (general unsecured

24 creditors).   The Debtors must therefore satisfy the "best

25 interest of creditors test" with respect to members of classes

1, 2, 3, 4 and 6 who do not vote to accept the Plan.

1   As described above, class 1, 2, 3 and 4 claims will be paid

2   the full amount of their allowed claims under the Plan, either

3   in cash or over time with market terms which will result in all

4   such claim holders receiving the full amount of the present

5   value of their allowed claims.   Since all such claim holders

6   would be paid the full amount of their allowed claims in a

7   chapter 7 liquidation of the Debtors, all holders of such

8   allowed claims will therefore receive *not less* under the Plan

9   than they would receive in a chapter 7 liquidation of the

10  Debtors.

11      Estimating the recovery that holders of class 6 allowed

12  claims would receive in a chapter 7 liquidation of the Debtors

13  is difficult and speculative.   The primary assets of the Debtors

14  consist of the restaurants that they own.   As a result, the

15  value of these restaurants is only what a third party buyer

16  would pay for them.   The Debtors believe that the book values of

17  those assets as maintained by the Debtors is irrelevant to this

18  analysis.

19      As explained above, the Debtors believe that the only

20  assets that FRC owns that have any real sellable value to a

21  third party are the thirteen (13) restaurants owned by FRC where

22  FRC is the named lessee.   However, if a third party purchased

23  these restaurants, they would either have to operate them as

24  entirely different restaurants or businesses other than as

25  "Fatburger" restaurants, or they would have to enter into

    franchise agreements with FB North America and become obligated

104

to pay normal royalty fees, etc. as all other franchisees pay. However, FB North America would have no obligation to provide such a buyer(s) with "Fatburger" franchise rights.  The Debtors estimate that the actual sellable value of these thirteen (13) restaurants in a chapter 7 liquidation of the Debtors is approximately $45,000 per restaurant, equating to a total actual sellable value of approximately $585,000.  The Debtors estimate that the other two (2) restaurants owned by FRC have an actual sellable value in a chapter 7 liquidation of the Debtor of approximately $25,000 per restaurant, meaning that the Debtors estimate that the actual sellable value of all fifteen (15) restaurants owned by FRC is approximately $635,000.

As also explained above, the Debtors believe that the thirteen (13) restaurants that FRN owns do not have any real sellable value because the two (2) restaurants where FRN is the named lessee are required by the terms of their leases to be "Fatburger" restaurants, which FRN cannot do without a franchise agreement from FB North America, and the balance of the restaurants owned by FRN do not contain any lease rights that could be sold to a third party buyer.  The Debtors therefore estimate that the actual value of these thirteen (13) restaurants is approximately $25,000 per restaurant, equating to a total actual sellable value of approximately $325,000.

As summarized below, the Debtors estimate that holders of class 6 allowed claims of FRC and FRN would receive 0% of the amount of their class 6 allowed claims (i.e., nothing) in a

105

chapter 7 liquidation of FRC and FRN.  In contrast, holders of class 6 allowed claims of FRC and FRN will receive, at their choice, either 25% of the amount of their class 6 allowed claims on the Plan Effective Date or 100% of the amount of their class 6 allowed claim over a period of five years with interest.  It is therefore clear that all holders of class 6 allowed claims will receive <u>substantially more</u> under the Plan than they would receive in a chapter 7 liquidation of the Debtors.

The Debtors have therefore satisfied the "best interests of creditors test" with respect to any class 6 claim holder who votes against the Plan.  The Debtors believe that the Plan provides fair and equitable treatment of all classes of creditors and the greatest feasible recovery to all creditors.

Below is a demonstration, in balance sheet format, that all holders of class 6 claims will receive more under the Plan than they would receive under a chapter 7 liquidation of the Debtors. This information is provided by the Debtors.

**ASSETS VALUED AT LIQUIDATION VALUES (ESTIMATED AS OF MARCH 31, 2010):**

**<u>Liquidation Analysis of FRC:</u>**

| | |
|---|---:|
| Cash | $ 0 |
| Accounts Receivable | $ 126,732 |
| Inventory – Net | $ 52,848 |
| Prepaid Expense | $ 0 |
| Restaurants | $ 635,000 |
| Fixed Assets | $ 0 |
| Other Assets | $ 0 |
| Total Assets | $ 814,580 |

**Less:**

Secured Claims:
| | |
|---|---|
| GE | $   250,000 |
| Bernardi | $    73,000 |
| S&S | $    45,000 |
| Signature DIP Loan | $1,100,000 |

Administrative Claims:
Chapter 7 Trustee Fees and       $   500,000
the Fees/Expenses of the
Professionals Employed By
the Trustee

Professionals Fees/Expenses      $   600,000
Incurred During Chapter 11
Outstanding Chapter 11 A/P   $   400,000

Pre-Petition Priority Tax Claims:   $   106,140

Balance Available to be Paid        $         0
To Pre-Petition General
Unsecured Creditors


**Liquidation Analysis of FRN:**

| | |
|---|---|
| Cash | $   173,830 |
| Accounts Receivable | $   155,811 |
| Inventory – Net | $    55,743 |
| Prepaid Expense | $         0 |
| Restaurants | $   325,000 |
| Fixed Assets | $         0 |
| Other Assets | $         0 |
| Total Assets | $   710,384 |


**Less:**

Secured Claims:
| | |
|---|---|
| GE | $   200,000 |
| Signature DIP Loan | $1,100,000 |

Administrative Claims:
Chapter 7 Trustee Fees and       $   500,000
the Fees/Expenses of the

```
      Professionals Employed By
      the Trustee

      Professionals Fees/Expenses     $   600,000
      Incurred During Chapter 11
      Outstanding Chapter 11 A/P      $   400,000

Pre-Petition Priority Tax Claims:    $   106,140

Balance Available to be Paid         $         0
To Pre-Petition General
Unsecured Creditors
```

**% OF THEIR CLAIMS WHICH GENERAL UNSECURED CREDITORS (HOLDERS OF CLASS 6 ALLOWED CLAIMS) OF FRC AND FRN WOULD RECEIVE OR RETAIN IN A CH. 7 LIQUIDATION = 0%.**

**% OF THEIR CLAIMS WHICH GENERAL UNSECURED CREDITORS (HOLDERS OF CLASS 6 ALLOWED CLAIMS) OF FRC AND FRN WILL RECEIVE OR RETAIN UNDER THE PLAN = 25% ON THE PLAN EFFECTIVE DATE OR 100% (PLUS INTEREST) OVER FIVE YEARS**

**L.    Feasibility.**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough cash on hand on the Plan Effective Date to pay all the claims and expenses which are entitled to be paid on such date. The New Value Contribution that FB Corp. will be contributing to the Reorganized Debtor on the Plan Effective Date will provide the Reorganized Debtor with enough cash on the

108

Plan Effective Date to enable the Reorganized Debtor to pay all the claims and expenses which are entitled to be paid on such date, enabling the Debtors to satisfy the first aspect of the feasibility analysis. Prior to the Plan confirmation hearing, FB Corp. will deposit into a segregated trust account maintained by LNBRB the entire amount of the New Value Contribution. The exact amount of the New Value Contribution will be dependent upon how many holders of class 6 allowed claims elect to receive the 25% cash out option.

The second aspect considers whether the Reorganized Debtor will have enough cash over the life of the Plan to make the required Plan payments. Attached as Exhibit "5" to this Disclosure Statement are cash flow projections prepared on a quarterly basis for the five-year period following the Plan Effective Date, which demonstrate the ability of the Reorganized Debtor to make all of the Plan payments which are required to be made over time.

## VII. <u>RISK FACTORS REGARDING THE PLAN</u>

The Debtors do not believe that there is any meaningful risk to the Debtors' ability to satisfy the first aspect of Plan feasibility because FB Corp. will have deposited the New Value Contribution into a segregated trust account maintained by LNBRB prior to the Plan confirmation hearing, and the Debtors will not proceed with confirmation of the Plan unless and until that has occurred.

The primary risk facing the Reorganized Debtor will be the ability of the Reorganized Debtor to make all of their Plan payments over time when they come due.  However, the Debtors are confident that between the lending to be made by FB North America to the Reorganized Debtor and the projected cash flow generated by the business operations of the Reorganized Debtor, the Reorganized Debtor will have sufficient funds available to make all of their Plan payments over time when they come due.

## VIII. <u>EFFECT OF CONFIRMATION OF THE PLAN</u>

### A.    Discharge.

The Debtors will receive a discharge under the Plan pursuant to and in accordance with the provisions of Section 1141 of the Bankruptcy Code because there has not been a liquidation of all or substantially all of the property of the Debtors' estates and because the Reorganized Debtor will be continuing with the Debtors' current business operations.

### B.    Modification of the Plan.

The Debtors may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or re-voting on the Plan if the Debtors modify the Plan before confirmation.  The Debtors may also seek to modify the Plan at any time after confirmation of the Plan so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

110

**C.    Post-Confirmation Status Reports.**

As described above, until a final decree closing the Debtors' chapter 11 cases is entered, the Reorganized Debtor will file quarterly post-confirmation status reports with the Court explaining what progress has been made toward consummation of the confirmed Plan.

**D.    Post-Confirmation Conversion/Dismissal.**

A creditor or any other party in interest may bring a motion to convert or dismiss these cases under Section 1112(b) of the Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan.  If the Court orders the cases converted to chapter 7 after the Plan is confirmed, then all property that had been property of the Debtors' chapter 11 estates, and that has not been disbursed pursuant to the Plan, will revest in the chapter 7 estates, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during these cases.  The Plan Confirmation Order may also be revoked under very limited circumstances.  The Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Plan Confirmation Order.

**E.    Final Decree.**

Once these estates have been fully administered as referred

111

1   to in Bankruptcy Rule 3022, the Reorganized Debtor will file a

2   motion with the Court to obtain a final decree to close these

3   cases.   The Reorganized Debtor will be responsible for the

4   timely payment of all fees incurred pursuant to 28 U.S.C.

5   Section 1930(a)(6).

6   Dated: November 3, 2009

7   Presented By:

8   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

9

10  By: _____
        RON BENDER

11      JACQUELINE L. RODRIGUEZ
        JULIET Y. OH

12      Attorneys for Chapter 11
        Debtors and Plan Proponents

13

14  Fatburger Restaurants of California, Inc.

15  Fatburger Restaurants of Nevada, Inc.

16  By: _____

17      Jason Melvin
        Chief Financial Officer and Secretary

18

19

20

21

22

23

24

25

                                112

**EXHIBITS TO DISCLOSURE STATEMENT**

**TO BE FILED**

| In re:<br><br>FATBURGER RESTAURANTS OF CALIFORNIA, INC., et al.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER **Lead Case No. 1:09-bk-13964-GM** (Jointly Administered with Case No. **1:09-bk-13965-GM**) |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as

### DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT PLAN OF REORGANIZATION (DATED NOVEMBER 3, 2009)

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On November 3, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Ron Bender    rb@lnbrb.com
- Bradley D Blakeley    bblakeley@blakeleyllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Candace Carlyon    ccarlyon@sheacarlyon.com
- Leslie A Cohen    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com
- Andrew A Goodman    agoodman@andyglaw.com
- Raffi Khatchadourian    raffi@hemar-rousso.com
- Raymond King    rking@raykinglaw.com
- Mette H Kurth    kurth.mette@arentfox.com
- Rodger M Landau    rlandau@lblawllp.com, kmoss@lblawllp.com
- Ian Landsberg    ilandsberg@lm-lawyers.com
- William Malcolm    bill@mclaw.org
- Kenneth Miller    kmiller@ecjlaw.com
- Ethan B Minkin    ethan.minkin@kutakrock.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Abel Ortiz    christy.errico@kts-law.com
- Jacqueline L Rodriguez    jlr@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- I Bruce Speiser    bspeiser@pircher.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Sanford M Wall    brenda.eiden@kts-law.com
- Aleksandra Zimonjic    azimonjic@lblawllp.com, azimonjic@lblawllp.com;kmoss@lblawllp.com

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                       **F 9013-3.1**

| In re: | CHAPTER 11 |
|---|---|
| | CASE NUMBER **Lead Case No. 1:09-bk-13964-GM** (Jointly Administered with Case No. **1:09-bk-13965-GM**) |
| FATBURGER RESTAURANTS OF CALIFORNIA, INC., et al.          Debtor(s). | |

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On November 3, 2009, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

SERVICE BY U.S. MAIL

Margaux Ross, Esq.
Office of the U.S. Trustee
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367

Harold Fox
Fatburger Restaurants of California
Fatburger Restaurants of Nevada
301 Arizona Avenue, Suite 200
Santa Monica, CA 90401

Counsel for Committee
Rodger M. Landau, Esq.
Landau & Berger
1801 Century Park East, #1460
Los Angeles, CA 90067

Counsel for GE
Ethan B. Minkin
Kutak Rock LLP
8601 North Scottsdale, Suite 300
Scottsdale, AZ 85253

Securities Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036

Securities Exchange Commission
450 5th Street, NW
Washington, DC 20549

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November 3, 2009, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

Via Personal Attorney Service
The Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Boulevard
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 3, 2009 | Lourdes Cruz | */s/ Lourdes Cruz* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009*                                                                                          **F 9013-3.1**