RON BENDER (SBN 143364)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>FATBURGER RESTAURANTS OF CALIFORNIA, INC., *et al.*,<br><br>Debtors.<br><br>———————————————<br><br>— Affects Fatburger Restaurants of California, Inc. Only<br><br>— Affects Fatburger Restaurants of Nevada, Inc. Only<br><br> X  Affects Both Debtors | Case No. 1:09-bk-13964-GM<br><br>Chapter 11<br><br>Jointly Administered with Case No. 1:09-bk-13965-GM<br><br>**DEBTORS' MOTION FOR ENTRY OF AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS (EXCLUDING CASH AND ACCOUNTS RECEIVABLE) FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS; (2) APPROVING OF DEBTORS' ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF WINSTON MAR**<br><br>Date:    May 3, 2011<br>Time:    1:30 p.m.<br>Place:   Courtroom "303"<br>          21041 Burbank Blvd.<br>          Woodland Hills, California |

Fatburger Restaurants of California, Inc. ("FB California") and Fatburger Restaurants of Nevada, Inc. ("FB Nevada," and together with FB California, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, hereby file this Motion ("Motion") for entry of an order of the Court: (A) pursuant to 11 U.S.C. § 363(f) approving the sale of the Debtors' twenty-six Restaurants and substantially all of the Debtors' tangible and intangible assets related to the Restaurants (excluding, among other things, the Debtors' cash and accounts receivable) (collectively, the "Purchased Assets") free and clear of all liens, claims and interests to the winning bidders at an auction sale to be held on April 21, 2011; (B) pursuant to 11 U.S.C. § 365, (i) authorizing the Debtors to assume executory contracts and unexpired leases ("Assumed Contracts") and assign them to the winning bidders and (ii) establishing the cure amounts, if any, payable under such Assumed Contracts; and (C) waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d) to enable the sale to close as quickly as possible.

This Motion is based upon the annexed Memorandum of Points and Authorities and the annexed Declaration of Winston Mar in support of the Motion (the "Mar Declaration"), as well as all statements, arguments and representations to be made by counsel to the Debtors at the hearing on the Motion.

WHEREFORE, the Debtors respectfully request the Court to enter an order:

1.      approving the sale of the Purchased Assets to the winning bidders free and clear of all liens, claims and interests, with the Debtors to submit the results of the auction sale with the Court following the conclusion of the auction sale;

2.      finding that the winning bidders are good faith buyers entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

3.      approving (effective as of the date of the sale closings) the Debtors' assumption and assignment to the winning bidders of all of the Debtors' unexpired leases and executory contracts which the winning bidders desire to acquire in accordance with the procedures outlined below;

4.      finding that the cure amounts which must be paid in connection with the Debtors' assumption and assignment of any of their unexpired leases and executory contracts are as set forth in exhibit "1" to the Mar Declaration (as supplemented or amended), with adequate assurance of future performance to be demonstrated as required by the other parties to the unexpired leases and executory contracts by the winning bidders, and ordering that any party that fails to file a timely objection to this Motion shall be deemed to have consented to the Debtors' proposed cure amounts and be forever barred from challenging the Debtors' proposed cure amounts or from asserting any claims on account of cure costs against the winning bidders in respect of any such unexpired leases or executory contract;

5.      waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

6.      granting such other and further relief as the Court deems just and proper.

Dated: April 12, 2011

FATBURGER RESTAURANTS OF
CALIFORNIA, INC., *et al.*

By:___*/s/ Ron Bender*_____
        Ron Bender
        Juliet Y. Oh
        LEVENE, NEALE, BENDER, YOO
        & BRILL L.L.P.
        Attorneys for Chapter 11 Debtors and
        Debtors in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### CASE BACKGROUND

The Debtors filed voluntary petitions under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code") on April 7, 2009 (the "Petition Date").  The Debtors continue to operate their business, manage their financial affairs and administer their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  An Official Committee of Unsecured Creditors (the "Committee") has been formed for both cases.

The Debtors are presently the owners and operators of twenty-six (26) Fatburger restaurants located in California and Nevada (collectively, the "Restaurants," and individually, a "Restaurant").  The Debtors' revenue is derived from sales at their respective Restaurants.

The Debtors are part of a larger Fatburger enterprise which, as of the Petition Date, consisted of approximately 90 restaurants in 14 states as well as 3 foreign countries (Canada, Dubai and China).  The Debtors are both wholly-owned subsidiaries of Fatburger Corporation ("FB Corp."), which is, in turn, a wholly-owned subsidiary of Fatburger Holdings, Inc. ("FB Holdings"), which is, in turn, a majority-owned subsidiary of Fog Cutter Capital Group Inc. ("Fog Cutter").  FB Holdings serves only as a holding company and does not have any employees.  FB Corp. houses the Fatburger enterprise's corporate activities and has approximately 31 employees.  Fatburger North America, Inc. ("FB North America"), another wholly-owned subsidiary of FB Corp., serves as the franchisor entity for the Fatburger enterprise and collects royalty and marketing fees from all Fatburger franchisees.  FB Corp., FB Holdings, Fog Cutter and FB North America are collectively referred to herein as the "Non-Debtor Affiliates".

Of the Debtors' twenty-six (26) Fatburger Restaurants located in California and Nevada, the Debtors are currently the actual named lessees of fifteen (15) of the Restaurants, while Non-Debtor Affiliates, FB Corp. and/or FB North America, are the actual named

4

lessees and/or owners of the real property for the remaining eleven (11) Restaurants. Specifically, FB Corp. and/or FB North America are parties to written lease agreements for the following nine (9) locations which are operated by the Debtors (collectively, the "Non-Debtor Leases," and individually, a "Non-Debtor Lease"):

        i.     3021 Michelson Drive, Irvine, California 92612;

       ii.     2300 Paseo Verde, Suite 2011, Henderson, Nevada 89052;

      iii.     4949 North Rancho Drive, Suite 4, Las Vegas, Nevada 89130;

      iv.     2101 Texas Star Lane, North Las Vegas, Nevada 89032;

       v.     1301 West Sunset Road, Henderson, Nevada 89014;

      vi.     3763 South Las Vegas Blvd., Suite A, Las Vegas, Nevada 89109;

     vii.     4525 North Rancho Drive, Las Vegas, Nevada 89130;

    viii.     6775 West Flamingo Road, Las Vegas, Nevada 89103; and

      ix.     4199 South Fort Apache Blvd., Las Vegas, Nevada 89147.

In addition, the Debtors are not party to any written lease or sublease agreements for the following two (2) locations, which are operated from real property owned by FB Corp.: (i) 4851 Charleston Boulevard, Las Vegas, Nevada 89146, and (ii) 4663 East Sunset Road, Henderson, Nevada 89014.

Although the Debtors are not actually the named parties to the Non-Debtor Leases, the Debtors have been the entities that have been in possession of and have owned and operated the Restaurants at such locations for many years, and have taken responsibility for the payment of all obligations under the Non-Debtor Leases and for such Restaurants. The Debtors therefore believe that they are *de facto* lessees, sublessees, "tenants at will," and/or the holders of other occupancy rights as well as *de facto* franchisees with respect to the foregoing locations.

Soon after the commencement of the Debtors' bankruptcy cases, the Debtors (in conjunction with certain of the Non-Debtor Affiliates) actively sought debtor in possession financing and ultimately elected to accept a financing proposal from Signature Credit Partners, LLC ("Signature"), which enabled the Debtors to borrow $1.1 million from

Signature on a secured basis (the "Signature DIP Financing").  The Signature DIP Financing was approved by the Court pursuant to orders entered on June 18, 2009 and June 26, 2009. Accordingly, the Debtors and Signature entered into a Loan and Security Agreement dated as of June 26, 2009, which provided for a term of 12 months after the Closing Date (the date of the Loan Agreement), absent an earlier confirmed plan.  The Signature DIP Financing has now matured.

The Debtors filed a joint plan of reorganization (the "Plan") and a disclosure statement describing the Plan on November 3, 2009.  The Plan was premised upon the ability of the Non-Debtor Affiliates to raise the money necessary to fund the Plan.  The Non-Debtor Affiliates have not been able to raise sufficient money to fund the Plan.  As a result, given the Debtors' dire financial circumstances (where the Debtors do not have the ability to operate without funding from the Non-Debtor Affiliates, which funding has been provided on a subordinated basis) and inability to confirm the Plan, the Debtors and the Non-Debtor Affiliates concluded that proceeding at this time with an expedited going concern sale of the Restaurants for the most money possible is the optimal manner to bring the Debtors' chapter 11 bankruptcy cases to a prompt conclusion.

With the consent of Signature and the Committee, the Debtors employed Winston Mar of CRG Partners Group, LLC to serve as the Debtors' chief restructuring officer ("CRO"), and the Debtors employed National Franchise Sales, Inc. ("NFS") as the Debtors' sales agent to conduct the sale process.  Since the Debtors' employment of the CRO was approved by the Court, which occurred on or about February 16, 2011, the CRO has been in control of the Debtors' business operations and revenue.  Since the Debtors' employment of NFS was approved by the Court on or about February 24, 2011 (and even commencing before that date), NFS has actively and aggressively marketed the Restaurants for sale.

After consulting with a number of parties, and taking into account the Debtors' financial constraints and inability to continue operating their business on any long-term basis, NFS determined that the optimal strategy to maximize the total purchase prices paid for the Restaurants was to establish a deadline of 12:00 p.m. Noon on March 28, 2011 for

prospective buyers who are interested in serving as stalking horse bidders to submit their proposed stalking horse bids and to have an open auction take place on April 21, 2011 in an effort to obtain the highest purchase prices possible for the Restaurants.  In connection with this process, NFS contacted a large number of prospective buyers.  NFS circulated to all prospective buyers a form asset purchase agreement for them to use which was prepared by NFS and counsel to the Debtors (the "Template APA").  A copy of the Template APA was attached as Exhibit "1" to the Declaration of Alan F. Gallup filed in support of the Debtors' bid procedures motion (the "Gallup Declaration").

By the stalking horse bid deadline of 12:00 p.m. Noon on March 28, 2011, a total of thirteen proposed stalking horse bidders submitted various stalking horse bids expressing an interest in buying multiple Restaurants.  After consultation with Signature and the Committee, and at the recommendation of NFS, the Debtors accepted stalking horse bids covering a total of nine of the Restaurants.[1]  With the consent of the Court, the Debtors will be proceeding to the auction sale with stalking horse bids in place for nine of the Restaurants and with minimum required bids for the balance of the Debtors' twenty-six Restaurants.  NFS anticipates that there likely will be a robust amount of bidding that will occur at the auction sale, including bidding on Restaurants for which there currently is no stalking horse bidder.

The following is a listing of each of the Debtors' twenty-six Restaurants which are available to be purchased at the auction sale, with the name of the tenant, the address of the Restaurant, the amount of the required minimum bid for each Restaurant, and an indication of whether a stalking horse bid has been accepted for that particular Restaurant[2]:

---

[1] The Debtors did receive a number of proposed stalking horse bids which were higher than the accepted stalking horse bids but the bids were non-conforming for a variety of reasons and therefore not eligible to serve as stalking horse bids.

[2] The words "Stalking Horse Bid" are indicated after the required Minimum Bid for those nine (9) Restaurants where stalking horse bids have been received and accepted by the Debtors.  The amount of the required Minimum Bid for those nine (9) Restaurants already takes into account the required $10,000 minimum overbid to the accepted stalking horse bid.

**California Restaurants**

| Named Tenant in Written Lease | Address of Restaurant | Minimum Bid |
|---|---|---|
| FB California | 4070 Marlton Ave.<br>Los Angeles, CA 90008<br>Restaurant #119 | $50,000 |
| FB California | 16848 Devonshire St.<br>Granada Hills, CA 91344<br>Restaurant #120 | $5,000 |
| FB California | 14402 Ventura Blvd.<br>Sherman Oaks, CA 90401<br>Restaurant #110 | $60,000<br>Stalking Horse<br>Bid Accepted |
| FB California | 1611 N. Vermont Ave.<br>Hollywood, CA 90027<br>Restaurant #109 | $375,000<br>Stalking Horse<br>Bid Accepted |
| FB California | 49500 Seminole Drive<br>Cabazon, CA 92230<br>Restaurant #137 | $60,000<br>Stalking Horse<br>Bid Accepted |
| FB California | 7450 Santa Monica Blvd.<br>West Hollywood, CA 90046<br>Restaurant #115 | $165,000<br>Stalking Horse<br>Bid Accepted |
| FB California | 1698 Pacific Coast Highway<br>Redondo Beach, CA 90277<br>Restaurant #104 | $25,000 |
| FB California | 21911 Ventura Blvd.<br>Woodland Hills, CA 91364<br>Restaurant #116 | $60,000<br>Stalking Horse<br>Bid Accepted |
| FB California | 2318 North Tustin Street, Suite C<br>Orange, CA 92665<br>Restaurant #61 | $5,000 |
| FB California | 451 Paseo Dorotea<br>Palm Springs, CA 92264<br>Restaurant #88 | $5,000 |
| FB California | 11226 4th Street, Suite 101<br>Rancho Cucamonga, CA 91730<br>Restaurant #1004 | $20,000 |
| FB California | 401 Newport Center Dr., #A-103<br>Newport Beach, CA 92660<br>Restaurant #135 | $10,000 |

| Named Tenant in Written Lease | Address of Restaurant | Minimum Bid |
|---|---|---|
| Fatburger Corporation | 3021 Michelson Drive, Irvine, California 92612 Restaurant #122 | $5,000 |

**Nevada Restaurants**

| Named Tenant in Written Lease | Address of Restaurant | Minimum Bid |
|---|---|---|
| FB Nevada | 11011 W. Charleston Blvd. Las Vegas, NV 89135 Restaurant #138 | $110,000 Stalking Horse Bid Accepted |
| FB Nevada | 777 West Lake Mead Drive Henderson, NV 89015 Restaurant #143 | $120,000 Stalking Horse Bid Accepted |
| FB Nevada | 2485 South Nellis Blvd., Las Vegas, Nevada 89121 Restaurant #125 | $5,000 |
| Fatburger North America, Inc., or Fatburger Corporation or FB Nevada | 2300 Paseo Verde, Suite 2011, Henderson, Nevada 89052 Restaurant #132 | $110,000 Stalking Horse Bid Accepted |
| Fatburger North America, Inc. | 4949 North Rancho Drive, Suite 4, Las Vegas, Nevada 89130 Restaurant #131 | $120,000 Stalking Horse Bid Accepted |
| Fatburger North America, Inc. | 2101 Texas Star Lane, North Las Vegas, Nevada 89032 Restaurant #129 | $70,000 |
| Fatburger North America, Inc. | 1301 West Sunset Road, Henderson, Nevada 89014 Restaurant #127 | $175,000 |
| Fatburger Corporation | 3763 South Las Vegas Blvd., Suite A, Las Vegas, Nevada 89109, Restaurant #123 | $1,500,000 |
| Fatburger North America, Inc. | 4525 North Rancho Drive, Las Vegas, Nevada 89130 Restaurant #128 | $5,000 |
| Fatburger North America, Inc. | 6775 West Flamingo Road, Las Vegas, Nevada 89103 Restaurant #130 | $5,000 |

| | | |
|---|---|---|
| Fatburger Corporation | 4199 South Fort Apache Blvd., Las Vegas, Nevada 89147 Restaurant #139 | $15,000 |
| No written lease exists but Fatburger Corporation (an affiliate) is the landlord and has agreed to provide a commercially reasonable lease agreement to any qualified buyer | 4851 Charleston Boulevard, Las Vegas, Nevada 89146 Restaurant #124 | $5,000 |
| No written lease exists but Fatburger Corporation (an affiliate) is the landlord and has agreed to provide a commercially reasonable lease agreement to any qualified buyer | 4663 East Sunset Road, Henderson, Nevada 89014 Restaurant #126 | $60,000 |

The identities of the approved stalking horse bidders, along with the Restaurant number which is the subject of the Stalking Horse Bid and the amount of such Stalking Horse Bid are as follows:

Ashok Israni – Restaurant #132 – Stalking Horse Bid amount = $100,000

Ashok Israni – Restaurant #138 – Stalking Horse Bid amount = $100,000

Hassan Sheikh – Restaurant #131 – Stalking Horse Bid amount = $110,000

Hassan Sheikh – Restaurant #143 – Stalking Horse Bid amount = $110,000

Toufic Hemaidan – Restaurant #115 – Stalking Horse Bid amount = $155,000

Michael Nakhleh – Restaurant #110 – Stalking Horse Bid amount = $50,000

Michael Nakhleh – Restaurant #116 – Stalking Horse Bid amount = $50,000

Ernie Abarro – Restaurant #137 – Stalking Horse Bid amount = $50,000

Mitra Jarrazadeh – Restaurant #109 – Stalking Horse Bid amount = $365,000

The Court approved the Stalking Horse Bids for the Restaurants involved in the amounts set forth above, subject to overbid at the auction sale to be held on April 21, 2011.

## II.

### THE AUCTION SALE PROCESS

With the consent of the Court, the auction sale will be held on April 21, 2011, commencing at 9:00 a.m., at the Newport Beach Radisson Hotel located at 4545 MacArthur Boulevard, Newport Beach, California 92660.

In the event any Stalking Horse Bid is not deemed to be the winning bid at the auction sale and the Debtors proceed to sell the Restaurant which is the subject of the Stalking Horse Bid to a different buyer and consummate that sale, the party who submitted the Stalking Horse Bid will receive a break-up fee of $5,000 per Restaurant, which break-up fee will be paid directly from the proceeds of the sale of the Restaurant to the winning bidder.

The auction sale will be conducted by NFS. The Stalking Horse Bids will establish the baseline purchase price for each Restaurant which is the subject of a Stalking Horse Bid. The minimum overbid for each Restaurant for which there is a Stalking Horse Bid will be $10,000 above the Stalking Horse Bid, which will provide sufficient funds to pay the $5,000 break-up fee and provide the Debtors' estates with an economic benefit. Each subsequent overbid must be at least $5,000. If multiple prospective bidders seek to be eligible to bid on a particular Restaurant, NFS will randomly establish the bidding order for bidders.

With regard to Restaurants for which there is no Stalking Horse Bid, there will be a minimum required bid at the auction sale as set forth in the chart above, which minimum required bids are subject to change by NFS after consultation with the Debtors and the Committee (and with Signature if Signature agrees to waive any right to participate as a bidder at the auction sale). If the Debtors and the Committee (and Signature if Signature agrees to waive any right to participate as a bidder at the auction sale) are not able to agree to a change to a required minimum bid, the final decision shall be made by the CRO.

The auction sale will continue until NFS has concluded that the highest and best bid has been submitted for each Restaurant. NFS shall encourage buyers, including those who submitted Stalking Horse Bids, to submit bulk bids for groups of Restaurants, and NFS will evaluate any such bulk bid against the compilation of individual or smaller bulk bids to

1   determine which bids would result in the highest and best total prices paid to the Debtors'

2   estates.  All economic decisions to be made by NFS in connection with the auction sale will

3   be made after consulting with the Debtors, the Committee, any respective landlord to the

4   extent a landlord attends the auction sale and wishes to participate in that regard for a

5   particular Restaurant involving such landlord, and with Signature if Signature agrees to waive

6   any right to participate as a bidder at the auction sale.  NFS, in consultation with the Debtors

7   and the Committee (and with Signature if Signature agrees to waive any right to participate as

8   a bidder at the auction sale), shall have the right to alter the auction sale format as appropriate

9   and beneficial to the Debtors' estates.  If the Debtors and the Committee (and Signature if

10  Signature agrees to waive any right to participate as a bidder at the auction sale) are not able

11  to agree to an alteration of the auction sale format, the final decision shall be made by the

12  CRO.  No later than April 22, 2011, the Debtors shall submit the results of the auction sale to

13  the Restaurants' landlords (as it relates to their respective locations) and to the Court and

14  request the Court to enter an order approving the Debtors' sale of the Restaurants (the "Sale

15  Approval Request") to the highest and best bidders ("Successful Bidder" in the singular and

16  "Successful Bidders" in the plural).  The hearing for the Court to consider approval of the

17  Sale Approval Request shall be held on May 3, 2011 at 1:30 p.m.

18      In order to participate in the auction sale, prospective bidders must become a qualified

19  bidder ("Qualified Bidder").  To become a Qualified Bidder, a prospective bidder ("Potential

20  Bidder") must deliver (unless previously delivered) to NFS by 5:00 p.m. Pacific Time on

21  April 20, 2011 the following qualifying materials:

22          i.      An executed confidentiality agreement.

23          ii.     Current financial statements of the Potential Bidder, or, if the Potential

24  Bidder is an entity formed for the purpose of acquiring any of the Restaurants, current

25  financial statements of the equity holder(s) of the Potential Bidder or such other acceptable

26  form of financial evidence of the Potential Bidder's financial ability to consummate the

27  transaction.

28

12

iii.    A completed Fatburger Franchise Application, and other franchisee application materials that may be required by the Franchisor (which is Fatburger North America, Inc.), along with a resume of each proposed equity holder and officer of the Potential Bidder setting forth relevant business and professional experience (unless the Potential Bidder does not intend to operate the Restaurant as a Fatburger Restaurant)[3].  As part of a stipulation which has been approved by the Court, the Franchisor has agreed to distribute disclosure materials to any Potential Bidder who may desire to be a Fatburger franchisee, in accordance with the provisions of California Franchise Investment Law. Qualified Bidders who qualify for franchise rights shall be offered the standard Fatburger franchise agreement for the applicable Restaurants, provided, however, that the Franchisor shall waive payment of any initial fees or deposits typically required by the Franchisor of franchisees.  The duration of the franchise rights to be offered by the Franchisor to buyers shall mirror the term of the applicable real property lease, including any and all options to extend such term and any additional extensions that the buyer is able to obtain from its respective landlord, and in the case of a transferred leasehold interest with no fixed term, the duration of the franchise rights offered by the Franchisor shall be the standard term offered to third party franchisees in the United States.  In connection with the making of their bid for a Restaurant, the bidder will be required to indicate whether the bidder intends to operate the Restaurant as a Fatburger restaurant or not.

iv.    Deliver to NFS a certified or cashier's check in the amount of $10,000 for each Restaurant the Potential Bidder desires to be eligible to bid for (e.g., if the Potential Bidder desires to be eligible to bid for eight Restaurants, the Potential Bidder will be required to deliver to NFS a certified or cashier's check in the total amount of $80,000).  The deposit checks must be made payable to the escrow agent, Citywide Escrow Services, Inc.

---

[3] Following the closing of their sales, buyers are not required to operate the Restaurants which they purchase as Fatburger restaurants if they desire to do something else with the location.

Within two business days following the completion of the auction sale, each Successful Bidder will be required to increase the amount of their deposit to the greater of (i) 20% of the amount of the winning bid per Restaurant and (ii) $20,000 per Restaurant by delivering to NFS an additional certified or cashier's check made payable to the escrow agent, Citywide Escrow Services, Inc.  All deposits will be credited towards the purchase price at the closing and will be completely non-refundable and forfeited to the Debtors in the event of the failure of the Successful Bidder to consummate its purchase in a timely manner unless the failure to consummate its purchase was not the fault of the Successful Bidder.  However, the forfeiture of the deposit will not be considered liquidated damages and any Successful Bidders who fail to consummate their purchase will be liable to the Debtors for the full amount of their winning bids.

A Potential Bidder may qualify as a Qualified Bidder only if the Potential Bidder demonstrates its ability to consummate its purchase of the Restaurants that it wishes to purchase, including demonstrating that it has the ability to provide adequate assurance of future performance under all real property leases and other contracts to be assumed by the Potential Bidder in connection with the Potential Bidder's purchase of the Restaurants.

All sale closings must occur by May 6, 2011, which means that in order to become a Qualified Bidder, a Potential Bidder must demonstrate that it has the ability to pay all cash, in the form of a certified cashier's check or wire transfer, for any offer made to purchase a Restaurant, or, if the Potential Bidder intends to obtain acquisition and/or working capital financing to fund the proposed transaction, then the Potential Bidder must demonstrate that all such financing can be obtained in time for the Potential Bidder to consummate the transaction by May 6, 2011.  NFS, in consultation with the Debtors and the Committee (and Signature if Signature agrees to waive any right to participate as a bidder at the auction sale), shall have the right to extend sale closing dates as appropriate and beneficial to the Debtors' estates.

In the event that any of the Successful Bidders fails to consummate its purchase, the Debtors will proceed to sell the respective Restaurant to the winning back up bidder ("Successful Back-Up Bidder" in the singular and "Successful Back-Up Bidders" in the

plural).  By participating in the auction sale, all bidders will be required to agree that the second highest bidder for any Restaurant will be deemed the Successful Back-Up Bidder and will be required to consummate its purchase of the respective Restaurant(s) in accordance with the terms of its successful back-up bid provided it is informed by May 7, 2011 that it is the Successful Bidder (because of the failure of the initial Successful Bidder to consummate its purchase), in which case the Successful Back-Up Bidder shall have until May 21, 2011 to consummate its purchase of the respective Restaurants.  Upon being notified that a Successful Back-Up Bidder is deemed to be the Successful Bidder for a particular Restaurant, the Successful Back-Up Bidder will be required to provide the Debtors with the same non-refundable deposit as the initial Successful Bidder.  There may be more than one Successful Back-Up Bidder for any particular Restaurant.

All Qualified Bidders, including those who have submitted approved Stalking Horse Bids, will be entitled to participate in the auction sale.  The Debtors and the Committee (and Signature if Signature agrees to waive any right to participate as a bidder at the auction sale) will all have the right to consult with and to provide input to the CRO as to whether it makes sense for the Debtors' estates to accept any bid which is not the highest bid amount as the winning bid for any particular Restaurants, but all final decisions will be made by the CRO.

All Successful Bidders at the auction sale will be required to enter into the Template APA attached as Exhibit "1" to the previously filed Gallup Declaration, subject to any reasonable changes which are made by the Successful Bidders and approved by the Debtors.

By accepting the Stalking Horse Bids and agreeing to pay the respective stalking horse bidders a break-up fee of $5,000 per Restaurant which is actually sold to an alternative buyer at the auction sale, the Debtors are not committing to proceed with consummating a sale of the Restaurants.  The Debtors shall proceed with consummating a sale of some or all of the Restaurants only if the Debtors, in consultation with the Committee (and Signature if Signature agrees to waive any right to participate as a bidder at the auction sale) conclude that doing so is in the best interests of the Debtors' estates and the Court approves the sale after notice and a hearing.  All sales shall be subject to the approval of the Court.

The Debtors' ability to assign leases, including leases where one of the Debtors is the actual named lessee under the lease, will subject to the approval of the Court. While the Non-Debtor Affiliates who are the actual named lessees of certain of the Restaurant leases have agreed to transfer and assign all of their respective rights, title and interests in and to those leases to the Successful Bidders at the auction sale provided the buyers of the Restaurants accept an assignment of those leases in full compliance with the terms of the respective written leases, all such proposed assignments of such leases shall be subject to and conditioned on the full and complete satisfaction of the terms of those respective leases, including each landlord's right to argue that the leases are not property of the Debtors' bankruptcy estates, that the Debtors are not the lessees or tenants under the leases, and/or that the Debtors have no standing to assign or request the landlord to consent to the assignment of the leases, and shall be further subject to all restrictions set forth in such leases with respect to any proposed assignments thereof, including that the landlord's consent must be obtained, delinquencies, fees, costs and other consideration owed to the landlord as provided for in such leases must be paid to the landlord or cured in full, adequate assurance of future performance by the Successful Bidders must be established, use restrictions must be enforced and existing lessees or tenants must not be released of any liability by virtue of the assignment (collectively, the "Non-Debtor Lease Compliance Issues"). The landlords shall file with the Court and serve on counsel for the Debtors, the Committee and Signature any opposition they may have to the Sale Approval Request, including raising any of the Non-Debtor Lease Compliance Issues no later than April 29, 2011.

Once the bidding at the auction sale on any Restaurant or group of Restaurants which were part of any stalking horse bid which was provided to Signature and which is not a matter of public record has been completed as determined by NFS, Signature shall have the right to submit a higher qualifying bid, which higher qualifying bid may include a credit bid for some or all of Signature's outstanding secured debt. Signature may use a portion of its secured debt to serve as the $10,000 per Restaurant required deposit to become a Qualified Bidder at the auction sale. Signature is excused from the need to provide financial data to the Debtors in

1    order to become a Qualified Bidder provided that Signature does not intend to bid more than

2    the outstanding amount of its secured debt (recognizing that if Signature is the Successful

3    Bidder for any Restaurants, Signature will still be required to provide whatever financial

4    information is necessary to enable the Debtors or the Non-Debtor Affiliates to assign their

5    real property leasehold rights to Signature).  If Signature does intend to bid more than the

6    outstanding amount of its secured debt, Signature will be required to demonstrate to the

7    satisfaction of NFS that Signature has the financial ability to do so.  Also, to the extent

8    Signature desires to become a Fatburger franchisee, Signature will be subject to the same

9    franchisee requirements as all other Potential Bidders.

10    ### III.

11    ### DISCUSSION

12    A.    The Court Should Authorize the Debtors to Sell the Purchased Assets to the

13    Successful Bidders at the Auction Sale.

14    Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a

15    hearing, may use, sell or lease, other than in the ordinary course of business, property of the

16    estate."  To approve a use, sale or lease of property other than in the ordinary course of

17    business, the court must find "some articulated business justification."  See, e.g., In re Martin

18    (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996) citing In re Schipper (Fulton State Bank v.

19    Schipper), 933 F.2d 513, 515 (7th Cir. 1991); Comm. of Equity SEC Holders v. Lionel Corp.

20    (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of

21    Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business

22    judgment" test of Lionel Corp. and requiring good faith); In re Delaware and Hudson Ry. Co.,

23    124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business

24    judgment" test in the Abbotts Dairies decision).

25    In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the

26    best interest of the estate, and a business justification exists for authorizing the sale.  In re

27    Huntington, Ltd., 654 F.2d 578 (9th Cir. 1981); In re Walter, 83 B.R. 14, 19-20 (9th Cir.

28    B.A.P. 1988).  The Ninth Circuit has also held that section 363 allows the sale of substantially

17

1  all assets of a debtor's bankruptcy estate after notice and a hearing.    In re Qintex

2  Entertainment, Inc., 950 F.2d 1492 (9th Cir. 1991).

3      In determining whether a sale satisfies the business judgment standard, courts have

4  held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice

5  of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is

6  fair and reasonable); and (4) the parties to the sale have acted in good faith.    Titusville

7  Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D.

8  Pa. 1991); see also, In re Walter, 83 B.R. at 19-20.

9      The Debtors submit that their proposed sale of the Purchased Assets to the Successful

10  Bidders clearly comports with each of these four criteria and demonstrates that the Debtors'

11  business judgment to proceed with the sale is sound.

12      1.    Sound Business Purpose.

13      There must be some articulated business justification, other than appeasement of

14  major creditors, for using, selling or leasing property out of the ordinary course of business

15  before the bankruptcy court may order such disposition under Section 363(b).    In re Lionel

16  Corp., 722 F.2d at 1070.  The Ninth Circuit Bankruptcy Appellate Panel in Walter v. Sunwest

17  Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case

18  test to determine whether the business purpose for a proposed sale justifies disposition of

19  property of the estate under Section 363(b).    In Walter, the Bankruptcy Appellate Panel,

20  adopting the reasoning of the Fifth Circuit in In re Continental Airlines, Inc., 780 F.2d 1223

21  (5th Cir. 1986) and the Second Circuit in In re Lionel Corp., supra, articulated the standard to

22  be applied under Section 363(b) as follows:

23
24      Whether the proffered business justification is sufficient depends on the case.
       As the Second Circuit held in Lionel, the bankruptcy judge should consider all
25      salient factors pertaining to the proceeding and, accordingly, act to further the
       diverse interests of the Debtor, creditors and equity holders, alike.  He might,
26      for example, look to such relevant facts as the proportionate value of the asset
       to the estate as a whole, the amount of elapsed time since the filing, the
27      likelihood that a plan of reorganization will be proposed and confirmed in the
       near future, the effect of the proposed disposition on future plans of
28      reorganization, the proceeds to be obtained from the disposition vis-a-vis any

18

appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.  This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

In Re Walter, 83 B.R. at 19-20, *citing* In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986).

The facts pertaining to the Debtors' proposed sale of the Purchased Assets to the Successful Bidders clearly substantiate the Debtors' business decision that such contemplated sale serves the best interests of the Debtors' estates and creditors, and merits the approval of the Court.

As indicated above, the Debtors have no ability to survive on any long-term basis or to confirm a plan of reorganization.  The Debtors believe that, if they fail to consummate an expedited sale of the Restaurants to the Successful Bidders, the Debtors will either end up selling the Restaurants for substantially less money, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of the going concern value of the Restaurants.  The Debtors believe that the liquidation value of their Restaurants is substantially lower than the going concern value of the Restaurants that will be achieved through the auction sale.

The Debtors have concluded that proceeding with an expedited sale to the Successful Bidders is in the overwhelming best interests of their estates and their creditors and is the only positive result available to the Debtors under the circumstances of these cases.  The Debtors therefore submit that their proposed sale is justified by sound business purposes, satisfying the first requirement for a sale under Section 363(b) of the Bankruptcy Code.

2.    Accurate and Reasonable Notice.

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors.  The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the

1  estate." In re Delaware & Hudson Railway Co., 124 B.R. 169, 180 (D. Del. 1991).  A notice

2  is sufficient if it includes the terms and conditions of the sale and if it states the time for filing

3  objections.  In re Karpe, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988).  The purpose of the notice

4  is to provide an opportunity for objections and hearing before the court if there are objections.

5  Id.

6        Following the Court's approval of the Stalking Horse Bids, the Debtors served notice

7  of the auction sale and the opportunity to overbid on all creditors of these estates and all other

8  known parties in interest.  NFS also provided a copy of the notice to all known prospective

9  overbidders.   The Debtors are serving a notice of this Motion upon the same group of

10 creditors and other known parties in interest.

11       The Debtors submit that the foregoing satisfies the requirements of Federal Rules of

12 Bankruptcy Procedure ("Bankruptcy Rules") 6004(a) and (c), which provide as follows:

13          "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course
            of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ...
14          (c) ... A motion for authority to sell property free and clear of liens or other
            interests shall be made in accordance with Rule 9014 and shall be served on
15          the parties who have liens or other interests in the property to be sold.   The
            notice required by subdivision (a) of this rule shall include the date of the
16          hearing on the motion and the time within which objections may be filed and
            served on the debtor in possession..."
17

18 Fed. R. Bankr. P. 6004(a)(c).   The Debtors have complied with all noticing procedures

19 required by the Bankruptcy Rules and the Court.

20          3.      Fair and Reasonable Price.

21       In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase

22 price must be fair and reasonable.  Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re

23 Coastal Indus., Inc.), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986).   Several courts have held

24 that "fair value" is given for property in a bankruptcy sale when at least 75% of the appraised

25 value of such property is paid.   See In re Karpe, 84 B.R. at 933; In re Abbotts Dairies of

26 Pennsylvania, Inc., 788 F.2d 143, 149 (3d Cir. 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th

27 Cir. 1985); In re Snyder, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); In re The Seychelles,

28

1    Partnership and Genius Corp. v. Banyan Corp., 32 B.R. 708 (N.D. Tex. 1983).  However, the

2    Debtors also realize that their "main responsibility, and the primary concern of the bankruptcy

3    court, is the maximization of the value of the asset sold."   In re Integrated Resources, Inc.,

4    135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992).  "It is a

5    well-established principle of bankruptcy law that the objective of bankruptcy rules and the

6    [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall

7    benefit possible for the estate."   In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131

8    (Bankr. N.D. Ga. 1988); see also In re Wilde Horse Enterprises, 136 B.R. 830, 841 (Bankr.

9    C.D. Cal. 1991) ["in any sale of estate assets, the ultimate purpose is to obtain the highest

10    price for the property sold"].

11         The auction sale process undertaken by the Debtors, which has been approved by the

12    Court with the consent of all of the key constituents in these cases, is specifically designed to

13    insure that the highest price possible is obtained for the Purchased Assets under the

14    circumstances of these cases.  The Debtors will obviously not know the results of the auction

15    sale until the auction sale has been completed.  As indicated above, the Debtors will promptly

16    file the results of the auction sale with the Court.  NFS is engaged in an extensive and broad

17    marketing and sale process, having facilitated due diligence with numerous parties.   All

18    interested and viable buyers are being provided with equal access to the Debtors and their

19    financial information and had the same opportunity to serve as Stalking Horse Bidders.   The

20    Debtors are therefore confident that the highest and best bids submitted at the auction sale will

21    constitute fair and reasonable value for the Purchased Assets, and therefore should be

22    approved by the Court.  If that proves not to be the case, the Debtors will withdraw the

23    Motion, at least with respect to certain Restaurants

24         4.    Good Faith.

25         When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is

26    required to make a finding with respect to the "good faith" of Purchaser.  In re Abbotts

27    Dairies, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be

28    employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the

1    requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's

2    reorganization plan and makes a finding that it has been proposed in good faith.  Id. at 150.

3        "Good faith" encompasses fair value, and further speaks to the integrity of the

4    transaction.  In re Wilde Horse Enterprises, 136 B.R. at 842.  With respect to the debtor's

5    conduct in conjunction with the sale, the good faith requirement "focuses principally on the

6    element of special treatment of the Debtor's insiders in the sale transaction."  See In re

7    Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

8    With respect to the buyer's conduct, this Court should consider whether there is any evidence

9    of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to

10   take grossly unfair advantage of other bidders."  In re Abbotts Dairies, 788 F.2d at 147, In re

11   Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); In re Wilde Horse

12   Enterprises, Inc., 136 B.R. at 842; In re Alpha Industries, Inc., 84 B.R. 703, 706 (Bankr. D.

13   Mont. 1988).  In short, "[l]ack of good faith is generally determined by fraudulent conduct

14   during the sale proceedings."  In re Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988),

15   citing In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983).

16       In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the

17   following test for determining whether a buyer is a good faith purchaser:

18       A good faith buyer "is one who buys 'in good faith' and 'for value.'"
         [citations omitted.]  [L]ack of good faith is [typically] shown by 'fraud,
19       collusion between the purchaser and other bidders or the trustee, or an
         attempt to take grossly unfair advantage of other bidders.'"  [citations
20       omitted.]

21   Filtercorp, 163 F.3d at 577.

22

23       The Ninth Circuit made clear in Filtercorp that this standard for determining good

24   faith is applicable even when the buyer is an insider.

25       Other than the Stalking Horse Bidders, whose identities are set forth above, the

26   Debtors will not know the identities of the Successful Bidders at the auction sale until the

27   auction sale has been completed.  However, NFS has been in charge of the entire sale process,

28   and the Debtors are not aware of any prospective bidders that have received any special

22

1    treatment from the Debtors or from NFS.  Neither the Debtor nor NFS is aware of any fraud,

2    collusion or attempt to take unfair advantage of other bidders.  Based on the foregoing, the

3    Debtors submit that the Court should find that the Successful Bidders at the auction sale are

4    good faith purchasers entitled to all of the protections afforded by Section 363(m) of the

5    Bankruptcy Code.

6    B.        Section 363(f) of the Bankruptcy Code Permits the Sale of the Purchased Assets to Be

7              Free and Clear of Any and All Liens, Claims and Interests.

8              Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

9              The trustee may sell property under subsection (b) . . . of this section free and
              clear of any interest in such property of an entity other than the estate, only
10             if—
11             (1)      applicable non-bankruptcy law permits the sale of such property free
              and clear of such interest; ...
12             (2)      such entity consents;
              (3)      such interest is a lien and the price at which such property is to be sold
13             is greater than the aggregate value of all liens on such property;
              (4)      Such interest is in bona fide dispute; or
14             (5)      such entity could be compelled, in a legal or equitable proceeding, to
              accept a money satisfaction of such interest.
15

16    11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code was drafted in the disjunctive.

17    Thus, a debtor need only meet the provisions of one of the five subsections of Section 363(f)

18    in order for a sale of property to be free and clear of liens, claims and interests.

19             The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f)

20    are satisfied with respect to the proposed sale of the Purchased Assets.  The only creditors the

21    Debtors are aware of who have a lien against any of the Purchased Assets are Signature and

22    General Electric Capital Business Asset Funding Corporation of Connecticut ("GE").  It is the

23    Debtors' understanding that both Signature and GE consent to the sale of the Purchased

24    Assets to the Successful Bidders at the auction sale (subject to Signature's and GE's

25    respective credit bid rights).  The Debtors are therefore able to consummate their sale of the

26    Purchased Assets to the Successful Bidders free and clear of the liens, claims and interests of

27    Signature and GE pursuant to the provisions of Section 363(f)(2) of the Bankruptcy Code.

28

Other than the liens of Signature and GE, the Debtors are not aware of the existence of any other encumbrances against the Purchased Assets.  If any other encumbrances do exist, the sale order will provide for all such liens to attach to the proceeds of the sale in the same validity and priority and subject to the same defenses and avoidability, if any, as before the sale closings, thereby satisfying the provisions of Section 363(f) of the Bankruptcy Code.

In addition to all of the foregoing, the Debtors also submit that they have satisfied at least one of the possible conditions of Section 363(f) for a free and clear sale to enable the Debtors to deliver the Purchased Assets to the Successful Bidders at the auction sale free and clear of all encumbrances as follows:

1.    The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(5).

Section 363(f)(5) of the Bankruptcy Code permits a sale of property free and clear of liens and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5).

Pursuant to 11 U.S.C. §363(f)(5), a trustee may sell property free and clear of any interest if the holder of that interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f)(5); P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dep't of Medical Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.), 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing sale of nursing home assets under §363(f)(5) over objection of the Department of Medical Assistance Service where its interest was reducible to a claim and subject to a hypothetical money satisfaction).

Section 363(f)(5) has generally been interpreted to mean that if, under applicable law, the holder of the lien or interest could be compelled to accept payment in exchange for its interest, the trustee (or debtor-in-possession) may take advantage of that right by replacing the holder's lien or interest with a payment or other adequate protection. Collier on Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier").  Applicable nonbankruptcy law may recognize a monetary satisfaction when the lien holder is to be paid in full out of the proceeds of the sale or otherwise.  Id.  Thus, for example, a sale free of a first mortgage might be approved when

24

1    the proceeds are sufficient to pay in full the first mortgage and the second mortgagee has

2    consented to the sale.

3        However, Section 363(f)(5) does not require full payment to the lien or interest holder

4    if the trustee can demonstrate the existence of another legal or equitable proceeding by which

5    the holder may be compelled to accept less than full satisfaction of the secured debt.  In re

6    Grand Slam U.S.A., Inc., 178 B.R. 460, 461-62 (E.D. Mich. 1995) (holding that the "money

7    satisfaction" language in § 363(f)(5) does not require full payment to the lien holder); In re

8    Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994) (construing "money

9    satisfaction of such interest" to mean a payment constituting less than full payment of the

10   underlying debt because any lien can always be discharged by full payment of the underlying

11   debt pursuant to § 363(f)(3));  Scherer v. Federal National Mortgage Association (In re

12   Terrace Chalet Apartments, LTD.), 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993).

13       Courts have held that chapter 11 cramdown is a typical "legal proceeding" by which

14   an entity may be compelled to accept less than full money satisfaction and which will permit

15   the sale of creditor's collateral free and clear of interest under Section 363(f)(5).  In re Gulf

16   States Steel, Inc. of Alabama, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002)(holding that the

17   liens or interests identified in the sale motion could be compelled to accept a money

18   satisfaction in a cram down plan of reorganization in a chapter 11 case); Scherer v. Federal

19   National Mortgage Association (In re Terrace Chalet Apartments, LTD.), 159 B.R. at 829

20   (finding that Section 1129(b)(2) cram down is such a provision); In re Perroncello, 170 B.R.

21   189 (Bankr. D. Mass. 1994); Collier ¶ 363.06[6][a].  Thus, the trustee can sell property free

22   and clear of a creditor's lien it if demonstrates it can cram down the creditor's interest

23   pursuant to § 1129(b)(2).

24       Likewise, the holder of a tax lien that would be subordinated under Section 724 can be

25   compelled to accept less than full payment.  In re Grand Slam U.S.A., Inc., 178 B.R. at 461-

26   62 (holding that § 724(b)(2) is applicable for purposes of § 363(f)(5) because it creates a

27   mechanism by which lien creditors are compelled to receive less than full payment of their

28   interest); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994)(concluding

1  that the Trustee may sell the property pursuant to section 363(f)(5) free of the County's tax

2  lien lien);  Collier, ¶ 363.06[6][a].

3      In addition to the legal arguments set forth above, the ability of a debtor to "cram-

4  down" a secured creditor under 11 U.S.C. Sec. 1129(b)(1) and (2) also constitutes a "legal

5  proceeding" pursuant to which a secured creditor could be compelled to accept a money

6  satisfaction.  See, In re Grand Slam, U.S.A. Inc., 178 B.R. 460, 462 (E.D. Mich. 1995);

7  1129(b)(2)(A).

8      Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided that it

9  receives "the indubitable equivalent" of its claim.  A debtor can cram down a secured creditor

10  if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, 11

11  U.S.C. § 1129(b)(1); (2) it is acting in good faith, 11 U.S.C. § 1129(a)(3)-(b)(1); and (3) the

12  secured creditor is receiving the actual value of its claim.  11 U.S.C. § 1129(b)(2)(A)(i)(II), 11

13  U.S.C. § 1129(b)(2)(A)(iii).  See also In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350

14  (5th Cir.1989) (holding that "indubitable equivalent" of a secured creditor's interest is the

15  actual value of the claim).

16      In In re Hunt Energy Co., Inc., 48 B.R. 472, 485 (Bankr. N.D. Ohio, E.D 1985), the

17  court found that a lien which attaches to the proceeds of a sale would necessarily be reduced

18  by subsequent valuation at a hearing under Section 506(a) to meet the "indubitable

19  equivalence" requirements of section 1129(b)(2)(A).  Once Section 1129(b)(2)(A) is satisfied,

20  the lienholder would be compelled through the cram-down process to accept such money

21  satisfaction as dictated by the cram-down provisions.  Id.

22      All of the above requirements for cram down are met in these cases.  The sale of the

23  Purchased Assets to the Successful Bidders is being conducted in good faith.  While the

24  Debtors do not believe that there are any secured creditors with valid liens against the

25  Purchased Assets other than Signature and GE, if there are any, they are being treated fairly

26  and in accordance with their respective lien priorities, so there is no unfair discrimination

27  present in the proposed sale.  Finally, any such secured creditor will receive the actual value

28  of its secured claim as measured by Section 506(a).

1    Based upon all of the foregoing, all creditors of the Debtors, including all secured

2    creditors of the Debtors, could be compelled, in a legal or equitable proceeding, to accept a

3    money satisfaction of their interests.  The Debtors' proposed sale of the Purchased Assets to

4    the Successful Bidders at the auction sale should therefore be free and clear of all

5    encumbrances.

6        2.    The Debtors' Proposed Asset Sale is Also Permissible Pursuant to 11 U.S.C.

7            Section 363(f)(2).

8    Section 363(f)(2) of the Bankruptcy Code also authorizes a sale to be free and clear of

9    an interest if the interest holder consents to the sale.  However, the "consent" of an entity

10   asserting an interest in the property sought to be sold, as referenced in Section 363(f)(2) of the

11   Bankruptcy Code, can be implied if such entity fails to make a timely objection to the sale

12   after receiving notice of the sale.  In re Eliot, 94 B.R. 343, 345 (E.D. Pa. 1988).  In the Eliot

13   case, the bankruptcy court approved the sale by a trustee of certain real property that was

14   subject to a mortgage in favor of Citicorp.  Citicorp had received notice of the sale, but did

15   not file any timely objection to the sale.  After the sale occurred, Citicorp filed a motion to set

16   aside the sale, which was handled by the bankruptcy court as an adversary proceeding.  The

17   bankruptcy court dismissed the complaint to set aside the sale, and Citicorp appealed the

18   ruling.  The district court affirmed the dismissal, and, in so doing, stated:

19           "… if any of the five conditions of § 363(f) are met, the Trustee has the
             authority to conduct the sale free and clear of all liens.
20
             In this case, the authority for the sale can be found in 11 U.S.C. §
21           363(f)(2).  That section allows the Trustee to sell the property free and
             clear of all liens because Citicorp consented to the sale.  **Citicorp**
22           **consented to the sale by failing to make any timely objection after**
             **receiving notice of the sale.**  Citicorp contends that implied consent is
23           insufficient to satisfy the consent requirement of § 363(f)(2).  I
             disagree.  (emphasis added)
24

25   In its ruling, the Eliot court relied on In re Gabel, 61 B.R. 661 (Bankr. W.D. La. 1985), which

26   held that implied consent is sufficient to authorize a sale under § 363(f)(2).  See also, In re

27   Ex-Cel Concrete Company, Inc., 178 B.R. 198, 203 (9th Cir. BAP 1995) ["The issue here is

28   whether there was consent or non-opposition by Citicorp."]; In re Paddlewheels, Inc., 2007

1   WL 1035151 (Bankr. E.D.La. April 2, 2007) ["The Sale Motion complies with section 363(f)

2   of the Bankruptcy Code, in that the Trustee either obtained the consent of Whitney to the sale

3   of the Vessel to Purchaser or Whitney had no objection to the Sale."].

4         As a result of the foregoing, the Debtors submit that the Court should approve the sale

5   of the Purchased Assets to the Successful Bidders at the auction sale free and clear of all

6   encumbrances of those parties who do not file a timely objection to the sale, by deeming all

7   such parties to have consented to the proposed sale pursuant to Section 363(f)(2) of the

8   Bankruptcy Code.

9   C.    <u>The Court Should Authorize the Debtors to Assume and Assign to the Successful</u>

10      <u>Bidders All Executory Contracts and Unexpired Leases that the Successful Bidders</u>

11      <u>Wish to Have Assigned to Them</u>.

12        Barring exceptions not herein relevant, Sections 365(a) and 1107(a) authorizes a

13  debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory

14  contract or unexpired lease of the debtor."    A debtor in possession may assume or reject

15  executory contracts for the benefit of the estate.    <u>In re Klein Sleep Products, Inc.</u>, 78 F.3d 18,

16  25 (2d. Cir. 1996); <u>In re Central Fla. Metal Fabrication, Inc.</u>, 190 B.R. 119, 124 (Bankr. N.D.

17  Fla. 1995); <u>In re Gucci</u>, 193 B.R. 411, 415 (S.D.N.Y. 1996).    In reviewing a debtor in

18  possession's decision to assume or reject an executory contract, a bankruptcy court should

19  apply the "business judgment test" to determine whether it would be beneficial to the estate to

20  assume it.    <u>In re Continental Country Club, Inc.</u>, 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990);

21  <u>see also</u> <u>In re Gucci</u>, 193 B.R. at 415.    The business judgment standard requires that the court

22  follow the business judgment of the debtor unless that judgment is the product of bad faith,

23  whim, or caprice.    <u>In re Prime Motors Inns</u>, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), *citing*

24  <u>Lubrizol Enterprises v. Richmond Metal Finishers</u>, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert.*

25  *denied*, 475 U.S. 1057 (1986).

26        Pursuant to Section 365(f)(2) of the Bankruptcy Code, a debtor may assign its

27  executory contracts and unexpired leases, provided the debtor first assumes such executory

28  contracts and unexpired leases in accordance with Section 365(b)(1), and provides adequate

assurance of future performance by the assignee.  Pursuant to Section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease.  11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995), In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993).

The assumption and assignment of executory contracts furthers the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred.  In re Embers 86th Street. Inc., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

Here, each of the Successful Bidders at the auction sale will have the right to have the Debtors assume and assign to the Successful Bidder those executory contracts and unexpired leases which are related to the Restaurants that the Successful Bidder will be buying.

As set forth in the bid procedures order which has been approved by the Court, the Debtors' ability to assign leases, including leases where one of the Debtors is the actual named lessee under the lease, will be subject to the approval of the Court.  While the Non-Debtor Affiliates who are the actual named lessees of certain of the Restaurant leases have agreed to transfer and assign all of their respective rights, title and interests in and to those leases to the Successful Bidders at the auction sale provided the buyers of the Restaurants accept an assignment of those leases in full compliance with the terms of the respective written leases, all such proposed assignments of such leases shall be subject to and conditioned on the full and complete satisfaction of the terms of those respective leases, including each landlord's right to argue that the leases are not property of the Debtors' bankruptcy estates, that the Debtors are not the lessees or tenants under the leases and/or that the Debtors have no standing to assign or request the landlord to consent to the assignment of the leases, and shall be further subject to all restrictions set forth in such leases with respect to

any proposed assignments thereof, including that the landlord's consent must be obtained, delinquencies, fees, costs and other consideration owed to the landlord as provided for in such leases must be paid to the landlord or cured in full, adequate assurance of future performance by the Successful Bidders must be established, use restrictions must be enforced and existing lessees or tenants must not be released of any liability by virtue of the assignment (collectively referred to herein as the "Non-Debtor Lease Compliance Issues").  The landlords shall file with the Court and serve on counsel for the Debtors, the Committee and Signature any opposition they may have to the Sale Approval Request, including raising any of the Non-Debtor Lease Compliance Issues no later than April 29, 2011.

**In connection with this Motion, the Debtors are requesting an order of the Court providing that the cure amounts set forth in Exhibit "1" to the annexed Declaration of Winston Mar (the "Mar Declaration") (as supplemented or amended) are the cure amounts which the Debtors must pay to the other parties to the leases that the Successful Bidders may elect to have the Debtors assume and assign to them to enable the Debtors to satisfy the cure requirements of Section 365(b)(1)(A) of the Bankruptcy Code.  The Debtors therefore submit that any party that fails to file a timely objection to this Motion should be deemed to have consented to the Debtors' proposed cure amount, as set forth in Exhibit "1" to the Mar Declaration, and be forever barred from challenging the Debtors' proposed cure amount.**

**In connection with this Motion, the Debtors are requesting an order of the Court providing that, as of the various sale closings, all executory contracts and unexpired leases that the Successful Bidders wish to have assumed by the Debtors and assigned to them shall become assumed contracts or assumed leases, as the case may be, which means that they will be assumed by the Debtors and assigned to the Successful Bidders effective as of the various sale closings.**

In connection with the Debtors' assumption and assignment to the Successful Bidders of executory contracts and unexpired leases, the Successful Bidders will be deemed to have assumed any ongoing liabilities and obligations in connection with all such assumed and

1   assigned executory contracts and unexpired leases, and the Debtors will be responsible for the

2   payment of all cure costs identified on Exhibit "1" to the annexed Mar Declaration for all

3   such assumed and assigned executory contracts and unexpired leases.

4        The Successful Bidders will be required to provide the other parties to all such

5   executory contracts and unexpired leases which the Debtors seek to have assumed and

6   assigned to the Successful Bidders as is reasonably required to enable the Successful Bidders

7   to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. §

8   365(b)(1)(C) with respect to all such executory contracts and unexpired leases.

9   D.   <u>The Debtors Request the Court to Waive the Fourteen-Day Waiting Periods Set Forth</u>

10        <u>in Bankruptcy Rules 6004(h) and 6006(d).</u>

11        Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the

12   use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of

13   the Court order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) has a similar

14   provision with respect to an order approving of a debtor's assumption and assignment of

15   unexpired leases and executory contracts.

16        For all of the reasons set forth above, the Debtors believe that it is critically important

17   that the Debtors and the Successful Bidders be permitted to consummate their respective sale

18   closings as soon after entry of the order approving the sale as possible.  As indicated above,

19   the Debtors are targeting their sale closings for early May, 2011.  In order to facilitate the

20   most expeditious sale closings possible, the Debtors request that any order approving the sale

21   of the Purchased Assets to the Successful Bidders and the Debtors' assumption and

22   assignment of executory contracts and unexpired leases the be effective immediately upon

23   entry by providing that the fourteen-day waiting periods of Bankruptcy Rule 6004(h) and

24   6006(d) are waived.

25                                   **IV.**

26                             **<u>CONCLUSION</u>**

27        Based upon all of the foregoing, the Debtors respectfully request that this Court enter

28   an order:

1.     approving the sale of the Purchased Assets to the Successful Bidders free and clear of all liens, claims and interests, with the Debtors to submit the results of the auction sale with the Court following the conclusion of the auction sale;

2.     finding that the Successful Bidders are good faith buyers entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code;

3.     approving (effective as of the date of the sale closings) the Debtors' assumption and assignment to the Successful Bidders of all of the Debtors' unexpired leases and executory contracts which the Successful Bidders desire to acquire in accordance with the procedures outlined below;

4.     finding that the cure amounts which must be paid in connection with the Debtors' assumption and assignment of any of their unexpired leases and executory contracts are as set forth in Exhibit "1" to the Mar Declaration (as supplemented or amended), with adequate assurance of future performance to be demonstrated as required by the other parties to the unexpired leases and executory contracts by the Successful Bidders, and ordering that any party that fails to file a timely objection to this Motion shall be deemed to have consented to the Debtors' proposed cure amounts and be forever barred from challenging the Debtors' proposed cure amounts or from asserting any claims on account of cure costs against the Successful Bidders in respect of any such unexpired leases or executory contract;

5.     waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

6.     granting such other and further relief as the Court deems just and proper.

Dated: April 12, 2011

FATBURGER RESTAURANTS OF CALIFORNIA, INC., *et al.*

By:   */s/ Ron Bender*
     Ron Bender
     Juliet Y. Oh
     LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
     Attorneys for Chapter 11 Debtors and Debtors in Possession

1

## <u>DECLARATION OF WINSTON MAR</u>

2        I, Winston Mar, hereby declare as follows:

3        1.        I have personal knowledge of the facts set forth below and, if called to testify,

4    would and could competently testify thereto.

5        2.        I am a Managing Director of CRG Partners Group, LLC, and am the

6    designated Chief Restructuring Officer ("<u>CRO</u>") of Fatburger Restaurants of California, Inc.

7    ("<u>FB California</u>") and Fatburger Restaurants of Nevada, Inc. ("<u>FB Nevada</u>," and together with

8    FB California, the "<u>Debtors</u>"), debtors and debtors in possession herein.  My designation as

9    the CRO of the Debtors was approved pursuant to an order entered by the Court on February

10   16, 2011.  Immediately following my designation as CRO of the Debtors, I obtained control

11   of the Debtors' cash and cash management system, began my evaluation of the Debtors'

12   business operations and financial situation, and began overseeing and managing all aspects of

13   the Debtors' business operations.

14       3.        I submit this Declaration in support of the Debtors' Motion ("<u>Motion</u>") for

15   entry of an order of the Court: (A) pursuant to 11 U.S.C. § 363(f) approving the sale of the

16   Debtors' twenty-six Restaurants and substantially all of the Debtors' tangible and intangible

17   assets related to the Restaurants (excluding, among other things, the Debtors' cash and

18   accounts receivable) (collectively, the "<u>Purchased Assets</u>") free and clear of all liens, claims

19   and interests to the winning bidders at an auction sale to be held on April 21, 2011; (B)

20   pursuant to 11 U.S.C. § 365, (i) authorizing the Debtors to assume executory contracts and

21   unexpired leases ("<u>Assumed Contracts</u>") and assign them to the winning bidders and (ii)

22   establishing the cure amounts, if any, payable under such Assumed Contracts; and (C)

23   waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d) to enable

24   the sale to close as quickly as possible.

25       4.        It is my understanding and belief that the Debtors filed voluntary petitions

26   under Chapter 11 of the Bankruptcy Code on April 7, 2009 (the "<u>Petition Date</u>").  It is also

27   my understanding and belief that an Official Committee of Unsecured Creditors (the

28   "<u>Committee</u>") was formed for both cases.

5.      The Debtors are presently the owners and operators of twenty-six (26) Fatburger restaurants located in California and Nevada (collectively, the "Restaurants," and individually, a "Restaurant").  The Debtors' revenue is derived from sales at their respective Restaurants.

6.      Following my appointment as CRO, with the approval of the Court, I caused the Debtors to employ National Franchise Sales, Inc. ("NFS") as the Debtors' sales agent to conduct the sale process.  Since the Debtors' employment of NFS was approved by the Court on or about February 24, 2011 (and even commencing before that date), NFS has actively and aggressively marketed the Restaurants for sale.

7.      After consulting with a number of parties, and taking into account the Debtors' financial constraints and inability to continue operating their business on any long-term basis, NFS and I determined that the optimal strategy to maximize the total purchase prices paid for the Debtors' Restaurants was to establish a deadline for prospective buyers who are interested in serving as stalking horse bidders to submit their proposed stalking horse bids (by 12:00 p.m. Noon on March 28, 2011) and to have an open auction take place on April 21, 2011. Based on my discussions with NSF, it is my understanding that NFS contacted a large number of prospective buyers and circulated to all prospective buyers a form asset purchase agreement for them to use which was prepared by NFS and counsel to the Debtors (the "Template APA").  A copy of the Template APA was attached as Exhibit "1" to the Declaration of Alan F. Gallup filed in support of the Debtors' bid procedures motion.

8.      By the stalking horse bid deadline of 12:00 p.m. Noon on March 28, 2011, a total of thirteen proposed stalking horse bidders submitted various stalking horse bids expressing an interest in buying multiple Restaurants.  After consultation with Signature and the Committee, and at the recommendation of NFS, I caused the Debtors to accept stalking horse bids covering a total of nine of the Restaurants.[4]  With the consent of the Court, the

---

[4] The Debtors did receive a number of proposed stalking horse bids which were higher than the accepted stalking horse bids but the bids were non-conforming for a variety of reasons and therefore not eligible to serve as stalking horse bids.

Debtors will be proceeding to the auction sale with stalking horse bids in place for nine of the Restaurants and with minimum required bids for the balance of the Debtors' twenty-six Restaurants. I am advised by NFS that it anticipates that there likely will be a robust amount of bidding that will occur at the auction sale, including bidding on Restaurants for which there currently is no stalking horse bidder.

9.    The following is a listing of each of the Debtors' twenty-six Restaurants which are available to be purchased at the auction sale, with the name of the tenant, the address of the Restaurant, the amount of the required minimum bid for each Restaurant, and an indication of whether a stalking horse bid has been accepted for that particular Restaurant[5]:

**California Restaurants**

| Named Tenant in Written Lease | Address of Restaurant | Minimum Bid |
|---|---|---|
| FB California | 4070 Marlton Ave. Los Angeles, CA 90008 Restaurant #119 | $50,000 |
| FB California | 16848 Devonshire St. Granada Hills, CA 91344 Restaurant #120 | $5,000 |
| FB California | 14402 Ventura Blvd. Sherman Oaks, CA 90401 Restaurant #110 | $60,000 Stalking Horse Bid Accepted |
| FB California | 1611 N. Vermont Ave. Hollywood, CA 90027 Restaurant #109 | $375,000 Stalking Horse Bid Accepted |
| FB California | 49500 Seminole Drive Cabazon, CA 92230 Restaurant #137 | $60,000 Stalking Horse Bid Accepted |
| FB California | 7450 Santa Monica Blvd. West Hollywood, CA 90046 Restaurant #115 | $165,000 Stalking Horse Bid Accepted |

---

[5] The words "Stalking Horse Bid" are indicated after the required Minimum Bid for those nine (9) Restaurants where stalking horse bids have been received and accepted by the Debtors. The amount of the required Minimum Bid for those nine (9) Restaurants already takes into account the required $10,000 minimum overbid to the accepted stalking horse bid.

| FB California | 1698 Pacific Coast Highway Redondo Beach, CA 90277 Restaurant #104 | $25,000 |
| FB California | 21911 Ventura Blvd. Woodland Hills, CA 91364 Restaurant #116 | $60,000 Stalking Horse Bid Accepted |
| FB California | 2318 North Tustin Street, Suite C Orange, CA 92665 Restaurant #61 | $5,000 |
| FB California | 451 Paseo Dorotea Palm Springs, CA 92264 Restaurant #88 | $5,000 |
| FB California | 11226 4th Street, Suite 101 Rancho Cucamonga, CA 91730 Restaurant #1004 | $20,000 |
| FB California | 401 Newport Center Dr., #A-103 Newport Beach, CA 92660 Restaurant #135 | $10,000 |
| Fatburger Corporation | 3021 Michelson Drive, Irvine, California 92612 Restaurant #122 | $5,000 |

**Nevada Restaurants**

| **Named Tenant in Written Lease** | **Address of Restaurant** | **Minimum Bid** |
| --- | --- | --- |
| FB Nevada | 11011 W. Charleston Blvd. Las Vegas, NV 89135 Restaurant #138 | $110,000 Stalking Horse Bid Accepted |
| FB Nevada | 777 West Lake Mead Drive Henderson, NV 89015 Restaurant #143 | $120,000 Stalking Horse Bid Accepted |
| FB Nevada | 2485 South Nellis Blvd., Las Vegas, Nevada 89121 Restaurant #125 | $5,000 |
| Fatburger North America, Inc., or Fatburger Corporation or FB Nevada | 2300 Paseo Verde, Suite 2011, Henderson, Nevada 89052 Restaurant #132 | $110,000 Stalking Horse Bid Accepted |

| Fatburger North America, Inc. | 4949 North Rancho Drive, Suite 4, Las Vegas, Nevada 89130 Restaurant #131 | $120,000 Stalking Horse Bid Accepted |
|---|---|---|
| Fatburger North America, Inc. | 2101 Texas Star Lane, North Las Vegas, Nevada 89032 Restaurant #129 | $70,000 |
| Fatburger North America, Inc. | 1301 West Sunset Road, Henderson, Nevada 89014 Restaurant #127 | $175,000 |
| Fatburger Corporation | 3763 South Las Vegas Blvd., Suite A, Las Vegas, Nevada 89109, Restaurant #123 | $1,500,000 |
| Fatburger North America, Inc. | 4525 North Rancho Drive, Las Vegas, Nevada 89130 Restaurant #128 | $5,000 |
| Fatburger North America, Inc. | 6775 West Flamingo Road, Las Vegas, Nevada 89103 Restaurant #130 | $5,000 |
| Fatburger Corporation | 4199 South Fort Apache Blvd., Las Vegas, Nevada 89147 Restaurant #139 | $15,000 |
| No written lease exists but Fatburger Corporation (an affiliate) is the landlord and has agreed to provide a commercially reasonable lease agreement to any qualified buyer | 4851 Charleston Boulevard, Las Vegas, Nevada 89146 Restaurant #124 | $5,000 |
| No written lease exists but Fatburger Corporation (an affiliate) is the landlord and has agreed to provide a commercially reasonable lease agreement to any qualified buyer | 4663 East Sunset Road, Henderson, Nevada 89014 Restaurant #126 | $60,000 |

10.    The identities of the approved stalking horse bidders, along with the Restaurant number which is the subject of the Stalking Horse Bid and the amount of such Stalking Horse Bid are as follows:

Ashok Israni – Restaurant #132 – Stalking Horse Bid amount = $100,000

37

Ashok Israni – Restaurant #138 – Stalking Horse Bid amount = $100,000

Hassan Sheikh – Restaurant #131 – Stalking Horse Bid amount = $110,000

Hassan Sheikh – Restaurant #143 – Stalking Horse Bid amount = $110,000

Toufic Hemaidan – Restaurant #115 – Stalking Horse Bid amount = $155,000

Michael Nakhleh – Restaurant #110 – Stalking Horse Bid amount = $50,000

Michael Nakhleh – Restaurant #116 – Stalking Horse Bid amount = $50,000

Ernie Abarro – Restaurant #137 – Stalking Horse Bid amount = $50,000

Mitra Jarrazadeh – Restaurant #109 – Stalking Horse Bid amount = $365,000

11.    The Court approved the Stalking Horse Bids for the Restaurants involved in the amounts set forth above, subject to overbid at the auction sale to be held on April 21, 2011.  The auction sale will commence at 9:00 a.m. on April 21, 2011, at the Newport Beach Radisson Hotel located at 4545 MacArthur Boulevard, Newport Beach, California 92660.

12.    In the event any Stalking Horse Bid is not deemed to be the winning bid at the auction sale and the Debtors proceed to sell the Restaurant which is the subject of the Stalking Horse Bid to a different buyer and consummate that sale, the party who submitted the Stalking Horse Bid will receive a break-up fee of $5,000 per Restaurant, which break-up fee will be paid directly from the proceeds of the sale of the Restaurant to the winning bidder.

13.    The auction sale will be conducted by NFS.  The Stalking Horse Bids will establish the baseline purchase price for each Restaurant which is the subject of a Stalking Horse Bid. The minimum overbid for each Restaurant for which there is a Stalking Horse Bid will be $10,000 above the Stalking Horse Bid, which will provide sufficient funds to pay the $5,000 break-up fee and provide the Debtors' estates with an economic benefit.   Each subsequent overbid must be at least $5,000.  If multiple prospective bidders seek to be eligible to bid on a particular Restaurant, NFS will randomly establish the bidding order for bidders.

14.    With regard to Restaurants for which there is no Stalking Horse Bid, there will be a minimum required bid at the auction sale as set forth in the chart above, which minimum required bids are subject to change by NFS after consultation with the Debtors and the Committee (and with Signature if Signature agrees to waive any right to participate as a

bidder at the auction sale).  If the Debtors and the Committee (and Signature if Signature agrees to waive any right to participate as a bidder at the auction sale) are not able to agree to a change to a required minimum bid, I shall make the final decision as CRO of the Debtors.

15.    The auction sale will continue until NFS has concluded that the highest and best bid has been submitted for each Restaurant.  NFS shall encourage buyers, including those who submitted Stalking Horse Bids, to submit bulk bids for groups of Restaurants, and NFS will evaluate any such bulk bid against the compilation of individual or smaller bulk bids to determine which bids would result in the highest and best total prices paid to the Debtors' estates.  All economic decisions to be made by NFS in connection with the auction sale will be made after consulting with the Debtors, the Committee, any respective landlord to the extent a landlord attends the auction sale and wishes to participate in that regard for a particular Restaurant involving that landlord, and with Signature if Signature agrees to waive any right to participate as a bidder at the auction sale.  NFS, in consultation with the Debtors and the Committee (and with Signature if Signature agrees to waive any right to participate as a bidder at the auction sale), shall have the right to alter the auction sale format as appropriate and beneficial to the Debtors' estates.  If the Debtors and the Committee (and Signature if Signature agrees to waive any right to participate as a bidder at the auction sale) are not able to agree to an alteration of the auction sale format, I shall make the final decision as the CRO of the Debtors.  No later than April 22, 2011, the Debtors shall submit the results of the auction sale to the Restaurants' landlords (as it relates to their respective locations) and to the Court and request the Court to enter an order approving the Debtors' sale of the Restaurants (the "Sale Approval Request") to the highest and best bidders ("Successful Bidder" in the singular and "Successful Bidders" in the plural).  The hearing for the Court to consider approval of the Sale Approval Request is scheduled to be held on May 3, 2011 at 1:30 p.m.

16.    In order to participate in the auction sale, prospective bidders must become a qualified bidder ("Qualified Bidder").  To become a Qualified Bidder, a prospective bidder ("Potential Bidder") must deliver (unless previously delivered) to NFS by 5:00 p.m. Pacific Time on April 20, 2011 the following qualifying materials:

i.      An executed confidentiality agreement.

ii.      Current financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring any of the Restaurants, current financial statements of the equity holder(s) of the Potential Bidder or such other acceptable form of financial evidence of the Potential Bidder's financial ability to consummate the transaction.

iii.      A completed Fatburger Franchise Application, and other franchisee application materials that may be required by the Franchisor (which is Fatburger North America, Inc.), along with a resume of each proposed equity holder and officer of the Potential Bidder setting forth relevant business and professional experience (unless the Potential Bidder does not intend to operate the Restaurant as a Fatburger Restaurant)[6].  As part of a stipulation which has been approved by the Court, the Franchisor has agreed to distribute disclosure materials to any Potential Bidder who may desire to be a Fatburger franchisee, in accordance with the provisions of California Franchise Investment Law.  Qualified Bidders who qualify for franchise rights shall be offered the standard Fatburger franchise agreement for the applicable Restaurants, provided, however, that the Franchisor shall waive payment of any initial fees or deposits typically required by the Franchisor of franchisees.  The duration of the franchise rights to be offered by the Franchisor to buyers shall mirror the term of the applicable real property lease, including any and all options to extend such term and any additional extensions that the buyer is able to obtain from its respective landlord, and in the case of a transferred leasehold interest with no fixed term, the duration of the franchise rights offered by the Franchisor shall be the standard term offered to third party franchisees in the United States.  In connection with the making of their bid for a Restaurant, the bidder will be required to indicate whether the bidder intends to operate the Restaurant as a Fatburger restaurant or not.

---

[6] Following the closing of their sales, buyers are not required to operate the Restaurants which they purchase as Fatburger restaurants if they desire to do something else with the location.

iv.    Deliver to NFS a certified or cashier's check in the amount of $10,000 for each Restaurant the Potential Bidder desires to be eligible to bid for (e.g., if the Potential Bidder desires to be eligible to bid for eight Restaurants, the Potential Bidder will be required to deliver to NFS a certified or cashier's check in the total amount of $80,000).  The deposit checks must be made payable to the escrow agent, Citywide Escrow Services, Inc.

17.    Within two business days following the completion of the auction sale, each Successful Bidder will be required to increase the amount of their deposit to the greater of (i) 20% of the amount of the winning bid per Restaurant and (ii) $20,000 per Restaurant by delivering to NFS an additional certified or cashier's check made payable to the escrow agent, Citywide Escrow Services, Inc.  All deposits will be credited towards the purchase price at the closing and will be completely non-refundable and forfeited to the Debtors in the event of the failure of the Successful Bidder to consummate its purchase in a timely manner unless the failure to consummate its purchase was not the fault of the Successful Bidder.  However, the forfeiture of the deposit will not be considered liquidated damages and any Successful Bidders who fail to consummate their purchase will be liable to the Debtors for the full amount of their winning bids.

18.    A Potential Bidder may qualify as a Qualified Bidder only if the Potential Bidder demonstrates its ability to consummate its purchase of the Restaurants that it wishes to purchase, including demonstrating that it has the ability to provide adequate assurance of future performance under all real property leases and other contracts to be assumed by the Potential Bidder in connection with the Potential Bidder's purchase of the Restaurants.

19.    All sale closings must occur by May 6, 2011, which means that in order to become a Qualified Bidder, a Potential Bidder must demonstrate that it has the ability to pay all cash, in the form of a certified cashier's check or wire transfer, for any offer made to purchase a Restaurant, or, if the Potential Bidder intends to obtain acquisition and/or working capital financing to fund the proposed transaction, then the Potential Bidder must demonstrate that all such financing can be obtained in time for the Potential Bidder to consummate the transaction by May 6, 2011.  NFS, in consultation with the Debtors and the Committee (and

1  Signature if Signature agrees to waive any right to participate as a bidder at the auction sale),

2  shall have the right to extend sale closing dates as appropriate and beneficial to the Debtors'

3  estates.

4        20.    In the event that any of the Successful Bidders fails to consummate its

5  purchase, the Debtors will proceed to sell the respective Restaurant to the winning back up

6  bidder ("Successful Back-Up Bidder" in the singular and "Successful Back-Up Bidders" in

7  the plural).  By participating in the auction sale, all bidders will be required to agree that the

8  second highest bidder for any Restaurant will be deemed the Successful Back-Up Bidder and

9  will be required to consummate its purchase of the respective Restaurant(s) in accordance

10  with the terms of its successful back-up bid provided it is informed by May 7, 2011 that it is

11  the Successful Bidder (because of the failure of the initial Successful Bidder to consummate

12  its purchase), in which case the Successful Back-Up Bidder shall have until May 21, 2011 to

13  consummate its purchase of the respective Restaurants.  Upon being notified that a Successful

14  Back-Up Bidder is deemed to be the Successful Bidder for a particular Restaurant, the

15  Successful Back-Up Bidder will be required to provide the Debtors with the same non-

16  refundable deposit as the initial Successful Bidder.  There may be more than one Successful

17  Back-Up Bidder for any particular Restaurant.

18        21.    All Qualified Bidders, including those who have submitted approved Stalking

19  Horse Bids, will be entitled to participate in the auction sale.  The Debtors and the Committee

20  (and Signature if Signature agrees to waive any right to participate as a bidder at the auction

21  sale) will all have the right to consult with and to provide input to me as to whether it makes

22  sense for the Debtors' estates to accept any bid which is not the highest bid amount as the

23  winning bid for any particular Restaurants, but all final decisions will be made by me.

24        22.    All Successful Bidders at the auction sale will be required to enter into the

25  Template APA, subject to any reasonable changes which are made by the Successful Bidders

26  and approved by the Debtors.

27        23.    By accepting the Stalking Horse Bids and agreeing to pay the respective

28  stalking horse bidders a break-up fee of $5,000 per Restaurant which is actually sold to an

alternative buyer at the auction sale, the Debtors are not committing to proceed with consummating a sale of the Restaurants.  The Debtors shall proceed with consummating a sale of some or all of the Restaurants only if the Debtors, in consultation with the Committee (and Signature if Signature agrees to waive any right to participate as a bidder at the auction sale) conclude that doing so is in the best interests of the Debtors' estates and the Court approves the sale after notice and a hearing.  All sales shall be subject to the approval of the Court.

24.    The Debtors' ability to assign leases, including leases where one of the Debtors is the actual named lessee under the lease, will subject to the approval of the Court.  While the Non-Debtor Affiliates who are the actual named lessees of certain of the Restaurant leases have agreed to transfer and assign all of their respective rights, title and interests in and to those leases to the Successful Bidders at the auction sale provided the buyers of the Restaurants accept an assignment of those leases in full compliance with the terms of the respective written leases, all such proposed assignments of such leases shall be subject to and conditioned on the full and complete satisfaction of the terms of those respective leases, including each landlord's right to argue that the leases are not property of the Debtors' bankruptcy estates, that the Debtors are not the lessees or tenants under the leases and/or that the Debtors have no standing to assign or request the landlord to consent to the assignment of the leases, and shall be further subject to all restrictions set forth in such leases with respect to any proposed assignments thereof, including that the landlord's consent must be obtained, delinquencies, fees, costs and other consideration owed to the landlord as provided for in such leases must be paid to the landlord or cured in full, adequate assurance of future performance by the Successful Bidders must be established, use restrictions must be enforced and existing lessees or tenants must not be released of any liability by virtue of the assignment (collectively, the "Non-Debtor Lease Compliance Issues").  The landlords shall be required to file with the Court and serve on counsel for the Debtors, the Committee and Signature any opposition they may have to the Sale Approval Request, including raising any of the Non-Debtor Lease Compliance Issues no later than April 29, 2011.

43

25.     Once the bidding at the auction sale on any Restaurant or group of Restaurants which were part of any stalking horse bid which was provided to Signature and which is not a matter of public record has been completed as determined by NFS, Signature shall have the right to submit a higher qualifying bid, which higher qualifying bid may include a credit bid for some or all of Signature's outstanding secured debt. Signature may use a portion of its secured debt to serve as the $10,000 per Restaurant required deposit to become a Qualified Bidder at the auction sale. Signature is excused from the need to provide financial data to the Debtors in order to become a Qualified Bidder provided that Signature does not intend to bid more than the outstanding amount of its secured debt (recognizing that if Signature is the Successful Bidder for any Restaurants, Signature will still be required to provide whatever financial information is necessary to enable the Debtors or the Non-Debtor Affiliates to assign their real property leasehold rights to Signature). If Signature does intend to bid more than the outstanding amount of its secured debt, Signature will be required to demonstrate to the satisfaction of NFS that Signature has the financial ability to do so. Also, to the extent Signature desires to become a Fatburger franchisee, Signature will be subject to the same franchisee requirements as all other Potential Bidders.

26.     I believe that the facts pertaining to the Debtors' proposed sale of the Purchased Assets to the Successful Bidders clearly substantiate the Debtors' business decision that such contemplated sale serves the best interests of the Debtors' estates and their creditors, and merits the approval of the Court.

27.     As indicated above, the Debtors have no ability to survive on any long-term basis or to confirm a plan of reorganization. I believe that, if the Debtors fail to consummate an expedited sale of the Restaurants to the Successful Bidders, the Debtors will either end up selling the Restaurants for substantially less money, or, worse, the Debtors will have to shut down their business and liquidate, which would result in the loss of the going concern value of the Restaurants. I believe that the liquidation value of the Restaurants is substantially lower than the going concern value of the Restaurants that will be achieved through the auction sale.

28.    I believe that proceeding with an expedited sale of the Debtor's Restaurants to the Successful Bidders is in the overwhelming best interests of the Debtors' estates and creditors and is the only positive result available to the Debtors under the circumstances of these bankruptcy cases.

29.    I believe that the auction sale process undertaken by the Debtors, which has been approved by the Court with the consent of all of the key constituents in the Debtors' cases, is specifically designed to insure that the highest price possible is obtained for the Purchased Assets under the circumstances of the cases.  The Debtors will obviously not know the results of the auction sale until the auction sale has been completed.  The Debtors will promptly file the results of the auction sale with the Court.  NFS is engaged in an extensive and broad marketing and sale process, having facilitated due diligence with numerous parties. All interested and viable buyers are being provided with equal access to the Debtors and their financial information and had the same opportunity to serve as Stalking Horse Bidders.  I am therefore confident that the highest and best bids submitted at the auction sale will constitute fair and reasonable value for the Purchased Assets, and therefore should be approved by the Court.  If that proves not to be the case, I will cause the Debtors to withdraw the Motion, at least with respect to certain Restaurants.

30.    Other than the Stalking Horse Bidders, whose identities are set forth above, the Debtors will not know the identities of the Successful Bidders at the auction sale until the auction sale has been completed.  However, NFS has been in charge of the entire sale process, and I am not aware of any prospective bidders that have received any special treatment from the Debtors or from NFS.  I am not aware of any fraud, collusion or attempt to take unfair advantage of other bidders.

31.    The only creditors the Debtors are aware of who have a lien against any of the Purchased Assets are Signature and General Electric Capital Business Asset Funding Corporation of Connecticut ("GE"), and it is my understanding that both Signature and GE consent to the sale of the Purchased Assets to the Successful Bidders at the auction sale (subject to Signature's and GE's respective credit bid rights).  Other than the liens of

45

1  Signature and GE, I am not aware of the existence of any other encumbrances against the

2  Purchased Assets.  If any other encumbrances do exist, it is my understanding and belief that

3  the sale order will provide for all such liens to attach to the proceeds of the sale in the same

4  validity and priority and subject to the same defenses and avoidability, if any, as before the

5  sale closings.

6        32.    Each of the Successful Bidders at the auction sale will have the right to have

7  the Debtors assume and assign to the Successful Bidder those executory contracts and

8  unexpired leases which are related to the Restaurants that the Successful Bidder will be

9  buying.  As set forth in the bid procedures order which has been entered by the Court, the

10  Debtors' ability to assign leases, including leases where one of the Debtors is the actual

11  named lessee under the lease, will subject to the approval of the Court.  While the Non-Debtor

12  Affiliates who are the actual named lessees of certain of the Restaurant leases have agreed to

13  transfer and assign all of their respective rights, title and interests in and to those leases to the

14  Successful Bidders at the auction sale provided the buyers of the Restaurants accept an

15  assignment of those leases in full compliance with the terms of the respective written leases,

16  all such proposed assignments of such leases shall be subject to and conditioned on the full

17  and complete satisfaction of the terms of those respective leases, including the Non-Debtor

18  Lease Compliance Issues.  The landlords shall be required to file with the Court and serve on

19  counsel for the Debtors, the Committee and Signature any opposition they may have to the

20  Sale Approval Request, including raising any of the Non-Debtor Lease Compliance Issues no

21  later than April 29, 2011.

22        33.    In connection with the Motion, the Debtors are requesting an order of the

23  Court providing that the cure amounts set forth in Exhibit "1" hereto (as supplemented or

24  amended) are the cure amounts which the Debtors must pay to the other parties to the leases

25  that the Successful Bidders may elect to have the Debtors assume and assign to them to

26  enable the Debtors to satisfy the cure requirements of the Bankruptcy Code.

27        34.    In connection with the Motion, the Debtors are requesting an order of the

28  Court providing that as of the various sale closings, all executory contracts and unexpired

46

1  leases that the Successful Bidders wish to have assumed by the Debtors and assigned to them

2  shall become assumed contracts or assumed leases, as the case may be, which means that they

3  will be assumed by the Debtors and assigned to the Successful Bidders effective as of the

4  various sale closings.

5      35.    In connection with the Debtors' assumption and assignment to the Successful

6  Bidders of executory contracts and unexpired leases, the Successful Bidders will be deemed

7  to have assumed any ongoing liabilities and obligations in connection with all such assumed

8  and assigned executory contracts and unexpired leases, and the Debtors will be responsible

9  for the payment of all cure costs identified on Exhibit "1" hereto for all such assumed and

10  assigned executory contracts and unexpired leases.

11      36.    The Successful Bidders will be required to provide the other parties to all such

12  executory contracts and unexpired leases which the Debtors seek to have assumed and

13  assigned to the Successful Bidders as is reasonably required to enable the Successful Bidders

14  to satisfy the "adequate assurance of future performance" requirements of the Bankruptcy

15  Code with respect to all such executory contracts and unexpired leases.

16      37.    For all of the reasons set forth above, I believe that it is critically important that

17  the Debtors and the Successful Bidders be permitted to consummate their respective sale

18  closings as soon after entry of the sale order as possible.  As indicated above, the Debtors are

19  targeting their sale closings for early May, 2011.  In order to facilitate the most expeditious

20  sale closings possible, I request on behalf of the Debtors that any order approving the sale of

21  the Purchased Assets to the Successful Bidders and the Debtors' assumption and assignment

22  of executory contracts and unexpired leases be effective immediately upon entry by providing

23  that the fourteen-day waiting periods of the Bankruptcy Rules are waived.

24      I declare under penalty of perjury that the foregoing is true and correct.

25      Executed this 12th day of April, 2011 at _____, California.

26

27                  _____*[To be submitted]*_____

                WINSTON MAR, Declarant

28

47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

# Fatburger Corporation
### *Estimated Store Sale Summary with Estimated Cure Costs*

**LEASE EXPENSE - ACCRUED**

| *California* | *Landlord* | *Lease Holding Entity* | Pre-petition Rent | Post-petition Rent |
|---|---|---|---|---|
| Baldwin Hills | Capri Urban Baldwin LLC | FB California | - | - |
| Hollywood | Marc Bernstein | FB California | - | - |
| Irvine | Crown Winthrop Dev | FB Corporation | 59,467 | 28,535 |
| Granada Hills | ACFPROP Devonshire, Ltd | FB California | - | - |
| West Hollywood | Sueyoshi, et al | FB California | - | 8,000 |
| Woodland Hills | Ventura Topanga Partners/Dusenberg | FB California | - | 22,053 |
| Sherman Oaks | Frances Rinck Partnership | FB California | - | 10,122 |
| Redondo Beach | Daisy Ellis | FB California | - | 11,493 |
| Palm Springs | Nat'l Bank of Long Beach/PS Metro | FB California | - | 6,545 |
| Fashion Island | The Irvine Company | FB California | - | 15,532 |
| Orange | OR Associates | FB Corporation | - | - |
| Morongo | Morongo Mission Indians | FB California | - | 19,502 |
| Rancho Cucamonga | SCP Rancho I, LLC | FB California | - | 6,000 |
| **Subtotal** | | | **59,467** | **127,783** |

| *Nevada* | | | | |
|---|---|---|---|---|
| Fiesta Henderson | Lake Mead Station, Inc. | FB Nevada | - | 9,158 |
| Green Valley | Green Valley Ranch Gaming, LLC | FB North America | 13,689 | 7,451 |
| Red Rock | Charleston Station, LLC | FB Nevada | - | 17,160 |
| Santa Fe Station | Santa Fe Station, Inc. | FB North America | 22,973 | 35,630 |
| Texas Station | Texas Station, Inc. | FB North America | 18,173 | 9,656 |
| Sunset Station | Sunset Station, Inc. | FB North America | 12,027 | 13,772 |
| Strip | Metroflag Cap/Tor, LLC | FB Corporation | - | 3,736 |
| Rancho | Roger Anderson | FB North America | - | - |
| Nellis | LD Nellis, LLC | FB Nevada | - | 21,914 |
| Flamingo | Spring Valley Shopping Center Las Vegas, NV Partnership | FB North America | - | 15,273 |
| Fort Apache | Baugh Corporation | FB Corporation | - | 10,072 |
| Charleston | | 0 FB Corporation | - | - |
| Henderson | | 0 FB Corporation | - | - |
| **Subtotal** | | | **66,862** | **143,821** |