RON BENDER (SBN 143364)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  rb@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>FATBURGER RESTAURANTS OF CALIFORNIA, INC., *et al.*,<br><br>Debtors.<br>—————————————————<br><br>__  Affects Fatburger Restaurants of California, Inc. Only<br><br>__  Affects Fatburger Restaurants of Nevada, Inc. Only<br><br> X  Affects Both Debtors | Case No. 1:09-bk-13964-GM<br><br>Chapter 11<br><br>Jointly Administered with Case No. 1:09-bk-13965-GM<br><br>**DEBTORS' MOTION FOR APPROVAL OF SALE OF DEBTORS' "FATMOBILE" VEHICLE FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS AND WAIVING THE 14-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF WINSTON MAR AND ANDREW A. WIEDERHORN**<br><br>Date:      July 1, 2011<br>Time:     9:00 a.m.<br>Place:    Courtroom "303"<br>            21041 Burbank Blvd.<br>            Woodland Hills, California |

In accordance with an oral order of the Court shortening time provided at a hearing held on June 14, 2011, Fatburger Restaurants of California, Inc. and Fatburger Restaurants of Nevada, Inc. (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases, hereby file this Motion ("Motion") for entry of an order of the Court: (A) pursuant to 11 U.S.C. § 363(f) approving the sale of the Debtors' "Fatmobile" vehicle (which is essentially a mobile Fatburger restaurant) to Adam Levin for $13,000 or to a successful qualified overbidder free and clear of all liens, claims and interests; (B) waiving the 14-day stay period set forth in Bankruptcy Rule 6004(h) to enable the sale to close as quickly as possible.

This Motion is based upon the Memorandum of Points and Authorities and Declarations of Winston Mar and Andrew A. Wiederhorn annexed hereto, as well as all statements, arguments and representations to be made at the hearing on the Motion.

As described in more detail below, the Debtors were formerly the owners and operators of twenty-six Fatburger restaurants located in California and Nevada (collectively, the "Restaurants," and individually, a "Restaurant"). All of the Debtors' Restaurants have now been sold or closed down. The Debtors are therefore no longer the owner or operator of any Fatburger Restaurants.

The Debtors continue to own their "Fatmobile" vehicle, which is essentially a mobile Fatburger restaurant. The Debtors recently conducted an auction sale of all of their Restaurants using an outside sales agent known as National Franchise Sales, Inc. ("NFS"). During this sales process the Debtors' operations and finances have been under the control of Winston Mar of CRG Partners Group, LLC, who is serving as the Debtors' chief restructuring officer. A picture of the Fatmobile is contained in the appraisal attached as Exhibit "1" to the

2

annexed Mar Declaration.  As indicated in the appraisal, the Fatmobile has an "as is" appraised value of $10,500.  The Debtors believe that the vehicle was built in or prior to 1994.

Adam Levin purchased a majority of the Debtors' California Restaurants at the auction sale.  Mr. Levin indicated to Mr. Mar that he was interested in purchasing the Fatmobile.  The Fatmobile had not been marketed for sale and was not included in the auction sale.  Mr. Mar requested Mr. Levin to submit a purchase offer, and Mr. Levin has offered to purchase the Fatmobile for $13,000 on an "as is" basis.

Subsequent to receiving Mr. Levin's "as is" $13,000 purchase offer, Mr. Mar has confirmed with the Debtors' franchisor, Fatburger North America, Inc. ("FNAI"), that FNAI is willing to enter into a standard franchise agreement with any qualified buyer of the Fatmobile[1] on the same general terms that were made available to the purchasers of the Restaurants at the auction sale (e.g., a 6% royalty fee + a .75% marketing fee with a fifteen-year term and no up front franchise fee with FNAI to have the right of first refusal to book the Fatmobile on a paid basis to the new owner for national marketing purposes).  A copy of the FNAI standard franchise agreement which would be available (at the option of the buyer) to any qualified buyer of the fatmobile is attached as Exhibit "1" to the annexed Wiederhorn Declaration.  The franchise agreement will need to be tailored somewhat to make it apply to the Fatmobile and not a free standing standard Restaurant.  One of the ways the franchise agreement will need to be modified would be to make it clear that the buyer of the Fatmobile (since it is mobile) will be prohibited from invading any other franchisee's territory without the consent of the franchisee (e.g., the buyer of the Fatmobile cannot park the Fatmobile outside of a free standing Fatburger Restaurant or close by and start selling Fatburger food in competition with the free standing Fatburger Restaurant).  Mr. Levin has advised Mr. Mar that

his ability to enter into such a franchise agreement with respect to the Fatmobile does not cause him to increase his purchase offer beyond the $13,000 he has offered.

The Debtors therefore seek authority to sell the Fatmobile to Mr. Levin on an "as is" basis for $13,000 free and clear of all liens, claims and interests unless any other qualified buyer(s) appears at the hearing on this Motion and offers to pay more money for the Fatmobile.  Concurrently with the filing of this Motion, the Debtors (with the assistance of NFS) will provide a copy of this Motion and a notice of the opportunity to overbid on all of the qualified bidders who appeared at the auction sale to make sure that the highest and best price is paid for the Fatmobile.  The notice will make clear that prospective overbidders will be required to bring with them to the hearing on this Motion cashier's checks for the full amount of their winning bid which the winning bidder will be required to deliver to the Debtors at the hearing, which sum will be fully non-refundable and be deemed forfeited if the winning buyer fails to consummate its purchase of the Fatmobile.  Prospective overbidders who desire to operate the Fatmobile as a Fatburger mobile restaurant must be qualified to operate as a franchisee.  Any party who wishes to discuss the terms of the offered franchisee agreement with FNAI should contact counsel to FNAI, Warren Christiansen, on his cell phone at 208/720-8272 or by email at warren@fatburger.com.

Pursuant to a stipulation the Debtors have entered into with the Official Committee of Unsecured Creditors, it is the Debtors' expectation that their Chapter 11 bankruptcy cases will have been converted to Chapter 7 prior to the hearing on this Motion.  As a result, it is the Debtors' expectation that it is likely that the newly appointed Chapter 7 trustee will be the person to actually conduct any auction of the Fatmobile that may occur at the hearing on this

---

[1] FNAI considers a qualified buyer to be one who already owns at least two California Fatburger franchises and who can demonstrate that it has at least $1 million of cash liquidity.

Motion and that the Chapter 7 trustee will be the person to actually consummate the sale of the Fatmobile.

The Debtors' (or Chapter 7 trustee's) sale of the Fatmobile will be on an "as is" "where is" basis with no representations or warranties of any kind. All prospective buyers will be required to conduct any due diligence they want to conduct, including any physical inspection of the Fatmobile and negotiations with FNAI over the form of the franchise agreement and qualifications to serve as a franchisee prior to the hearing on July 1, 2011.

The Debtors believe that the sale of the Fatmobile for the most money possible is in the best interests of the estates as the Debtors no longer have any use for the Fatmobile since they are no longer in the business of owning and operating Restaurants. The only alternatives available to the Debtors are to abandon the Fatmobile or to continue to pay for the storage of the Fatmobile, neither of which makes any sense under the circumstances.

WHEREFORE, the Debtors respectfully request the Court to enter an order:

1.      approving their sale of the Fatmobile to Mr. Levin for $13,000 or to a successful qualified overbidder free and clear of all liens, claims and interests, with such sale to be on an "as is" "where is" basis with no representations or warranties of any kind;

2.      waiving the 14-day stay period set forth in Bankruptcy Rule 6004(h); and

3.      granting such other and further relief as the Court deems just and proper.

Dated: June 21, 2011                          FATBURGER RESTAURANTS OF
                                              CALIFORNIA, INC., *et al.*

                                              By:    */s/ Ron Bender*
                                                     Ron Bender
                                                     Juliet Y. Oh
                                                     LEVENE, NEALE, BENDER, YOO
                                                     & BRILL L.L.P.
                                                     Attorneys for Chapter 11 Debtors and
                                                     Debtors in Possession

5

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### CASE BACKGROUND AND PROPOSED SALE OF "FATMOBILE" VEHICLE

The Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code on April 7, 2009.  The Debtors continue to operate their business, manage their financial affairs and administer their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.   An Official Committee of Unsecured Creditors (the "Committee") has been formed for both cases.

The Debtors were formerly the owners and operators of twenty-six Fatburger restaurants located in California and Nevada (collectively, the "Restaurants," and individually, a "Restaurant").  As of the date of the filing of this Motion (June 21, 2011), all of the Debtors' Restaurants have either been sold or closed down.  The Debtors therefore are no longer the owner or operator of any Fatburger Restaurants.

The Debtors continue to own their "Fatmobile" vehicle, which is essentially a mobile Fatburger restaurant.  The Debtors recently conducted an auction sale of all of their Restaurants using an outside sales agent known as National Franchise Sales, Inc. ("NFS").  During this sales process the Debtors' operations and finances have been under the control of Winston Mar of CRG Partners Group, LLC, who is serving as the Debtors' chief restructuring officer.  A picture of the Fatmobile is contained in the appraisal attached as Exhibit "1" to the annexed Mar Declaration.   As indicated in the appraisal, the Fatmobile has an "as is" appraised value of $10,500.  The vehicle was built in or prior to 1994.

Adam Levin purchased a majority of the Debtors' California Restaurants at the auction sale.  Mr. Levin indicated to Mr. Mar that he was interested in purchasing the Fatmobile.  The Fatmobile had not been marketed for sale and was not included in the auction

sale.  Mr. Mar requested Mr. Levin to submit a purchase offer, and Mr. Levin has offered to purchase the Fatmobile for $13,000 on an "as is" basis.

Subsequent to receiving Mr. Levin's "as is" $13,000 purchase offer, Mr. Mar has confirmed with the Debtors' franchisor, Fatburger North America, Inc. ("FNAI"), that FNAI is willing to enter into a standard franchise agreement with any qualified buyer[2] of the Fatmobile on the same general terms that were made available to the purchasers of the Restaurants at the auction sale (e.g., a 6% royalty fee + a .75% marketing fee with a fifteen-year term and no up front franchise fee with FNAI to have the right of first refusal to book the Fatmobile on a paid basis to the new owner for national marketing purposes).  A copy of the FNAI standard franchise agreement which would be available (at the option of the buyer) to any qualified buyer of the Fatmobile is attached as Exhibit "1" to the annexed Wiederhorn Declaration.  The franchise agreement will need to be tailored somewhat to make it apply to the Fatmobile and not a free standing standard Restaurant.  One of the ways the franchise agreement will need to be modified would be to make it clear that the buyer of the Fatmobile (since it is mobile) will be prohibited from invading any other franchisee's territory without the consent of the franchisee (e.g., the buyer of the Fatmobile cannot park the Fatmobile outside of a free standing Fatburger Restaurant or close by and start selling Fatburger food in competition with the free standing Fatburger Restaurant).  Mr. Levin has advised Mr. Mar that his ability to enter into such a franchise agreement with respect to the Fatmobile does not cause him to increase his purchase offer beyond the $13,000 he has offered.

The Debtors therefore seek authority to sell the Fatmobile to Mr. Levin on an "as is" basis for $13,000 free and clear of all liens, claims and interests unless a qualified buyer(s) appears at the hearing on this Motion and offers to pay more money for the Fatmobile.

1   Concurrently with the filing of this Motion, the Debtors (with the assistance of NFS) will

2   provide a copy of this Motion and a notice of the opportunity to overbid on all of the qualified

3   bidders who appeared at the auction sale to make sure that the highest and best price is paid

4   for the Fatmobile.  The notice will make clear that prospective overbidders will be required to

5   bring with them to the hearing on this Motion cashier's checks for the full amount of their

6   winning bid which the winning bidder will be required to deliver to the Debtors at the hearing,

7   which sum will be fully non-refundable and be deemed forfeited if the winning buyer fails to

8   consummate its purchase of the Fatmobile.  Propsective overbidders who desire to operate the

9   Fatmobile as a Fatburger mobile restaurant must be qualified to operate as a franchisee.  Any

10  party who wishes to discuss the terms of the offered franchisee agreement with FNAI should

11  contact counsel to FNAI, Warren Christiansen, on his cell phone at 208/720-8272 or by email

12  at warren@fatburger.com.

13

14

## II.

### DISCUSSION

**A.** **The Court Should Authorize the Debtors to Sell the Fatmobile to Mr. Levin or to a Successful Qualified Overbidder.**

Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some articulated business justification."  See, e.g., In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996) citing In re Schipper (Fulton State Bank v. Schipper), 933 F.2d 513, 515 (7th Cir. 1991); Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of

_____

[2] FNAI considers a qualified buyer to be one who already owns at least two California

1    Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business

2    judgment" test of Lionel Corp. and requiring good faith); In re Delaware and Hudson Ry. Co.,

3    124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business

4    judgment" test in the Abbotts Dairies decision).

5

6          In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the

7    best interest of the estate, and a business justification exists for authorizing the sale.  In re

8    Huntington, Ltd., 654 F.2d 578 (9th Cir. 1981); In re Walter, 83 B.R. 14, 19-20 (9th Cir.

9    B.A.P. 1988).  The Ninth Circuit has also held that section 363 allows the sale of substantially

10   all assets of a debtor's bankruptcy estate after notice and a hearing.  In re Qintex

11   Entertainment, Inc., 950 F.2d 1492 (9th Cir. 1991).

12

13         In determining whether a sale satisfies the business judgment standard, courts have

14   held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice

15   of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is

16   fair and reasonable); and (4) the parties to the sale have acted in good faith.  Titusville

17   Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D.

18   Pa. 1991); see also, In re Walter, 83 B.R. at 19-20.

19

20         The Debtors submit that their proposed sale of the Fatmobile comports with each of

21   these four criteria and demonstrates that the Debtors' business judgment to proceed with the

22   sale is sound.

23      **1.**      **Sound Business Purpose.**

24         There must be some articulated business justification, other than appeasement of

25   major creditors, for using, selling or leasing property out of the ordinary course of business

26   before the bankruptcy court may order such disposition under Section 363(b).  In re Lionel

27   Corp., 722 F.2d at 1070.  The Ninth Circuit Bankruptcy Appellate Panel in Walter v. Sunwest

28

_____

Fatburger franchises and who can demonstrate that it has at least $1 million of cash liquidity.

1    Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case

2    test to determine whether the business purpose for a proposed sale justifies disposition of

3    property of the estate under Section 363(b).   In Walter, the Bankruptcy Appellate Panel,

4    adopting the reasoning of the Fifth Circuit in In re Continental Airlines, Inc., 780 F.2d 1223

5    (5th Cir. 1986) and the Second Circuit in In re Lionel Corp., supra, articulated the standard to

6

7    be applied under Section 363(b) as follows:

8

9            Whether the proffered business justification is sufficient depends on the case.
             As the Second Circuit held in Lionel, the bankruptcy judge should consider all
10           salient factors pertaining to the proceeding and, accordingly, act to further the
             diverse interests of the Debtor, creditors and equity holders, alike.  He might,
11           for example, look to such relevant facts as the proportionate value of the asset
             to the estate as a whole, the amount of elapsed time since the filing, the
12           likelihood that a plan of reorganization will be proposed and confirmed in the
             near future, the effect of the proposed disposition on future plans of
13           reorganization, the proceeds to be obtained from the disposition vis-a-vis any
             appraisals of the property, which of the alternatives of use, sale or lease the
14           proposal envisions and, most importantly perhaps, whether the asset is
             increasing or decreasing in value.  This list is not intended to be exclusive, but
15           merely to provide guidance to the bankruptcy judge.

16

17   In Re Walter, 83 B.R. at 19-20, citing In re Continental Air Lines, Inc., 780 F.2d 1223, 1226

18   (5th Cir. 1986).

19           The Debtors seek authority to sell the Fatmobile to Mr. Levin on an "as is" basis for

20   $13,000 free and clear of all liens, claims and interests unless a qualified buyer(s) appears at

21   the hearing on this Motion and offers to pay more money for the Fatmobile.  Concurrently

22   with the filing of this Motion, the Debtors (with the assistance of NFS) will provide a copy of

23   this Motion and a notice of the opportunity to overbid on all of the qualified bidders who

24   appeared at the auction sale to make sure that the highest and best price is paid for the

25   Fatmobile.  The notice will make clear that prospective overbidders will be required to bring

26

27   with them to the hearing on this Motion cashier's checks for the full amount of their winning

28   bid which the winning bidder will be required to deliver to the Debtors at the hearing, which

sum will be fully non-refundable and be deemed forfeited if the winning buyer fails to consummate its purchase of the Fatmobile.  Propsective overbidders who desire to operate the Fatmobile as a Fatburger mobile restaurant must be qualified to operate as a franchisee.  Any party who wishes to discuss the terms of the offered franchisee agreement with FNAI should contact counsel to FNAI, Warren Christiansen, on his cell phone at 208/720-8272 or by email at warren@fatburger.com.

Pursuant to a stipulation the Debtors have entered into with the Committee, it is the Debtors' expectation that their Chapter 11 bankruptcy cases will have been converted to Chapter 7 prior to the hearing on this Motion.  As a result, it is the Debtors' expectation that it is likely that the newly appointed Chapter 7 trustee will be the person to actually conduct any auction of the Fatmobile that may occur at the hearing on this Motion and that the Chapter 7 trustee will be the person to actually consummate the sale of the Fatmobile.

The Debtors' (or Chapter 7 trustee's) sale of the Fatmobile will be on an "as is" "where is" basis with no representations or warranties of any kind.  All prospective buyers will be required to conduct any due diligence they want to conduct, including any physical inspection of the Fatmobile and negotiations with FNAI over the form of the franchise agreement and qualifications to serve as a franchisee prior to the hearing on July 1, 2011.

The Debtors believe that the sale of the Fatmobile for the most money possible is in the best interests of the estates as the Debtors no longer have any use for the Fatmobile since they are no longer in the business of owning and operating Restaurants.  The only alternatives available to the Debtors are to abandon the Fatmobile or to continue to pay for the storage of the Fatmobile, neither of which makes any sense under the circumstances.  The Debtors therefore submit that their proposed sale is justified by sound business purposes, satisfying the first requirement for a sale under Section 363(b) of the Bankruptcy Code.

2.     **Accurate and Reasonable Notice.**

In connection with a proposed sale under Section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors. The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate." In re Delaware & Hudson Railway Co., 124 B.R. 169, 180 (D. Del. 1991). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. In re Karpe, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. Id.

Concurrently with the filing of this Motion, the Debtors served a copy of this Motion and related notice of opportunity to overbid on the Committee, the United States Trustee and all parties who have requested special notice and, with the assistance of NFS, the Debtors will also serve a copy of this Motion and related notice of opportunity to overbid on all qualified bidders who appeared at the original auction sale.

The Debtors submit that the foregoing satisfies the requirements of Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") 6004(a) and (c), which provide as follows:

> "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ...
> (c) ... A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession..."

Fed. R. Bankr. P. 6004(a)(c). The Debtors have complied with all noticing procedures required by the Bankruptcy Rules and the Court.

1

### 3.    Fair and Reasonable Price.

2

3    In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase

4    price must be fair and reasonable.  Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re

5    Coastal Indus., Inc.), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986).  Several courts have held

6    that "fair value" is given for property in a bankruptcy sale when at least 75% of the appraised

7    value of such property is paid.  See In re Karpe, 84 B.R. at 933; In re Abbotts Dairies of

8    Pennsylvania, Inc., 788 F.2d 143, 149 (3d Cir. 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th

9    Cir. 1985); In re Snyder, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); In re The Seychelles,

10   Partnership and Genius Corp. v. Banyan Corp., 32 B.R. 708 (N.D. Tex. 1983).  However, the

11   Debtors also realize that their "main responsibility, and the primary concern of the bankruptcy

12   court, is the maximization of the value of the asset sold."  In re Integrated Resources, Inc.,

13   135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992).  "It is a

14   well-established principle of bankruptcy law that the objective of bankruptcy rules and the

15   [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall

16   benefit possible for the estate."  In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131

17   (Bankr. N.D. Ga. 1988); see also In re Wilde Horse Enterprises, 136 B.R. 830, 841 (Bankr.

18   C.D. Cal. 1991) ["in any sale of estate assets, the ultimate purpose is to obtain the highest

19   price for the property sold"].

20

21    The $13,000 "as is" offer submitted by Mr. Levin is higher than the "as is" appraised

22   value of the Fatmobile.  As indicated above, Mr. Levin has not increased his offer as a result

23   of the option to enter into a franchise agreement with FNAI for the Fatmobile.  The Debtors

24   submit that the overbid process that has been put in place will determine whether any other

25   buyer is willing to pay more money than $13,000 for the Fatmobile on an "as is" basis or

26

27

28

13

1    whether the option to enter into a franchise agreement with FNAI will cause any qualified

2    buyer to pay more than the $13,000 that Mr. Levin has offered.

3        **4.**    **Good Faith.**

4           When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is

5
6    required to make a finding with respect to the "good faith" of Purchaser.  In re Abbotts

7    Dairies, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be

8    employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the

9    requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's

10   reorganization plan and makes a finding that it has been proposed in good faith. Id. at 150.

11          "Good faith" encompasses fair value, and further speaks to the integrity of the

12
13   transaction.  In re Wilde Horse Enterprises, 136 B.R. at 842.  With respect to the debtor's

14   conduct in conjunction with the sale, the good faith requirement "focuses principally on the

15   element of special treatment of the Debtor's insiders in the sale transaction."  See In re

16   Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

17   With respect to the buyer's conduct, this Court should consider whether there is any evidence

18   of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to

19
20   take grossly unfair advantage of other bidders."  In re Abbotts Dairies, 788 F.2d at 147, In re

21   Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); In re Wilde Horse

22   Enterprises, Inc., 136 B.R. at 842; In re Alpha Industries, Inc., 84 B.R. 703, 706 (Bankr. D.

23   Mont. 1988).  In short, "[l]ack of good faith is generally determined by fraudulent conduct

24   during the sale proceedings."  In re Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988),

25   *citing* In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983).

26          In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the

27   following test for determining whether a buyer is a good faith purchaser:

28

1

A good faith buyer "is one who buys 'in good faith' and 'for value.'"
[citations omitted.] [L]ack of good faith is [typically] shown by 'fraud,
collusion between the purchaser and other bidders or the trustee, or an
attempt to take grossly unfair advantage of other bidders.'" [citations
omitted.]

2

3

4

Filtercorp, 163 F.3d at 577.

5

6       The Ninth Circuit made clear in Filtercorp that this standard for determining good

7  faith is applicable even when the buyer is an insider.

8       Other than the fact that Mr. Levin was the winning bidder at the auction sale for a

9

10  number of the Debtors' California Restaurants, Mr. Levin has no other known connection to

11  the Debtors or to any insiders or affiliates of the Debtors.  Mr. Mar knows of no reason why

12  Mr. Levin's purchase offer was not made in good faith, particularly since it exceeds the

13  appraised value of the Fatmobile.  Further, the overbid process that has been put in place is

14  designed to insure that the highest and best price possible is paid for the Fatmobile for the

15  benefit of these estates.[3]

16  **B.**    **Section 363(f) of the Bankruptcy Code Permits the Sale of the Fatmobile to Be**

17          **Free and Clear of Any and All Liens, Claims and Interests.**

18       Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

19
    The trustee may sell property under subsection (b) . . . of this section free and
20   clear of any interest in such property of an entity other than the estate, only
     if—
21   (1)    applicable non-bankruptcy law permits the sale of such property free
     and clear of such interest; ...
22   (2)    such entity consents;
23   (3)    such interest is a lien and the price at which such property is to be sold
     is greater than the aggregate value of all liens on such property;
24   (4)    Such interest is in bona fide dispute; or
     (5)    such entity could be compelled, in a legal or equitable proceeding, to
25   accept a money satisfaction of such interest.

26

27  _____

28      [3] The Debtors understand that an "insider" or "affiliate" of the Debtors may elect to
    appear at the hearing on this Motion and seek to overbid the $13,000 bid submitted by Mr.
    Levin.

15

11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code was drafted in the disjunctive.  Thus, a debtor need only meet the provisions of one of the five subsections of Section 363(f) in order for a sale of property to be free and clear of liens, claims and interests.

The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f) are satisfied with respect to the proposed sale of the Fatmobile.  The Debtors do not believe that any creditor holds a lien against the Fatmobile.  If the Debtors are incorrect in this regard, the sale order will provide for all such liens to attach to the proceeds of the sale in the same validity and priority and subject to the same defenses and avoidability, if any, as before the sale closing, thereby satisfying the provisions of Section 363(f) of the Bankruptcy Code.

In addition to all of the foregoing, the Debtors also submit that they have satisfied at least one of the possible conditions of Section 363(f) for a free and clear sale to enable the Debtors to deliver the Fatmobile to Mr. Levin or to a successful qualified overbidder free and clear of all liens, claims and interests as follows:

1.    **The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(5).**

Section 363(f)(5) of the Bankruptcy Code permits a sale of property free and clear of liens and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f)(5).

Pursuant to 11 U.S.C. §363(f)(5), a trustee may sell property free and clear of any interest if the holder of that interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f)(5); P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dep't of Medical Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.), 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing sale of nursing

home assets under §363(f)(5) over objection of the Department of Medical Assistance Service where its interest was reducible to a claim and subject to a hypothetical money satisfaction).

Section 363(f)(5) has generally been interpreted to mean that if, under applicable law, the holder of the lien or interest could be compelled to accept payment in exchange for its interest, the trustee (or debtor-in-possession) may take advantage of that right by replacing the holder's lien or interest with a payment or other adequate protection. Collier on Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier"). Applicable nonbankruptcy law may recognize a monetary satisfaction when the lien holder is to be paid in full out of the proceeds of the sale or otherwise. Id. Thus, for example, a sale free of a first mortgage might be approved when the proceeds are sufficient to pay in full the first mortgage and the second mortgagee has consented to the sale.

However, Section 363(f)(5) does not require full payment to the lien or interest holder if the trustee can demonstrate the existence of another legal or equitable proceeding by which the holder may be compelled to accept less than full satisfaction of the secured debt. In re Grand Slam U.S.A., Inc., 178 B.R. 460, 461-62 (E.D. Mich. 1995) (holding that the "money satisfaction" language in § 363(f)(5) does not require full payment to the lien holder); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994) (construing "money satisfaction of such interest" to mean a payment constituting less than full payment of the underlying debt because any lien can always be discharged by full payment of the underlying debt pursuant to § 363(f)(3)); Scherer v. Federal National Mortgage Association (In re Terrace Chalet Apartments, LTD.), 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993).

Courts have held that chapter 11 cramdown is a typical "legal proceeding" by which an entity may be compelled to accept less than full money satisfaction and which will permit the sale of creditor's collateral free and clear of interest under Section 363(f)(5). In re Gulf

17

1   States Steel, Inc. of Alabama, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002)(holding that the

2   liens or interests identified in the sale motion could be compelled to accept a money

3   satisfaction in a cram down plan of reorganization in a chapter 11 case); Scherer v. Federal

4   National Mortgage Association (In re Terrace Chalet Apartments, LTD.), 159 B.R. at 829

5   (finding that Section 1129(b)(2) cram down is such a provision); In re Perroncello, 170 B.R.

6   189 (Bankr. D. Mass. 1994); Collier ¶ 363.06[6][a].  Thus, the trustee can sell property free

7   and clear of a creditor's lien it if demonstrates it can cram down the creditor's interest

8   pursuant to § 1129(b)(2).

9

10      Likewise, the holder of a tax lien that would be subordinated under Section 724 can be

11  compelled to accept less than full payment.  In re Grand Slam U.S.A., Inc., 178 B.R. at 461-

12  62 (holding that § 724(b)(2) is applicable for purposes of § 363(f)(5) because it creates a

13  mechanism by which lien creditors are compelled to receive less than full payment of their

14  interest); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994)(concluding

15  that the Trustee may sell the property pursuant to section 363(f)(5) free of the County's tax

16  lien lien);  Collier, ¶ 363.06[6][a].

17

18      In addition to the legal arguments set forth above, the ability of a debtor to "cram-

19  down" a secured creditor under 11 U.S.C. Sec. 1129(b)(1) and (2) also constitutes a "legal

20  proceeding" pursuant to which a secured creditor could be compelled to accept a money

21  satisfaction.  See, In re Grand Slam, U.S.A. Inc., 178 B.R. 460, 462 (E.D. Mich. 1995);

22  1129(b)(2)(A).

23

24      Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided that it

25  receives "the indubitable equivalent" of its claim.  A debtor can cram down a secured creditor

26  if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, 11

27  U.S.C. § 1129(b)(1); (2) it is acting in good faith, 11 U.S.C. § 1129(a)(3)-(b)(1); and (3) the

28

secured creditor is receiving the actual value of its claim.  11 U.S.C. § 1129(b)(2)(A)(i)(II), 11 U.S.C. § 1129(b)(2)(A)(iii).  See also In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir.1989) (holding that "indubitable equivalent" of a secured creditor's interest is the actual value of the claim).

In In re Hunt Energy Co., Inc., 48 B.R. 472, 485 (Bankr. N.D. Ohio, E.D 1985), the court found that a lien which attaches to the proceeds of a sale would necessarily be reduced by subsequent valuation at a hearing under Section 506(a) to meet the "indubitable equivalence" requirements of section 1129(b)(2)(A).  Once Section 1129(b)(2)(A) is satisfied, the lienholder would be compelled through the cram-down process to accept such money satisfaction as dictated by the cram-down provisions.  Id.

All of the above requirements for cram down are met here.  The sale of the Fatmobile is being conducted in good faith.  While the Debtors do not believe that there are any secured creditors with valid liens against the Fatmobile, if there are any, they are being treated fairly and in accordance with their respective lien priorities, so there is no unfair discrimination present in the proposed sale.  Finally, any such secured creditor will receive the actual value of its secured claim as measured by Section 506(a).

Based upon all of the foregoing, all creditors of the Debtors, including all secured creditors of the Debtors, could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interests.  The Debtors' proposed sale of the Fatmobile to Mr. Levin or to a successful qualified overbidder should therefore be free and clear of all liens, claims and interests.

**2.      The Debtors' Proposed Asset Sale is Also Permissible Pursuant to 11 U.S.C. Section 363(f)(2).**

Section 363(f)(2) of the Bankruptcy Code also authorizes a sale to be free and clear of an interest if the interest holder consents to the sale. However, the "consent" of an entity asserting an interest in the property sought to be sold, as referenced in Section 363(f)(2) of the Bankruptcy Code, can be implied if such entity fails to make a timely objection to the sale after receiving notice of the sale. In re Eliot, 94 B.R. 343, 345 (E.D. Pa. 1988). In the Eliot case, the bankruptcy court approved the sale by a trustee of certain real property that was subject to a mortgage in favor of Citicorp. Citicorp had received notice of the sale, but did not file any timely objection to the sale. After the sale occurred, Citicorp filed a motion to set aside the sale, which was handled by the bankruptcy court as an adversary proceeding. The bankruptcy court dismissed the complaint to set aside the sale, and Citicorp appealed the ruling. The district court affirmed the dismissal, and, in so doing, stated:

> "… if any of the five conditions of § 363(f) are met, the Trustee has the authority to conduct the sale free and clear of all liens.
>
> In this case, the authority for the sale can be found in 11 U.S.C. § 363(f)(2). That section allows the Trustee to sell the property free and clear of all liens because Citicorp consented to the sale. Citicorp consented to the sale by failing to make any timely objection after receiving notice of the sale. Citicorp contends that implied consent is insufficient to satisfy the consent requirement of § 363(f)(2). I disagree. (emphasis added)

In its ruling, the Eliot court relied on In re Gabel, 61 B.R. 661 (Bankr. W.D. La. 1985), which held that implied consent is sufficient to authorize a sale under § 363(f)(2). See also, In re Ex-Cel Concrete Company, Inc., 178 B.R. 198, 203 (9th Cir. BAP 1995) ["The issue here is whether there was consent or non-opposition by Citicorp."]; In re Paddlewheels, Inc., 2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ["The Sale Motion complies with section 363(f) of the Bankruptcy Code, in that the Trustee either obtained the consent of Whitney to the sale of the Vessel to Purchaser or Whitney had no objection to the Sale."].

20

As a result of the foregoing, the Debtors submit that the Court should approve the sale of the Fatmobile to Mr. Levin or to a successful qualified overbidder free and clear of all liens, claims and interests of those parties who do not file a timely objection to the sale, by deeming all such parties to have consented to the proposed sale pursuant to Section 363(f)(2) of the Bankruptcy Code.

**C.**   **The Debtors Request the Court to Waive the Fourteen-Day Waiting Period Set Forth in Bankruptcy Rule 6004(h).**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise.  For all of the reasons set forth above, the Debtors believe that it is important to consummate their sale of the Fatmobile as quickly as possible as the Debtors have no use for the Fatmobile and, until the sale closing, are required to store and maintain the Fatmobile.  The Debtors request that any order approving the sale of the Fatmobile to Mr. Levin or to a successful qualified overbidder be effective immediately upon entry by providing that the fourteen-day waiting period of Bankruptcy Rule 6004(h) be waived.

**III.**

**CONCLUSION**

Based upon all of the foregoing, the Debtors respectfully request that this Court enter an order:

1.      approving their sale of the Fatmobile to Mr. Levin for $13,000 or to a successful qualified overbidder free and clear of all liens, claims and interests, with such sale to be on an "as is" "where is" basis with no representations or warranties of any kind;

2.      waiving the 14-day stay period set forth in Bankruptcy Rule 6004(h); and

21

1        3.    granting such other and further relief as the Court deems just and proper.

2    Dated: June 21, 2011                FATBURGER RESTAURANTS OF
CALIFORNIA, INC., *et al.*

3

4    By:   */s/ Ron Bender*
Ron Bender

5    Juliet Y. Oh
LEVENE, NEALE, BENDER, YOO

6    & BRILL L.L.P.
Attorneys for Chapter 11 Debtors and

7    Debtors in Possession

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION OF WINSTON MAR</u>

I, Winston Mar, hereby declare as follows:

1.       I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.       I am a Managing Director of CRG Partners Group, LLC, and am the designated Chief Restructuring Officer ("<u>CRO</u>") of Fatburger Restaurants of California, Inc. and Fatburger Restaurants of Nevada, Inc. (collectively, the "<u>Debtors</u>"), debtors and debtors in possession herein.  My designation as the CRO of the Debtors was approved pursuant to an order entered by the Court on February 16, 2011.  Immediately following my designation as CRO of the Debtors, I obtained control of the Debtors' cash and cash management system, began my evaluation of the Debtors' business operations and financial situation, and began overseeing and managing all aspects of the Debtors' business operations.

3.       I submit this Declaration in support of the Debtors' Motion ("<u>Motion</u>") for entry of an order of the Court: (A) pursuant to 11 U.S.C. § 363(f) approving the sale of the Debtors' "Fatmobile" vehicle (which is essentially a mobile restaurant) to Adam Levin for $13,000 or to a successful qualified overbidder free and clear of all liens, claims and interests; (B) waiving the 14-day stay period set forth in Bankruptcy Rule 6004(h) to enable the sale to close as quickly as possible.

4.       The Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code on April 7, 2009.  The Debtors continue to operate their business, manage their financial affairs and administer their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  An Official Committee of Unsecured Creditors (the "<u>Committee</u>") has been formed for both cases.

5.      The Debtors were formerly the owners and operators of twenty-six Fatburger restaurants located in California and Nevada (collectively, the "Restaurants," and individually, a "Restaurant").  As of the date of this Declaration (June 21, 2011), the Debtors have either sold or closed down all of their Restaurants.  The Debtors are therefore no longer the owner or operator of any Fatburger Restaurants.

6.      The Debtors continue to own their "Fatmobile" vehicle, which is essentially a mobile Fatburger restaurant.  The Debtors recently conducted an auction sale of all of their Restaurants using an outside sales agent known as National Franchise Sales, Inc. ("NFS").  I played an active role at the auction sale.  During this sales process the Debtors' operations and finances have been under my control.  A picture of the Fatmobile is contained in the appraisal attached hereto as Exhibit "1" which I cause to be commissioned.  As indicated in the appraisal, the Fatmobile has an "as is" appraised value of $10,500.  I understand that the vehicle was built in or prior to 1994.

7.      Adam Levin purchased a majority of the Debtors' California Restaurants at the auction sale.  Mr. Levin indicated to me that he was interested in purchasing the Fatmobile.  The Fatmobile had not been marketed for sale and was not included in the auction sale.  I requested Mr. Levin to submit a purchase offer, and Mr. Levin has offered to purchase the Fatmobile for $13,000 on an "as is" basis.

8.      Subsequent to receiving Mr. Levin's "as is" $13,000 purchase offer, I have confirmed with the Debtors' franchisor, Fatburger North America, Inc. ("FNAI"), that FNAI is willing to enter into a standard franchise agreement with any qualified buyer of the Fatmobile on the same general terms that were made available to the purchasers of the Restaurants at the auction sale.  Mr. Levin has advised me that his ability to enter into such a

franchise agreement with respect to the Fatmobile does not cause him to increase his purchase offer beyond the $13,000 he has offered.

9.    On behalf of these estates, I therefore seek authority to have the Debtors sell the Fatmobile to Mr. Levin on an "as is" basis for $13,000 free and clear of all liens, claims and interests unless a qualified buyer(s) appears at the hearing on the Motion and offers to pay more money for the Fatmobile.  Concurrently with the filing of the Motion, the Debtors (with the assistance of NFS) will provide a copy of the Motion and a notice of the opportunity to overbid on all of the qualified bidders who appeared at the auction sale to make sure that the highest and best price is paid for the Fatmobile.  The notice will make clear that prospective overbidders will be required to bring with them to the hearing on this Motion cashier's checks for the full amount of their winning bid which the winning bidder will be required to deliver to the Debtors at the hearing, which sum will be fully non-refundable and be deemed forfeited if the winning buyer fails to consummate its purchase of the Fatmobile.  Propsective overbidders who desire to operate the Fatmobile as a Fatburger mobile restaurant must be qualified to operate as a franchisee.  Any party who wishes to discuss the terms of the offered franchisee agreement with FNAI should contact counsel to FNAI, Warren Christiansen, on his cell phone at 208/720-8272 or by email at warren@fatburger.com.

10.    Pursuant to a stipulation the Debtors have entered into with the Committee, it is my expectation that the Debtors' Chapter 11 bankruptcy cases will have been converted to Chapter 7 prior to the hearing on the Motion.  As a result, it is my expectation that it is likely that the newly appointed Chapter 7 trustee will be the person to actually conduct any auction of the Fatmobile that may occur at the hearing on the Motion and that the Chapter 7 trustee will be the person to actually consummate the sale of the Fatmobile.  At a hearing held on

June 14, 2011, the Court authorized the Debtors to file the Motion and to set it for hearing on July 1, 2011 at 9:00 a.m.

11.    The Debtors' (or Chapter 7 trustee's) sale of the Fatmobile will be on an "as is" "where is" basis with no representations or warranties of any kind.  All prospective buyers will be required to conduct any due diligence they want to conduct, including any physical inspection of the Fatmobile and negotiations with FNAI over the form of the franchise agreement and qualifications to serve as a franchisee prior to the hearing on July 1, 2011.

12.    I believe that the sale of the Fatmobile for the most money possible is in the best interests of the estates as the Debtors no longer have any use for the Fatmobile since they are no longer in the business of owning and operating Restaurants.  The only alternatives available to the Debtors are to abandon the Fatmobile or to continue to pay for the storage of the Fatmobile, neither of which makes any sense to me under the circumstances.  I therefore submit that the Debtors' proposed sale of the Fatmobile is justified by sound business purposes.

13.    Concurrently with the filing of the Motion, the Debtors served a copy of the Motion and related notice of opportunity to overbid on the Committee, the United States Trustee and all parties who have requested special notice and, with the assistance of NFS, the Debtors will also serve a copy of the Motion and related notice of opportunity to overbid on all qualified bidders who appeared at the original auction sale.

14.    The $13,000 "as is" offer submitted by Mr. Levin is higher than the "as is" appraised value of the Fatmobile.  As indicated above, Mr. Levin has not increased his offer as a result of the option to enter into a franchise agreement with FNAI for the Fatmobile.  I submit that the overbid process that has been put in place will determine whether any other qualified buyer is willing to pay more money than $13,000 for the Fatmobile on an "as is"

basis or whether the option to enter into a franchise agreement with FNAI will cause any buyer to pay more than the $13,000 that Mr. Levin has offered.

15.    Other than the fact that Mr. Levin was the winning bidder at the auction sale for a number of the Debtors' California Restaurants, I am not aware of Mr. Levin having any other known connection to the Debtors or to any insiders or affiliates of the Debtors. I know of no reason why Mr. Levin's purchase offer was not made in good faith, particularly since it exceeds the appraised value of the Fatmobile. Further, the overbid process that has been put in place is designed to insure that the highest and best price possible is paid for the Fatmobile for the benefit of these estates.[4]

16.    I believe that the sale of the Fatmobile is being conducted in good faith. While I do not believe that there are any secured creditors with valid liens against the Fatmobile, if there are any, they are being treated fairly and in accordance with their respective lien priorities, so there is no unfair discrimination present in the proposed sale.

17.    For all of the reasons set forth above, I believe that it is important for the Debtors (or a subsequently appointed Chapter 7 trustee) to consummate the sale of the Fatmobile as quickly as possible as the Debtors have no use for the Fatmobile and, until the sale closing, are required to store and maintain the Fatmobile. The Debtors therefore request that any order approving the sale of the Fatmobile to Mr. Levin or to a successful overbidder be effective immediately upon entry by providing that the fourteen-day waiting period of Bankruptcy Rule 6004(h) be waived.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of June, 2011 at _Beverly Hills_ , California.

---

[4] I understand that an "insider" or "affiliate" of the Debtors may elect to appear at the hearing on this Motion and seek to overbid the $13,000 bid submitted by Mr. Levin.

1
2
3

WINSTON MAR, Declarant

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"





<u>Fair Market Valuation</u>
# FATBURGER FATMOBILE

**Effective Date: May 16, 2011**

Prepared for: Winston Mar
CRG Partners, Inc.

Prepared by:  Brian Testo C.E.A.

Brian Testo Associates, LLC
21208 Costanso St. #1 Woodland Hills, CA 91364 (818) 592-6592



Appraisal Services                                                                Fatburger Corporation

# Table of Contents

**Cover Letter**     **3**

| **Appraisal Narrative** |
|:---:|

| **I.** | **Executive Summary** | **4** |
| | Introduction | |
| | Intended User and Use Statement | |
| | Certificate of Values | |
| | Certification | |

| **II.** | **Valuation Methodology** | **7** |
| | Approach | |
| | General Information and Definitions | |
| | Appraisal Procedures | |
| | Primary Valuation Factors | |

| **III.** | **Limitations and Qualifications** | **9** |
| | Statement of Limiting Conditions | |
| | Qualifications | |
| | AMEA Certification | |



Brian Testo Associates, LLC                                                        1

May 16, 2011

Winston Mar
CRG Partners, LLC
11835 West Olympic Blvd.
Suite 650E
Los Angeles, CA 90064

Dear Mr. Mar:

Pursuant to your request, I, as an AMEA Certified Appraiser of Brian Testo Associates, LLC, have prepared this written opinion of value for the Fatburger Osk Kosh Catering Truck (also know as "Fatmobile").    This report is intended for CRG Partners and is intended for use for business planning purposes.  Use of this report by others is not intended by the appraiser, nor is the report intended for any other use, unless express written consent is further granted.

The cost, income and market approaches to value have been considered for this appraisal and have either been utilized where necessary or deemed inappropriate for the value conclusions found therein.  After careful consideration of all three approaches, the appraiser used the market and cost approach to value, for purpose of this report. The enclosed appraisal is a self contained appraisal.

After a thorough inspection of the asset and review of the information made available to me, it is my opinion that as of May 15, 2011 the Fatburger Osk Kosh Catering Truck ("aka" Fatmobile) Fatburger Osk Kosh Catering Truck ("aka" Fatmobile) has Fair Market Values as shown on the enclosed certificate.

The exhibits contained herein should be reviewed in conjunction with the text of the appraisal in order to understand the scope of this appraisal, assumptions and any other relevant factors to assessing the value of the assets.  These opinions were based on conditions in the industry as they existed then, and do not anticipate or forecast the future.  Thus, there are no guarantees should the results be tested in the future.

As an agent of Brian Testo Associates, LLC, I certify that neither Brian Testo, nor any of its employees have any present or future interest in the appraised property. The fees charged for this appraisal were not contingent on the values reported, nor were any undisclosed fees, commissions, or other compensation received.

Respectfully submitted,


Brian Testo
Certified Equipment Appraiser




Brian Testo Associates, LLC                                                          2

## I. Executive Summary

### Introduction

Brian Testo Associates was engaged by CRG Partners, LLC for the purpose of providing a written opinion of value of the Fair Market values of the Fatmobile.

### Intended User and Use Statement

"This report is intended for CRG Partners, LLC and is intended only for use for business planning purposes. Use of this report by others is not intended by the appraiser, nor is the report intended for any other use, unless express written consent is further granted."

Appraisal Services                                                    Fatburger Corporation

# ~Certificate of Values ~

**BRIAN TESTO ASSOCIATES, LLC**
21208 Costanso St. Suite #1, Woodland Hills, CA 91364

**DOES HEREBY**

*-Certify-*
That this is our Opinion of Value of the Property of

**Fatburger, Inc.**

WAS WELL AND RESONABLY WORTH:

$10,500.00
**1994 Osk Kosh Catering Truck
("aka" Fatmobile).**

On the basis of Fair Market Values

Effective: May 13, 2011          Certified By_____
                                         Brian Testo, C.E.A.

## Certification

*I certify that, to the best of my knowledge and belief:*

*The statements of fact contained in this report are true and correct.*

*The reported analysis, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and is my personal, unbiased professional analysis, opinion and conclusion.*

*I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.*

*My compensation is not contingent on an action or event resulting from the analysis, opinions or conclusions in or the use of, this report.*

*My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Association of Machinery and equipment Appraisers Standards and Procedures of Professional Appraisal Ethics and Practice and the Uniform Standards of Professional Practice.*

*A personal inspection of the property subject in this report has been made.*

*No one provided significant professional assistance to the persons signing this report.*

_____ *C.E.A.*
*Brian Testo*



## II. Valuation Methodology

### Approach

In all assignments, the appraiser is called upon to address and consider the three approaches to value. They are the cost approach, the income approach and the sales comparison approach. The appraiser will utilize the approaches to value in varying degrees based upon the nature of assets under appraisement, the purpose and scope of the appraisal and the judgment of the appraiser, as to how they related to the assignment at hand.

❖ **Market Approach (Sales Comparison) -** One of the three recognized approaches used in appraisal analysis, this approach involves the collection of market data pertaining to the subject assets being appraised. This approach is also known as the "Comparison Sales Approach". The primary intent of the market approach is to determine the desirability of the assets and recent sales or offering of similar assets currently on the market in order to arrive at an indication of the most probable selling price for the assets being appraised, adjustment must be made to bring them as closely in line as possible with the subject property.

❖ **Cost Approach -** One of the three recognized approaches used in appraisal analysis, this approach is based on the proposition that the informed purchaser would pay no more for a property than the cost of producing a substitute property with the same utility as the subject property. It considers that the maximum value of a property to a knowledgeable buyer would be the amount currently required to construct or purchase a new asset of equal utility. When subject asset is not new, the current cost must be adjusted for all forms of depreciation as of the effective date of the appraisal.

❖ **Income Approach -** (not utilized for the purpose of this report). One of the three recognized approaches used in appraisal analysis, this approach considers value in relation to the present worth of future benefits derived from ownership and is usually measured through the capitalization of a specific level of income. This approach is the least common approach used in the valuation of Machinery & Equipment since it is difficult to isolate income attributable to such assets.

### General Information and Definitions

**Function of Appraisal -** The property interest (rights) appraised is that of ownership in fee simple, and the subject's assets are appraised as if free and clear, without liens or encumbrances (unless otherwise noted).

**Fair Market Value** - A professional opinion of the estimated most probable price expressed in terms of currency to be realized for property in an exchange between a



willing buyer and a willing seller, with equity to both, neither being under any compulsion to buy or sell, and both parties fully aware of all relevant facts, as of the effective date of this appraisal report.

## Appraisal Procedures

Our assignment called for us to establish a written opinion of the Fair Market value of the Fatburger Fatmobile.  While there were no obvious risk factors, no consideration was given for any hazardous waste conditions.

BTA performed the following procedures to determine the net values expressed herein:

1. Conducted a walkthrough inspection to view the condition of the Fatmobile located in the city of Torrance, CA.

2. Contacted dealers of similar types of event catering trucks, to discuss the market conditions and values.

3. Conducted internet searches that provided a host of web sites dedicated to this industry.

## Primary Valuation Factors

In assessing the value of the FATMOBILE, BTA considered various relevant factors, including but not limited to the following;

❖ Condition: <u>The condition of the FATMOBILE is generally poor.</u>

❖ Age, manufacturer, model, characteristics, size, and capabilities:

❖ Current market demand within related industries

❖ Current economic conditions

❖ Physical, functional and economic

❖ Consideration has been given to the highest and best use of the subject assets.



## III. Limitations and Qualifications

### Statement of Limiting Conditions

❖ All facts and data set forth in this report are based upon an estimate of value only and are true and accurate to the best of the appraiser's knowledge and belief.

❖ No investigation has been made into the title to the property and all items as listed are assumed to be the property of the subject company.

❖ No consideration has been given to liens or encumbrances, which may be against the property other than those discussed in this report.

❖ The values reported herein are an opinion only and are not a warranty or representation of fact.  The appraiser makes no guarantee or warranty whatsoever as to the outcome of a liquidation of the assets valued in this report.

❖ I have no present or prospective interest in the property that is the subject of the report, and I have no personal interest or bias with respect to the parties involved.

❖ This appraisal has been made in accordance with accepted appraisal practices in accordance with *Uniform Standards of Professional Appraisal Practice* and reflects the best judgment of the appraiser.  When appropriate, new and used machinery & equipment dealers have been consulted for comparable prices; and catalogs, trade publications and results of auction sale comparables have also been utilized.

❖ Information provided by others has been assumed to be correct for the purposes of this report and no responsibility is taken for the accuracy of same.

❖ Since conclusions by the appraiser are based upon judgments, isolation of any single element as sole basis of comparison to the whole appraisal may be inaccurate.

❖ This appraisal is a guide to values and should not be used as the sole basis for any business planning decisions.  This appraisal should be used in conjunction with an independent second opinion.

❖ The fees for this appraisal are not contingent upon values reported.

❖

❖ Consideration for possible environmental hazards from any source goes beyond the scope of this appraisal.



❖ It is assumed that there are no hidden or unapparent conditions, for which would render the asset more or less valuable.

❖ The appraiser is not required to give testimony, be present in court of law, or appear before any commission or board by reason of this appraisal, unless prior arrangements have been made.

❖ BTA is not responsible or liable for market changes in the values of the appraised asset which may be affected by, but not limited to the following:

   ∗ Condition of the machinery & equipment
   ∗ Technological obsolescence
   ∗ Economic changes
   ∗ Comparable machinery & equipment sales which may saturate market value
   ∗ Environmental rules affecting business

Appraisal Services                                                                  Fatburger Corporation

## Qualifications

**Brian Testo** has over twenty years of experience in the field of capital asset management and disposition, specializing in industrial Machinery & Equipment.  He has personally managed and conducted over 200 auctions and controlled liquidations for many Fortune 500 Corporations such as Lockheed Martin, Kaiser and British Petroleum.  Brian Testo also conducts approximately 50 to 75 appraisals per year (nationally) for asset based lenders and private business sectors, verifying asset values for loans, buy/sell agreements, mergers and acquisitions.

During his career, he has successfully completed Machinery & Equipment projects in the following industries:

- Automotive
- Aerospace
- Telecommunications
- Biotech
- Food Processing
- Metal Fabrication & Testing
- Electronics
- Plastics and Composites
- Construction
- Woodworking
- General machine tool manufacturing
- Printing
- Pharmaceutical
- Circuit Board Manufacturing
- Furniture Manufacturing
- Agriculture
- Semi-Conductor

Brian Testo attended Citrus College where he studied small business management. He also participates in industry related continuing education programs.

Brian is a member in good standing in the following organizations:

AMEA        Association of Machinery & Equipment Appraisers
MDNA        Machinery Dealers National Association
EAANA       Equipment Appraisers Association of North America
IAA         Industrial Auctioneers Association
NAA         National Auctioneer Association
CSAA        California State Auctioneers Associations, Inc.
SCAA        Southern California Auctioneers Association
ABI         American Bankruptcy Institute
TMA         Turnaround Management Association



Brian Testo Associates, LLC                                                              10

## DECLARATION OF ANDREW A. WIEDERHORN

I, Andrew A. Wiederhorn, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the Board Chairman and Chief Executive Officer of Fatburger North America, Inc. ("FNAI"), which serves as the franchisor of the Fatburger Restaurant chain.

3.      I submit this Declaration in support of the Debtors' Motion ("Motion") for entry of an order of the Court: (A) pursuant to 11 U.S.C. § 363(f) approving the sale of the Debtors' "Fatmobile" vehicle (which is essentially a mobile restaurant) to Adam Levin for $13,000 or to a successful qualified overbidder free and clear of all liens, claims and interests; (B) waiving the 14-day stay period set forth in Bankruptcy Rule 6004(h) to enable the sale to close as quickly as possible.

4.      The Debtors continue to own their "Fatmobile" vehicle, which is essentially a mobile Fatburger restaurant.

5.      Adam Levin purchased a majority of the Debtors' California Restaurants at the recently conducted auction sale of the Fatburger Restaurants.  Mr. Levin has offered to purchase the Fatmobile for $13,000 on an "as is" basis.

6.      FNAI is willing to enter into a standard franchise agreement with any qualified buyer[5] of the Fatmobile on the same general terms that were made available to the purchasers of the Restaurants at the auction sale (e.g., a 6% royalty fee + a .75% marketing fee with a fifteen-year term and no up front franchise fee with FNAI to have the right of first refusal to

_____

[5]   FNAI considers a qualified buyer to be one who already owns at least two California Fatburger franchises and who can demonstrate that it has at least $1 million of cash liquidity.

1    book the Fatmobile on a paid basis to the new owner for national marketing purposes). A

2    copy of the FNAI standard franchise agreement which would be available (at the option of the

3    buyer) to any qualified buyer of the fatmobile is attached hereto as Exhibit "1". I understand

4    that the franchise agreement will need to be tailored somewhat to make it apply to the

5    Fatmobile and not a free standing standard Restaurant. One of the ways the franchise

6    agreement will need to be modified would be to make it clear that the buyer of the Fatmobile

7    (since it is mobile) will be prohibited from invading any other franchisee's territory without

8    the consent of the franchisee (e.g., the buyer of the Fatmobile cannot park the Fatmobile

9    outside of a free standing Fatburger Restaurant or close by and start selling Fatburger food in

10   competition with the free standing Fatburger Restaurant).

11      I declare under penalty of perjury that the foregoing is true and correct.

12

13      Executed this 21st day of June, 2011 at _____Los Angeles_____, California.

14

15

16

17       ANDREW A. WIEDERHORN, Declarant

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

**FATBURGER NORTH AMERICA, INC.**

**FRANCHISE AGREEMENT**

# FATBURGER NORTH AMERICA, INC.

## FRANCHISE AGREEMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

| | | |
|---|---|---|
| 1. | GRANT | 1 |
| 2. | TERM AND RENEWAL | 2 |
| 3. | DUTIES OF FRANCHISOR | 4 |
| 4. | FEES | 4 |
| 5. | DUTIES OF FRANCHISEE | 6 |
| 6. | PROPRIETARY MARKS | 14 |
| 7. | CONFIDENTIAL OPERATIONS MANUAL | 16 |
| 8. | CONFIDENTIAL INFORMATION | 17 |
| 9. | ACCOUNTING AND RECORDS | 17 |
| 10. | ADVERTISING | 19 |
| 11. | INSURANCE | 22 |
| 12. | TRANSFER OF INTEREST | 23 |
| 13. | DEFAULT AND TERMINATION | 27 |
| 14. | OBLIGATIONS UPON TERMINATION OR EXPIRATION | 30 |
| 15. | COVENANTS | 32 |
| 16. | TAXES, PERMITS, INDEBTEDNESS; COMPLIANCE WITH LAW | 33 |
| 17. | INDEPENDENT CONTRACTOR AND INDEMNIFICATION | 34 |
| 18. | APPROVALS AND WAIVERS | 34 |
| 19. | NOTICES | 35 |
| 20. | BUSINESS PRACTICES | 35 |
| 21. | APPLICABLE LAW; DISPUTE RESOLUTION | 36 |
| 22. | FORCE MAJEURE | 37 |
| 23. | SEVERABILITY AND CONSTRUCTION | 37 |
| 24. | MISCELLANEOUS | 38 |
| 25. | ENTIRE AGREEMENT | 40 |
| 26. | REPRESENTATIONS AND ACKNOWLEDGMENTS | 40 |

# FATBURGER NORTH AMERICA, INC.

# FRANCHISE AGREEMENT

THIS **FRANCHISE AGREEMENT** ("**Agreement**") is made and entered into this ___ day of _____, 200__, between FATBURGER NORTH AMERICA, INC., a Delaware corporation ("**Franchisor**") and _____ ("**Franchisee**") with reference to the following facts:

**WHEREAS**, Franchisor, as the result of the expenditure of time, skill, effort, and money, has developed and owns a distinctive system (the "**System**") relating to the establishment and operation of restaurants for the sale of hamburgers and related products;

**WHEREAS**, the distinguishing characteristics of the System include, without limitation, special recipes, ingredients, and menu items; distinctive design, decor, color scheme, and furnishings; uniform standards, specifications, and procedures for operations; defined product and service offerings; procedures for quality control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

**WHEREAS**, the System is identified by means of certain trade names, service marks, trademarks, logos, emblems, trade dress, and indicia of origin, including but not limited to the marks "FATBURGER" and "THE LAST GREAT HAMBURGER STAND," and such additional and replacement trade names, service marks, and trademarks as are now designated, and may hereafter be designated by Franchisor in writing, for use in connection with the System (the "**Proprietary Marks**");

**WHEREAS**, capitalized terms used in this Agreement shall have the meanings (such meanings to be applicable to the both the singular and plural forms of the term defined) set forth in **Schedule A** attached hereto and incorporated herein, unless the context otherwise requires:

**WHEREAS**, Franchisee desires to enter into the business of operating a Fatburger restaurant under the System and wishes to obtain the right to operate a franchise from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith; and

**WHEREAS**, Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, cleanliness, appearance, and service and the necessity of operating the business franchised hereunder in conformity with Franchisor's standards and specifications.

**NOW, THEREFORE**, the parties, in consideration of the undertakings and commitments of each party to the other party set forth herein, hereby agree as follows:

## 1.        GRANT

1.1        Franchisor hereby grants to Franchisee, upon the terms and conditions herein contained, the right and license, and Franchisee undertakes the obligation, to operate a Fatburger restaurant (the "**Restaurant**") and to use solely in connection therewith the Proprietary Marks and the System, as they may be changed, improved, and further developed from time to time, only at the

1

accepted location specified in the Attachment hereto (the "**Accepted Location**").  Franchisee will not relocate the Restaurant without the express prior written consent of Franchisor.

1.2     Except as specifically permitted in writing by Franchisor, Franchisee shall not sublicense, sublease, subcontract or enter any management agreement providing for, the right to operate the Restaurant at the Accepted Location or to use the System licensed pursuant to this Agreement.

1.3     During the Term, neither Franchisor nor any Affiliate of Franchisor shall open or operate any Traditional Restaurant, nor license others to do so, within the geographic area described on the Attachment hereto (the "**Protected Territory**").

1.4     Except to the limited extent expressly provided in **Section 1.3**, the license granted to the Franchisee under this Agreement is nonexclusive and Franchisor expressly reserves all other rights including, the exclusive, unrestricted right, in its discretion, directly and indirectly, itself and through its employees, Affiliates, representatives, franchisees, licensees, assigns, agents and others:

1.4.1     to own or operate, and to license others (which may include its Affiliates) to own or operate (i) restaurants under the Proprietary Marks (or any of them) at any location outside the Protected Territory, (ii) restaurants and other facilities under the Proprietary Marks (or any of them) at Non-Traditional Venues at any location, and of any type whatsoever, within or outside the Protected Territory, and regardless of  proximity to the Restaurant developed pursuant hereto; (iii) facilities offering catering services and mobile units designed to service special events within and outside the Protected Territory, and (iv) restaurants and other systems operating under names other than "FATBURGER" or the other Proprietary Marks, at any location, and of any type whatsoever, within or outside the Protected Territory and regardless of their proximity to the Restaurant developed pursuant hereto; and

1.4.2     to produce, license, distribute and market products and services under the Proprietary Marks, including food and beverage products; books; clothing; souvenirs and novelty items; through any outlet (regardless of its proximity to the Restaurant opened pursuant hereto), including grocery stores, supermarkets and convenience stores and through any distribution channel, at wholesale or retail, including by means of the Internet or Internet web site, mail order catalogs, direct mail advertising and other distribution methods; and to advertise and promote the System through any means, including the Internet.

## 2.     TERM AND RENEWAL

2.1     Except as otherwise provided herein and subject to **Section 13**, the term ("**Term**") of this Agreement will commence on the date hereof and expire 15 years from such date.

2.2     Subject to the conditions contained in **Section 2.3**, at the expiration of the Term, Franchisee shall have the right (the "**Renewal Right**") to enter into a new franchise agreement in the form then generally being offered to prospective "FATBURGER" franchisees (the "**Renewal Franchise Agreement**") for a 10 year period (the "**First Renewal Term**"), which Renewal Franchise Agreement shall likewise grant Franchisee the right to enter into one additional Renewal Franchise Agreement for a 10 year period (the "**Second Renewal Term**").     Franchisee acknowledges that the weekly royalty fee and advertising fund contributions payable thereunder shall

be at the rates then applicable to new franchisees.  The term of each Renewal Franchise Agreement shall commence upon the date of expiration of the Term hereof or the First Renewal Term, as applicable; *provided, however*, that each Renewal Franchise Agreement shall (i) be modified to conform to the Renewal Rights granted above; (ii) provide that Franchisee must pay, in lieu of an initial franchise fee, a renewal fee in an amount equal to forty percent (40%) of the then-current initial franchise fee charged to new Fatburger franchisees, and (iii) provide that the Protected Territory provided for herein will remain the same.

     2.3     Franchisee's Renewal Right is conditioned upon Franchisee's fulfillment of each and all of the following conditions precedent:

     2.3.1     Franchisee will give Franchisor written notice (the "**Renewal Notice**") of Franchisee's election to renew not less than 6 months nor more than 12 months before the end of the initial term or any subsequent renewal term;

     2.3.2     Franchisee will make or provide for, in a manner satisfactory to Franchisor, such renovation and modernization of the Restaurant premises as Franchisor may reasonably require, including, without limitation, renovation of signs, furnishings, fixtures, and decor, to reflect the then-current standards and image of the System; but that such renovation and modernization will not be required if Franchisee has refurbished the Restaurant, in accordance with the provisions of **Section 5.17** hereof, within the 5 years immediately preceding the end of the applicable renewal term;

     2.3.3     Franchisee will not be in material default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its Affiliates; and Franchisee will have substantially complied with all the terms and conditions of such agreements during the terms thereof;

     2.3.4     Franchisee will have satisfied all monetary obligations owed by Franchisee to Franchisor and its Affiliates and will have timely met those obligations throughout the term of this Agreement;

     2.3.5     Franchisee will present satisfactory evidence that Franchisee has the right to remain in possession of the Accepted Location for the duration of the renewal term or, in the alternative, has prior to the expiration of the Term obtained Franchisor's approval of a new location and lease for the Restaurant which approval Franchisor may grant or withhold in its sole discretion**;**

     2.3.6     Franchisee will execute a general release, in a form prescribed by Franchisor, of any and all known and unknown claims against Franchisor and its Affiliates, and their respective officers, directors, shareholders, agents, and employees in their corporate and individual capacities; and

     2.3.7     Franchisee will comply with Franchisor's then-current qualification and training requirements.

     2.4     If Applicable Law requires that Franchisor give notice to Franchisee prior to the expiration of the Term, this Agreement shall remain in effect on a week to week basis until

3

Franchisor has given the notice required by such Applicable Law.  If Franchisor is not offering new franchises, is in the process of revising, amending or renewing its form of franchise agreement or franchise disclosure document, or is not lawfully able to offer Franchisee its then-current form of franchise agreement, at the time Franchisee delivers its Renewal Notice, Franchisor may, in its discretion, (i) offer to renew this Agreement upon the same terms set forth herein for a renewal term determined in accordance with **Section 2.3**, or (ii) offer to extend the Term hereof on a week to week basis following the expiration of the Term hereof for as long as it deems necessary or appropriate so that it may lawfully offer its then-current form of franchise agreement.

## 3.    DUTIES OF FRANCHISOR

3.1    Franchisor will provide training to Franchisee as more fully described in **Section 5.8** of this Agreement.

3.2    Franchisor will provide pre-opening and post-opening supervision and assistance as more fully described in **Section 5.9** of this Agreement.

3.3    Franchisor will provide Franchisee, on loan, one copy of the Manual, as more fully described in **Section 7** hereof, unless Franchisee purchased the Restaurant from an existing franchisee or Franchisee has entered into this Agreement as a Renewal Franchise Agreement. Franchisee must pay Franchisor its then-current replacement cost for any lost Manual.

3.4    Franchisor will provide to Franchisee, from time to time as Franchisor deems appropriate, advice and written materials concerning techniques of managing and operating the Restaurant including new developments and improvements in restaurant equipment, food products, packaging, and preparation.

## 4.    FEES

4.1    Franchisor acknowledges having received from Franchisee an initial franchise fee of $_____.  The initial franchise fee will be deemed fully earned and non-refundable upon execution of this Agreement in consideration for, among other things, the administrative and other expenses incurred by Franchisor in granting this franchise and for Franchisor's lost or deferred opportunity to franchise others.  Under no circumstances will the franchise fee be refundable.

4.2    For each Weekly Accounting Period during the term of this Agreement, Franchisee will pay to Franchisor a continuing royalty fee in an amount equal to six percent (6%) of the Net Sales of the Restaurant.

4.3    For each Weekly Accounting Period during the term of this Agreement, Franchisee will contribute to the advertising fund the amounts specified in **Section 10** of this Agreement.

4.4    All payments required by this **Section 4** for each Weekly Accounting Period will be paid on or before the second Tuesday following such Weekly Accounting Period and will be submitted to Franchisor together with any reports or statements required under **Section 9** hereof. **"Weekly Accounting Periods"** shall consist of the seven (7) day period ending each Sunday at midnight.  Notwithstanding the above, Franchisor reserves the right to change the time when the weekly payments required by this **Section 4** must be paid by Franchisee.

4

4.5     In addition to all other payments provided herein, Franchisee shall pay to Franchisor, its Affiliates and designees, as applicable, promptly when due:

4.5.1     All amounts advanced by Franchisor or which Franchisor has paid, or for which Franchisor has become obligated to pay on behalf of Franchisee for any reason whatsoever.

4.5.2     The amount of all sales taxes, use taxes, personal property taxes and similar taxes, which shall be imposed upon Franchisee if, and to the extent, required to be collected or paid by Franchisor (a) on account of Franchisee's Net Sales, or (b) on account of royalties, advertising fund contributions, or initial franchise fees collected by Franchisor from Franchisee (but excluding Franchisor's ordinary income taxes). Franchisor, in its discretion, may collect the taxes in the same manner as royalties are collected herein and promptly pay the tax collections to the appropriate Governmental Authority; *provided, however,* that unless Franchisor so elects, it shall be Franchisee's responsibility to pay all sales, use or other taxes now or hereinafter imposed by any Governmental Authorities on royalties, initial franchise fees, or advertising fund contributions.

4.5.3     Any amounts due on account of purchases of goods, supplies or services relating to the Restaurant.

4.6     At Franchisor's request, Franchisee, at Franchisee's sole cost and expense, shall instruct its bank to pay the amount of all funds required to be paid directly to Franchisor (or in the case of advertising fund contributions, to the Fund) from Franchisee's account, by electronic funds transfer or such other automatic payment mechanism which Franchisor may designate ("**EFT**") and upon the terms and conditions set forth in the Manuals, and promptly upon Franchisor's request, Franchisee shall execute or re-execute and deliver to Franchisor such pre-authorized check forms and other instruments or drafts required by Franchisor's bank, payable against Franchisee's bank account, to enable Franchisor (or the Fund) to draw sums payable under the terms of this Agreement. If Franchisor shall designate EFT, then Franchisee shall, in addition to those terms and conditions set forth in the Manuals, maintain a single bank account for such payments and shall maintain such minimum balance in such account as Franchisor may reasonably specify from time to time. Franchisee shall not alter or close such account except upon Franchisor's prior written approval. Any failure by Franchisee to implement such EFT system in strict accordance with Franchisor's instructions shall constitute a material default of this Agreement. If Franchisee is delinquent more than 2 times in any continuous 12 month period during the Term in the payment of fees hereunder, or of other sums due to Franchisor, its Affiliates or to the Fund, including on account of the purchase of goods or services, or fails to report its sales on a timely basis, Franchisor may require Franchisee to implement a system prescribed by Franchisor (or the Fund) which shall permit Franchisor (or the Fund) unilaterally to estimate and draw down the amounts owed by Franchisee, which system may include EFT systems, automatic debits, use of Franchisee pre-authorized checks, other instruments or authority or any other arrangement Franchisor may prescribe. Franchisor may base its estimates of payments which are calculated based on Net Sales, on Franchisee's historically reported Net Sales. Franchisee shall promptly implement such system in strict accordance with Franchisor's instructions and failure to do so shall constitute a material default of this Agreement.

4.7     Any payment or report not actually received by Franchisor on or before the due date will be deemed overdue. If any payment is overdue, Franchisee will pay Franchisor, in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of one

5

and one-half percent (1.5%) per month, or the maximum rate permitted by Applicable Law, whichever is less, calculated on a daily basis, and a late charge of $25 per week for each week during which such payment is not received by Franchisor.  Entitlement to such interest and late charge will be in addition to any other remedies Franchisor may have.

4.8     Upon Franchisor's demand, Franchisee shall reimburse Franchisor for its direct and indirect costs (including the reasonable value of Franchisor's employees and its Affiliates employees) incurred in connection with Franchisor's review of Franchisee's proposed lease or real estate purchase agreement, up to a maximum of $2,500, unless Franchisee has previously reimbursed Franchisor for its review of such lease or real estate purchase agreement.  If Franchisor has reviewed and accepted Franchisee's lease or purchase agreement, such review and acceptance is solely for Franchisor's benefit and, is solely an indication that the lease or purchase agreement, as applicable, meets Franchisor's minimum standards and specifications at the time of acceptance.  Such review and acceptance shall not be construed as any express or implied representation or warranty that an accepted lease or purchase agreement complies with applicable law or represents a transaction that is fair or is in Franchisee's best interest.

## 5.    DUTIES OF FRANCHISEE

Franchisee understands and acknowledges that every detail of the Restaurant is important to Franchisee and Franchisor in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all Fatburger franchisees, and to protect Franchisor's reputation and goodwill.

5.1     A Franchisee which is a corporation will comply, except as otherwise approved in writing by Franchisor, with the following requirements throughout the term of this Agreement:

5.1.1    Franchisee will furnish Franchisor with its Articles of Incorporation, By-laws, other governing documents, any other documents Franchisor may reasonably request, and any amendments thereto.

5.1.2    Franchisee will confine its activities exclusively to operating the Restaurant and any other "FATBURGER" restaurants owned and operated by Franchisee pursuant to a validly existing franchise agreement.

5.1.3    Franchisee will maintain stop transfer instructions against the transfer on its records of any Equity securities; and will issue no securities upon the face of which does not legibly and conspicuously appear a printed legend in the form reasonably prescribed by Franchisor stating that the transfer of such stock is subject to the terms and conditions of this Agreement.

5.1.4    Franchisee will maintain a current list of all owners of record and all beneficial owners of any class of voting securities or securities convertible into voting securities of Franchisee and will furnish the list to Franchisor upon request.

5.2     A Franchisee which is a limited liability company will comply, except as otherwise approved in writing by Franchisor, with the following requirements throughout the term of this Agreement:

SM01DOCS602932.7

5.2.1    Franchisee will furnish Franchisor with its Articles of Organization, Certificate of Formation, Operating Agreement, Limited Liability Company Agreement, other governing documents, any other documents Franchisor may reasonably request, and any amendments thereto.

5.2.2    Franchisee will confine its activities exclusively to operating the Restaurant and any other "FATBURGER" restaurants owned and operated by Franchisee pursuant to a validly existing franchise agreement.

5.2.3    Franchisee will maintain stop transfer instructions against the transfer on its records of any Equity securities; and will issue no securities upon the face of which does not legibly and conspicuously appear a printed legend in the form reasonably prescribed by Franchisor stating that the transfer of such stock is subject to the terms and conditions of this Agreement.

5.2.4    Franchisee will maintain a current list of all owners of record and all beneficial owners of any class of voting securities or securities convertible into voting securities of Franchisee and will furnish the list to Franchisor upon request.

5.3    A Franchisee which is a Partnership will comply, except as otherwise approved in writing by Franchisor, with the following requirements throughout the term of this Agreement:

5.3.1    Franchisee will furnish Franchisor with its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto.

5.3.2    Franchisee will confine its activities exclusively to operating the Restaurant.

5.3.3    Franchisee will prepare and furnish to Franchisor a list of all general and limited partners in Franchisee, and Franchisee shall furnish to Franchisor an updated list from time to time to reflect any changes thereto.

5.4    Franchisee (or if Franchisee is a corporation, limited liability company or Partnership, its Owner(s) accepted by Franchisor in writing) will be responsible for financing the entire cost of constructing, equipping, supplying and operating the Restaurant (the "**Required Funds**").  Franchisee acknowledges and agrees that at all times during the term of this Agreement twenty-five percent (25%) of the Required Funds will consist of Equity from Franchisee or its Owner(s) and will not be borrowed from, or financed by, any third party.  Franchisor reserves the right to waive this requirement for Franchisees with more than one Restaurant.

5.5    Subject to Force Majeure, within 180 days after the date hereof, Franchisee will, at its sole expense, construct or remodel, furnish, and equip the Restaurant, utilizing the construction company, architect, kitchen designer, interior designer, and signage company designated by Franchisor and all in accordance with Franchisor's current requirements and specifications as provided in this Agreement and as otherwise specified by Franchisor in writing, and, subject to Franchisor's prior written approval, commence operation of the Restaurant.  The time periods for the commencement and completion of construction as referred to in this Section are of the essence in this Agreement.  If Franchisee fails to perform its obligations contained in this Section, Franchisor may deem the Franchisee's failure to so perform its obligations as aforesaid to constitute a material breach of this Agreement.

7

5.6    Franchisee will, at its sole expense, employ the construction company, architect, kitchen designer, interior designer and signage company designated by Franchisor as may be necessary to complete, adapt, or modify the sample plans and specifications for the Restaurant. Upon Franchisee's written request, and subject to Franchisor's approval in its sole discretion, (a) Franchisor may allow Franchisee to engage an architect selected by Franchisee, in which case Franchisee must reimburse Franchisor, on demand, for all costs and expenses incurred by Franchisor to review and have an architect acceptable to Franchisor review the designs and plans of Franchisee's selected architect, which reimbursement shall not exceed $2,500, and (b) Franchisor may allow Franchisee to engage a contractor selected by Franchisee. In the case of either (a) or (b), Franchisee shall provide Franchisor with such information as Franchisor may require to evaluate such proposed architect or contractor, and which may include without limitation, evidence of satisfactory prior restaurant construction/design experience, references, adequate financial resources and stability and evidence of insurance. Franchisee will submit to Franchisor a complete set of final plans and specifications before commencing construction of the Restaurant. Franchisor will promptly review such plans and specifications. Franchisee will not commence construction of the Restaurant until Franchisor accepts in writing the final plans and specifications to be used in constructing the Restaurant. Franchisor will consult with Franchisee on the design, construction, and equipping of the Restaurant, but it will be and remain the sole responsibility of Franchisee to diligently construct, equip, and otherwise ready and open the Restaurant. Franchisee must obtain Franchisor's written acceptance of any and all changes in Restaurant plans before construction of the Restaurant or the implementation of such changes. Franchisor shall have access to the Restaurant site while work is in progress and may require such reasonable alterations or modification of the construction of the Restaurant as it deems necessary to comply with accepted plans and specifications. In the event the Restaurant is, at any time, to be altered or remodeled, or additional decorations, fixtures, furniture, signs, or equipment are to be installed or substituted, all such work will be subject to the prior written approval of Franchisor and shall only be performed by contractors and architects, kitchen designers, interior designers and signage companies designated by Franchisor, and, when completed, will conform to plans and specifications accepted by Franchisor.

5.7    Although it is not obligated to do so, Franchisor may inspect such work at any time to determine whether the work is being done in accordance with the plans and specifications previously approved by Franchisor. No Franchisor review, approval, consultation, designation or inspection provided pursuant to this **Section 5.7** will constitute or be deemed to constitute a warranty, guarantee, or assurance by Franchisor. Without limiting the generality of the foregoing, Franchisor's acceptance of Franchisee's plans and specifications for the Accepted Location, Franchisor's guidance with the development of the Accepted Location, and Franchisor's authorization to open the Restaurant are to assure that Franchisee complies with Franchisor's standards and specifications, and shall not be construed as any express or implied representation or warranty that the Accepted Location complies with any Applicable Laws, codes or regulations or that the construction is sound or free from defects. Franchisor's criteria for acceptance or rejection do not encompass technical, architectural or engineering considerations. Franchisor will have no liability with respect to construction of the Accepted Location, nor shall Franchisor be responsible in any way for delays or losses occurring during the design, construction or other preparation of the Restaurant, whether caused by the condition of the Accepted Location, the design, engineering, construction, equipping, decorating, or stocking of the Restaurant, or any other reason. Franchisee expressly acknowledges and agrees that Franchisor does not, directly or indirectly, warrant or ensure that the design, decor, appearance, fixtures, layout, and/or other improvements of the Restaurant will guaranty Franchisee's success.

SM01DOCS602932.7

5.8     Before the opening of the Restaurant, the person designated by Franchisee and accepted by Franchisor as Manager of the Restaurant (which may be Franchisee, if Franchisee is an individual), the Operating Partner and 3 additional persons (or 4 persons if an Operating Partner is not required hereunder) designated by Franchisee as assistant managers or shift leaders of the Restaurant will attend and complete, to Franchisor's satisfaction, the initial training program offered by Franchisor at Franchisor's certified training center.   Additionally, one or more Owners of Franchisee acceptable to Franchisor will attend and complete, to Franchisor's satisfaction, the executive training program offered by Franchisor at Franchisor's certified training center. Franchisor will provide instructors and the majority of the training materials for the training programs; and Franchisee or its employees will be responsible for any and all other expenses incurred by them in connection with any training programs, including, the costs of transportation, lodging, meals, and any wages.   Franchisee must procure, before the commencement of the initial training program offered by Franchisor, statutory worker's compensation insurance covering all participants in the training program.   At Franchisor's option, any persons subsequently employed by Franchisee in the positions of Operating Partner, Manager and/or assistant manager will also attend Franchisor's initial training program, and Franchisee will reimburse Franchisor for its costs of such training up to a maximum of $500 for each individual.   At Franchisor's option, Franchisee, the Operating Partner and/or Franchisee's Manager will attend Franchisor's quarterly training and status meetings, and the Operating Partner, Franchisee's Manager, assistant managers, and other employees will attend such additional training programs and seminars as Franchisor may require from time to time.   For all such programs and seminars, Franchisor will provide instructors and training material, and Franchisee or its employees will be responsible for any and all other expenses incurred by them in connection with such programs and seminars, including, without limitation, the costs of transportation, lodging, meals, and any wages.

5.9     Franchisee shall notify Franchisor, at least 60 days in advance, of the projected date by which all construction or remodeling shall be completed in accordance with Franchisor's specifications and all final health, fire, occupancy and other permits required for the occupancy and operation of the Restaurant shall have been obtained and Franchisee shall have fully prepared the Restaurant for pre-opening training in accordance with Franchisor's policies and specifications. Franchisor will then contact Franchisee to establish a scheduled opening date (the "**Scheduled Opening Date**"), which shall be subject to Franchisor's scheduling needs and availability of personnel, and which will be set at least 30 days in advance (unless otherwise mutually agreed).

5.9.1     During the period between 60 and 30 days preceding the Scheduled Opening Date, Franchisee shall prepare and submit a proposed store opening and staffing plan in the form and manner required in the Manuals (**"Opening Plan"**), and shall complete by not later than 30 days prior to the Scheduled Opening Date such final modifications to such plan as Franchisor may require after consultation with Franchisee.   Not later than 15 days prior to the Scheduled Opening Date, Franchisee shall have hired and payroll shall have commenced for the Operating Partner, Manager and all assistant managers and shift leaders of the Restaurant as contemplated by the final Opening Plan.

5.9.2     Following establishment of, and at least 7 days prior to, the Scheduled Opening Date, the Operating Partner, Manager and assistant managers or shift leaders of the Restaurant shall attend and complete, to Franchisor's satisfaction, the training of hourly employees of the Restaurant pursuant to Franchisor's pre-opening training program.   Except as described

9

below, Franchisor will provide, as Franchisor deems advisable, pre-opening supervision and assistance as described in **Section 3.2**, at no charge to Franchisee.

5.9.3  If, following establishment of the Scheduled Opening Date, the Scheduled Opening Date must be changed, for any reason, Franchisee shall promptly notify Company of said change, and Franchisee shall reimburse Franchisor for all of its additional travel expenses and wages resulting from changing the travel arrangements of Franchisor's representatives scheduled to provide training to Franchisee, the estimated amount of which shall be payable in advance, before Franchisor's representatives travel to Franchisee's Accepted Location and before the Restaurant opens to the public.  Franchisee or its employees will be responsible for any and all other expenses incurred by them in connection with the training program, including, without limitation, the costs of meals and any wages.

5.9.4  Franchisor or its representative, will provide such pre-opening and post-opening supervision and assistance to Franchisee, as Franchisor deems advisable based on Franchisee's Opening Plan, subject (as to timing) to scheduling needs and availability of personnel. If this is the first Restaurant opened by Franchisee (or any of its Affiliates), Franchisor shall bear up to $20,000 of the direct and indirect wages and other labor costs and expenses of its personnel who provide such training and other pre-opening and post-opening supervision and assistance, and Franchisee shall reimburse Franchisor, within 21 days of demand, the amount of all said wages, labor costs and expenses in excess of $20,000.  If this is the second or subsequent Restaurant opened by Franchisee (or by any of its Affiliates), Franchisee shall be responsible for and shall bear all direct and indirect wages and other labor costs and expenses of Franchisor's personnel who provide such training or other pre-opening and post-opening supervision and assistance, and Franchisee shall reimburse Franchisor within 10 days of demand, or at Franchisor's option advance, the entire amount all said wages, labor costs and expenses (as estimated by Franchisor in the case of an advance).  Whether this is the first or any subsequent Restaurant opened by Franchisee, Franchisee shall reimburse, or advance, at Franchisor's option, all reasonable travel expenses, including airfare, hotel and Franchisor's then current per diem charge, of its personnel.

5.10                                    Franchisee will use the Restaurant premises solely for the operation of the business franchised hereunder; will keep the business open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manual or as Franchisor may otherwise approve in writing; and will refrain from using or permitting the use of the premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor.  Franchisee will not knowingly permit the Restaurant to be filmed or used in any visual media (including movies and other product placement arrangements) without Franchisor's prior written consent.  Franchisee will not provide catering or other services outside of the Restaurant without the prior written consent of the Franchisor.  Franchisee will install an in store music system on the Restaurant premises, but will not install or allow to be installed on the Restaurant premises any other vending, ATM or amusement machines, except as otherwise approved in writing by Franchisor.  Franchisee shall operate each in store music system located at the Restaurant premises without charge to Franchisee's customers and otherwise in accordance with the Manual.

5.11  Franchisee shall, at all times, maintain a competent, conscientious, trained staff, as required by Franchisor in the Manual or otherwise in writing.  Franchisee will take such steps as are necessary to ensure that all employees of the Restaurant keep a neat and clean personal appearance, preserve good customer relations, and comply with such dress codes as Franchisor may prescribe.

SM01DOCS602932.7

Franchisee acknowledges and agrees that Franchisee will be solely responsible for all employment decisions and functions, including, without limitation, those related to hiring, firing, establishing wage and hour requirements, disciplining, supervising, and record keeping.

5.12    Franchisee, or a person designated by Franchisee (and accepted by Franchisor) before the opening of the Restaurant and approved of in writing by Franchisor, will assume responsibility for the day-to-day management and operation of the Restaurant, oversight of the preparation of food products, and supervision of personnel and accounting (the "**Manager**"). Also, Franchisee will designate 1 assistant manager and 3 shift leaders. The Manager must spend at least 40 hours per week overseeing the operation of the Restaurant; but that at all times during open and operating hours of the Restaurant, either Franchisee (or, in the case where Franchisee is a Entity, an Owner thereof accepted by Franchisor), the Manager, assistant manager, or shift leader will be physically present at and actively supervising the operation of the Restaurant. Franchisee may replace the Manager or any assistant manager at any time provided that Franchisee immediately notifies Franchisor of any such changes. Franchisor may require any new Manager or assistant manager to complete Franchisor's initial training program as described in **Section 5.8** hereof.

5.13    Franchisee will meet and maintain the highest health standards and ratings applicable to the operation of the Restaurant. Franchisee will furnish to Franchisor, within 5 days after receipt thereof, a copy of any violation, citation, notice or correspondence which relates in any way to local health or safety standards in the operation of the Restaurant. Franchisee will take all reasonable steps necessary or desirable to cure and/or avoid any health or safety standards violation, including, without limitation, causing a re-inspection of the Restaurant by health officials for the purpose of obtaining a higher health rating.

5.14    Franchisee will operate the Restaurant in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual or otherwise in writing. Without limiting the foregoing, Franchisee agrees:

5.14.1  To maintain in sufficient supply (as Franchisor may prescribe in the Manual or otherwise in writing), and to use at all times, only such fixtures, furnishings, equipment, signage, menu items, ingredients, products, materials, supplies, and paper goods as conform with Franchisor's standards and specifications, and to refrain from deviating therefrom by the use of nonconforming items, without Franchisor's prior written consent.

5.14.2  To sell or offer for sale only such menu items and sizes, products, and services as have been expressly approved for sale in writing by Franchisor; to sell or offer for sale all types of menu items, products, and services specified by Franchisor; to refrain from any deviation from Franchisor's standards and specifications without Franchisor's prior written consent; and to discontinue selling and offering for sale any menu items, products, or services which Franchisor may, in its discretion, disapprove in writing at any time.

5.14.3  To use, in the preparation of food products, only such seasonings and chili as prescribed by Franchisor. Franchisee acknowledges that the seasonings and chili used in the preparation of Fatburger food products are unique and their formulae and manufacturing processes constitute trade secrets essential to the success of the System. Franchisee will purchase the seasonings and chili exclusively from Franchisor or its Affiliates or from supplier(s) designated by Franchisor from time to time.

5.14.4  To use and display only the standard format menu provided by Franchisor, as the same may be revised by Franchisor from time-to-time.  Any changes in the menu format must be approved in writing by Franchisor before use.  Franchisee will have sole discretion as to the prices to be charged to customers.

5.14.5  To permit Franchisor or its agents, at any reasonable time, to remove from the Restaurant premises, or sample on-premises, food or non-food items without payment therefor, in amounts reasonably necessary for inspection or testing by Franchisor or an independent laboratory to determine whether said samples meet Franchisor's then-current standards and specifications.  In addition to any other remedies it may have under this Agreement, Franchisor may require Franchisee to bear the cost of such testing if the supplier of the item has not been approved by Franchisor (or, with respect to the seasonings and chili, designated by Franchisor) or if the sample fails to conform to Franchisor's specifications.

5.14.6  To purchase and/or install, at Franchisee's expense, all fixtures, furnishings, equipment, and signage as Franchisor may direct from time to time in the Manual or otherwise in writing, including specified flat screen television monitors, an in store music system, a related sound system and sound recordings designated by Franchisor; and to refrain from installing or permitting to be installed on or about the Restaurant premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, signage, or other items not previously approved as meeting Franchisor's standards and specifications.

5.14.7  To purchase and display at the Restaurant certain photographs and decor items designated by Franchisor, and no others.

5.14.8  To refrain from selling, or offering for sale, any alcoholic beverages without the prior written approval of Franchisor, which approval may be conditioned upon such requirements as Franchisor deems necessary for the protection of the Proprietary Marks and the System, including, without limitation, the requirement that Franchisee complies with all laws and regulations applicable to the sale of alcoholic beverages.

5.14.9  To refrain from selling, or offering for sale, any merchandise without first obtaining the prior written approval of Franchisor.  Franchisee will purchase and offer for sale such merchandise as Franchisor designates from suppliers designated by Franchisor.

5.14.10 To obtain and install, and upgrade, enhance and/or replace from time to time, equipment, software and hardware, including digital still and video cameras, as Franchisor may specify to enable Franchisee to send and receive, and Franchisor to access, e-mail and digital photos and streaming video or other multimedia signals and information to and from the Restaurant and premises, and, to transmit digital photos, video and audio signals of the Restaurant and premises to, and in the form and manner prescribed by, Franchisor.

5.15     Franchisee will purchase all fixtures, furnishings, equipment, signage, ingredients (other than seasonings or chili which will be purchased pursuant to **Section 5.14.3** hereof), products, materials (including promotional materials), supplies, and paper goods solely from suppliers (including manufacturers, distributors and other sources) who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to

12

supply Franchisee's needs promptly and reliably; and who have been approved in writing by Franchisor and not thereafter been disapproved. Franchisor reserves the right, at its option, to inspect from time to time the facilities and products of any approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria.

5.16    Franchisee will maintain the Restaurant in the highest degree of sanitation, repair, and condition as Franchisor may require, and in connection therewith will make such additions, alterations, repairs, and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repairs to or repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct.

5.17    At Franchisor's request, which will not be more often than once every 5 years, Franchisee will refurbish the Restaurant at its expense to conform to the building design, trade dress, color schemes, signage and presentation of trademarks and service marks consistent with the image then in effect for new restaurants under the System, including, without limitation, such structural changes, remodeling, redecoration, and such modifications to existing improvements as may be necessary.

5.18    Franchisee will grant Franchisor and its agents the right to enter upon the Restaurant premises at any time for the purpose of conducting inspections; will cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, will take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection, including, without limitation, immediately desisting from the further use of any equipment, advertising materials, products, ingredients, supplies, or other items that do not conform to Franchisor's then-current specifications, standards, or requirements. The parties agree and acknowledge that Franchisor's damages for Franchisee's violation of certain provisions of this Section are difficult to assess. Therefore, if Franchisee utilizes an ingredient or sells or offers to sell any item, product or service that has not been approved by Franchisor, or if Franchisee purchases or otherwise acquires any item from a supplier that has not been approved by Franchisor, Franchisor may require Franchisee to pay $500 per day. Franchisor's right to require Franchisee to make this payment is in addition to, and not in limitation of, any and all of Franchisor's other rights and remedies.

5.19    Franchisor may establish and impose fines for violating Franchisee's duties under this Agreement or the Manuals. The fact that fines may be imposed will neither be construed as a waiver of Franchisor's right to require strict compliance with this Agreement and the Manuals, nor as liquidated damages. Franchisor may require you to pay such fines upon demand or may utilize EFT to collect such fines.

5.20    If Franchisee, individually or together with its Affiliates, at any time operates Multiple Restaurants, then at all times thereafter, Franchisee shall employ and retain an individual (the "**Operating Partner**"), accepted by Franchisor (and subject to subsequent rejection by Franchisor) who shall be vested with the authority and responsibility for supervising the overall operations of such Multiple Restaurants; if Franchisee (or its Affiliates operate Multiple Restaurants some of which are geographically remote from one another, Franchisor reserves the right to require Franchisee to appoint a separate Operating Partner for each such geographic area). The Operating

13

Partner (and each of them if more than one) shall, during the entire period that he or she serves as such, meet the following qualifications:  (a) devote full time and best efforts solely to operation of the Multiple Restaurants and to no other business activities; (b) meet Franchisor's educational, experience, financial and such other reasonable criteria for such individual, as set forth in the Manual or otherwise in writing by Franchisor, including satisfactory completion of Franchisor's initial training program; (c) be an individual acceptable to Franchisor, (d) at Franchisor's request, at all times following such request, own such percentage of the Equity and voting rights in Franchisee (and such of its Affiliates as own Restaurants over which the Operating Partner has supervisory responsibilities) as may be required by Franchisor (not to exceed 25% of the issued and outstanding Equity and voting rights of Franchisee, and/or the applicable Affiliate); and (e) reside in the same geographical area as the Multiple Restaurants as to which the Operating Partner has supervisory responsibilities.  The Operating Partner shall be responsible for all actions necessary to ensure that each of the Multiple Restaurants are operated in compliance with this Agreement, all applicable franchise agreements and the Manuals.  If, during the Term, the Operating Partner is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section (including Franchisor's subsequent rejection of such person), Franchisee shall promptly notify Franchisor and designate a replacement as soon as practicable, but not more than 30 days after the Operating Partner ceases to serve, such replacement being subject to Franchisor's acceptance.  Franchisor's acceptance of the Operating Partner or any Manager, shall not constitute Franchisor's endorsement of such individual or a guarantee by Franchisor that such individual will perform adequately for Franchisee, nor shall Franchisor be estopped from subsequently rejecting or otherwise challenging such person's qualifications or performance.

   5.21 Franchisee hereby grants Franchisor and its agents the right to enter the Restaurant premises at any time upon reasonable prior notice for the purpose of photographing the interior and/or exterior of the Restaurant for promotional purposes, and shall cooperate with Franchisor's representatives for such purposes and in obtaining photo releases from employees and other individuals, if required.  Photographs of the interior or exterior of the Restaurant may be included in any promotional materials developed or distributed by Franchisor without remuneration to or prior consent by Franchisee.

## 6. PROPRIETARY MARKS

   6.1 With respect to Franchisee's use of the Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

    6.1.1 Franchisee will use only the Proprietary Marks designated by Franchisor, and will use them only in the manner authorized under this Agreement and permitted by Franchisor.

    6.1.2 Franchisee will use the Proprietary Marks only for the operation of the Restaurant and only at the Accepted Location or in advertising for the business conducted at or from the Accepted Location.  Unless otherwise authorized or required by Franchisor, Franchisee will not use the Proprietary Marks in connection with the operation of an Internet website or in connection with any advertising on an Internet website.

    6.1.3 Unless otherwise authorized or required by Franchisor, Franchisee will operate and advertise the Restaurant only under the name "FATBURGER," without prefix or suffix, and will require all advertising and promotional materials, signs, decorations, paper goods

(including disposable food containers and napkins), and other items which may be designated by Franchisor to bear the Proprietary Marks in the form, color, location, and manner prescribed by Franchisor.

6.1.4    During the term of this Agreement and any renewal hereof, Franchisee will identify itself as the franchisee of the Restaurant in conjunction with any use of the Proprietary Marks, including, but not limited to, on invoices, business cards, stationary, order forms, receipts, and contracts, as well as at such conspicuous locations on the premises of the Restaurant as Franchisor may designate in writing.

6.1.5    Franchisee will not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor.

6.1.6    Franchisee will not use the Proprietary Marks as part of an Internet domain name (or URL), e-mail address, or as part of Franchisee's corporate or other legal name.

6.1.7    Franchisee will execute any documents deemed necessary by Franchisor to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

6.1.8    Franchisee will promptly notify Franchisor of any unauthorized use of the Proprietary Marks, any challenge to the validity of the Property Marks, or any challenge to the ownership by Fatburger Corporation ("**Fatburger**") of, or Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks.  Franchisee acknowledges that Franchisor and/or Fatburger have the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof.  Franchisor (or Fatburger) has the sole right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks.  Franchisor will defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Marks.  If Franchisor, in its sole discretion, determines that Franchisee has used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, will be borne by Franchisor.  If Franchisor, in its sole discretion, determines that Franchisee has not used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, will be borne by Franchisee.  In the event of any litigation relating to Franchisee's use of the Proprietary Marks, Franchisee will execute any and all documents and do such acts as may, in the opinion of Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action.

6.2    Franchisee expressly understands and acknowledges that:

6.2.1    Fatburger is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them.

6.2.2    The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System.

6.2.3    Franchisee will not directly or indirectly contest the validity of or Fatburger's ownership of the Proprietary Marks.

6.2.4    Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks, except the license granted by this Agreement.

6.2.5    Any and all goodwill arising from Franchisee's use of the Proprietary Marks in its franchised operation under the System will inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount will be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.

6.3    From time to time, in the Manual or in directives or bulletins supplemental thereto, Franchisor may add to, delete or modify any or all of the Proprietary Marks.  Franchisee shall, at its cost and expense, use, or cease using, as may be applicable, the Proprietary Marks, including, , any such modified or additional trade names, trademarks, service marks, logotypes and commercial symbols, in strict accordance with the procedures, policies, rules and regulations contained in the Manual or in written directives issued by Franchisor to Franchisee, as though they were specifically set forth in this Agreement.  Except as Franchisor may otherwise direct,  Franchisee shall implement any such change within 60 days after notice thereof by Franchisor, at Franchisee's expense.

## 7.    CONFIDENTIAL OPERATIONS MANUAL

7.1    Franchisee shall participate in the System and operate the Restaurant at the Location in strict compliance with the standard procedures, policies, rules and regulations established by Franchisor and incorporated in Franchisor's Manual.  Franchisee acknowledges having received one copy of the Manual, on loan, from Franchisor for the Term.

7.2    The subject matter of the Manual may include, matters such as:  forms, information relating to product and menu specifications, purchase orders, general operations, labor management, Net Sales reports, training and accounting; sanitation; design specifications and uniforms; display of signs and notices; authorized and required equipment and fixtures, including specifications therefor; Proprietary Mark usage; insurance requirements; lease requirements; ownership requirements, décor; standards for management and personnel, hours of operation; yellow page and local advertising formats; standards of maintenance and appearance of the Restaurant; procedures upon the occurrence of a Crisis Management Event; and required posting of notices to customers as to how to contact the Franchisor to submit complaints; and such other matters and policies as Franchisor may reasonably elect to include which relate to the System or the franchise relationship under the System.  In the event of the occurrence of a Crisis Management Event, Franchisor may also establish emergency procedures pursuant to which Franchisor may require Franchisee to, among other things, temporarily close the Restaurant to the public, in which event Franchisor shall not be liable to Franchisee for any losses or costs, including consequential damages or loss profits occasioned thereby.  In the event of any dispute as to the contents of the Manual, the terms and contents of the master copy maintained by Franchisor shall be controlling.

7.3    The Manuals and all amendments to the Manuals (and copies thereof) are copyrighted and remain Franchisor's sole property.  Franchisee will at all times keep the Manual in a secure place on the Restaurant premises.  Franchisee will at all times treat the Manual and the information contained therein as confidential, and will use all reasonable efforts to maintain such information as secret and confidential.  Franchisee will not at any time copy, duplicate, record, or

16

otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

7.4     Franchisor shall have the right to modify the Manual at any time and from time to time; *provided*, that no such modification shall alter Franchisee's fundamental status and rights under this Agreement. Modifications to the Manual shall become effective upon delivery of written notice thereof to Franchisee unless a longer period is specified in such written notice and Franchisee shall comply with each modification as provided in the Manual. The Manual, as modified from time to time, shall be an integral part of this Agreement and reference made in this Agreement, or in any amendments, exhibits or schedules hereto, to the Manuals shall be deemed to mean the Manual kept current by amendments from time to time.

7.5     In lieu of, or in addition to, loaning a paper copy of the Manual to Franchisee, Franchisor may make the Manual available to Franchisee in electronic form, by means of the internet, electronic file or program or otherwise.

## 8.    CONFIDENTIAL INFORMATION

8.1     Franchisee will not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, or corporation any confidential information, knowledge, or know-how which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement. Franchisee will divulge such confidential information only to such of its employees as must have access to it in order to operate the Restaurant. Any and all information, knowledge, know-how, and techniques which Franchisor designates as confidential will be deemed confidential for purposes of this Agreement.

8.2     Franchisee will require the Operating Partner, Manager, assistant managers, and any personnel having access to any confidential information of Franchisor to execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Restaurant. Such covenants will be in a form designated by Franchisor and will include, without limitation, specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

## 9.    ACCOUNTING AND RECORDS

9.1     Franchisee will record all sales on a computer-based point-of-sale record keeping and control system as designated by Franchisor for use in the Restaurant, and on any forms and equipment as prescribed by Franchisor in the Manual or otherwise in writing. Franchisee must purchase a certain cash register or point of sale system, including specialized software, a personal computer, printer, firewall, DSL or other type of high speed connection and modem which will enable Franchisor to access, in a read-only mode, the information entered by Franchisee relating to the operations of the Restaurant. Franchisee agrees and acknowledges that Franchisor may from time to time specify additional or replacement hardware and software components which Franchisee may be obligated to purchase. Franchisee further agrees and acknowledges that Franchisor may also designate supplier(s) from whom Franchisee must purchase such items. Except as described above, Franchisee will have the option of purchasing components of the system from various suppliers, as long as the hardware and software meet Franchisor's then-current specifications. Franchisee will

17

also purchase a maintenance contract with respect to the hardware and software components of the system. Franchisee must purchase upgrades and updates to the software and hardware components of the system as Franchisor may deem necessary from time to time. Franchisee shall accept MasterCard, Visa and American Express as well as such other credit and debit cards and other non-cash systems, Fatburger loyalty cards and gift cards as Franchisor may specify, and shall obtain, replace and modify such equipment as required to implement the same, all in accordance with the policies and procedures Franchisor may establish and modify from time to time.

9.2     Franchisee's computer-based point-of-sale system (and/or cash register system) and computer system shall be electronically linked to Franchisor or its designee, and Franchisee shall allow Franchisor and/or its designee, to poll the such system on a daily or other basis at such times and in such manner as established by the Franchisor or its designee, with or without notice, and to retrieve such transaction information including sales, sales mix, food usage, paper usage, inventory, labor hours, labor rates, labor distribution, and other operations data as Franchisor and/or its designee deems appropriate.

9.3     Franchisee will maintain during the term of this Agreement, and will preserve for at least 5 years from the dates of their preparation, full, complete, and accurate books, records, and accounts, including cash register or point-of-sales tapes, in accordance with generally accepted accounting principles and based on period accounting or any other form and manner prescribed by Franchisor from time to time in the Manual or otherwise in writing.

9.4     Franchisee will submit to Franchisor no later than 10:00 a.m. PST each Monday during the term of this Agreement after the opening of the Restaurant, Net Sales information for the seven day period ending on and including the immediately preceding Sunday, in the form prescribed by Franchisor, and such other data or information as Franchisor may require.

9.5     Franchisee will submit to Franchisor, no later than 30 days following the end of each calendar month, "compilation" financial statements including a statement of profit and loss. Franchisee will also submit to Franchisor within 30 days following the end of each semi-annual (which will mean 6 months) calendar period, or in the case of a corporation or partnership, within 30 days following the end of each semi-annual fiscal period, "review" financial statements including a balance sheet and a statement of profit and loss for each such semi-annual period, prepared by Franchisee's certified public accountant.

9.6     Franchisee will also submit to Franchisor, for review or auditing, Franchisee's tax returns (including, without limitation, both income and sales tax returns) pertaining to the Restaurant and such other forms, reports, records, information, and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing.

9.7     Franchisor or its designated agents will have the right at all reasonable times to examine and copy, at Franchisor's expense, the books and records of the Restaurant. Franchisor will also have the right, at any time, to have an independent audit made of the books of the Restaurant. If an inspection should reveal that any payments have been understated in any report to Franchisor during the current year or during the preceding 5 calendar years, then Franchisee will immediately pay to Franchisor upon demand the amount understated in such reports, in addition to interest on such amount from the date such amount was due until paid, at the rate of one and one-

half percent (1.5%) per month, or the maximum rate permitted by Applicable Law, whichever is less, calculated on a daily basis, and a late charge of $25 per week for each week during which such payment was not received by Franchisor.  If an inspection discloses an understatement in any payment of two percent (2%) or more, Franchisee will, in addition, reimburse Franchisor for any and all costs and expenses connected with the inspection (including, without limitation, travel, lodging and wage expenses and reasonable accounting and legal costs).  The foregoing remedies will be in addition to any other remedies Franchisor may have.

9.8      Franchisee acknowledges and agrees that Franchisor may include financial performance information concerning Franchisee's Restaurant in its franchise disclosure document (including providing prospective franchisees with such backup documentation as may be required by Applicable Law), in related media claims, to existing franchisees, and as otherwise required or permitted by Applicable Law.

## 10.     ADVERTISING

Recognizing the value of advertising and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

10.1     **Local Advertising**

10.1.1   Franchisee will expend an amount equal to two percent (2%) of its Net Sales or $1,200, whichever is greater, on local advertising and promotion of the Restaurant during each of the following periods:  January 1 through June 30, and July 1 through December 31 of each year during the Term.  Not later than 30 days after the end of each period, Franchisee will furnish to Franchisor a marketing report for the immediately preceding concluded period in form and substance specified by Franchisor, including evidence to verify such expenditure during the such period.  The local store marketing report template can be found on the Marketing Extranet along with deadline requirements.  Incomplete reports will not be accepted.

10.1.2  Franchisee will obtain a listing in the yellow pages of the telephone directories serving the location of the Restaurant.  The expenditure by Franchisee in obtaining such listing will qualify for purposes of **Section 10.1.1** hereof.

10.1.3  Franchisee will obtain and maintain at appropriate locations on the Restaurant premises an adequate supply of Marketing Materials and special promotion materials of the kinds and sizes specified by Franchisor in the Manual, Franchise Marketing Resource Guide and New Store Opening Guide, Marketing Extranet, or otherwise in writing.  Unapproved marketing materials and advertising communication that is submitted with local store marketing reports will not receive credit.

10.1.4   All advertising and promotion by Franchisee in any manner or medium will be conducted in a dignified manner and will conform to such standards and requirements as are specified by Franchisor.  Franchisee will submit to Franchisor (through the mail, return receipt requested), for its prior approval at least 2 weeks before its intended use (except with respect to prices to be charged), samples of all advertising and promotional plans and materials that Franchisee desires to use and which have not been prepared or previously approved by Franchisor, including,

19

without limitation, business cards, stationary, T-shirts, buttons, caps, watches, and similar items. If written disapproval thereof is not received by Franchisee from Franchisor within 2 weeks after the date of receipt by Franchisor of such samples or materials, Franchisor will be deemed to have given the required approval, subject to Franchisor's subsequent disapproval of said advertising materials. Franchisor may require, at its option, that Franchisee purchase certain advertising and promotional merchandise from suppliers who have been approved by Franchisor and who have entered into Franchisor's standard license agreement which shall provide, among other things, for the payment of royalties to Franchisor. Franchisee may not, without Franchisor's express prior written consent, distribute, display, market or promote, at the Restaurant or in connection with any advertising, promotion or marketing of the Restaurant, any third party's goods or services, including any unauthorized co-promotions (e.g., drop boxes promoting fitness clubs).

10.2    **National Advertising**

Franchisee will make a weekly contribution to a fund for national/regional advertising of the System (the "**Fund**") in an amount equal to the greater of $250 or two percent (2%) of Franchisee's weekly Net Sales. Franchisor reserves the right in its absolute discretion to increase said dollar amount and percentage rate at any time throughout the term of this agreement to up to $400 and four percent (4%), respectively. Franchisor reserves the right, in its sole discretion, to authorize some but not all franchisees, which may or may not include Franchisee, to withhold all or a portion of its or their required contribution to the Fund, as Franchisor may determine in its sole discretion. Upon receipt of Franchisor's prior written approval, which Franchisor may subsequently modify or withdraw at any time upon 30 days written notice, Franchisee may withhold from its Fund contribution a dollar amount or percentage specified by Franchisor, in it sole discretion, provided that Franchisee must spend the dollar amount or percentage withheld on local advertising in accordance in Section 10.1.4 above. Such local advertising may, at Franchisor's option, be in lieu of or in addition to the local advertising required pursuant to Section 10.1.1 above. If Franchisor subsequently withdraws its approval of such withholding program, at the end of the 30 day notice period, Franchisee must immediately cease withholding any amounts from the Fund and must remit the full $250 or 2% of weekly Net Sales to the Fund. The Fund will be maintained and administered by Franchisor or its designee, as follows:

10.2.1  Franchisor or its designee will direct all advertising programs with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof, including on a national, regional or local basis, as Franchisor may determine in its sole discretion. Franchisee and Franchisor agree and acknowledge that the Fund is intended to maximize general public recognition, acceptance, and the use of the Proprietary Marks for the System and that Franchisor or its designee undertake no obligation in administering the Fund to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution or to insure that any particular Franchisee benefits directly or pro rata from expenditures by the Fund.

10.2.2  Franchisor will, for each of its company-owned Fatburger restaurants, if any, make contributions to the Fund on the same basis as assessments required of comparable franchisees within the System.

10.2.3  The Fund, all contributions thereto, and any earnings thereon will be used exclusively to reimburse Franchisor for advances relating to, and/or to meet any and all future costs

20

of maintaining, administering, directing, and preparing advertising and/or promotional activities (including, among other things, the cost of preparing and conducting television, radio, magazine, and newspaper advertising campaigns; direct mail and outdoor billboard advertising; marketing surveys and other public relations activities; sponsorship of athletic and other events and activities; soliciting franchisee sales; use of advertising agencies to assist therein; and promotional brochures and other marketing materials for restaurants operated under the System).

10.2.4   Franchisee will contribute to the Fund by separate check (or EFT payment) made payable to the Fund, or in the manners provided in **Section 4.6**.  All sums paid by Franchisee to the Fund will be maintained in an account separate from the other monies of Franchisor and will not be used to defray any of Franchisor's expenses, except for such reasonable administrative costs and overhead, if any, as Franchisor may incur in activities reasonably related to the administration or direction of the Fund and advertising programs for franchisees and the System.  The Fund and its earnings will not otherwise inure to the benefit of Franchisor.  Franchisor or its designee will maintain separate bookkeeping accounts for the Fund, and will provide Franchisee, at its request, with an accounting of receipts and disbursements of the Fund.

10.2.5   It is anticipated that all contributions to and earnings of the Fund will be expended for advertising and/or promotional purposes during the taxable year within which the contributions and earnings are received.  However, (a) if less than the total of all contributions to the Fund are expended during any year, such excess may be accumulated for use during subsequent years, in which case expenditures in the following taxable year(s) will be made first out of accumulated earnings from previous years, next out of earnings in the current year, and finally from contributions; and (b) Franchisor may spend in any year an amount greater than the aggregate contributions to the Fund in that year and may cause the Fund to borrow funds to cover deficits, and if Franchisor (or an Affiliate) advances money to the Fund, it will be entitled to be reimbursed for such advances plus interest.

10.2.6   Although the Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Fund.  The Fund will not be terminated, however, until all monies in the Fund have been expended for advertising and/or promotional purposes, applied to reimburse Franchisor for funds otherwise advanced by Franchisor for advertising activities, or returned to contributors on the basis of their respective contributions.

10.3    **Internet**

10.3.1   Franchisee shall not develop, create, generate, own, license, lease or use in any manner any computer medium or electronic medium (including, without limitation, any Internet home page, e-mail address, website, domain name, bulletin board, newsgroup or other Internet-related medium or activity) which in any way uses or displays, in whole or part, the Proprietary Marks, or any of them, or any words, symbols or terms confusingly similar thereto without Franchisor's express prior written consent, and then only in such manner and in accordance with such procedures, policies, standards and specifications as Franchisor may establish from time to time.

10.3.2   Franchisor has established one or more Internet web sites.  Franchisor shall have discretion over the design, content and functionality of such web sites.  Franchisor may, from time to time, include one or more interior pages that identifies restaurants operated under the

Proprietary Marks, including the Restaurant, by among other things, geographic region, address, telephone number(s), and menu items. Franchisor may permit Franchisee to customize or post certain information to the an interior page, subject to Franchisee's execution of Franchisor's then-current participation agreement, as in effect from time to time, and Franchisee's compliance with the procedures, policies, standards and specifications that Franchisor may establish from time to time. Franchisor may disable or terminate such website(s) without Franchisor having any liability to Franchisee.

10.3.3 Franchisee acknowledges and agrees that Franchisor (or its Affiliate) is the owner of, and will retain all right, title and interest in and to (i) the domain names "fatburger.com", "fatburger.net", "fatburgerchina.com", "fatburger.cn" and "fatburger.com.cn"; (ii) all existing and future domain names, URLs, future addresses and subaddresses using the Proprietary Marks in any manner; (iii) means all computer programs and computer code (*e.g.*, HTML, XML DHTML, Java) used for or on the Franchisor's web site(s), excluding any software owned by third parties; (iv) all text, images, sounds, files, video, designs, animations, layout, color schemes, trade dress, concepts, methods, techniques, processes and data used in connection with, displayed on, or collected from or through Franchisor's web site(s); and (iv) all intellectual property rights in or to any of the foregoing. Franchisor's web-site(s) may include one or more interior pages that identifies restaurants operated under the Proprietary Marks, including the Restaurant developed and operated hereunder, by among other things, geographic region, address, telephone number(s), and menu items. Such web-site(s) may also include one or more interior pages dedicated to the sale of franchises by Franchisor and/or relations with Franchisor's or its Affiliate's investors.

## 11.    INSURANCE

11.1    Franchisee will procure, before the commencement of any operations under this Agreement, and will maintain in full force and effect at all times during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee and Franchisor, and their respective officers, directors, partners, agents, and employees, against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the Restaurant, including, but not limited to, comprehensive general liability insurance, property and casualty insurance, statutory worker's compensation insurance, and business interruption insurance. Notwithstanding the foregoing, Franchisee must procure, before the commencement of the initial training program offered by Franchisor, statutory worker's compensation insurance covering all participants in the training program. Such policy or policies will be written by an insurance company acceptable to Franchisor, will name Franchisor and its Affiliates as an additional insureds, and will provide, at a minimum (except as additional coverages and higher policy limits may reasonably be specified by Franchisor from time to time), the types and minimum amounts of coverage specified in the Manual or otherwise in writing. Franchisee must, before the commencement of any construction of the Restaurant, and will maintain in full force and effect at all times during construction, at Franchisee's expense, builders risk insurance in the minimum amounts of coverage specified in the Manual or otherwise in writing. Franchisor will have the right to obtain, directly from Franchisee's insurance carriers, any and all information relating to the foregoing policy or policies and any claims thereunder. Upon the request of Franchisor, Franchisee will execute, acknowledge, and deliver such instruments, and do such further acts, as may be required by Franchisor to enable Franchisor to obtain such information.

22

11.2    Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified will not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor will Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in **Section 17.3** of this Agreement.

11.3    At least 30 days before the commencement of operations under this Agreement and thereafter on an annual basis and at least 30 days prior to the expiration of any such policy, Franchisee will deliver to Franchisor Certificates of Insurance evidencing the proper coverage with limits not less than those required hereunder.  All Certificates will expressly provide that no less than 30 days' before written notice will be given Franchisor in the event of material alteration to, or cancellation of, the coverages evidenced by such Certificates.

11.4    Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in the Manual or otherwise in writing, Franchisor will have the right and authority (without, however, any obligation to do so) immediately to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, will be payable by Franchisee immediately upon notice.  The foregoing remedies will be in addition to any other remedies Franchisor may have.

## 12.    TRANSFER OF INTEREST

### 12.1    Transfer by Franchisor:

Franchisor will have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity, and, upon such transfer or assignment, any designated assignee of Franchisor will become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

### 12.2    Transfer by Franchisee:

12.2.1   Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee.  This Agreement has been entered into by Franchisor in reliance upon and in consideration of the singular individual or collective character, reputation, skill attitude, business ability, and financial capacity of Franchisee, or if applicable, its Owners.  Accordingly, neither Franchisee nor any Owner (other than Franchisor, if applicable) shall effect an Assignment without Franchisor's prior written consent.

12.2.2   Any purported Assignment, transfer or encumbrance, by operation of law or otherwise, not having the written consent of Franchisor required by this **Section 12.2.1** will be null and void and will constitute a material breach of this Agreement, for which Franchisor may terminate without opportunity to cure pursuant to **Section 13.2** of this Agreement.  Except in the instance of Franchisee advertising to sell the Restaurant and assign this Agreement in accordance with the terms hereof, Franchisee shall not, without Franchisor's prior written consent, offer for sale or transfer at public or private auction or advertise publicly for sale or transfer, the furnishings, interior and exterior decor items, supplies, fixtures, equipment, Franchisee's lease or the real or personal property used in connection with the Restaurant.  Franchisee may not make any Assignment to a public Entity, or to any Entity whose direct or indirect parent's securities are

23

publicly traded and no shares of Franchisee or any Owner of Franchisee may be offered for sale through the public offering of securities. Franchisee shall promptly provide Franchisor with written notice (stating such information as Franchisor may from time to time require) of each and every transfer, assignment and encumbrance by any Owner of any direct or indirect Equity or voting rights in Franchisee, notwithstanding that the same may not constitute an "Assignment."

12.2.3   Franchisee will notify Franchisor in writing of any proposed Assignment at least 90 days before such Assignment is proposed to take place. Franchisee may not disclose any confidential information to any proposed transferee unless it shall first have obtained, and provided Franchisor with an executed original copy of, a confidentiality agreement in form prescribed or approved by Franchisor, naming Franchisor as an express intended third party beneficiary thereto. Franchisor will not unreasonably withhold its consent to any transfer subject to Franchisor's rights under **Section 12.4**; but Franchisor may impose reasonable conditions to its assignment including, in its sole discretion, any or all of the following as conditions, each of which shall be deemed to be reasonable:

12.2.3.1   All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor and its Affiliates will have been satisfied;

12.2.3.2   Franchisee is not in material default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its Affiliates;

12.2.3.3   Franchisee's right to receive compensation pursuant to any agreement for the purchase of any interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Restaurant will be subordinated and secondary to Franchisor's rights to receive any outstanding monetary obligations or other outstanding obligations due from Franchisee pursuant to this Agreement or any other agreement between Franchisor or its Affiliates and Franchisee, whether arising before or after such transfer;

12.2.3.4   Franchisee will have executed a general release, in a form satisfactory to Franchisor, of any and all known and unknown claims against Franchisor and its Affiliates, and their respective officers, directors, shareholders, agents, and employees, in their corporate and individual capacities;

12.2.3.5   The transferee (and, if the transferee is other than an individual, such Owners of a beneficial interest in the transferee as Franchisor may request) will enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement;

12.2.3.6   The transferee (and, if the transferee is other than an individual, such Owners of a beneficial interest in the transfer as Franchisor may request) will demonstrate to Franchisor's satisfaction that it, he or she meets Franchisor's educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to conduct the Restaurant (as may be evidenced by prior related business experience or otherwise); and has adequate financial resources and capital to operate the Restaurant;

SM01DOCS602932.7

12.2.3.7    The transferee will execute, for a term ending on the expiration date of this Agreement and with such renewal term as may be provided by this Agreement, the standard form franchise agreement then being offered to new franchisees of Franchisor and such other ancillary agreements as Franchisor may require for the Restaurant, which agreements will supersede this Agreement in all respects and the terms of which agreements may differ from the terms of this Agreement, including, a higher percentage royalty rate and advertising contribution; but that the transferee will not be required to pay any initial franchise fee and the Protected Territory provided for in this Agreement will remain the same;

12.2.3.8    At Franchisor's request, Franchisee and/or its Owners, the transferor and the transferee's Owners shall have executed a continuing guaranty in favor of Franchisor of the performance and payment by the transferee of all obligations and debts to Franchisor and its Affiliates under this Agreement and, if applicable, the replacement franchise agreement.

12.2.3.9    The transferee, at its expense, will upgrade the Restaurant to conform to the then-current standards and specifications of "FATBURGER" restaurants, and will complete the upgrading and other requirements within the time specified by Franchisor; but that the transferee franchisee will not be required to upgrade the Restaurant if Franchisee has refurbished the Restaurant, in accordance with the provisions of **Section 5.17** hereof, within the 5 year period immediately preceding the date on which Franchisee notifies Franchisor of the proposed transfer;

12.2.3.10    Franchisee will remain liable for all of the obligations to Franchisor in connection with the Restaurant before the effective date of the transfer and will execute any and all instruments reasonably requested by Franchisor to evidence such liability;

12.2.3.11    At the transferee's expense, the transferee's operating partner, manager and/or such additional persons as may be reasonably designated by Franchisor will complete any training programs then in effect for Fatburger franchisees upon such terms and conditions as Franchisor may reasonably require, including that such training be completed before the effective date of the transfer;

12.2.3.12    If this Agreement has been executed pursuant to an Area Development Agreement (whether or not such agreement remains in effect) or a Multi-Unit Restaurant Agreement or similar agreement, that this Agreement and all other franchise agreements executed pursuant to such agreement shall be concurrently transferred/assigned to the same assignee; and

12.2.3.13    Except in the case of a transfer to a corporation, limited liability company or Partnership formed by Franchisee (that is one or more individuals) for the convenience of ownership (for which no fee will be required but with respect to which Franchisor may impose other conditions, including, the requirements that operation of the Restaurant be the sole business of the Entity and that the original Franchisee remain the same beneficial ownership of the Entity as the original Franchisee had prior to the Assignment), Franchisee shall, pay to Franchisor a transfer fee of $15,000, payable concurrently with Franchisee's notification to Franchisor of the proposed Assignment, unless waived in writing by Franchisor in its sole discretion; *provided, however*, that Franchisor may, in its sole discretion, condition its approval of the transaction and proposed transferee on the proposed transferee attending training prior to closing, in which event Franchisee

25

must pay the transfer fee prior to commencement of such training and each trainee must execute a confidentiality agreement in form prescribed by Franchisor.

12.2.4  Franchisee acknowledges and agrees that each condition which must be met by the transferee is necessary to assure such transferee's full performance of the obligations hereunder.

### 12.3    Offerings by Franchisee:

Securities, partnership or other ownership interests in Franchisee may not be offered to the public under the Securities Act of 1933, as amended, nor may they be registered under the Securities Exchange Act of 1934, as amended, or any comparable federal, state or foreign law, rule or regulation. Securities or partnership interests in Franchisee may be sold, by private offering or otherwise, only pursuant to the requirements of **Section 12.2**. All materials required for such offering by federal or state law will be submitted to Franchisor for limited review before their being filed with any Governmental Authority; and any materials to be used in any exempt offering will be submitted to Franchisor for limited review before their use. No Franchisee offering will imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating as an underwriter, issuer, or offeror of Franchisee's or Franchisor's securities; and Franchisor's limited review of any offering will be limited solely to the subject of the relationship between Franchisee and Franchisor. Franchisee and the other participants in the offering must fully indemnify Franchisor in connection with the offering. For each proposed offering, Franchisee will pay to Franchisor a non-refundable fee of $10,000, or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering. Franchisee will give Franchisor written notice at least 30 days before the date of commencement of any offering or other transaction covered by this Section.

### 12.4    Right of First Refusal:

12.4.1  If Franchisee, any of Franchisee's Owners or any person holding any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Restaurant desires to accept any bona fide offer from a third party to purchase such interest, Franchisee will notify Franchisor in writing of each such offer, and will provide such information and documentation relating to the offer as Franchisor may require.

12.4.2  Franchisor will have the right and option, exercisable within 45 days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. If Franchisor elects to purchase the seller's interest, closing on such purchase must occur within 45 days from the date of notice to the seller of the election to purchase by Franchisor. If Franchisor does not elect to purchase the seller's interest, closing on the purchase must occur within 45 days from the date Franchisor notifies seller that it does not want to purchase the interest or the expiration of the initial notice period, whichever first occurs. Any material change in the terms of any offer before closing will constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section will not constitute a waiver of any other provision of this Agreement, including all of the requirements of this **Section 12** with respect to a proposed transfer.

26

12.4.3  If the consideration, terms, or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the cash consideration, each party will designate an independent appraiser, and the two so chosen will designate a third, and the determination of the majority will be binding.

12.5    **Transfer Upon Death or Mental Incapacity:**

Upon the death or mental incapacity of Franchisee, any of Franchisee's Owners or any person any person with an interest in this Agreement or in all or substantially all of the assets of the Restaurant, the executor, administrator, or personal representative of such person will transfer within 6 months after such death or mental capacity the interest of such person to a third party approved by Franchisor.  Such transfers, including, without limitation, transfers by devise or inheritance, will be subject to the same conditions as any *inter vivos* transfer.  However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Section, the personal representative of the decedent will transfer the decedent's interest to another party approved by Franchisor within such six-month period, which disposition will be subject to all the terms and conditions for transfers contained in this Agreement.  If the interest is not disposed of within such six-month period, Franchisor may terminate this Agreement.

12.6    **Security Interest:**

Without limiting the broad prohibition set forth in **Section 12.2.1**, any security interest granted by Franchisee in the Restaurant or in any of the assets of the Restaurant with Franchisor's consent, Franchisor may require that the secured party agree that in the event of any default by Franchisee under any documents related to the security interest, Franchisor will have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Franchisee, and, in the event Franchisor exercises such option, any acceleration of indebtedness due to Franchisee's default will be void.  To the extent that any prohibition on the pledge, hypothecation, encumbrance or granting of a security interest in this Agreement or the assets of the Restaurant may be ineffective under Applicable Law, Franchisee shall provide not less than 10 days prior written notice (which notice shall contain the name and address of the secured party and the terms of such pledge, hypothecation, encumbrance or security interest) of any pledge, encumbrance, hypothecation or security interest in this Agreement or the assets of the Restaurant.

12.7    **Non-Waiver of Claims**

Franchisor's consent to a transfer hereunder will not constitute a waiver of any claims it may have against the transferring party, nor will it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

## 13.    DEFAULT AND TERMINATION

13.1    Franchisee will be deemed to be in default under this Agreement, and all rights granted herein will automatically terminate without notice to Franchisee, if Franchisee will become insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy is

SM01DOCS602932.7

filed by Franchisee or such a petition is filed against and not opposed by Franchisee; or if Franchisee is adjudicated a bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless supersedeas bond is filed); or if Franchisee is dissolved and not reformed within 30 days thereafter; or if execution is levied against Franchisee's business or property so that Franchisee loses its right to such business or property; or if the real or personal property of the Restaurant will be sold after levy thereupon by any sheriff, marshal, constable or other government official.

13.2    Franchisee will be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following events:

13.2.1    If Franchisee fails to open the Restaurant in accordance with **Sections 5.5** through **5.9**.

13.2.2    If Franchisee shall abandon the Restaurant.  For purposes of this Agreement, "**abandon**" shall refer to (i) Franchisee's failure, at any time during the Term, to keep the Restaurant open and operating for business for a period of 5 consecutive days, except as provided in the Manual, (ii) Franchisee's failure to keep the Restaurant open and operating for any period after which it is not unreasonable under the facts and circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the Restaurant at the Location, unless such failure to operate is due to Force Majeure (subject to Franchisee's continuing compliance with this Agreement), (iii) failure to actively and continuously maintain and answer the telephone listed by Franchisee for the Restaurant solely with the "FATBURGER" name; (iv) the loss of possession of the Accepted Location; or (v) closing of the Restaurant required by Applicable Law if such closing was not the result of a violation of this Agreement by Franchisor.  Notwithstanding the foregoing, if any "abandonment" results from a Governmental Authority's exercise of the power of eminent domain, or if, through no fault of Franchisee, the premises are damaged or destroyed, then Franchisee will have 30 days after either such event in which to apply for Franchisor's approval to relocate or reconstruct the premises, which approval will not be unreasonably withheld.

13.2.3    If Franchisee (or, if Franchise is other than an individual, any of Franchisee's Owners) is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein.

13.2.4    If an approved transfer is not effected within a reasonable time, as required by **Section 12.5** hereof, following Franchisee's death or mental incapacity.

13.2.5    If, contrary to the terms of **Sections 7** or **8**, Franchisee makes any disclosure or divulgence of the contents of the Manual or other confidential information provided to Franchisee by Franchisor which Franchisor reasonably believes is likely to have an adverse effect on

28

the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein.

13.2.6  If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Restaurant.

13.2.7  If Franchisee fails, refuses, or neglects to seek Franchisor's prior written approval or consent, including consent to an Assignment, as required by this Agreement.

13.2.8  If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein.

13.2.9  Franchisee engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks.

13.2.10 If Franchisee fails to comply with the covenants applicable during the term of this Agreement in **Section 15.2**.

13.2.11 If Franchisee fails to obtain execution of the covenants required under **Section 15.6**.

13.2.12 If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor.

13.2.13 If Franchisee fails to perform or observe any provision of the lease of the Restaurant premises, including failure timely to pay rent.

13.2.14 If Franchisee, the Operating Partner, or any of its managers or assistant managers fail to complete to Franchisor's satisfaction the initial training program in accordance with the provisions of **Section 5.8** hereof.

13.2.15 If Franchisee fails to correct or repair any defects, deficiencies, or unsatisfactory conditions at the Restaurant immediately after being advised of same by Franchisor.

13.2.16 If Franchisee repeatedly is in default under **Section 13.3** hereof for failure substantially to comply with any of the requirements imposed by this Agreement, whether or not cured after notice.

13.3    Except as provided in **Sections 13.1** and **13.2**, and as otherwise expressly provided elsewhere in this Agreement, Franchisee shall have 10 days (5 days in the case of any default in the timely payment of sums due to Franchisor or its Affiliates or to Franchisee's suppliers or vendors) after Franchisor's written notice of default within which to remedy any default under this Agreement, and to provide evidence of such remedy to Franchisor.  Franchisor may specify in such notice of default that this Agreement and all rights granted by it shall thereupon automatically terminate without further notice or opportunity to cure if any such default is not cured within that time period, or such longer time period as Applicable Law may require or as Franchisor may specify in the notice of default.  Such defaults will include, without limitation, the Franchisee's failure to

29

maintain any of the standards or procedures prescribed by Franchisor in this Agreement, the Manual, or otherwise in writing.

13.4    Notwithstanding anything to the contrary contained in this Article, in the event any valid, Applicable Law of a competent Governmental Authority having jurisdiction over this Agreement and the parties hereto shall limit Franchisor's rights of termination hereunder or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods or restrictions upon termination required by such laws and regulations.    Franchisor shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination thereof.

13.5    Except for a default or termination of any Area Development Agreement or Multi-Unit Restaurant Agreement, or similar agreement, consisting solely of Franchisee's failure to meet the development schedule thereunder, any default by Franchisee under the terms and conditions of this Agreement, or any other agreement between Franchisor (or its Affiliate), and Franchisee (or any Affiliate of Franchisee), shall be deemed to be a default of each and every said agreement. Furthermore, in the event of termination, for any cause, of this Agreement or any other agreement between the parties hereto, Franchisor may, at its option, terminate any or all said agreements.

13.6    Franchisee may terminate this Agreement due to a material default by Franchisor of its obligations hereunder, which default is not cured by Franchisor within 60 days after Franchisor's receipt of prompt written notice by Franchisee to Franchisor detailing the alleged default with specificity; *provided*, that if the default is such that it cannot be reasonably cured within such 60 day period, Franchisor shall not be deemed in default for so long as it commences to cure such default within 60 days and diligently continues to prosecute such cure to completion.    If Franchisee terminates this Agreement pursuant to this Section, Franchisee shall comply with all of the terms and conditions of **Section 14**.

## 14.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee will forthwith terminate, and:

14.1    Franchisee will immediately cease to operate the business franchised under this Agreement, and will not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

14.2    Franchisee will immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System; the Proprietary Mark "FATBURGER"; and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System; provided that the foregoing will not apply to with respect to the continued operation by Franchisee of any other "FATBURGER" Restaurant pursuant to another validly subsisting franchise agreement with Franchisor.    In particular, Franchisee will cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, menu items and any other articles which display the Proprietary Marks, and Franchisee hereby appoints Franchisor as Franchisee's attorney in fact to do so in the event that Franchisee fails or refuses to do so for any reason; this power of attorney granted by Franchisee to Franchisor and such designee is a

special power of attorney coupled with an interest and is irrevocable and shall survive the death or disability of Franchisee.  In addition, Franchisor will have the right to enter upon the premises where the Restaurant was conducted, without being guilty of trespass or any other tort, for the purpose of removing any or all signs, advertising materials, displays, menus and any other articles which bear the Proprietary Marks.

14.3    Franchisee will take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "FATBURGER" or any other service mark or trademark of Franchisor, and Franchisee will furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within 30 days after termination or expiration of this Agreement.

14.4    Franchisee will, at Franchisor's option, assign to Franchisor any interest which Franchisee has in any lease or sublease for the premises of the Restaurant.  In the event Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Restaurant, Franchisee will make such modifications or alterations to the premises operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other Fatburger restaurants, and will make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this **Section 14.4**, Franchisor will have the right to enter upon the premises where the Restaurant was conducted, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

14.5    Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

14.6    Franchisee will promptly pay all sums owing to Franchisor and its Affiliates.  In the event of termination for any default of Franchisee, such sums will include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

14.7    Franchisee will pay to Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this **Section 14**.

14.8    Franchisee will immediately deliver to Franchisor all manuals, including the Manual, records, files, instructions, correspondence, all materials related to operating the Restaurant, including, without limitation, brochures, signs, menus, displays, advertising materials, agreements, invoices, and any and all other materials relating to the operation of the Restaurant in Franchisee's possession, and all copies thereof (all of which are acknowledged to be Franchisor's property), and will retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement

31

SM01DOCS602932.7

and of any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any provision of Applicable Law.

14.9    Franchisor will have the option, to be exercised within 30 days after termination or expiration, to purchase from Franchisee any or all of the furnishings, equipment, fixtures, supplies, or inventory of Franchisee related to the operation of the Restaurant, at Franchisee's cost or fair market value, whichever is less.  If the parties cannot agree on a fair market value within a reasonable time, each party will designate an independent appraiser, and the two so chosen will designate a third, and the determination of the majority will be binding.  If Franchisor elects to exercise any option to purchase herein provided, it will have the right to set off all amounts due from Franchisee, and the cost of the appraisal, if any, against any payment therefor.

14.10    Franchisee will assign to Franchisor all telephone numbers utilized by Franchisee in the operation of the Restaurant.

14.11    Franchisee will comply with the covenants contained in **Section 15**.

## 15.    COVENANTS

15.1    Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of Franchisor and the System.  Franchisee covenants that, during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee will not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity:

15.1.1    Divert or attempt to divert any business or customer of the Restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System.

15.1.2    Employ or seek to employ any employee of Franchisor or of any Fatburger franchisee or Franchisee for a period of at least one (1) year following the non-employment of such employee, or otherwise directly or indirectly induce any employee of Franchisor or of any franchisee or developer of Franchisor to leave his or her employment.

15.2    During the Term, no Restricted Person shall in any capacity, either directly or indirectly, through one or more Affiliates or otherwise, engage in any Competitive Activities at any location, whether within or outside the Protected Territory, unless Franchisor shall consent thereto in writing.

15.3    To the extent permitted by Applicable Law, upon (i) the expiration or termination of this Agreement, (ii) the occurrence of any Assignment, or (iii) the cession of any Restricted Person's relationship with Franchisee, each person who was a Restricted Person before such event shall not for a period of 2 years thereafter, either directly or indirectly, through one or more Affiliates, engage in any Competitive Activities within a radius of 5 miles of the Accepted Location or of the location of any other restaurant operated, or intended to be operated, under the Proprietary Marks.

SM01DOCS602932.7

15.4    The parties have attempted in **Section 15** to limit Franchisee's right to compete only to the extent necessary to protect the Franchisor from unfair competition. The parties hereby expressly agree that if the scope or enforceability of **Section 15** (or any subsection thereof) is disputed at any time by Franchisee, a court or arbitrator, as the case may be, may modify either or both of such provisions to the extent that it deems necessary to make such provision(s) enforceable under Applicable Law.   In addition, Franchisor reserves the right to reduce the scope of said provisions without Franchisee's consent, at any time or times, effective immediately upon notice to Franchisee.

15.5    In view of the importance of the Franchisor's trademarks, trade names, service marks, logotypes, insignias, trade dress and designs and the incalculable and irreparable harm that would result to the parties in the event of a default or breach under this **Section 15**, the parties agree that each party may seek specific performance and/or injunctive relief to enforce the covenants and agreements in this Agreement, in addition to any other relief to which such party may be entitled at law or in equity.   Each party submits to the exclusive jurisdiction of the courts of the State of California and the U.S. federal courts sitting in Los Angeles, California for purposes thereof.   The parties agree that venue for any such proceeding shall be the state and federal courts located in Los Angeles, California.

15.6    At Franchisor's request, Franchisee will obtain and furnish to Franchisor covenants similar in substance to those set forth in this **Section 15** (including covenants applicable upon the termination of a person's relationship with Franchisee) from any or all of the following persons:  (1) the Manager and assistant managers of the Restaurant; and (2) any or all Restricted Persons.  Every covenant required by this **Section 15.6** will be in a form satisfactory to Franchisor, including, specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

## 16.    TAXES, PERMITS, INDEBTEDNESS; COMPLIANCE WITH LAW

16.1    Franchisee will promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the Restaurant.  Franchisee will pay to Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

16.2    In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or Applicable Law; however, in no event will Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Restaurant or any improvements thereon.

16.3    Franchisee will comply with all federal, state, and local laws, rules, and regulations, and will timely obtain any and all permits, certificates, or franchises necessary for the full and proper conduct of the Restaurant, including, licenses to do business, fictitious name registrations, sales tax permits, health and sanitation permits and ratings, and fire clearances.

16.4    Franchisee will notify Franchisor in writing within 5 days after the receipt of notice by Franchisee of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Restaurant.  Notwithstanding the foregoing, upon the occurrence of a Crisis Management Event, Franchisee shall immediately inform Franchisor's President, Chief Operating Officer, Vice President-Operations and Vice President - Marketing (and as otherwise instructed in the Manual) by telephone and Email. Franchisee shall cooperate fully with Franchisor with respect to Franchisor's response to the Crisis Management Event.

## 17.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

17.1    It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee will be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, employer, joint employer, enterprise, or servant of the other for any purpose whatsoever.

17.2    During the Term and any extensions hereof, Franchisee will hold itself out to the public as an independent contractor operating the Restaurant pursuant to a franchise from Franchisor.  Franchisee agrees to take such action as may be necessary to do so, including, exhibiting a notice of that fact in a conspicuous place in the Restaurant premises, the content and form of which Franchisor reserves the right to specify.

17.3    It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor will in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor will Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Restaurant or for any claim or judgment arising therefrom against Franchisee or Franchisor.  Franchisee will indemnify and hold Franchisor, and Franchisor's officers, directors, agents, and employees, harmless against any and all claims arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Restaurant, as well as the costs, including attorneys' fees, of defending against them.

## 18.    APPROVALS AND WAIVERS

18.1    Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee will make a timely written request to Franchisor therefor, and such approval or consent will be obtained in writing.

18.2    Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

18.3    No failure of Franchisor to exercise any power reserved to it in this Agreement, or to insist upon compliance by Franchisee with any obligation or condition in this Agreement, and no custom or practice of the parties at variance with the terms hereof, will constitute a waiver of

SM01DOCS602932.7

Franchisor's rights to demand exact compliance with any of the terms of this Agreement.  Waiver by Franchisor of any particular default will not affect or impair Franchisor's right with respect to any subsequent default of the same or of a different nature; nor will any delay, forbearance, or omission of Franchisor to exercise any power or right arising out of any breach or default by Franchisee of any of the terms, provisions, or covenants of this Agreement affect or impair Franchisor's rights; nor will such constitute a waiver by Franchisor of any rights hereunder or rights to declare any subsequent breach or default.

## 19.    NOTICES

Except as otherwise expressly provided herein, all written notices and reports permitted or required to be delivered by the parties pursuant hereto shall be deemed so delivered at the time delivered by hand, one business day after transmission by facsimile with copy also sent by Email or other electronic system expressly approved in the Manuals as appropriate for delivery of notices hereunder  (with confirmation copy sent by regular U.S. mail), or 3 business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed as follows:

**Notices to Franchisor:**

> Fatburger North America, Inc.
> 9906 South Santa Monica Blvd., Penthouse
> Beverly Hills, CA  90210
> Attn: Chief Executive Officer and Chief Financial Officer
> email:  CEO@fatburger.com and CFO@fatburger.com

**Notices to Franchisee:**

> _____
> _____
> _____
> _____
> _____

Any party may change his or its address by giving 10 days prior written notice of such change to all other parties.

## 20.    BUSINESS PRACTICES

20.1    Neither Franchisee nor any of its Owners conducts any activity, or has failed to conduct any activity, if such action or inaction constitutes a money laundering crime, including any money laundering crime prohibited under the International Money Laundering Abatement and Anti-Terrorist Financing Act, as amended, and any amendments or successors thereto.

20.2    Neither Franchisee, any of its Owners nor any employee of either of them is named as a "Specially Designated Nationals" or "Blocked Persons" as designated by the U.S. Department of the Treasury's Office of Foreign Assets Control.  Currently, this list is published under the internet website address "www.treas.gov/offices/enforcement/ofac/sdn/".  Franchisee is neither directly nor indirectly owned or controlled by the government of any country that is subject to a

35

United States embargo.  Nor does Franchisee or its Owners act directly or indirectly on behalf of the government of any country that is subject to a United States embargo.  Franchisee agrees that Franchisee will notify Company in writing immediately of the occurrence of any event, which renders the foregoing representations and warranties of this paragraph incorrect.

20.3    Franchisee represents that it understands and has been advised by legal counsel on the requirements of the Applicable Laws referred to above, including the United States Foreign Corrupt Practices Act (currently located at www.usdoj.gov/criminal/fraud/fcpa.html), as amended, any local foreign corrupt practices laws, and the USA Patriot Act of 2001, as amended, and hereby acknowledges the importance to Franchisor and the parties' relationship of Franchisee's compliance with any applicable auditing requirements and any requirement to report or provide access to information to Company or any government, that is made part of any Applicable Law.  Franchisee must take all reasonable steps to require its consultants, agents and employees to comply with such laws prior to engaging or employing any such persons.

## 21.    APPLICABLE LAW; DISPUTE RESOLUTION

21.1    The parties acknowledge that a substantial portion of performance under this Agreement will take place in California.  Therefore, the parties agree that the laws of California (without giving effect to any conflict of laws) shall govern enforcement of this Agreement, excepting, however, the provisions of **Sections 15.2** and **15.3** (and to the extent applicable, **Section 15.4**) respecting Non-Competition Covenants which shall be governed in accordance with the laws of the State where the Accepted Location is located.

21.2    Except for a claim with respect to:  (a) ownership or use of the Proprietary Marks, (b) enforcement of **Section 15** hereof, or (c) monies owed by Franchisee to Franchisor, any claim or controversy arising out of or related to this Agreement or the making, performance, or interpretation thereof will be conducted before and in accordance with (a) the then prevailing commercial rules of the American Arbitration Association ("**AAA**"), or at Franchisor's option, (b) the Rules of Practice and Procedure of Judicial Arbitration & Mediation Services, Inc. ("**JAMS**") (AAA and JAMS, as applicable are referred to below as the "**Arbitration Association**").  Franchisee and Franchisor will each appoint one arbitrator from a list of arbitrators provided by the Arbitration Association, and those two arbitrators will appoint a third arbitrator from such list.  The three arbitrators will determine facts, apply the Applicable Law, and award compensatory damages, but not punitive damages, which are hereby waived by Franchisee and Franchisor.  All arbitration proceedings will take place in the county in which Franchisor's headquarters is located.  Each party to the arbitration will bear such party's own legal fees and expenses, and the fees and expenses of the Arbitration Association and the arbitrators will be paid by such party or parties as the arbitrators determine.  The award made by the arbitrators will be binding and final on the parties to such proceedings, and will not be subject to review by a court of law; but that judgment upon the award may be entered in a court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the award or an order of enforcement.  All arbitration proceedings and claims shall be filed and prosecuted separately and individually in the name of Franchisee and Franchisor, and not in any representative capacity, and shall not be joined or consolidated with claims asserted by or against any other licensee, franchisee or area developer.  The arbitration and the parties' agreement therefor shall be deemed to be self-executing, and if either party fails to appear at any properly-noticed arbitration proceeding, an award may be entered against such party despite said failure to appear.  The arbitral decision shall be binding and conclusive on the parties.  All issues

36

relating to arbitrability or the enforcement of the agreement to arbitrate contained herein shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.), notwithstanding any provision of this Agreement specifying the state law under which this Agreement shall be governed and construed.

21.3    Unless prohibited by Applicable Law, any legal action or proceeding (including mediation or arbitration) brought or instituted by Franchisee with respect to any dispute arising from or related to this Agreement, any breach of the terms of this Agreement, or the relationship between the parties hereto must be brought or instituted within a period of one (1) year from the date of discovery of the conduct or event that is the basis of the legal action or proceeding. Franchisee agrees to be bound by the provisions of the limitation on the period of time in which claims must be brought under Applicable Law or this Agreement, whichever expires earlier. Franchisee further agrees that, in connection with any arbitration proceeding conducted hereunder, Franchisee must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the federal rules of civil procedure) within the same proceeding as the claim to which it relates.  Any such claim which is not submitted or filed as described above shall be forever barred.

21.4    No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor will be, deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each will be cumulative of every other right or remedy.

21.5    Nothing herein contained will bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

21.6    Franchisee will pay to Franchisor all damages, costs, and expenses, including attorneys' fees, incurred by Franchisor in enforcing any provision of this Agreement, including without limitation the obtaining of injunctive relief.

## 22.    FORCE MAJEURE

In the event of the occurrence of an event which Franchisee claims to constitute Force Majeure, Franchisee shall provide written notice to Franchisor in writing within 5 days following commencement of the alleged Force Majeure which notice shall include the words "Force Majeure" and explicitly describe the specific nature and extent of the Force Majeure, and how it has impacted Franchisee's performance hereunder.  Franchisee shall provide Franchisor with continuous updates (no less frequently than once each week) on Franchisee's progress and diligence in responding to and overcoming the Force Majeure, and shall notify Franchisor immediately upon cessation of such Force Majeure, and provide all other information as may be requested by Franchisor.  If Franchisee shall fail to notify Franchisor of any alleged Force Majeure within said 5 days, or shall fail to provide any such updates during the continuance of the alleged Force Majeure, Franchisee shall be deemed to have waived the right to claim such Force Majeure.

## 23.    SEVERABILITY AND CONSTRUCTION

23.1    Except as expressly provided to the contrary herein, each portion, section, part, term, and/or provision of this Agreement will be considered severable; and if, for any reason, any portion, section, part, term, and/or provision herein is determined to be invalid and contrary to, or in

SM01DOCS602932.7

conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such will not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible; and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, and/or provisions will be deemed not to be a part of this Agreement.

23.2    Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor will be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, and employees, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by **Section 12**, any rights or remedies under or by reason of this Agreement.

23.3    Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by Applicable Law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

23.4    All captions in this Agreement are intended solely for the convenience of the parties, and none will be deemed to affect the meaning or construction of any provision hereof.

23.5    The terms of all Exhibits hereto are hereby incorporated into and made a part of this Agreement as if the same had been set forth in full herein.  All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context, or sense of this Agreement or any article or Section hereof may require.  As used in this Agreement, the words "include," "includes" or "including" are used in a non-exclusive sense.  Unless otherwise expressly provided herein to the contrary, any consent, acceptance, approval or authorization of Franchisor which Franchisee may be required to obtain hereunder may be given or withheld by Franchisor in its sole discretion, and on any occasion where Franchisor is required or permitted hereunder to make any judgment, determination or use its discretion, including any decision as to whether any condition or circumstance meets Franchisor's standards or satisfaction, Franchisor may do so in its sole subjective judgment and discretion.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against the drafter hereof, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.  Franchisor and Franchisee intend that if any provision of this Agreement is susceptible to two or more constructions, one of which would render the provision enforceable and the other or others of which would render the provision unenforceable, then the provision shall be given the meaning that renders it enforceable.

23.6    Any references to a Section, Article, Schedule or Exhibit are to sections, articles, schedules and exhibits to this Agreement, unless otherwise specifically stated.

## 24.   MISCELLANEOUS

24.1    **Franchisor's Right To Cure Defaults**

38

In addition to all other remedies herein granted if Franchisee shall default in the performance of any of its obligations or breach any term or condition of this Agreement or any related agreement, Franchisor may, at its election, immediately or at any time thereafter, without waiving any claim for default or breach hereunder and without notice to Franchisee, cure such default or breach for the account and on behalf of Franchisee, and the cost to Franchisor thereof shall be due and payable on demand and shall be deemed to be additional compensation due to Franchisor hereunder and shall be added to the amount of compensation next accruing hereunder, at the election of Franchisor.

### 24.2   Survival

The covenants contained in this Agreement which, by their nature or terms, require performance by the parties after the expiration or termination of this Agreement, shall be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

### 24.3   Joint and Several Liability

If Franchisee consists of more than one person or Entity, or a combination thereof, the obligations and liabilities of each such person or entity to Franchisor are joint and several, and such person(s) and/or Entities shall be deemed to be a general partnership.

### 24.4   Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

### 24.5   Submission of Agreement

The submission of this Agreement does not constitute an offer and this Agreement shall become effective only upon the execution thereof by Franchisee and Franchisor.

### 24.6   Guaranty

All present and future Owners of a 10% or more (directly or indirectly), in the aggregate, of the Equity or voting rights in Franchisee, will execute a written guaranty in a form prescribed by Franchisor, personally, irrevocably and unconditionally guaranteeing, jointly and severally, with all other guarantors, the full payment and performance of Franchisee's obligations to Franchisor and to Franchisor's Affiliates.   For purposes of determining whether said 10% threshold is satisfied, holdings of spouses (and family members who live in the same household) and Affiliates shall be aggregated.   Upon each transfer or assignment of an interest in Franchisee, or other change in ownership interests in Franchisee, and at any other time upon Franchisor's request, said holders shall re-execute a written guaranty in a form prescribed by Franchisor.

### 24.7   Amendments

This Agreement may be amended only by a document signed by all of the parties to this Agreement or by their authorized agents.

SM01DOCS602932.7

## 25.    ENTIRE AGREEMENT

This Agreement, the documents referred to herein, and the Attachments hereto constitute the entire, full, and complete Agreement between Franchisor and Franchisee concerning the subject matter hereof. No other agreements oral or otherwise shall be deemed to exist or to bind any of the parties hereto and all prior agreements, understandings and representations are merged herein and superseded hereby. Except as set forth in the Franchise Disclosure Document, Franchisee represents that there are no contemporaneous agreements or understandings relating to the subject matter hereof between the parties that are not contained herein. No officer or employee or agent of Franchisor has any authority to make any representation or promise not contained in this Agreement or in any Franchise Disclosure Document for prospective franchisees required by applicable law, and Franchisee agrees that it has executed this Agreement without reliance upon any such representation or promise. Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement will be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

## 26.    REPRESENTATIONS AND ACKNOWLEDGMENTS

26.1    If Franchisee is an Entity, Franchisee represents and warrants that the information set forth in **Schedule B**, which is attached hereto and incorporated herein, is accurate and complete in all material respects. Franchisee shall notify Franchisor in writing within 10 days of any change in the information set forth in **Schedule B**, and shall submit to Franchisor a revised Schedule, which shall be certified by Franchisee as true, correct and complete and upon acceptance thereof by Franchisor shall be annexed to this Agreement as **Schedule B**. Franchisee promptly shall provide such additional information as Franchisor may from time to time request concerning all persons who may have any direct or indirect financial interest in Franchisee, including providing copies of all amendments to Franchisee's "Entity Documents" as defined in **Schedule B**. Franchisee shall conduct no business other than the business contemplated hereunder and under any currently effective Multi-Unit Restaurant Agreement between Franchisor and Franchisee. The Entity Documents of Franchisee shall recite that the issuance and transfer of any interest therein is subject to the restrictions set forth in this Agreement.

26.2    Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent businessperson. Except as set forth in the Franchise Disclosure Document, if any such representation was made, Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

26.3    Franchisee acknowledges that it has read and understood this Agreement, the Attachments hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

26.4    Franchisee acknowledges that it received a copy of the complete Fatburger North America, Inc. Franchise Agreement, the Attachments thereto, and agreements relating thereto, if

any, at least 5 business days before the date on which this Agreement was executed.  Franchisee further acknowledges that it received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least 10 business days before the date on which this Agreement was executed.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement on the day and year first above written.


"FRANCHISEE"                                    "FRANCHISOR"

_____                FATBURGER NORTH AMERICA, INC.,
                                                a Delaware corporation


By: _____                   By: _____

    Its: _____            Its: _____

SM01DOCS602932.7

## SCHEDULE A
### to
## FATBURGER NORTH AMERICA, INC.
## FRANCHISE AGREEMENT

DEFINITIONS - In this Agreement the following capitalized terms shall have the meanings set forth below, unless the context otherwise requires:

"**AAA**" shall have the meaning set forth in **Section 21.2**.

"**Arbitration Association**" shall have the meaning set forth in **Section 21.2**.

"**Accepted Location**" shall have the meaning set forth in **Section 1.1**.

"**Affiliate**" when used herein in connection with Franchisor or Franchisee, includes each person or Entity which directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Franchisor or Franchisee, as applicable. Without limiting the foregoing, the term "Affiliate" when used herein in connection with Franchisee includes any Entity 10% or more of whose Equity or voting control, is held by person(s) or Entities who, jointly or severally, hold 10% or more of the Equity or voting control of Franchisee. For purposes of this definition, control of a person or Entity means the power, direct or indirect, to direct or cause the direction of the management and policies of such person or Entity whether by contract or otherwise. Notwithstanding the foregoing definition, if Franchisor or its Affiliate has any ownership interest in Franchisee, the term "Affiliate" shall not include or refer to the Franchisor or that Affiliate, and no obligation or restriction upon an "Affiliate" of Franchisee, shall bind Franchisor, or said Affiliate or their respective direct and indirect parents or subsidiaries, or their respective officers, directors, or managers.

"**Assignment**" means:

(i) the direct or indirect, voluntary or involuntary, sale, assignment, transfer, conveyance, gift, pledge, mortgage, hypothecation, or encumbrance, in whole or in part, of:

(A) this Agreement, or

(B) all or any substantial portion of the assets of the Restaurant, or

(ii) the direct or indirect, voluntary or involuntary, sale, assignment, transfer, conveyance, gift, pledge, mortgage, or encumbrance of 10% or more, in the aggregate, whether in one or more transactions, of the Equity or voting power of Franchisee, by operation of law or otherwise, or any other event(s) or transaction(s) which, directly or indirectly, effectively changes control of Franchisee;

(iii) the issuance of any securities by Franchisee which by itself or in combination with any other transaction(s) results in its Owners, as constituted on the date of this Agreement, owning, on an as-converted or as-exercised basis, less than 90% of the outstanding Equity or voting power of Franchisee;

43

(iv) if Franchisee is a Partnership, the resignation, removal, withdrawal, death or legal incapacity of a general partner or of any limited partner owning 10% or more, in the aggregate, whether in one or more transactions, of the Partnership Rights of the Partnership, or the admission of any additional general partner, or the transfer by any general partner of any of its Partnership Rights in the Partnership, or any change in the ownership or control of any general partner;

(v) the death or legal incapacity of any Owner of Franchisee owning 10% or more of the Equity or voting power of Franchisee;

(vi) any merger, stock redemption, consolidation, reorganization, recapitalization or other transfer of control of Franchisee, however effected; or

(vii) incurring any indebtedness (including principal, interest, fees and charges) for borrowed money or for the deferred purchase price of goods or services, except indebtedness (including principal, interest, fees and charges) owed to Permitted Lenders, and except indebtedness owed in connection with the purchase of goods or services, in the ordinary course of Franchisee's business, for use in or by the Restaurant and due and payable in full within 90 days of the date incurred.

"**Applicable Law**" means and includes applicable common law and all applicable statutes, laws, rules, regulations, ordinances, policies and procedures established by any Governmental Authority, including all labor, immigration, food and drug laws and regulations, as in effect on the date of this Agreement, and as may be amended, supplemented or enacted from time to time.

"**Competitive Activities**" means to, own, operate, lend to, advise, be employed by, or have any financial interest in any restaurant that is the same as or similar to the Restaurant, other than a restaurant operated under the Proprietary Marks pursuant to a validly subsisting franchise agreement with Franchisor.  Notwithstanding the foregoing, "Competitive Activities" shall not include the direct or indirect ownership solely as an investment, of securities of any Entity which are traded on any national securities exchange if applicable owner thereof (i) is not a controlling person of, or a member of a group which controls, such Entity and (ii) does not, directly or indirectly, own 5% or more of any class of securities of such Entity.

"**Crisis Management Event**" means any event that occurs at or about the Restaurant that has or may cause harm or injury to customers or employees, such as food contamination, food spoilage/poisoning, food tampering/sabotage, contagious diseases, natural disasters, terrorist acts, shootings, or any other circumstance which may damage the System, Proprietary Marks, or image or reputation of Restaurants or Franchisor or its Affiliates.

"**Entity**" means any limited liability company, Partnership, trust, association, corporation or other entity which is not an individual.

"**Equity**" means (i) capital stock, membership interests, Partnership Rights or other equity ownership interests of an Entity, and/or (ii) phantom equity, stock appreciation rights and similar rights.

"**Fatburger**" shall have the meaning set forth in **Section 6.1.8**.

"**First Renewal Term**" shall have the meaning set forth in **Section 2.2**.

"**Force Majeure**" means acts of God (such as tornadoes, earthquakes, hurricanes, floods, fire or other natural catastrophe); strikes, lockouts or other industrial disturbances; war, terrorist acts, riot, or other civil disturbance; epidemics; or other similar forces which Franchisee could not by the exercise of reasonable diligence have avoided; provided however, that neither an act or failure to act by a Governmental Authority, nor the performance, non-performance or exercise of rights under any agreement with Franchisee by any lender, landlord, or other person shall be an event of Force Majeure hereunder, except to the extent that such act, failure to act, performance, non-performance or exercise of rights results from an act which is otherwise an event of Force Majeure. For the avoidance of doubt, Franchisee's financial inability to perform or Franchisee's insolvency shall not be an event of Force Majeure hereunder.

"**Governmental Authority**" means and includes all Federal, state, county, municipal and local governmental and quasi-governmental agencies, commissions and authorities.

"**Manager**" shall have the meaning set forth in **Section 5.12**.

"**Manual**" means Franchisor's confidential operations and training manuals, and any other written directive related to the System, as the same may be amended and revised from time to time, including all bulletins, supplements and ancillary and additional manuals and written directives established by Franchisor as in effect and amended from time to time.

"**Multiple Restaurants**" means 3 or more Restaurants within reasonable geographic proximity of each other.

"**Net Sales**" means and includes all revenue (regardless of collection in the case of credit) from the sale of all food, merchandise, and services sold or rendered from or at the Restaurant whether for by cash, services, property, barter, or other means of exchange, and whether or not Franchisor offers such services or products in its other locations, including: (a) sales and services where orders originate or are accepted by Franchisee in the Restaurant but delivery or performance thereof is made from or at any place other than the Restaurant or which are pursuant to telephone or other similar orders received or filled at or in the Restaurant, (b) the proceeds of any business interruption insurance, after the satisfaction of any applicable deductible, and (c) sales from authorized (subject to **Section 5.10**) vending devices including in store music systems and pay telephones. Notwithstanding the foregoing, "Net Sales" shall exclude the amount of bona fide refunds paid to customers, the amount of any state or local sales or use tax actually paid by Franchisee and sales of fixtures or other capital items sold by Franchisee after use thereof in the operation of the Restaurant.

"**Non-Traditional Venue**" means a site, venue or location within another primary business or in conjunction with other businesses or at institutional settings, including, toll roads, highway travel plazas, hotels and motels, casinos and casino adjacent locations, airports, sports arena, stadiums, bus stations, train stations, theme parks, amusement facilities, military and other governmental facilities, movie theaters, hospitals, grocery stores, supermarkets, convenience stores, schools, college and university campus, piers, gyms, offices or in-plant food service facilities, shopping mall food courts operated by a master concessionaire, and any site for which the lessor, owner or operator thereof shall have indicated its intent to prefer or limit the operation of its food service facilities to a master concessionaire or contract food service provider.

45

"**Opening Plan**" shall have the meaning set forth in **Section 5.9**.

"**Owner**" means any direct or indirect shareholder, member, general or limited partner, trustee, or other Equity owner of an Entity, except, that if Franchisor or any Affiliate of Franchisor has any ownership interest in Franchisee, the term "Owner" shall not include or refer to the Franchisor or that Affiliate or their respective direct and indirect parents and subsidiaries, and no obligation or restriction upon the "Franchisee", or its Owners shall bind Franchisor, or said Affiliate or their respective direct and indirect parents and subsidiaries or their respective officers, directors, or managers.

"**Partnership**" means any general partnership, limited partnership, or limited liability partnership.

"**Partnership Rights**" means voting power, property, profits or losses, or partnership interests of a Partnership.

"**Permitted Lender**" means a (i) bank, savings institution, trust company, insurance company, or other licensed financial institution; or (ii) an Owner of Franchisee as of the date of this Agreement for so long as such Owner remains an Owner of Franchisee.

"**Proprietary Marks**" shall have the meaning set forth in the Recitals.

"**Protected Territory**" shall have the meaning set forth in **Section 1.3**.

"**Renewal Franchise Agreement**" shall have the meaning set forth in **Section 2.2**.

"**Renewal Right**" shall have the meaning set forth in **Section 2.2**.

"**Restaurant**" shall have the meaning set forth in **Section 1.1**.

"**Required Funds**" shall have the meaning set forth in **Section 5.4**.

"**Restricted Person**" means Franchisee, and each of its Owners and Affiliates, and the respective officers, directors, managers, and Affiliates of each of them, and the spouse and family members who live in the same household of each of the foregoing who are individuals.

"**Scheduled Opening Date**" shall have the meaning set forth in **Section 5.9**.

"**Second Renewal Term**" shall have the meaning set forth in **Section 2.2**.

"**System**" shall have the meaning set forth in the Recitals.

"**Term**" shall have the meaning set forth in **Section 2.1**.

"**Traditional Restaurant**" is a business premises that exists primarily as a "FATBURGER" restaurant, excluding any "FATBURGER" restaurant at a Non-Traditional Venue, however, which Traditional Restaurant may also have other types of Franchisor-approved co-branded businesses located in it, but in such case the "FATBURGER" restaurant is the primary business.

SM01DOCS602932.7

**"Weekly Accounting Periods"** shall have the meaning set forth in **Section 4.4**.

SM01DOCS602932.7

## SCHEDULE B
to
### FATBURGER NORTH AMERICA, INC.
### FRANCHISE AGREEMENT
### Entity Information

Franchisee represents and warrants that the following information is accurate and complete in all material respects:

(i)     Franchisee is a (check as applicable):
[ ] corporation
[ ] limited liability company
[ ] general partnership
[ ] limited partnership
[ ] Other (specify): _____

(ii)    Franchisee shall provide to Franchisor concurrently with the execution hereof true and accurate copies of its charter documents including Articles of Incorporation, Bylaws, Operating Agreement, Regulations Partnership Agreement, resolutions authorizing the execution hereof, and any amendments to the foregoing ("**Entity Documents**").

(iii)   Franchisee promptly shall provide such additional information as Franchisor may from time to time request concerning all persons who may have any direct or indirect financial interest in Franchisee.

(iv)    The name and address of each of Franchisee's owners, members, or general and limited partner:

| NAME | ADDRESS | NUMBER OF SHARES OR PERCENTAGE INTEREST |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

(v)     There is set forth below the names, and addresses and titles of Franchisee's principal officers or partners who will be devoting their full time to the Business:

| NAME | ADDRESS |
|---|---|
|  |  |
|  |  |
|  |  |

(vi)    The address where Franchisee's Financial Records, and Entity Documents are maintained is:

1

**ATTACHMENT**
to
**FATBURGER NORTH AMERICA, INC.**
**FRANCHISE AGREEMENT**

<u>Accepted Location</u>

The address of the Accepted Location referred to in **Section 1.1** of the Agreement is as follows:

<u>Protected Territory</u>

The Protected Territory referred to in **Section 1.3** of the Agreement is as follows:

"FRANCHISEE"                              "FRANCHISOR"

_____         FATBURGER NORTH AMERICA, INC.,
                                          a Delaware corporation

By: _____        By: _____

    Its: _____            Its: _____

## GUARANTY, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to Fatburger North America, Inc. ("**Franchisor**") to execute the Franchise Agreement between Franchisor and _____ ("**Franchisee**") dated _____, 20___ (the "**Agreement**"), the undersigned, jointly and severally, hereby unconditionally and irrevocably guarantee to Franchisor and its successors and assigns, the prompt full payment and performance of all obligations of Franchisee that are or may become due and owing to Franchisor or its affiliates, including, but not limited to, all obligations arising out of the Franchise Agreement or any other agreement between the parties and all extensions or renewals of it in the same manner as if the Franchise Agreement was signed between Franchisor or its affiliate. and the undersigned directly, as Franchisee.

Upon demand by Franchisor, the undersigned will immediately make each payment and perform each obligation required of Franchisee under the Agreement.  The undersigned hereby waive any right to require Franchisor to:  (a) proceed against Franchisee or any other guarantor for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee or any other guarantor; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee or any other guarantor.  Without affecting the obligations of the undersigned under this Guaranty, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee.  The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned expressly waive notice of the acceptance by Franchisor to or for the benefit of Franchisee, of the purchase of inventory and goods by Franchisee, the maturing of bills and the failure to pay the same, the incurring by Franchisee of any additional future obligations and liability to Franchisor, and any other notices and demands.  This Guaranty will not be affected by the modification, extension, or renewal of any agreement between Franchisor and Franchisee, the taking of a note or other obligation from Franchisee or others, the taking of security for payment, the granting of an extension of time for payment, the filing by or against Franchisee of bankruptcy, insolvency, reorganization or other debtor relief afforded Franchisee under the Federal Bankruptcy Act or any other state or federal statute or by the decision of any court, or any other matter, whether similar or dissimilar to any of the foregoing; and this Guaranty will cover the terms and obligations of any modifications, notes, security agreements, extensions, or renewals.  The obligations of the undersigned will be unconditional in spite of any defect in the validity of the Franchisee's obligations or liability to Franchisor, or any other circumstances whether or not referred to in this Guaranty that might otherwise constitute a legal or equitable discharge of a surety or guarantor.

Without limiting the generality of any other provision of this Guaranty, the undersigned hereby expressly waives: any defense, right of set-off, claim or counterclaim whatsoever and any and all other rights, benefits, protections and other defenses available to the undersigned now or at any time hereafter, including, without limitation, under California Civil Code Sections 2787 to 2855, inclusive, and Civil Code Sections 2899 and 3433, and all successor sections; and all other principles or provisions of law, if any, that conflict with the terms of this Guaranty, including, without limitation, the effect of any circumstances that may or might constitute a legal or equitable discharge of a guarantor or surety.  The undersigned waives all rights and defenses arising out of an election of remedies.  Without limiting the generality of the foregoing, the undersigned acknowledges that it has

been made aware of the provisions of California Civil Code Section 2856, has read and understands the provisions of that statute, has been advised by its counsel (or has had an opportunity to consult with counsel and has not availed itself of such opportunity) as to the scope, purpose and effect of that statute, and based thereon, and without limiting the foregoing waivers, the undersigned agrees to waive all suretyship rights and defenses available to the undersigned that are described in California Civil Code Section 2856(a).

The undersigned hereby agree to defend, indemnify, and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

This is a Guaranty of payment and performance and not of collection.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants contained in **Section 15** of the Agreement.

The undersigned agree that any current or future indebtedness by the Franchisee to the undersigned will always be subordinate to any indebtedness owed by Franchisee to Franchisor. The undersigned will promptly modify any financing statements on file with state agencies to specify that Franchisor's rights are senior to those of the undersigned.  The undersigned further agree that as long as the Franchisee owes any money to Franchisor (other than royalty and advertising fund payments that are not past due) the Franchisee will not pay and the undersigned will not accept payment of any part of any indebtedness owed by Franchisee to any of the undersigned, either directly or indirectly, without the consent of Franchisor.

This Guaranty will terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination will remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement will remain in force according to their terms.  Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guaranty will have the same meaning as in the Agreement, and will be interpreted and construed in accordance with **Section 21** of the Agreement.  This Guaranty will be interpreted and construed under the laws of the State of California.  In the event of any conflict of law, the laws of California will prevail, without regard to, and without giving effect to, the application of the State of California conflict of law rules.

Except as otherwise expressly provided herein, all written notices and reports permitted or required to be delivered by the parties pursuant hereto shall be deemed so delivered at the time delivered by hand, one business day after transmission by facsimile with copy also sent by Email or other electronic system expressly approved in the Manuals as appropriate for delivery of notices hereunder  (with confirmation copy sent by regular U.S. mail), or 3 business days after placement in

2

the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed as follows:

**Notices to Franchisor:**

> Fatburger North America, Inc.
> 9906 South Santa Monica Blvd., Penthouse
> Beverly Hills, CA  90210
> Attn: Chief Executive Officer and Chief Financial Officer
> email:  CEO@fatburger.com and CFO@fatburger.com

**Notices to Guarantors:**

> _____
> _____
> _____
> _____
> _____

Any party may change his or its address by giving 10 days prior written notice of such change to all other parties.

**IN WITNESS WHEREOF**, each of the undersigned has signed this Guaranty as of the date of the Agreement.

"GUARANTORS"

_____

Print Name: _____

_____

Print Name: _____

SM01DOCS602932.7

| | |
|---|---|
| In re:<br><br>    **FATBURGER RESTAURANTS OF CALIFORNIA, INC.,**<br><br>                                  **Debtor(s).** | **CHAPTER 11**<br>**Case No. 1:09-bk-13964-GM**<br>**Jointly Administered with**<br>**Case No. 1:09-bk-13965-GM** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Suite 1700, Los Angeles, CA  90067.

A true and correct copy of the foregoing document described as: **DEBTORS' MOTION FOR APPROVAL OF SALE OF DEBTORS' "FATMOBILE" VEHICLE FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS AND WAIVING THE 14-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF WINSTON MAR AND ANDREW A. WIEDERHORN** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On June 21, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Bradley D Blakeley    bblakeley@blakeleyllp.com, seb@blakeleyllp.com;rclifford@blakeleyllp.com;jwhite@blakeleyllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Howard Camhi    hcamhi@ecjlaw.com
- Candace Carlyon    ccarlyon@sheacarlyon.com
- Louis J Cisz    lcisz@nixonpeabody.com
- Leslie A Cohen    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Mark S Faulkner    mfaulkner@mrllp.com, fbaig@mrllp.com;jjacobs@mrllp.com
- Philip A Gasteier    pag@lnbrb.com
- Andrew A Goodman    agoodman@goodmanfaith.com
- Steven T Gubner    sgubner@ebg-law.com, ecf@ebg-law.com
- Joan Huh    joan.huh@boe.ca.gov
- Raffi Khatchadourian    raffi@hemar-rousso.com
- Raymond King    rking@raykinglaw.com
- Mette H Kurth    kurth.mette@arentfox.com
- Rodger M Landau    rlandau@lblawllp.com, kmoss@lgbfirm.com
- Ian Landsberg    ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;ssaad@landsberg-law.com
- Jonathan G Maile    jmaile@gordonrees.com
- William Malcolm    bill@mclaw.org
- Kenneth Miller    kmiller@ecjlaw.com
- Ethan B Minkin    ethan.minkin@kutakrock.com
- Abel Ortiz    Abel.ortiz@kts-law.com, Kristyann.brodecki@kts-law.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- David J Pope    dpope@ag.nv.gov, ahansen@ag.nv.gov;dwright2@ag.nv.gov;dturman@ag.nv.gov
- Ronald N Richards    ron@ronaldrichards.com
- Monica Rieder    mrieder@lgbfirm.com, kmoss@lgbfirm.com
- Martha E Romero    Romero@mromerolawfirm.com
- S Margaux Ross    margaux.ross@usdoj.gov
- I Bruce Speiser    bspeiser@pircher.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Maurice Wainer    mrwainer@aol.com
- Sanford M Wall    brenda.eiden@kts-law.com
- David C Winton    david@dcwintonlaw.com
- Aleksandra Zimonjic    azimonjic@lblawllp.com, kmoss@lgbfirm.com;cscott@lgbfirm.com

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL:** On **June 21, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

*[X] Service list served by U.S. Mail attached*

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 21, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

*__By Personal Delivery Via Attorney Service__:*
Hon. Geraldine Mund
United States Bankruptcy Court
San Fernando Valley Division
21041 Burbank Blvd., Suite 303
Woodland Hills, CA 91367

*__By Email:__*

| | |
|---|---|
| | David J. Pope |
| | DPope@ag.nv.gov |
| Office of the U.S. Trustee | |
| S Margaux Ross | Ashley Ruiz |
| margaux.ross@usdoj.gov | ruiz@mromerolawfirm.com |
| Signature's Bankruptcy Counsel | |
| Steve Gubner | Ernie Zachary Park |
| sgubner@ebg-law.com | ernie.park@bewleylaw.com |
| Committee Counsel | |
| Roger Landau | Raffi Khatchadourian |
| rlandau@lgbfirm.com | raffi@hemar-rousso.com |
| Rich Reinis | |
| rreinis@steptoe.com | Maurice Wainer |
| | mrwainer@aol.com |
| Maurice Wainer | |
| mrwainer@swmfirm.com | Louis J. Cisz |
| | lcisz@nixonpeabody.com |
| James Shea | |
| JShea@sheacarlyon.com | Joan Huh |
| | joan.huh@boe.ca.gov |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 21, 2011 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

**Fatburger CA and NV
RSN**

**II. SERVED BY U.S. MAIL:**

Margaux Ross, Esq.
Office of the U.S. Trustee
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367

Andrew Wiederhorn
Fatburger Restaurants of California
Fatburger Restaurants of Nevada
301 Arizona Avenue, Suite 200
Santa Monica, CA 90401

Co-Counsel for Keith Warlick
Ian S. Landsberg
LANDSBERG MARGULIES LLP
16030 Ventura Blvd., Ste. 470
Encino, California  91436

Co-Counsel for Keith Warlick
Ralph C. Hofer
Blecher & Collins
515 S. Figueroa Street, Suite 1750
Los Angeles, CA 90071

Counsel for Daisy Ellis
Eric Meller Esq
Meller & Floyd
2001 Wilshire Blvd., Ste 504
Santa Monica, CA 90403-5675

Counsel for Universal Art Gallery
Law Ofcs Peter A. Schwartz
9701 Wilshire Blvd., 10th Floor
Beverly Hills, CA 90210

Counsel for the Irvine Co.
Ernie Zachary Park
Bewley, Lassleben and Miller
13215 E. Penn Street, Ste. 510
Whittier, California 90602

Willard M. Reisz, Esq.
(Counsel for Hoxsie Equipment)
10880 Wilshire Blvd., #2240
Los Angeles, CA 90024

Counsel for Westside Properties
Andrew Goodman, Esq.
Goodman, Faith LLP
21550 Oxnard St., Suite 830
Woodland Hills, CA 91367

Counsel for Industrial Plaza, LLC
Leslie A. Cohen, Esq.
506 Santa Monica Blvd., Ste. 200
Santa Monica, CA 90401

Counsel for US Foodservice
Scott E. Blakeley
Blakeley & Blakeley
4685 MacArthur Court, Ste 421
Newport Beach, CA 92660

Weingarten Nostat, Inc.
c/o Weingarten Realty Investors
Attn:  Jenny J. Hyun, Esq.
2600 Citadel Plaza Drive, Ste 125
Houston, TX 77008

Counsel for OR Associates
John L. Smaha
Smaha Law Group
7860 Mission Center Court, Suite 100
San Diego, CA 92108

Counsel for Stations Casinos
Candace Carlyon, Esq.
Shea & Carlyon
701 E. Bridger Ave., Ste. 850
Las Vegas, NV 89101

Counsel for GE
Ethan B. Minkin
Kutak Rock LLP
8601 North Scottsdale, Suite 300
Scottsdale, AZ 85253

Counsel for SIMA
Patrick C. McGarrigle
McGarrigle Kenney & Zampiello, APC
9600 Topanga Canyon Blvd., Ste. 200
Chatsworth, CA 91311

Counsel for Committee
Rodger M. Landau, Esq.
Landau & Berger
1801 Century Park East, #1460
Los Angeles, CA 90067

Counsel for P.S. Metro, LLC
William G. Malcolm
Malcolm ♦ Cisneros, a Law Corp.
2112 Business Center Drive, 2nd Floor
Irvine, CA 92612

Attorneys for Interested Party, The
Macerich Company
Thomas J. Leanse, Esq.
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012

Counsel for Centennnial Bank
Kenneth Miller, Esq.
Ervin Cohen & Jessup LLP
9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212

RSN
L.A. County Treasurer and Tax Collector
P.O. Box 54110
Los Angeles, CA 90054

Counsel for S&S Hospitality
Joseph Angelo
Alyssa Milman White
450 Newport Center Drive, Suite 625
Newport Beach, CA 92660

C/o Bob and Mark Plumbing
Michael Damsky
Guagenti & Damsky
2615 190th Street, Suite 105
Redondo Beach, CA 90278

Everett Jack, Esq.
Davis Wright Tremaine
1300 SW Fifth Avenue, Ste 2300
Portland, OR 97201-5630

Counsel for Cold-Tech Refrigeration
Dean P. Sperling
Law Offices of Dean Sperling
201 East Sandpointe, Suite 220
Santa Ana, CA 92707-57425

Jennifer L. Brocket
Davis Wright Tremaine LLP
865 S. Figueroa St., Ste. 2400
Los Angeles, CA 90017

Counsel for Anhausner, Inc.
Raffi Khatchadourian
Hemar, Rousso & Heald
15910 Ventura Boulevard, 12th Floor
Encino, CA 91436-2829

Counsel for Signature Group Holdings,
LLC
Richard B. Polivy, Esq.
Polivy & Taschner, LLC
Six Central Row
Hartford, CT 06103

Counsel for Counties. of
San Bernardino and Riverside
Martha E. Romero, Esq.
BMR Professional Building
6516 Bright Ave
Whittier, CA 90601

Counsel for Sterling Pacific Meat Co., Inc.
Mark S. Faulkner
Michelman & Robinson, LLP
17901 Von Karman Avenue, 10th Floor
Irvine, CA 92614-6297